**McLeod Law Offices, P.C.**
**77 Franklin Street**
**Boston, Massachusetts 02110**
**617-542-2956**
**617-695-2778 fax**



December 29, 2004

The Hon. Robert B. Collings, U.S.M.J.
U.S. District Court - District of Massachusetts
One Courthouse Way, Suite 6420
Boston, MA 02210

RE:    Kiernan v. Armored Motor Service of America, Inc.
       Civil No. 04-10131-RBC

Dear Honorable Sir:

As per your request at the hearing on the Motions filed by the Bristol County District Attorney's Office, I enclose herewith a photocopy of the transcript of the Motion to Dismiss hearing which took place on August 25, 2003 at the New Bedford Superior Court.

Thank you for your time and attention to this important matter.

Very truly yours,
McLeod Law Offices, P.C.

William J. McLeod

WJM
Enclosures as stated
cc:    William R. Connolly, Office of the Bristol County District Attorney (without enclosures)
       Allison Romantz, counsel for the Defendant AMSA (without enclosures)
       David Aridito, counsel for the Defendant Ciambriello (without enclosures)

Volume:  1
Pages:   83
Exhibits: 3

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.                          SUPERIOR COURT
No. BRCR2002-0773

COMMONWEALTH OF MASSACHUSETTS

vs.

FRANCESCO CIAMBRIELLO

BEFORE:  Burnes, J.

Motion to Dismiss

APPEARANCES:

   Jeanne M. Veenstra, Assistant District Attorney,
Bristol District, 888 Purchase Street, New Bedford,
Massachusetts 02740, for the Commonwealth.

   David R. Ardito, Esq., 228 County Street,
Attleboro, Massachusetts 02730, for the Defendant.

New Bedford Superior Courthouse
New Bedford, Massachusetts
August 25, 2003

LORI R. SAULNIER
Official Court Reporter
Certified Shorthand Reporter

2

## I N D E X

| Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| John Otrando | | | | |
| by Ms. Veenstra: | 9 | | 32 | |
| by Mr. Ardito: | | 23 | | 34 |
| Christopher Markey | | | | |
| by Ms. Veenstra: | 35 | | | |
| by Mr. Ardito: | | 42 | | |
| Christopher Abreu | | | | |
| by Ms. Veenstra: | 43 | | | |
| by Mr. Ardito: | | 53 | | |
| Russell Castro | | | | |
| by Ms. Veenstra: | 55 | | 63 | |
| by Mr. Ardito: | | 61 | | 63 |
| Louis Pacheco | | | | |
| by Ms. Veenstra: | 64 | | | |
| by Mr. Ardito: | | 71 | | |

## E X H I B I T S

| No. | Description | Iden. | Evid. |
|---|---|---|---|
| 1 | Receipt | | 22 |
| 2 | Tape | | 30 |
| 3 | Affidavit | | 43 |

3

P R O C E E D I N G S

THE CLERK:  #16 on the list, Francesco Ciambriello with Mr. Ardito, Ms. Veenstra.

THE COURT:  Yes.  Good morning.

MS. VEENSTRA:  Good morning.

MR. ARDITO:  Good morning.

THE COURT:  Mr. Ardito, this is your motion to dismiss?

MR. ARDITO:  Yes, it is, judge.

THE COURT:  Do either of you want to be heard in opening?  I've read both the motion and the opposition.  Do I need to know anything more before you start?

MR. ARDITO:  I don't believe so, your Honor.

THE COURT:  Okay.  Why don't we --

MS. VEENSTRA:  Judge, I just suggest I think that, as the Court knows, the balancing test is going to require the Court to determine the culpability of the Commonwealth, and I would expect to elicit some evidence on that.  It also needs to determine the potential exculpatory value and the nature of that evidence and the materiality of it.  So, I would expect to offer testimony on those two prongs, and then obviously

1    it will be up to the Court to determine what the

2    potential prejudice to the defendant will be; and

3    that obviously will be arguments of counsel.

4              THE COURT:  Right.  I also notice, Ms.

5    Veenstra, there is a letter from you to Mr.

6    Ardito in here saying that there were three tapes

7    that were retrieved?

8              MS. VEENSTRA:  Yes, your Honor.

9              THE COURT:  I'd be interested in

10   knowing -- and I'm sure you will elicit this --

11   how many there were to start with, what these

12   tapes covered, what they --

13             MS. VEENSTRA:  Absolutely, your Honor.

14   I think that the number of witnesses will be able

15   to give your Honor the best picture possible of

16   what was depicted, what happened to the tapes,

17   how many there were initially, what happened to

18   them, what the Commonwealth has retained

19   possession of, and what those tapes depicted.

20             THE COURT:  Okay.  All right.

21             MR. ARDITO:  Your Honor, may I use the

22   podium?

23             THE COURT:  Yes, certainly.

24             MR. ARDITO:  Your Honor, as stated in

25   my brief, we believe that the lost tapes are

1    paramount to our defense.  Reason being is if you

2    just look quickly -- and I know your Honor hasn't

3    had time, but there's certain things that were

4    elicited in the grand jury indictment were

5    actually shown on those tapes, because I

6    witnessed the tapes with one of counsel's

7    witnesses.  For example, Officer Otrando, I

8    believe -- and my sister will probably elicit

9    that -- says that in interviewing one of the

10   witnesses, a Ms. Parrott, Ms. Parrott in her

11   sworn statement says that the client was dragged

12   into the room.  It's right in the minutes of the

13   grand jury.  I've seen the tape.  They walked

14   into the room.  We have a copy of that tape of

15   them walking.  Officer Otrando says when asked

16   whether or not my client's left hand was free, he

17   says he did not have a good look.  We have a tape

18   today, and you can see them both walking down the

19   aisle toward where this alleged incident took

20   place.  Well, certainly if a jury was to view the

21   entire tape the way I viewed the tape, it

22   certainly contradicts everything that was

23   mentioned not only in the grand jury indictment,

24   but the police reports.

25           For example, there's a clear picture --

1    this is not a contradiction, but it certainly

2    goes to the state of mind.  There was a clear

3    picture of the alleged victim standing outside

4    the building smoking a cigarette with a friend

5    that she called up to take her over a bottle of

6    wine.  I think that picture in itself -- this is

7    hours later -- sends a message, and I need that

8    message to be shown to a jury.

9              This is a consent defense.  We're

10   saying that they walked down the aisle, went into

11   the room for five minutes, came out.  There was a

12   picture of her very clear walking out of that

13   room heading towards the ladies room.  I seen

14   it.  There was no distress.  There was no putting

15   herself together.  There was none of that.  I

16   need to show that to a jury.  That's the whole

17   case.  If I was to show this tape to a jury, I

18   probably wouldn't even have to cross-examine

19   witnesses.  That's how telling this tape was.

20   And for the Commonwealth not to have the tape

21   today puts us in a terrible position because now

22   we have testimony that's going to be very very

23   hard to cross-examine.

24             With the tape itself, it clearly shows

25   that if anything at all was done -- and that was

1    out of the view of the camera. And according to

2    Officer Otrando, he said he timed it. It was

3    about five minutes that they were in this room.

4    It clearly shows that there was no distress, no

5    one was in any pain.

6            There's another part of the video that

7    shows them having a coke after. Mr. Ciambriello

8    asked Ms. Kiernan if she wanted something to

9    drink. They were in a waiting room. All of

10   this, you know, hours and hours and hours of tape

11   that are missing right now are paramount to our

12   defense. To allow this case to go on without

13   this tape, it certainly prejudices my client.

14           You know, I don't want to recite case

15   law, in this case what was said or that case.

16   You have that in front of you. But I seen this

17   tape. And from the onset I believe that if I had

18   this tape, there wouldn't have been a problem.

19   Reason why we couldn't get the tape is it was

20   shot over some type of security system where

21   there was several different cameras taking place

22   at the same time, and we needed -- it had to be

23   seen at AMSA the place where the alleged incident

24   took place; and that's where myself and at that

25   time Assistant District Attorney Saunders went to

1    go view the tape.  We only stood there for a

2    couple of hours, and what we saw was enough to

3    let me believe this is paramount.  This is what I

4    need to show a jury.  This is how my client gets

5    exonerated of these indictments.

6            The only thing I have today is a

7    five -- two minute walk showing Mr. Ciambriello

8    and the victim walking to the alleged place of

9    the incident, which I'm sure we're going to show

10   your Honor.  And even that video contradicts

11   testimony in the grand jury report.  Without that

12   video, your Honor, we are extremely prejudiced,

13   extremely prejudiced.  It just -- we just need

14   it.  It showed other armored personnel coming

15   in.  One particular personnel truck was very --

16   came in after the alleged incident.  So, if Ms.

17   Kiernan was really in distress, she was two feet

18   away.  The camera showed her two feet away from

19   this armored guard.

20           THE COURT:  Well, I assume that I'm

21   going to hear from him.

22           MR. ARDITO:  You are.  You are.  But I

23   think the picture itself -- the day of reality

24   TV, the picture itself is what I need a jury to

25   see.  That's gone.  I mean when I cross-examine

1  Ms. Kiernan and I asked her hypothetically, you

2  know, why didn't you ask this person for help, I

3  don't know what her answer's going to be.  But if

4  I could show that on television, if I could show

5  a jury here's this man, he's armed, here's Ms.

6  Kiernan, there's Mr. Ciambriello, and ask that

7  question then --

8          THE COURT:  Okay.  I think you've made

9  a showing --

10         MR. ARDITO:  Thank you, judge.

11         THE COURT:  -- that you need it.

12         MR. ARDITO:  Desperately.

13         THE COURT:  Let's see what the

14  Commonwealth has to show why you don't.

15         MS. VEENSTRA:  The Commonwealth would

16  call Sergeant John Otrando.

17         THE COURT:  Okay.

18         **JOHN OTRANDO, Sworn**

19         THE WITNESS:  Morning, your Honor.

20         **DIRECT EXAMINATION**

21  **BY MS. VEENSTRA:**

22  Q.  Would you please introduce yourself for the

23      record.

24  A.  Yes.  My name's John Otrando.  I'm a sergeant

25      with the Attleboro Police Department.

10

1                    THE COURT:   You can sit down.

2    Q.   How long have you been with the Attleboro Police

3         Department?

4    A.   Fifteen years.

5    Q.   Sergeant Otrando, I'd like to direct your

6         attention to the year 2001, in the month of May,

7         and ask you whether you began an investigation

8         with regard to an alleged rape at an armored car

9         facility?

10   A.   Yes, I was involved in that.

11   Q.   And what is the name of that facility?

12   A.   It's AMSA, Armored Motor Services of America, I

13        believe.

14   Q.   And directing your attention to the early morning

15        hours of May 20th in the year 2001, did you go to

16        that location in furtherance of your

17        investigation?

18   A.   Yes, I did.

19   Q.   And do you know who you were with or who was

20        present at that location when you went there?

21   A.   Yes.   I believe it was Officer Castro, Officer

22        Larsen, and a civilian from AMSA Edward O'Brien.

23        There was also another gentleman there.   His name

24        escapes me at this time, from AMSA.

25   Q.   And would that name be contained in your police

1    report, detective?

2    A.    It may be.

3                MS. VEENSTRA:    Your Honor, may he

4         refresh his memory?

5                THE COURT:    Yes.

6                THE WITNESS:    It may be contained in

7         the initial incident report.

8    Q.    I direct your attention to Page 2 approximately

9         halfway down.    A little more than halfway down.

10   A.    Jason Khoury.

11   Q.    And that would be K-H-O-U-R-Y?

12   A.    That's correct.

13   Q.    Did you and other members of your police

14        department have an opportunity to take a look at

15        that facility at that time?

16   A.    Yes, we did.

17   Q.    And did you have an opportunity at that time to

18        view some surveillance equipment?

19   A.    Yes, we did.

20   Q.    As best you can, can you describe the nature of

21        that equipment and that surveillance system for

22        the Court?

23   A.    It's a small room by the manager's room.    There

24        are various screens in front of you, monitors,

25        and there's like a VCR type system.    I believe it

12

1       contains six VCRs. The system they told me was a

2       multiplex tape system where on each screen you

3       would see nine frames, and they informed me that

4       the entire facility was monitored by video

5       camera, and there's also recorded audio.

6   Q.  So, if I understand you correctly, there are a

7       number of screens, and within those screens there

8       are a number of frames?

9   A.  That's correct.

10  Q.  And you said that the entire facility is

11      monitored. Is the entire facility monitored?

12  A.  Everything except for the supervisor's office

13      which was informed to me to be Jason Khoury's

14      office.

15  Q.  And where specifically within AMSA did the

16      alleged rape take place?

17  A.  Inside Jason Khoury's office.

18  Q.  Did you have an opportunity while visiting that

19      facility to view what was depicted on those

20      surveillance tapes?

21  A.  Yes, I did.

22  Q.  Could you describe what you saw to the Court?

23  A.  One portion -- I observed one portion of the tape

24      shows Heather Kiernan and Francesco --

25  Q.  And would that be the alleged victim?

1   A.   Yes.   The alleged victim Heather Kiernan,

2        Francesco Ciambriello, and another female

3        identified later as Christina Parrott outside the

4        facility, appeared to be smoking cigarettes

5        outside.

6                    THE COURT:  All three of them outside?

7                    THE WITNESS:  All three were outside,

8        yes.

9   Q.   And did you hear any audio, specifically with

10       regard to what was depicted outside?

11  A.   No, I did not.

12  Q.   Could you, sergeant, see any facial expressions

13       on any one of these three people that were

14       outside?

15  A.   No, I could not.

16  Q.   Did you make any other observations of what was

17       depicted on the tapes?

18  A.   Yes.   There was another section where it showed

19       Heather Kiernan at her desk, and Francesco

20       Ciambriello was speaking with her by her desk.

21       They appeared to be in some sort of

22       conversation.   He was in the room by her desk.

23  Q.   And when you said that they appeared to be

24       involved in some sort of conversation, could you

25       hear what was said?

14

1    A.  I could not make out what was said, no.

2    Q.  And again, were you able to determine any facial

3         expressions that stood out to you?

4    A.  No, I could not.

5    Q.  Did you make any other observations of what was

6         depicted on the tapes?

7    A.  Yes.  There was another section of the tape where

8         Francesco Ciambriello was walking side by side

9         with the victim Heather Kiernan.  He was to her

10       left.  He had his right arm around her -- the

11       waist, buttocks area.  His left arm I could not

12       see where it was.  I know it wasn't down by his

13       side.  It was into his right side, and he was

14       walking along with her through what they told me

15       was the money room.

16    Q.  And you said that his left hand was where?

17    A.  His left hand was on the right side of his body.

18       It wasn't down by his side.  It was like this,

19       but I couldn't see where it was.  And his right

20       hand was around her waist, buttocks area.

21    Q.  As best you can, describe the angle of that view

22       of them walking down the corridor.  Would that be

23       a view of their backs, their sides, their

24       fronts?  Could you describe that to the Court?

25    A.  Their left side.  I had the view of their left

1    side.  If the camera was situated here higher up

2    on the wall, it was coming down.  So, I could see

3    his left side very clearly, and the tape only

4    lasted a few seconds.

5  Q.  Did you hear any audio in viewing that portion of

6    the tape?

7  A.  No, I did not.

8  Q.  At some later time -- and I'll get to that more

9    completely later, but at some later time did you

10    have some communication with Edward O'Brien

11    regarding that audio?

12  A.  Yes, I did.

13  Q.  Can you describe that to the Court?

14  A.  At this time when I viewed the tapes, there was a

15    humming noise coming from the audio where a lot

16    of -- there was feedback or whatever you would

17    call it.  So, a lot of the audio was inaudible.

18    When the tapes were viewed later, I had a chance

19    to speak with Edward O'Brien who was present at

20    that second viewing.  He informed me that that

21    feedback or that humming noise was gone and that

22    he could hear some of the statements that were

23    made by the victim.

24  Q.  Okay.  Do you know what he said he heard on that

25    tape?

16

1          MR. ARDITO:  Objection, your Honor.

2      Hearsay.

3          THE COURT:  Well, I think she can have

4      it on this for this motion.

5          MR. ARDITO:  For the record.

6  Q.  Did he tell you what he heard on that tape?

7  A.  Yes.  He informed me that he could hear Heather

8      Kiernan state, "No.  No.  I don't want to go back

9      there."

10  Q.  But you didn't hear that?

11  A.  No, I did not.

12  Q.  And you were not present at that second viewing;

13      is that correct?

14  A.  That's correct.

15  Q.  Now, you said that you saw them coming down the

16      hallway.  Did you see where they went when they

17      went down the hallway?

18  A.  Yes.  After they went through the money room,

19      they went down a longer hallway.  They went

20      through the money room and took a right down a

21      long hallway.  Then I observed them from a

22      different camera that again was positioned -- say

23      it was up here.  They took a right, and the

24      camera was at their back leading down to Jason

25      Khoury the supervisor's office.

17

1    Q.  And what happened once they got to that office?

2        Did you see --

3                THE COURT:  Let me just interrupt.  You

4        said you were looking at them from the back?

5                THE WITNESS:  Yes, your Honor.

6                THE COURT:  Okay.

7    Q.  Let me ask you while looking at them from the

8        back, did you make any observations of Mr.

9        Ciambriello's hands?

10   A.  He had his arm around the victim in the same

11       manner I mentioned before, the waist, buttocks

12       area.

13   Q.  What hand would that be?

14   A.  His right hand.

15   Q.  And when you say waist, buttocks area, sir, is it

16       low on the buttocks, or is it in the waist?

17   A.  It's -- well, I'd say the hip area.  Yes, right

18       around that area.  To the back.

19   Q.  And did you see what happened once they got to

20       that door?

21   A.  I observed them enter the supervisor's office.

22   Q.  Who went in first; do you remember?

23   A.  I believe it was Heather Kiernan.

24   Q.  And did you continue -- did that door close?

25   A.  Yes, it did.

1   Q.  Did you continue to watch?

2   A.  Yes, I did.

3   Q.  And at some point did that door open?

4   A.  Yes, it did.

5   Q.  Can you estimate for the Court about how much

6       time elapsed while that door was closed?

7   A.  I'd have to say several minutes.

8   Q.  And when you say several minutes, five, ten,

9       fifteen?  As best you can estimate.

10  A.  Estimate, five.

11  Q.  And when you see that door open, what else did

12      you see?

13  A.  I observed Heather Kiernan exit and turn left.

14  Q.  And do you know where she went to?

15  A.  From later speaking with her, she informed me

16      that she had gone to the female's bathroom.

17  Q.  Did you see her go to the bathroom?

18  A.  No.  I just observed her exit and head in that

19      general direction.

20  Q.  Did you make any observations of her demeanor or

21      her facial expression as she exited that office?

22  A.  No, I did not.

23  Q.  Was the angle such that you would see the front

24      of her?

25  A.  Yes.

19

1   Q.  Now, is that, sergeant, basically what you saw

2        depicted on those tapes that evening initially

3        starting your investigation?

4   A.  That is correct.

5   Q.  That evening did you seize some video tapes?

6   A.  Yes, I did.

7   Q.  How many video tapes did you seize on May 20th in

8        the early morning hours?

9   A.  Three.

10  Q.  And were those labeled in any way?

11  A.  Yes, they were.

12  Q.  How were they labeled?

13  A.  D -- the letter D, E, and F.

14  Q.  And at some point did you have some conversation

15       with an assistant district attorney Christopher

16       Markey?

17  A.  Yes, I did.

18  Q.  And did some of that conversation revolve around

19       those video tapes that you seized?

20  A.  Yes.

21  Q.  And were some arrangements made for the viewing

22       of those video tapes?

23  A.  Yes.

24  Q.  Can you describe what happened to the Court?

25  A.  ADA Markey asked me if he could get those tapes

20

1   in order to view them to make copies of them to

2   further the case.  So, my recollection is that I

3   brought them up to New Bedford and dropped them

4   off to ADA Markey.

5 Q. And that would be three tapes?

6 A. Yes.

7 Q. And at some point did you have some conversation

8   with Assistant District Attorney Markey to

9   retrieve other tapes?

10 A. Yes.

11 Q. And what other tapes were you asked to retrieve?

12 A. The three remaining tapes that were left in

13   AMSA's possession.

14 Q. And how were those labeled?

15 A. A, B, and C.

16 Q. Okay.  Do you know if this was before or after

17   you turned over the original tapes labeled D, E,

18   and F?

19 A. I'm not sure.

20 Q. But you're sure that you gave him tapes D, E, and

21   F?

22 A. Yes, I am sure about that.

23 Q. And you were instructed to go and retrieve A, B,

24   and C?

25 A. That is correct.  He gave me a subpoena.

1    Q.   And did you retrieve A, B, and C?

2    A.   Yes, I did.

3    Q.   And do you still retain -- let me ask you this.

4         Did A, B, and C ever leave your custody?

5    A.   No, they did not.

6    Q.   Well, at some point were they forwarded to the

7         Raynham Police Department?

8    A.   Yes.   Correct.

9    Q.   Okay.   Are they -- subsequent are they now back

10        in your possession?

11   A.   Yes, they are.

12   Q.   Do you know whether there were some arrangements

13        made between Assistant District Attorney Markey

14        and counsel for the defendant and AMSA to view

15        those tapes?

16   A.   Yes, there were.

17              THE COURT:  Which tapes are we talking

18        about?   A, B, and C or D, E, and F?

19              MS. VEENSTRA:  D, E, and F.

20   A.   Yes, there were arrangements made.

21   Q.   And were you present?

22   A.   No, I was not present.

23   Q.   Did you ever receive back tapes D, E, and F?

24   A.   No, I did not.

25   Q.   I'm going to show you what appears to be a

1       handwritten receipt and ask you if you recognize

2       it?

3  A.  Yes, I do.

4  Q.  What do you recognize that to be, Sergeant

5       Otrando?

6  A.  I recognize this to be a receipt.  I believe it

7       was cosigned by Jason Khoury the supervisor at

8       AMSA and signed by myself.  I signed this the

9       second time I went back to pick up Tapes A, B,

10      and C, and he indicates on here that I had seized

11      Tapes D, E, and F initially.

12           MS. VEENSTRA:  I'd ask that this be

13      marked as an exhibit.

14           MR. ARDITO:  No objection, your Honor.

15           THE COURT:  It may be marked.

16           **(The receipt was marked Exhibit No. 1**

17      **and received into evidence.)**

18  Q.  Now, at some point did you ask an Officer Castro

19      of your police department to assist you?

20  A.  Yes, I did.

21  Q.  And was he actually one of the responding

22      officers in this investigation anyway?

23  A.  Yes, he was.

24  Q.  What did you ask Officer Castro to do?

25  A.  I gave him custody of the tapes and asked him to

1    go to the REACT Organization which is headed by

2    Deputy Chief Pacheco of the Raynham Police

3    Department so that he may view the tapes, extract

4    whatever information was available.

5         THE COURT:  Which tapes are we talking

6    about here?

7         THE WITNESS:  Those were A, B, and C,

8    your Honor.

9         THE COURT:  All right.

10   Q.  And does the Raynham Police Department have some

11       special equipment with which to view this type of

12       evidence?

13   A.  Yes.  It's through REACT.

14        MS. VEENSTRA:  If I could have one

15   moment, your Honor?

16        THE COURT:  Uh-huh.  While you're

17   thinking, let me just ask, you have A, B, and C

18   now.  What you don't have is D, E, and F?

19        THE WITNESS:  That's correct, your

20   Honor.

21        MS. VEENSTRA:  I have no further

22   questions of this witness, your Honor.

23        THE COURT:  Counsel.

24              **CROSS EXAMINATION**

25   **BY MR. ARDITO:**

1   Q.  Detective, did you view A, B, and C?

2   A.  I viewed the tapes.  I can't say specifically if

3      it was A, B, and C.  From what Edward O'Brien

4      informed me, that the views that we saw that day

5      were on A, B, and C.  They have six VCRs, and

6      they're all set up, and he informed me that what

7      we were viewing was on A, B, and C.  And I

8      observed portions of it.  I didn't view the whole

9      tape from say 3:00 in the afternoon until 11:00,

10     but there were portions of A, B, and C I viewed,

11     yes.

12  Q.  And on Tapes A, B, and C, do you recall how many

13     hours of tape they were?

14  A.  No, I do not recall.

15  Q.  So, there was six tapes total; am I correct?

16  A.  Yes, sir.

17  Q.  And the facility outside of the supervisor's

18     office was completely surrounded by cameras,

19     correct?

20  A.  I don't know if it's accurate to say it's

21     completely surrounded by cameras.  Some cameras

22     view it like -- I wouldn't say it's completely

23     surrounded.  There are cameras that, you know,

24     can view it.  But to say it's completely

25     surrounded, I don't believe so.

1   Q.  But someone working an eight hour shift would

2        constantly be on camera, would they not?  Or the

3        facility would be on camera?

4   A.  Yes, yes.

5   Q.  We have what the police transcribed for us on a

6        VCR of Tapes A, B, and C?

7   A.  Yes.

8   Q.  Did you view that?

9   A.  Yes, I did view that.

10   Q.  And there's less than three minutes on that tape;

11       isn't that true?

12   A.  If you're telling me that.  I didn't time it.

13   Q.  But that tape only shows them walking down a

14       room; isn't that true?  It shows -- I believe it

15       shows the victim talking to someone, and then her

16       and Mr. Ciambriello walking down a room; isn't

17       that true?

18   A.  Walking down a hallway, and there's some

19       conversation in there, some interaction.

20   Q.  But that's all that tape shows?

21   A.  I don't know if they were completely viewed to

22       extract everything out of those three tapes.  I

23       can't say that that's a final product from

24       examining all eight hours from all three tapes.

25       From whatever portion they viewed, that's on that

1      tape.

2  Q.  But that's the size of it though?  That's all we

3      have right now?

4  A.  Right now, yes.

5              THE COURT:  Let me just interrupt you.

6      Are these tapes labeled by the camera that took

7      the tape, that took the image?

8              THE WITNESS:  No.  On each tape -- from

9      what I recall, I believe it's a multiplex

10     system.  So, there's nine cameras on each tape.

11     So, I don't know if that means there would be

12     fifty some odd cameras.

13             THE COURT:  I see.

14             THE WITNESS:  I don't know.

15             THE COURT:  And the tapes are from the

16     six screens on which these nine -- each of which

17     has nine images on it; is that right?

18             THE WITNESS:  Yes.  There's six VCRs

19     and each VCR shows nine, I believe, different

20     cameras.

21             THE COURT:  Okay.  And these tapes are

22     the ones that came from the VCR?

23             THE WITNESS:  Yes.

24             THE COURT:  And this three minutes or

25     whatever that counsel is asking you about, did

1    somebody extract information or extract images

2    off these tapes?

3            THE WITNESS:  Off A, B, and C, yes,

4    your Honor.

5            THE COURT:  Who did that?

6            THE WITNESS:  That was Deputy Chief

7    Pacheco from the Raynham Police Department.

8            THE COURT:  And do you know what his

9    instructions were, what he was to take off the

10   tape?

11           THE WITNESS:  He went there with

12   Officer Castro who I gave custody of the tapes

13   to, and they were asked to extract whatever they

14   could out of the tapes.  They spent eight hours

15   looking and extracting information.  From what

16   they imparted to me, they were unable to

17   complete -- they weren't able to go through the

18   whole eight hour shift, your Honor, from each

19   tape.  That's a portion of what they have now.

20   There's still more work to do which could be

21   extracted.

22           THE COURT:  The extraction was any

23   images of either the defendant or Ms. Kiernan?

24           THE WITNESS:  Yes.

25           THE COURT:  Okay.

1    Q.   I'm sorry, detective.  Prior to you seeing this
2         tape, you testified earlier and also at the grand
3         jury that the first tape was from the back of the
4         room; is that correct?
5    A.   Well, the first tape I saw -- well, which part
6         are you asking me about?
7    Q.   Well, when you investigated the alleged crime
8         originally, when you went to answer the first
9         tape, you saw -- you testified that it was from
10        the back; that the camera was behind; isn't that
11        true?
12   A.   I don't know which position you're asking me
13        about.  There's one part where they're going down
14        the hallway where the camera is from the back.
15   Q.   That's what you testified to?
16   A.   Yes.
17   Q.   Yes, because you knew this was available.  This
18        new tape wasn't available then?
19   A.   No, sir, it was not.
20   Q.   Have you seen this new tape?
21   A.   Yes, sir, I have.
22   Q.   And it clearly shows them walking?  You have a
23        frontal view now, correct?
24   A.   Yes, sir, you do.
25   Q.   Was there any dragging in this tape?