1    Q.   I'm sorry, detective.  Prior to you seeing this

2         tape, you testified earlier and also at the grand

3         jury that the first tape was from the back of the

4         room; is that correct?

5    A.   Well, the first tape I saw -- well, which part

6         are you asking me about?

7    Q.   Well, when you investigated the alleged crime

8         originally, when you went to answer the first

9         tape, you saw -- you testified that it was from

10        the back; that the camera was behind; isn't that

11        true?

12   A.   I don't know which position you're asking me

13        about.  There's one part where they're going down

14        the hallway where the camera is from the back.

15   Q.   That's what you testified to?

16   A.   Yes.

17   Q.   Yes, because you knew this was available.  This

18        new tape wasn't available then?

19   A.   No, sir, it was not.

20   Q.   Have you seen this new tape?

21   A.   Yes, sir, I have.

22   Q.   And it clearly shows them walking?  You have a

23        frontal view now, correct?

24   A.   Yes, sir, you do.

25   Q.   Was there any dragging in this tape?

1   A.   I didn't see any dragging, sir.

2   Q.   Any pushing?

3   A.   I didn't see any pushing, no.

4   Q.   Was there any -- was the alleged victim trying to

5        stop at any time?

6   A.   I didn't observe that.

7   Q.   You didn't observe that.  Is it your testimony

8        they're just freely walking down into this room,

9        correct?

10  A.   I wouldn't testify that she was freely brought

11       down to the room.

12              MR. ARDITO:  Your Honor, may I show

13       this tape?

14              THE COURT:  Sure.  Do you want it at

15       this point, or do you want it when this

16       officer -- at this point or when this officer is

17       completed?  Do you want it now?

18              MR. ARDITO:  Well, I'd like to have him

19       testify to what --

20              THE COURT:  Okay.

21              MS. VEENSTRA:  It might be clearer,

22       your Honor.

23              THE COURT:  All right.

24              MS. VEENSTRA:  I'd ask that this be

25       marked as Exhibit 2.

30

1          THE COURT:  Okay.

2              **(The tape was marked Exhibit No. 2 and**

3      **received into evidence.)**

4          THE OFFICER:  There's no volume on

5      this.

6          MR. ARDITO:  I'm sorry?

7          THE OFFICER:  There's no volume.

8          MR. ARDITO:  Actually there was some

9      conversation.

10          (The tape was played).

11  Q.  Detective, do you know whose voice that is in the

12      background?

13  A.  No, I do not.

14  Q.  Do you know who put that soda there?

15  A.  It appears to be Heather Kiernan in one of the

16      voices appears to be her.

17  Q.  And does it appear that there are more than two

18      voices?  Who is that?

19  A.  Heather Kiernan.

20          MR. ARDITO:  Your Honor, I just -- the

21      detectives then do some further work.  It's a

22      repeat of what was visually depicted, and I'll

23      leave that for the Court to view.

24          THE COURT:  Okay.  Did you have

25      questions now?

1           MR. ARDITO:  Well, I believe this is

2       another shot of what took place.  You see them

3       walking.

4           THE COURT:  What?

5           MR. ARDITO:  This is another of the

6       stroll down the -- right here.  Can you stop

7       that?  Sorry, judge.

8           MS. VEENSTRA:  Would you like me to

9       rewind it just a little bit?

10          THE COURT:  Yeah.

11          MS. VEENSTRA:  It appears to depict

12      some shadows and then the two walking down the

13      hallway.

14          THE COURT:  Right.  Okay.  When they

15      get in the frame, if you can stop it there.

16          THE OFFICER:  Pause?

17          THE COURT:  Okay.  Counsel, you have

18      questions?

19          MR. ARDITO:  Thank you, judge.

20  Q.  Where is Mr. Ciambriello's left arm in this

21      photograph?

22  A.  By his side.

23  Q.  Not around her body as you earlier testified?

24  A.  I had testified that her right hand -- that his

25      right arm was around her body.

1    Q.   And did you not say that his left arm appeared to

2         be around her?

3    A.   No.  I testified that in the shot where they went

4         through the money room, that I couldn't see --

5         from what I recall of that tape, I couldn't see

6         his left hand.  So, it would lead me to believe

7         that it was towards the right-hand side of his

8         body.  It wasn't down by his side like it is

9         here.

10   Q.   Clearly it was by his side when they walked in?

11   A.   That's correct.

12   Q.   No struggle to your --

13   A.   No.

14              MR. ARDITO:  Okay.  No further

15         questions, judge.

16              THE COURT:  Okay.  Ms. Veenstra.

17                   **REDIRECT EXAMINATION**

18   **BY MS. VEENSTRA:**

19   Q.   Detective Otrando, is this the money room?

20   A.   No.  From my understanding, I may be wrong, but

21         the money room is the initial -- I think it was

22         just before this, that door that opened.  I

23         said -- when I spoke about the money room was

24         when the camera was up here high.  Mr.

25         Ciambriello had his right arm around her side,

33

1       and they were walking through that -- by that

2       camera.  Then they went through a door, down this

3       long hallway.  That's the long hallway that I saw

4       from the back on that second camera.  I don't

5       believe that's the money room.  I could be

6       mistaken.

7  Q.   Okay.  And the other portion of this tape,

8       sergeant, which appears to show the alleged

9       victim drinking a soda; do you know when in time

10      that was with regard to the alleged rape?  Do you

11      know if that was before or after the alleged

12      rape?

13  A.   I'm not sure.  I'd have to check.

14  Q.   The time?

15  A.   Yeah.

16            MS. VEENSTRA:  May I, your Honor?

17            THE COURT:  You may.

18  Q.   Do you see --

19  A.   In the lower right hand corner it says 1900.  So,

20      I would have to say that would be after the

21      incident.

22  Q.   And would it be fair to say that the alleged

23      victim was working alongside of the defendant at

24      that time?

25  A.   That's correct.

```
1    Q.   Did it appear from information you received that

2         there were employees that actually delivered

3         money to that location after the alleged

4         incident?

5    A.   That's correct.

6    Q.   Is it your belief that that is what is depicted

7         on that portion of this tape?

8    A.   Yes.

9              MS. VEENSTRA:  I have no further

10        questions.

11             MR. ARDITO:  Just brief recross.

12                   RECROSS EXAMINATION

13   BY MR. ARDITO:

14   Q.   Detective, you interviewed my client, correct?

15   A.   That's correct.

16   Q.   And in interviewing him, you noticed he has a

17        very heavy heavy Italian accent; is that true?

18   A.   Yes.

19   Q.   And you heard a voice besides the alleged victim

20        on that tape; isn't that true?  Another voice

21        just now?

22   A.   Yes.

23   Q.   And that other voice wasn't Mr. Ciambriello,

24        correct?  There was a third voice?

25   A.   I heard two other male voices.
```

1    Q.   Two other males voices, correct?  And you're

2         saying -- you're testifying that this based on

3         the time took place after the alleged assault,

4         correct?

5    A.   Yes, from the time, yes.

6              MR. ARDITO:  All right.  No further

7         questions, your Honor.

8              THE COURT:  Okay.  Thank you very

9         much.  You may step down.

10             THE WITNESS:  Thank you, your Honor.

11             MS. VEENSTRA:  The Commonwealth would

12        call Christopher Markey.

13             THE COURT:  Okay.

14             **CHRISTOPHER MARKEY, Sworn**

15             THE WITNESS:  Morning, your Honor.

16             **DIRECT EXAMINATION**

17   **BY MS. VEENSTRA:**

18   Q.   Could you please state your name for the record?

19   A.   Christopher Markey, M-A-R-K-E-Y.

20   Q.   How are you employed?

21   A.   I'm an assistant district attorney for Bristol

22        County.

23   Q.   I'd like to direct your attention to the month of

24        May in the year 2001 and ask you whether you had

25        an opportunity to review an alleged rape

1       regarding a defendant Francesco Ciambriello?

2  A.  Yes, I did.

3  Q.  And do you know who the lead investigator was on

4      that case?

5  A.  Detective John Otrando from the Attleboro Police

6      Department.

7  Q.  And at some point did you receive information

8      from Sergeant Otrando regarding information

9      regarding some surveillance tapes at the location

10     of the alleged rape?

11  A.  Yes.

12  Q.  Were you aware of whether some of that

13     surveillance activity had already been viewed by

14     Sergeant Otrando?

15  A.  Yes.

16  Q.  And how did you know that?

17  A.  I believe he made mention of it to me, and I said

18     that we needed to get -- we should get someone --

19     we should get those tapes and obtain the tapes.

20  Q.  And at some point do you know if Sergeant Otrando

21     seized some tapes initially in the investigation?

22  A.  I'm unsure if he seized them right off the bat,

23     but I know I had conversation with him to get

24     more tapes or get tapes; but he may have had some

25     right then that we were making plans.  I'm not

1      sure of that.

2  Q.  And at some point did you have some communication

3      with defense counsel Mr. Ardito regarding viewing

4      some tapes?

5  A.  Yes, I did.

6  Q.  And were some arrangements made to meet with

7      counsel to look at those tapes?

8  A.  We made arrangements to have him view the tapes

9      at our office in New Bedford at 888 Purchase

10     Street on the fifth floor because we have some

11     video equipment that we can use to look at tapes.

12  Q.  At some point did you receive some tapes from

13     Sergeant Otrando?

14  A.  Yes.  I believe I went to the Attleboro Police

15     Department, picked those up, and brought those

16     back to New Bedford.

17  Q.  Do you know how many you seized?

18  A.  I believe I had two or three.

19  Q.  And you brought those back to New Bedford for the

20     purpose of trying to view those on equipment that

21     the district attorney's office had?

22  A.  Yes.  I was waiting.  I made arrangements with

23     Mr. Otrando -- I mean the attorney for the

24     defendant to do it some afternoon I believe it

25     was.

38

Q.   And did you in fact attempt to do that?

A.   Yes.  Mr. Ardito came down, went to my office,
     and then two offices away is the video room where
     we would have that equipment.  We went in there.
     We put the tape in, and we didn't have the proper
     equipment to view it.  Everything was kind of
     going really fast.  As a result of that, I think
     Mr. Ardito stayed for a little bit longer to view
     and see if he could make any adjustment.  I
     remember I was doing something else in my
     office.  So, I just went to my office for a
     little bit, and then Mr. Ardito came over, and we
     just -- he said, "It's not going to work."  I
     said, "Okay.  We'll go up to the armored car
     place and view the tapes there, and we'll make
     arrangements there."

Q.   And that would be to view those tapes on the
     actual equipment that it was taped on?

A.   Yes.

Q.   And so, your attempts to view it at the district
     attorney's office were unsuccessful?

A.   That's correct.

Q.   And Mr. Ardito left?

A.   Mr. Ardito left.  I kept the tapes, and then I
     went to Attleboro District Court office and -- or

1  our office.  I think we were trying to make

2  arrangements to watch the video with Mr. Ardito

3  again because at that point it was going to be my

4  case; and what happened was I don't think --

5  there was some mix-up in communication between

6  the two of us, and we didn't go that afternoon.

7  I kept the tapes there.  I gave them to Assistant

8  District Attorney Chris Saunders.  I said, "Look,

9  I can't -- I'm not going to come back up here.

10  Why don't you look at the tapes", because he was

11  going to end up doing the probable cause

12  hearing.  And I left them in the Attleboro

13  District Court office.

14  Q.  And that would have been two, maybe three tapes?

15  A.  Two, maybe three tapes, and that was some time if

16  I remember correctly in the Summer of 2001.

17  Q.  And you said that the purpose of that was so that

18  Christopher Saunders could then meet defense

19  counsel at the facility, the work place facility?

20  A.  That's right.  What happened in the meantime was

21  it was decided that Chris was going to

22  actually -- Chris Saunders was going to actually

23  handle the case.  It was going to be his first

24  Superior Court case.  He was going to do the

25  probable cause hearing and do everything.  Some

1   time towards the end of Summer of 2001 we made

2   that decision.  So, I said, "Just you keep it and

3   handle the case."

4               THE COURT:  When you said you left the

5   tapes in the Attleboro District Court office,

6   that's the DA's office?

7               THE WITNESS:  Yeah, that's right.  At

8   120 North Main Street.

9   Q.  And did you have some conversation with Mr.

10      Saunders about the fact he would be handling the

11      case?

12  A.  I did, and I said that he would be handling it.

13      I had talked to his supervisor, and he said it

14      would be fine for him to handle it; and at that

15      point, you know, I'd check up on it once in a

16      while.  Hey, what's going on with this case?  And

17      then at some point, I don't know when it was, but

18      I know when the case was pending, the defendant

19      either became ill or was involved in some

20      accident, and they continued the case over for a

21      significant amount of time because of a serious

22      injury to the defendant.  I remember that.  But

23      that's basically how I remember ending it at that

24      point.

25  Q.  And do you know whether Chris Saunders ever

1       viewed those tapes with defense counsel at AMSA?

2   A.   I don't know if he ever viewed it.  I heard later

3        that Chris Abreu had viewed the tapes, and he's

4        another assistant DA attorney who worked in the

5        Attleboro District Court.  That's the last --

6   Q.   Now, did you ever receive those two or three

7        tapes back?

8   A.   No.

9   Q.   Did you ever take possession of any other tapes

10       seized by the Attleboro Police Department?

11  A.   No.

12  Q.   Would it be fair to say that some time in June of

13       2002, the case was assigned to me to prosecute?

14  A.   Excuse me?

15  Q.   Would it be fair to say --

16  A.   Yes, it was.  For you, yes.

17  Q.   Can you report, Mr. Markey, whether a diligent

18       search of your office has been able to turn up

19       those tapes?

20  A.   I went through every box and every unmarked video

21       that I have in my office to check to see if it

22       could be any relation to this case, and the

23       videos that I viewed and went through did not

24       have any correspondence to this case.

25               MS. VEENSTRA:  I have no further

1    questions of this witness.

2          THE COURT:  Mr. Ardito.

3          MR. ARDITO:  Very briefly, judge.

4    Thank you.

### CROSS EXAMINATION

**BY MR. ARDITO:**

7  Q.  The last time you saw the tapes was when you

8      delivered them to the Attleboro district

9      attorney's office, correct?

10 A.  That's correct.

11 Q.  And you yourself never viewed the tapes in your

12     office, correct?

13 A.  The only -- I think I did for about two minutes

14     when we -- you and I were sitting there in that

15     office; and all it did was kept -- you couldn't

16     understand anything on it.

17          MR. ARDITO:  No further questions.

18          MS. VEENSTRA:  No further questions of

19     this witness.

20          THE COURT:  Thank you, Mr. Markey.

21          THE WITNESS:  Thank you, judge.

22          MS. VEENSTRA:  At this time, your

23     Honor, I would offer an affidavit of Christopher

24     Saunders.  He was unavailable today due to a

25     medical appointment.

43

1        MR. ARDITO:  I have no objection, your

2   Honor.

3        THE COURT:  Okay.

4        MS. VEENSTRA:  I have shared that with

5   counsel.

6        THE COURT:  All right.

7        MS. VEENSTRA:  I'd ask that that be

8   marked as an exhibit.

9        THE COURT:  Okay.

10        **(The affidavit was marked Exhibit No. 3**

11   **and received into evidence.)**

12        MS. VEENSTRA:  The Commonwealth would

13   call Christopher Abreu.

14           **CHRISTOPHER ABREU, Sworn**

15             **DIRECT EXAMINATION**

16   **BY MS. VEENSTRA:**

17   Q.  Could you please state your name for the record?

18   A.  My name is Christopher Abreu.

19   Q.  And could you spell your last name, please?

20   A.  It's A-B-R-E-U.

21   Q.  And how are you employed, sir?

22   A.  I am currently employed at the law offices of

23      G.M. Rego.  I'm an attorney.

24   Q.  And were you formerly an assistant district

25      attorney in Bristol County?

1   A.   Yes, I was.

2   Q.   And for how long were you employed with the DA's

3        office?

4   A.   For approximately five years from 1997 to 2002,

5        September.

6   Q.   And at some point were you assigned to the

7        Attleboro District Court district attorney's

8        office?

9   A.   Yes, I was.

10  Q.   And do you know your approximate time of service

11       for that office?

12  A.   I was there for approximately seven months, and I

13       believe I left in February of 2002 and was

14       transferred to New Bedford.

15  Q.   And at some point during your time with the

16       Attleboro District Court district attorney's

17       office, did you become aware of a case that was

18       pending, Commonwealth vs. Francesco Ciambriello?

19  A.   Yes, I was.

20  Q.   And at some point were you asked to assist

21       Assistant District Attorney Saunders?

22  A.   Yes, I was.

23  Q.   And can you describe that to the Court, please?

24  A.   Well, I believe it was a day where ADA Saunders

25       had a trial, and my trials had pled out.  So, he

1      asked me if I would simply go view a tape at an

2      armored car employment place.

3   Q. And were there some specific plans as to who was

4      supposed to go to that facility?

5   A. Yes.  I was told that Attorney Ardito would be

6      there and also the security supervisor would be

7      there to watch the tapes with us.

8   Q. And did you receive some tapes to bring to that

9      location?

10  A. I believe so, yes.

11  Q. Do you recall how many tapes you received?

12  A. I want to say at least two, maybe more than two.

13  Q. Do you believe it was as many as six?

14  A. Possibly.  It's tough to say.  But more than two.

15  Q. More than --

16  A. Maybe three.

17  Q. Okay.  Do you recall whether those tapes were

18     labeled in any way?

19  A. I do recall that they were labeled with letters

20     in black marker, I believe, with a circle around

21     it.

22  Q. Did you in fact go to AMSA and meet with defense

23     counsel for the purpose of viewing the tapes?

24  A. Yes, I did.

25  Q. And you brought the tapes with you?

1   A.   Yes.

2   Q.   Did you meet a member or an employee of AMSA at

3        that location?

4   A.   Yes, I did.

5   Q.   Do you remember his name?

6   A.   I believe it was O'Brien, but I'm not totally

7        sure.

8   Q.   Okay.  Do you remember what he looked like?

9   A.   White male.  I'd say in his late thirties,

10       possibly thinning hair, maybe glasses, 180

11       pounds.

12  Q.   And was he able to assist you in viewing those

13       tapes with counsel?

14  A.   Yes.  We went into the -- like it was a viewing

15       room where all the cameras were, and we put a few

16       video tapes in and did watch some segments of the

17       tapes.

18  Q.   As best you can recall, can you describe what was

19       depicted on the tapes that you saw at AMSA?

20  A.   From my recollection, the beginning of the tapes

21       were basically a male and a female sitting down.

22       It seemed like they were doing some work in a

23       room, and you really couldn't hear anything on

24       the tapes.  And that was for a lengthy period of

25       time.  I don't recall, but it was more than an

1    hour possibly.  And at some point in time, they

2    get up.  And what we had to do was you had to

3    change different views of the cameras because

4    each camera was actually on the screen.  So, we'd

5    be watching one segment.  That would be them

6    sitting down.  And there would be noise, and you

7    really didn't hear anything, but you'd just see

8    some movement.  And then we would ask to see

9    another angle of the camera, and then that camera

10   angle would come up.  So, at one point in time

11   they did get up from original location where they

12   were talking.  You didn't hear anything.  And

13   then they walked into a hallway.  And I do recall

14   when they entered that hallway, I recall the

15   female saying, "I don't want to go back there."

16   I also recall the male had his hand not so much

17   around her waist, but towards her backside,

18   walking with her.  And I recall that he did have

19   a firearm tucked in the belt in his back.

20 Q.  So, your view of the walking of the hallway as

21   best you can describe it, is that a forward view,

22   a backward view, or a combination with side?  As

23   best you can describe it.

24 A.  The view that I remember is it's -- the view was

25   going forward down the hallway, and they were

1    entering the hallway, and that's how I could see

2    his hand placement and also see the firearm

3    tucked in the back of his pants.

4  Q.  And when you say that it was tucked in the back

5    of his pants, is that in the back, or on the

6    side, or --

7  A.  It was just tucked into the back of his belt

8    area.

9  Q.  Would that be on his left side or his right side?

10  A.  I recall his left side.

11  Q.  And when you say that he was walking down the

12    hallway with her, where was her body positioned?

13    Was it on his right side or his left side?

14  A.  She was on his right side.

15  Q.  And you said that you heard some words uttered?

16  A.  Yes.

17  Q.  Did you -- were you able to see any specific

18    facial expressions or obvious signs of demeanor?

19  A.  No, I don't recall that.

20  Q.  On either the male or the female?

21  A.  Yeah.  Nothing.

22  Q.  Did you see what was depicted once they get down

23    the hallway?

24  A.  They entered a room, but that's all that happened

25    at that point.  Once they entered the room, you

49

1       didn't see anything.  I was told there were no

2       cameras in that room.

3   Q.  Okay.  So, do you -- were you able to see how the

4       door gets opened?

5   A.  I don't recall.

6   Q.  And did that door -- when you say that you can't

7       see, you don't see anything after that?  The door

8       closes?

9   A.  Yes.

10  Q.  Did at some point that door open?

11  A.  Yes.  I believe it was approximately five minutes

12      after that.  I believe it was like a short period

13      of time.  Maybe five minutes.  The female exited

14      first, and then the male exited some time after

15      that.

16  Q.  Again, did you see -- were you able to, or do you

17      recall any obvious signs of demeanor or facial

18      expressions?

19  A.  No.

20  Q.  On either of the two parties?

21  A.  No.  It was just walking from that room, first

22      the female and then later the male.

23  Q.  And were you able to hear anything on that tape?

24  A.  No.

25  Q.  That portion of the tape?

1    A.    No.

2    Q.    In viewing those tapes, did you have an

3          opportunity to see anything that was depicted on

4          the outside of the building?

5    A.    Yes.  I do recall the female and the male later

6          smoking outside in the parking lot together.

7    Q.    And do you know if that was later in time than

8          what was -- according to the tape than what was

9          depicted as them going into the room?

10   A.    It was after the room.  It was later in time.

11   Q.    And you say that you saw who outside smoking?

12   A.    The male and the female.

13   Q.    Anybody else?

14   A.    Not at first.  At first I believe if my

15         recollection is correct, it was just the male and

16         the female smoking outside.  Then the male went

17         inside again.

18              THE COURT:  Was this the same male that

19         you'd seen on the tape before?

20              THE WITNESS:  Yes.

21              THE COURT:  Okay.

22              THE WITNESS:  And the male and female

23         were outside smoking.  At one point the male went

24         inside.  Then if my recollection is correct,

25         another party actually went to that location.  I

1       saw a car pull up.  There was some conversation,

2       and later the female went back into the building.

3   Q.  And you said that another party arrived.  Would

4       that be male or female?

5   A.  I don't recall.  I just remember a car.

6   Q.  Did you see some interaction between the alleged

7       victim and that party who arrived?

8   A.  Yes.

9   Q.  Outside the building?

10  A.  Yes.

11  Q.  And then the alleged victim returned inside?

12  A.  Yes.

13  Q.  Can you describe, if you can -- you went to the

14      facility to view these tapes?

15  A.  Yes.

16              THE COURT:  Ms. Veenstra, just for a

17      second.  You said you described some interaction

18      between this person who arrived and the woman

19      outside.  What did you see?

20              THE WITNESS:  It was just basically the

21      female walking up to that car, and I don't recall

22      if she went in the car or not, or if that person

23      from that car got out to talk.  I just remember

24      some interaction taking place.

25              THE COURT:  Okay.

1   Q.  Can you describe what, if any, security measures

2       were in place that you became aware of that day?

3   A.  Well, it was a very secure facility.  That's one

4       of the reason I actually remember going there and

5       viewing it.  Because you had to be buzzed in a

6       couple of doors to get into the building.  And

7       they had cameras in numerous places around, and

8       also I still remember that they had actually a

9       fingerprint entry.  To get into a certain room,

10      you had to have the correct fingerprint to enter

11      the room.  It was a pretty secure facility.

12  Q.  And now, do you recall seeing anything else

13      depicted on the tapes during your viewing at

14      AMSA?

15  A.  Not that I recall.

16  Q.  And so, at some point yourself, counsel, and the

17      employee of AMSA finished viewing those tapes; is

18      that right?

19  A.  Yes.

20  Q.  And did you leave with those tapes?

21  A.  I don't recall.  I believe that I would have left

22      with the tapes.  At the time the only reason I

23      would have left the tapes there was to provide

24      copies for the defense counsel and for the

25      district attorney's office because at the time we

1    did not have the technology to make copies, but I

2    still don't think I would have done that.  I

3    think I would have brought the tapes back to the

4    office, but I'm unsure.

5  Q.  So, you don't have a specific memory of what

6    happened to those tapes?

7  A.  No.  The only thing I remember is actually going

8    there and viewing the tapes.

9          MS. VEENSTRA:  I have no further

10   questions of this witness.

11          THE COURT:  Mr. Ardito.

12          MR. ARDITO:  Yes.

13               **CROSS EXAMINATION**

14  **BY MR. ARDITO:**

15  Q.  We viewed those tapes together, correct?

16  A.  Yes.

17  Q.  And we were there just about a couple of hours;

18    isn't that true?

19  A.  Yep, that's correct.

20  Q.  So, we really didn't get to see all the tapes?

21  A.  No, we did not.

22  Q.  You stated on the direct examination that another

23    person pulled up, and there was some interaction?

24  A.  Correct.

25  Q.  Do you remember seeing on any of the tapes that

1      person inside the facility?

2  A.   I don't recall that.

3  Q.   You testified on direct examination that before

4      the alleged incident you saw Mr. Ciambriello and

5      the alleged victim sitting together working?

6  A.   Correct.

7  Q.   During that period of time when you saw them

8      sitting together working, did you see Mr.

9      Ciambriello attack her in any way, shape, or

10     form?

11  A.   I did not see any type of struggle taking place.

12  Q.   Do you recall seeing a video -- do you recall

13     seeing on the video some time after the alleged

14     incident Mr. Ciambriello and the alleged victim

15     in a cafeteria type setting having a soda?

16  A.   I don't recall that.

17          MR. ARDITO:  No further questions,

18     judge.

19          THE COURT:  Ms. Veenstra?

20          MS. VEENSTRA:  Nothing further of this

21     witness.

22          THE COURT:  All right.  Thank you very

23     much.

24          THE WITNESS:  Thank you.

25          THE COURT:  You may step down.