1    MS. VEENSTRA:  Russell Castro.

2    **RUSSELL CASTRO, Sworn**

3    THE WITNESS:  Good morning.

4    THE COURT:  Good morning.

5    **DIRECT EXAMINATION**

6    **BY MS. VEENSTRA:**

7    Q.  Could you please introduce yourself for the

8        record?

9    A.  Russell Castro, C-A-S-T-R-O.

10   Q.  And how are you employed, sir?

11   A.  Employed with the City of Attleboro.  Police

12       officer.

13   Q.  And how long have you been a police officer with

14       the City of Attleboro?

15   A.  Approximately ten years.

16   Q.  I'd like to direct your attention, Officer

17       Castro, to the month of May in the year 2001, and

18       ask you whether you were dispatched along with a

19       number of other officers to AMSA located in the

20       City of Attleboro?

21   A.  Yes.  Originally Sturdy Hospital.

22   Q.  Okay.  And at some point did you respond to AMSA?

23   A.  Yes.

24   Q.  And what other officers, if you recall, also

25       responded to that location?

1   A.   Officer Larsen and Detective Otrando.

2   Q.   At that time did you have an opportunity to view

3        the facility and some video surveillance?

4   A.   Yes.

5   Q.   Can you describe as best you recall what you saw

6        depicted on the video surveillance?

7   A.   On the video surveillance we seen the male and a

8        female, Mr. Ciambriello and Kiernan the female --

9   Q.   The alleged victim?

10  A.   -- the alleged victim walking through a room.  I

11       believe it was the money processing room.  At

12       that point the male had his right arm around her

13       backside, lower back, upper buttocks, walking

14       through the room.  Then on another view, more of

15       a back view, they walk down a hallway with the

16       hand on the back and entering an office; and

17       several minutes later, the female exited the

18       office and went to the left.

19  Q.   Can you estimate, if you can, about how long they

20       were in that office?

21  A.   I'd say less than four minutes.

22  Q.   Did you ever see any tape which -- or segment or

23       portion of a tape which may have depicted the

24       inside of that office?

25  A.   No.

1    Q.   Did you hear any words that were spoken when

2         viewing that tape?

3    A.   Not that I recall.

4    Q.   Did you note any obvious facial expressions or

5         expressions of demeanor on either the alleged

6         victim or Mr. Ciambriello?

7    A.   No, I did not.

8    Q.   Now, I'm going to direct your attention to later,

9         much later in the investigation.  Were you asked

10        by Sergeant Otrando of your department to bring

11        some tapes to the Raynham Police Department,

12        specifically Deputy Chief Louis Pacheco?

13   A.   Yes.

14   Q.   And do you know what the purpose of that was?

15   A.   For further investigation to try to get any other

16        information out of the tapes.

17   Q.   And did you bring some tapes to Deputy Chief

18        Pacheco?

19   A.   Yes, I did.

20   Q.   And how many did you bring?

21   A.   Three.

22   Q.   And were they labeled?

23   A.   I believe they were labeled.

24   Q.   And how were they labeled?

25   A.   A, B, and C.

1  Q.  And did you have an opportunity to work with

2      Deputy Chief Pacheco and view those tapes?

3  A.  Yes.

4  Q.  And can you -- let me ask you.  Was he able to

5      retrieve some images from those tapes?

6  A.  Yes.

7  Q.  And do you know if those were then transferred

8      onto a videotape?

9  A.  Yes, they were.

10  Q.  And do you know if a copy of that videotape was

11      provided to me?

12  A.  I brought it back to Sergeant Otrando, and I

13      believe he's given it to you, yes.

14  Q.  And did you have an opportunity to view that

15      tape?

16  A.  Yes, I did.

17  Q.  And can you describe what, if anything, was

18      depicted on the tape?  What was depicted?  What

19      did you see?

20  A.  The tape that was made?

21  Q.  Yes.

22  A.  In the first scene you're going to see -- I

23      believe it's like the cashiers room where they

24      check out.  The trucks will come in and go.  I

25      believe that's the room it is.  You're going to

1     see a reflection in door number 1's window of a

2     symbol of a male and a female walking through

3     that room.  The male has his arm around that

4     female's backside.

5  Q.  Did you see anything else depicted on that tape?

6  A.  Yeah.  Several minutes later they were seen

7     walking down a hallway.  I refer to it as a money

8     cashing room because there was all counting

9     machines there, and the male and the female were

10    walking down the corridor.  The male has his arm

11    around the backside of the victim; and then as

12    they're coming off the screen, you can see the

13    hand, his left hand come up to the elbow.

14  Q.  Okay.  And that was depicted on the tape?

15  A.  Yes.

16  Q.  Now, you said that you saw a similar scene at the

17    night -- on the night of the alleged incident; is

18    that right?

19  A.  Yes.

20  Q.  What is the difference between those two

21    depictions of the two of them coming down that

22    hallway?  What was the difference between them?

23  A.  On this one here they're coming at the camera.

24    The one that I viewed at the scene, they were

25    walking -- the camera was the backside of them,

1      more toward the backside of them.

2   Q.   Okay.  While walking down that hallway -- strike

3        that.  Did you notice or -- describe what else

4        was depicted on that tape.

5   A.   Later on, I believe it was like 1900 hours, the

6        female, the alleged victim comes up, puts a soda

7        can on the door rim.  It's like a shelf on door

8        #2, I believe it was.  And several minutes later

9        she walks back to that, and it appears that the

10       defendant's checking in or cashing out a truck,

11       because you can hear -- you can't really hear,

12       but you can hear the money banging on the counter

13       in one of the volumes; and then the alleged

14       victim is standing to the left at door 2 which is

15       probably like three to four feet from door 1, and

16       she's handing the alleged defendant looks like

17       rubber bands to strap the money.

18  Q.   Would it be fair to say they appear to be working

19       together?

20  A.   Yes.

21  Q.   Did it appear or sound as if there was more than

22       the alleged victim and Mr. Ciambriello in that

23       immediate vicinity?

24  A.   Yes.

25  Q.   There were more than those two voices?

1    A.    I don't know about the voice, but you can believe

2          that there's two males there and the female.  I'd

3          have to view it.

4    Q.    The original tapes that you brought to Raynham

5          Police Department Deputy Chief Pacheco, were

6          those subsequently given back to you?

7    A.    Yes.

8    Q.    And you said that -- or strike that.  Did you

9          turn those over to someone?

10   A.    Yes, I did.

11   Q.    Who did you turn those over to?

12   A.    I returned them back to Sergeant Otrando.

13               MS. VEENSTRA:  If I could have one

14         moment, your Honor?  I have no further questions

15         of this witness.

16               THE COURT:  Mr. Ardito.

17                    CROSS EXAMINATION

18   BY MR. ARDITO:

19   Q.    Detective, did you happen to see any tape of

20         them -- when I mean them, I mean Mr. Ciambriello

21         and Ms. Kiernan.  Did you ever see any tape of

22         them working together?

23   A.    Just that one at the end of that made tape by

24         Chief Pacheco.

25   Q.    And which tape -- could you describe that?  I'm

1       not sure --

2   A.  It was -- they were at the two doors that I just

3       described, door 2 and door 1.  She appeared to be

4       handing him elastics.

5   Q.  And that was the one that allegedly they're

6       working together after the incident?

7   A.  Yes.

8   Q.  Nothing prior to?

9   A.  Not to my recollection, no.

10  Q.  Did you see any video or any tape of another

11      woman in the building?

12  A.  I did not, no.

13  Q.  Did you see the video of the alleged victim

14      leaving the area where she alleged the assault

15      took place?

16  A.  On the night of it happening?

17  Q.  Yes.

18  A.  The night of it happening, they left I guess it

19      was the office area.  They left the office area.

20      She left the office area.

21  Q.  And isn't it true it was a clear picture of her

22      leaving?  She was walking towards the camera?

23  A.  She walked out and took a left.

24  Q.  And you could see her very plainly?

25  A.  I could see her.  I couldn't see her face if

63

1     that's what you're asking me.

2   Q.  All right.  What about her clothes?

3   A.  I don't recall her clothes.

4   Q.  You can't tell us if her clothes were ripped or

5       torn --

6   A.  No.

7   Q.  -- or together, not together?

8   A.  No, I don't have --

9   Q.  You have no recollection?

10  A.  No.

11              MR. ARDITO:  No further questions,

12      judge.

13              THE COURT:  Ms. Veenstra?

14              **REDIRECT EXAMINATION**

15  BY MS. VEENSTRA:

16  Q.  Let me ask you, Officer Castro, if her clothes

17      had been disheveled in any way, would you have

18      noticed it?

19  A.  From that view, probably not, in my recollection.

20  Q.  Okay.

21              MR. ARDITO:  Redirect, your Honor?

22              THE COURT:  Yep.

23              MR. ARDITO:  Recross.

24              **RECROSS EXAMINATION**

25  BY MR. ARDITO:

1    Q.   Is it your testimony, detective, that on a rape

2         case if you have a video of someone walking away

3         from the incident, you're not looking at that

4         person?

5    A.   I couldn't see with the clarity of the film, to

6         my recollection, and I only seen the tape for a

7         short time.  I'm not the investigating detective.

8    Q.   So --

9                   MR. ARDITO:  No further questions.

10                  THE COURT:  Okay.

11                  MS. VEENSTRA:  Nothing further.

12                  THE COURT:  Thank you very much.  You

13        may step down.

14                  MS. VEENSTRA:  Deputy Chief Louis

15        Pacheco.  Your Honor, I would be offering this

16        evidence just to describe the technology for the

17        Court.

18                  THE COURT:  Okay.

19                   **LOUIS PACHECO, Sworn**

20                   **DIRECT EXAMINATION**

21   **BY MS. VEENSTRA:**

22   Q.   Could you please introduce yourself for the

23        record?

24   A.   My name is Louis, L-O-U-I-S, Pacheco,

25        P-A-C-H-E-C-O.  I'm a police officer in the Town

65

1    of Raynham, and I currently hold the rank of

2    deputy chief.

3  Q.  How long have you been with the Raynham Police

4    Department?

5  A.  Approximately thirty years.

6  Q.  And let me ask you, what is REACT, R-E-A-C-T?

7  A.  REACT is a Regional Electronic and Computer

8    Crimes task force stationed in Raynham.  It has

9    about twenty-eight different agencies involved,

10   and we deal with computer and video forensics.

11 Q.  And what is a multiplex system, if you can?

12 A.  Basically it's recording; and when talking about

13   video, it's recording multiple images to the same

14   tape from different cameras.

15 Q.  And would that be a normal videotape that it's

16   recorded on?

17 A.  Could be, yes.

18 Q.  If one tried to view a videotape in which a

19   number of images were depicted on that same tape,

20   what would one see?

21 A.  If you used a normal VCR, you'd see a fast

22   collage of pictures go by the screen.

23 Q.  Would it be fair to say that they may not be

24   decipherable?

25 A.  They wouldn't be until you slowed the speed up on

1       the VCR, yes.

2    Q.  And is it more involved than just slowing it, or

3        do you have to isolate, or can you describe what,

4        if any, procedure you would go through to

5        retrieve images?

6    A.  Well, basically a video image is laid down at

7        30 -- 29.97 frames per second when you watch a

8        regular video, normal regular video.  Obviously

9        the tapes are only two hours long.  So, if you

10       want to put multiple cameras on, you can't keep

11       thirty frames per second because the tape would

12       only last two hours for one camera and more for

13       more cameras.  So, the technology of a multiplex

14       system picks certain frames which are made from

15       two fields, the odd and the even, and lay them

16       down on the videotape as it runs depending on --

17       and how many frames you get laid on depends on

18       how long the time lapse is.  So, if you had your

19       tape on for forty-eight hours, you're taking a

20       two hour tape and laying down forty-eight hours

21       of pictures.  If you have your system set up for

22       twenty-four hours, then you're putting

23       twenty-four hours of pictures on two hours.

24                THE COURT:  And how does the machine

25       pick the frame?  Is it a time issue, or is it by

1    if there's movement?

2              THE WITNESS:  It's generally a time

3    issue, your Honor.  However, it could be set by

4    the operator.  Different systems -- for instance,

5    if you had a camera setting up in this particular

6    courtroom, you may want the camera that's got the

7    witness on it more than the camera that's taking

8    the back of the thing.  So, you adjust it so so

9    many frames get recorded from that camera.

10   Depending on how the system is set up, you could

11   adjust it manually.  Most just rotate around.  A

12   frame, a frame, a frame, a frame.

13   Q.  So, with those systems, is it fair to say that

14   you may not have or probably would not have

15   continuous coverage of one particular location?

16   A.  Absolutely true.

17   Q.  At some point, deputy chief, were you asked to

18   assist Sergeant --

19              THE COURT:  Let me just ask another

20   question before you go from that.  So, if you

21   have a system where you've let's just say put in

22   a two hour tape to take an eight hour shift, that

23   tape is going to cover the whole eight hours, but

24   it's going to record the frames as it has been

25   told to pick those frames?

1          THE WITNESS:  Yes, as it's been told to

2     depict them, and so many frames to make it fill

3     the eight hours.

4          THE COURT:  Right.

5          THE WITNESS:  So, if it was a

6     twenty-four hour tape, you'd have less frames.

7     You'd have one frame, for instance, every three

8     seconds.  If it was forty-eight, you'd have one

9     frame every six seconds.

10          THE COURT:  So, if you have a system

11     like the one that was involved in this case where

12     there are six VCR screens that you can look at of

13     these cameras taking the videos, and they're

14     recording however they're set up on the time,

15     each of those screens is going to cover -- the

16     tapes for those VCRs is going to cover the period

17     that it's set for?  Am I making myself clear?

18          THE WITNESS:  It will cover the period

19     of time, and depending on the settings of the

20     unit, which I never saw, it would -- how many

21     frames you get per second.  So, you could get --

22     you're supposed to get 29.97 frames per second.

23     As you extend that tape over two hours, that

24     drops down to -- some systems you only get one

25     frame every ten seconds.

69

```
 1            THE COURT:  But you could cover -- you
 2       could set it to cover eight hours or twenty-four
 3       hours or forty-eight hours?
 4            THE WITNESS:  Yes, ma'am.  Yes, your
 5       Honor.
 6            THE COURT:  Okay.
 7  Q.   And do you know what, if any, setting was in
 8       place with regard to an alleged incident at
 9       Armored Motor Services of America in May of 2001?
10  A.   I have no personal knowledge of what the settings
11       were or anything.  I may -- you may get some
12       information off of the tape that we did.
13       However, those are adjustments that are made at
14       the system.  You would have to go to the scene
15       and look.
16  Q.   And you were actually asked by the Attleboro
17       Police Department to assist them in retrieving
18       some images; is that right?
19  A.   Yes, I was.
20  Q.   And were you able to retrieve some images which
21       appear to depict a male and female walking down a
22       hallway at that location?
23  A.   Yes, I did.
24  Q.   And were you also able to retrieve some
25       depictions of a female working near a door with a
```

```
 1        soda and some voices in the background?
 2   A.   Yes, I was.
 3   Q.   And were you working with three tapes when asked
 4        to assist?
 5   A.   Yes.
 6   Q.   Were those tapes ultimately returned to the
 7        Attleboro Police Department?
 8   A.   Yes.
 9   Q.   And you were able to provide a videotape of the
10        images that you were able to retrieve?
11   A.   Yes.  Generally at REACT what we do is the police
12        officers bring the tape in, make an appointment
13        to bring the tape in.  We digitize the tape.  So,
14        we take it from an analog signal to a digital
15        signal.  Once you have it as a digital signal,
16        it's a data base, and you can play it, put it
17        back.  You don't destroy the tape.  On a regular
18        tape if you pause a regular tape or you do
19        anything with it, you're actually destroying the
20        tape, because the heads are still spinning, but
21        the tape's stopped.  So, you're wearing off the
22        oxide.  So, by digitizing it allows you to work
23        on it, you know, ad infinitum.
24               THE COURT:  Do you recall what period
25        of time -- what the hours over which these --
```

1    that these tapes covered?

2              THE WITNESS:  I don't recall that right

3    now, your Honor.

4              THE COURT:  Do you recall whether they

5    were -- they each covered the same amount of

6    time?

7              THE WITNESS:  The section that I looked

8    at, that I was asked to examine was relatively

9    the same amount of time, the same day and the

10   same hour.

11             THE COURT:  On each tape?

12             THE WITNESS:  On each tape.

13             THE COURT:  Okay.

14             MS. VEENSTRA:  I have no further

15   questions of this witness.

16             THE COURT:  Mr. Ardito.

17             MR. ARDITO:  Very briefly, judge.

18                     **CROSS EXAMINATION**

19   **BY MR. ARDITO:**

20   Q.   You were able to transcribe -- transpose one copy

21        of the tape for the Attleboro police, correct?

22   A.   I didn't hear the question.

23   Q.   I'm sorry.  You were able to make a copy?

24   A.   Yes.  I changed the original tape to digital and

25        then played the digital back onto a VCR, which

```
 1         you can have more copies or whatever you want.
 2    Q.   And during this process you were able to view the
 3         three tapes that the Attleboro police took to
 4         your office, correct?
 5    A.   Pieces of them.  I didn't view the whole thing.
 6    Q.   You didn't view the whole thing?
 7    A.   No.
 8    Q.   And in your work, the only thing you were able to
 9         copy for the Attleboro police was a couple
10         walking down an aisle?
11    A.   That was what they had asked me to reproduce,
12         yes, sir.
13    Q.   And there was a little conversation with the
14         alleged victim and a soda can and some voices in
15         the background, correct?
16    A.   Yes, sir.
17    Q.   There was nothing else on those tapes?
18    A.   Not that I saw, sir.
19                   MR. ARDITO:  No further questions.
20                   THE COURT:  Ms. Veenstra?
21                   MS. VEENSTRA:  I have nothing further.
22                   THE COURT:  Thank you very much.
23         Anything further, Ms. Veenstra?
24                   MS. VEENSTRA:  No, your Honor.
25                   THE COURT:  Commonwealth rests?
```

1          MS. VEENSTRA:  Yes, your Honor.

2          THE COURT:  Mr. Ardito, anything

3     further?

4          MR. ARDITO:  Just a closing regarding

5     the motion to dismiss, your Honor.

6          THE COURT:  Okay.  Why don't I hear

7     you.

8          MR. ARDITO:  Briefly, again, we've

9     heard testimony from Chris Abreu the

10     Commonwealth's witness.  He was the assistant

11     district attorney that at the time viewed the

12     tapes with myself.  He testified under direct

13     examination that he saw Ms. Kiernan and Mr.

14     Ciambriello working together at a bench and then

15     get up and leave.  In the grand jury

16     investigation, in this report she states that --

17     and I'm sure she's going to testify to -- that he

18     began his assault while they were sitting down.

19     That he had his arms around her, he had his legs

20     around her, he was unbuttoning her blouse, he was

21     biting her, he was massaging her.  We just heard

22     from the district attorney who said that he would

23     have testified that that would have happened,

24     that they were working together, they got up, and

25     they left.  It's issues like that that make the

1    losing of this tape so prejudiced.

2            Again, on the tape and ultimately grand

3    jury testimony, Ms. Kiernan calls a friend of

4    hers who arrives.  And we heard testimony that

5    Mr. Saunders -- Mr. Abreu saw this young lady

6    show up, and they were outside.  The tape clearly

7    showed that they were smoking outside, and they

8    described that in their grand jury testimony.

9    Then this young lady goes into the building with

10   the alleged victim, and they're all sitting

11   together.  Then this lady leaves of course, and

12   the rest is not on the tape.  The tapes clearly

13   showed when we saw them that there was a

14   cafeteria where Mr. Ciambriello asked her for

15   soda, and she says she -- she says in the grand

16   jury report that that never happened.  Yet we saw

17   her with a can of soda after the incident.

18           These tapes are vitally important to

19   any defense we have.  You couldn't possibly

20   cross-examine any witness thoroughly unless we

21   had these tapes.  They show a completely

22   different picture.  They show the demeanor which

23   was asked for, and I state that in my motion when

24   one of the grand jurors asked the police what was

25   her facial expression like.  I disagree with the

1    detective.  I mean it was clear when she left the

2    ladies room.  Certainly I would think a jury

3    would want to see this four or five minute

4    interlude, what she looked like when she walked

5    out; and the camera was clearly on her face,

6    clearly on her body.  She turned into the camera

7    and walked to the ladies room.  Without these

8    tapes, we are crippled, judge.  We need these

9    tapes to try the case.

10          Now, if they were lost by the police

11    department, if there was a mishandling between

12    the district attorney's office and the police

13    department, then so be it.  This case should be

14    dismissed.  There is case law.  I cite case law.

15    This case should not go forward.  You've

16    handcuffed us.

17          THE COURT:  Mr. Ardito, what I

18    understood from these witnesses is that the tapes

19    that you do have or the piece that you do have

20    covers the whole period of time when she was --

21    when Ms. Kiernan and Mr. --

22          MR. ARDITO:  It's Ms. Kiernan and Mr.

23    Ciambriello, your Honor.

24          THE COURT:  -- Ciambriello were at the

25    facility that night.  It just doesn't give the

same views that you're talking about.

MR. ARDITO:  No, your Honor.

THE COURT:  Do you agree with that?

MR. ARDITO:  No, I disagree.  The views
we're talking about are on the three tapes that
were never transcribed.

THE COURT:  No, no, no, I understand
that.  What you're saying is there were views on
other tapes --

MR. ARDITO:  Correct.

THE COURT:  -- that were not
transcribed.  But these tapes that they do have
and were transcribed cover the same period of
time.

MR. ARDITO:  They can't, because there
are other people in the other tapes.  How can
they cover the same period of time?

THE COURT:  I understood Chief Pacheco
to say that the way this system works, each of
the tapes that he looked at covered the same
period of time before and after the alleged
assault.

MR. ARDITO:  Then --

THE COURT:  But they don't show what
you say the other tape shows.  So, they don't

1    show the same views, but they cover the same

2    period of time.  You say that's not correct?

3               MR. ARDITO:  I disagree, because I know

4    what I saw.  We saw other tapes.

5               THE COURT:  But do you understand my

6    question?

7               MR. ARDITO:  Yes.  Yes, and I disagree

8    with the chief.

9               THE COURT:  Okay.  All right.

10               MR. ARDITO:  How is that possible, your

11    Honor?  He's showing us he transcribed a period

12    of time that they were working, that they walked

13    from room 1 to room 2 and down the aisle.  Then

14    he goes back to I believe it's 1900 and -- I

15    forgot the exact time -- where again she's

16    working with another person.  Where is -- I mean

17    he himself testified that if there were any

18    images, he would have picked them out.

19               THE COURT:  That's what I'm saying.

20    The views that you say you saw are not on these

21    tapes.

22               MR. ARDITO:  Correct.

23               THE COURT:  But that doesn't mean that

24    it doesn't cover the whole period of time that

25    you're concerned about.  These tapes cover the

1    same period of time.

2                    MR. ARDITO:  Yes.

3                    THE COURT:  Okay.

4                    MR. ARDITO:  Yes.

5                    THE COURT:  All right.  Okay.

6                    MR. ARDITO:  Now I understand.

7                    THE COURT:  Ms. Veenstra.

8                    MS. VEENSTRA:  Thank you, your Honor.

9    I'd ask your Honor not to dismiss this case.  I

10   know that counsel is asking for a dismissal.  I'd

11   suggest that that is a drastic remedy in a case

12   in which it comes down -- the central issue in

13   this case is what happened when they went into

14   that room and were in that room for five

15   minutes.  That has always been the issue in this

16   case, and that is the central issue.

17          The cases that talk about dismissal is

18   when the defendant is foregone from any possible

19   defense or a theory of defense.  Counsel has

20   suggested I know to me that this is an issue of

21   consent, and the issues that he raises for

22   reasons to need the tape, your Honor, I believe

23   are adequately addressed in my motion.  It is

24   much conduct that the alleged victim herself has

25   already testified to under oath.  For example, if

1    the witness says as she initially did to the

2    police that she was dragged into that room, she

3    testified before the grand jury that she was not

4    in fact dragged.  I believe she indicated that

5    she was guided.  She cannot now come before any

6    court and reasonably be expected to say that she

7    was dragged.  The alleged victim in this case

8    actually admitted that she was allowed outside by

9    the defendant who had to buzz her out to smoke

10   and talk with her friend.  That is not something

11   she can now deny.  So that, the issue -- the

12   depiction on the tape of them walking down the

13   hallway I'd suggest is important.  The depiction

14   of her talking and working with the defendant

15   after the alleged incident is very important to

16   the defendant obviously.  Those important

17   depictions will be before the fact finder.

18              Counsel suggests a very drastic

19   remedy.  I suggest to the Court that there are

20   less drastic remedies.  If this Court were to

21   find that some remedy -- this defendant needs

22   some remedy to get a fair trial, the cases that

23   the Commonwealth and I believe the defendant

24   cite, there are other alternatives.  The Court

25   can obviously consider suppression of any of that

1    testimony, any testimony regarding what was

2    depicted on the tapes like the tapes never

3    existed.   Tactically for a defendant I would

4    suggest that that would be his call.  Or the

5    Court's.   There is I think possible based on

6    testimony here that there may be a way to

7    stipulate as to what was depicted on those tapes

8    and put that before the fact finder.  Counsel has

9    not suggested to me -- and I think he may be in a

10   difficult position because he may be a witness,

11   but he has not suggested to me that what was --

12   what has been described as depicted is different

13   than his recollection.  So that, a stipulation

14   may be possible.  Counsel with a stipulation

15   could also have curative or a sort of instruction

16   by the Court that any discrepancy or doubt as to

17   what was depicted on the missing evidence would

18   be in the defendant -- would need to be in favor

19   of the defendant.  And counsel could lastly argue

20   that the Commonwealth has lost evidence.

21            So, I'd suggest that the remedy counsel

22   seeks here is drastic, and I'd ask the Court not

23   to dismiss the case, but allow this case to go to

24   trial and to allow the alleged victim her day in

25   court.  Thank you.

1          THE COURT:  Thank you very much.

2          MR. ARDITO:  Your Honor, I have a last

3    minute motion -- I don't know if it reached the

4    Court -- regarding --

5          THE COURT:  I'm sorry.  What?

6          MR. ARDITO:  I'm sorry, your Honor.  I

7    filed a last minute motion last week knowing we

8    were going to be here today about a gag order.

9    Apparently I've got every TV station in the

10   neighborhood in the State of Rhode Island and

11   Massachusetts contacting both the defendant

12   and -- the victim is giving interviews about how

13   these lost tapes are going to hurt her in a civil

14   lawsuit.  I filed a motion.  I'd like to have

15   this stop.  It's bad enough we don't have the

16   tapes.  Now she's out there saying she'll never

17   get a fair trial.  So, if there's any way we

18   could --

19         THE COURT:  Okay.  Ms. Veenstra, do you

20   have a position on this?

21         MS. VEENSTRA:  Your Honor, I don't.  I

22   can tell the Court that there have been a number

23   of statements.  This case has garnered some

24   press.  We are scheduled for trial on September

25   9th.  I'd leave that to the Court's discretion.

1          THE COURT:  Okay.  I don't have it in

2     the file, but we'll find it, and I'll rule on it.

3          MR. ARDITO:  Thank you, judge.

4          THE COURT:  Okay.

5          (The Court recessed at 11:50 a.m.)

## CERTIFICATE

I, Lori R. Saulnier, Official Court Reporter, do hereby certify that the foregoing record, Pages 1 through 82, is a complete, accurate, and true transcription of my stenographic notes taken in the aforementioned matter to the best of my skills and ability.

*Lori R Saulnier*
**LORI R. SAULNIER**
**Official Court Reporter**

Please Note:

The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or direction of the certifying reporter.