Page 1

1       UNITED STATES DISTRICT COURT
2        DISTRICT OF MASSACHUSETTS
3           C.A. NO. 10131MW
4
5   * * * * * * * * * * * * * * * * *
6   HEATHER KIERNAN,                 *
7           Complainant              *
8   vs.                              *
9   ARMORED MOTOR SERVICES OF        *
10  AMERICA, INC.,                   *
11          Respondent               *
12  * * * * * * * * * * * * * * * * *
13
14       DEPOSITION OF JOHN P. KIERNAN
15         MORGAN, BROWN & JOY, LLP
16       One Boston Place, 16th Floor
17           Boston, Massachusetts
18    November 30, 2004     10:07 a.m.
19
20
21
22
23           Maryellen Coughlin
24    Registered Professional Reporter

Page 17

1  Q.    And in approximately July of 2000,
2  you moved out of Castle Court Estates and back
3  into the home of your mother in North Attleboro?
4  A.    That's correct.
5  Q.    And what was the reason for that
6  move?
7  A.    We had gotten into an argument, and
8  again, similar circumstances, she basically
9  kicked me out of the apartment.
10 Q.    She being Heather?
11 A.    She and the Fall River police.
12 Q.    Excuse me.
13 A.    She and the Fall River police.
14 Q.    Do you remember the date of that?
15 A.    It would have been the same date
16 that she was scheduled to meet with Attorney Bill
17 McLeod, which would have been sometime around
18 July 15th, I believe.
19 Q.    What was the argument about?
20 A.    She had her friend Chris Parrott
21 come over, and we had argued, and she went out
22 with Chris, and I believe she wanted Chris to
23 stay overnight. The plan was that Chris was
24 going to watch Matthew while I went with her to

Page 18

1  Attorney Bill McLeod's office in Boston.
2      Q.    Mm-hmm.
3      A.    She didn't agree with my
4  disagreement with her staying out late that night
5  with Chris. She came back. We argued further
6  that night, and I told her that there was no need
7  for me to attend this meeting at Bill McLeod's
8  office, and that she could go to the meeting
9  herself, and I didn't want Chris Parrott watching
10 Matthew, and I decided that I would spend the day
11 with Matthew instead, and that's what I did.
12         MR. McLEOD: If I can just for the
13 record object and state that: Mr. Keirnan is
14 here under subpoena today, but as counsel for the
15 plaintiff, Heather Kiernan, she has not waived
16 the spousal privilege. I'm just stating that for
17 the record.
18     Q.    Just so that I understand this,
19 your wife had a meeting with her attorney, and
20 she and her friend Chris Parrott went out the
21 night prior to the meeting?
22         MR. McLEOD: Objection.
23     A.    Correct.
24     Q.    And you stayed home with Matthew?

1  A. I was originally scheduled to go
2  with her.
3  Q. **Out that night?**
4  A. No, no, to Boston the following
5  morning for this meeting with Attorney McLeod.
6  Q. **Right, right.**
7  A. So I told her that I wasn't going
8  at that point. I called Attorney McLeod and told
9  him that I wouldn't be attending, and I left a
10 voice mail and explained that Heather would
11 likely explain the circumstances as to why I
12 wasn't coming, and later on that day, that same
13 day when she did go to Attorney Bill McLeod's
14 office with Chris Parrott, apparently, later on
15 that day after I had taken Matthew to my mother's
16 and spent the day with him, I returned home, fed
17 my son and was greeted at about approximately
18 6 p.m. by my wife and the Fall River police
19 serving me with a restraining order to leave the
20 premises immediately.
21       MR. McLEOD: If I could also
22 interject for the record here. At one point
23 Mr. Kiernan was represented by me, and on the
24 record, I would instruct him not to disclose any

JOHN P. KIERNAN
November 30, 2004

Page 20

1   communications he had with me while I was acting
2   as his counsel.
3       Q.      Okay.  And just so I can follow up
4   on that --
5               MR. McLEOD:  Sure.
6       Q.      -- can you tell me the dates that
7   you were represented by Mr. McLeod?
8       A.      It would have been, I would say,
9   from the time period that Heather was represented
10  by Mr. McLeod, Attorney McLeod up until -- I'd
11  say I received a letter approximately two weeks
12  after the July 15th incident or week.
13      Q.      That's July 15th, 2003?
14      A.      2003?
15              MS. ROMANTZ:  If you have any --
16              MR. McLEOD:  I actually don't.
17      A.      Yeah, I received a letter saying he
18  no longer represented me.
19      Q.      Okay.  And when you say from the
20  time that your wife first was represented by
21  Mr. McLeod, can you tell me when that was,
22  approximately?
23      A.      I'm guessing approximately June of
24  2001.

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

JOHN P. KIERNAN
November 30, 2004

Page 21

1   Q.   Okay.

2   A.   In the midst, she was also
3   represented by a worker's comp. attorney.

4   Q.   Okay. And just going back to this
5   evening which sounds like it was July 14th, I
6   thought you had indicated that your wife and
7   Christina Parrott went out late --

8   A.   Yes.

9   MR. McLEOD: Objection.

10  Q.   -- on the evening, is that correct?

11  A.   Yeah, that's what occurred that
12  night anyway.

13  Q.   And do you mean the night after, do
14  you mean the night that --

15  A.   The same night.

16  Q.   -- the Fall River police served you
17  with a restraining order or the night prior to
18  that?

19  MR. McLEOD: Objection.

20  A.   No, no. The order of this is she
21  went out late prior to meeting on that July 15th,
22  or whatever date that was.

23  Q.   So if we assume that the meeting
24  was on July 15th, on the evening of July 14th

```
 1    Christina Parrott and your wife went out late --
 2              MR. McLEOD:  Objection.
 3        A.    Correct.
 4        Q.    -- leaving you at home with your
 5    son?
 6        A.    Correct.
 7        Q.    Okay.  And what time did your wife
 8    and Christina return?
 9        A.    Approximately midnight is my best
10    recollection.
11        Q.    And did Christina spend the night
12    at your home?
13        A.    She did.
14        Q.    And the next morning you and your
15    wife were scheduled to come into Boston and meet
16    with Attorney McLeod?
17        A.    Correct.
18        Q.    Okay.  And at some point, you
19    decided that you were not going to attend that
20    meeting?
21        A.    I let her know that the night
22    before.
23        Q.    Before she and Christina went out?
24        A.    When she came home.
```

1   Q.   And what were the circumstances as
2   to why you decided not to attend that meeting?
3   A.   First of all, I didn't think there
4   was any purpose for me to go there. And,
5   secondly, I didn't want to be with my wife at
6   that point when we were arguing to the extent
7   that we were. Not only that, I didn't want to
8   subject bringing my son into Boston for something
9   that was almost entirely pointless for him to be
10  there.
11  Q.   Okay.
12  A.   Because we didn't really have
13  someone to watch him, other than Chris, and I
14  didn't want Chris to watch him. I didn't
15  particularly think she was a very good day-care
16  provider, to say the least.
17  Q.   And why was that, that you didn't
18  think that she could provide capable day care for
19  your son?
20  A.   There's just been instances where I
21  think my judgment or my wife's judgment would
22  have been better than Chris's judgment. You
23  know, at one point we let her watch him, and we
24  had gone out to a movie at some point, and we

JOHN P. KIERNAN
November 30, 2004

Page 24

1  came home, and my son had, you know, a
2  temperature of, like, 102 degrees, and you know,
3  she neglected to even call us to tell us that he
4  was feeling ill, so that's just one example.
5      Q.     What were you and your wife arguing
6  about on the evening of July 14th?
7      A.     The fact that Chris Parrott needed
8  to remain at the apartment for the night. As a
9  baby sitter per se, I expected that, you know,
10 she didn't need to stay at the apartment, that
11 she could simply drive home and then return in
12 the morning when we needed her.
13     Q.     Okay. Had your wife and Christina
14 Parrott been out drinking that evening?
15     A.     I don't know.
16     Q.     Did either one of them appear
17 intoxicated when they returned home?
18            MR. McLEOD: Objection.
19     A.     Not to my recollection.
20     Q.     Do you recall what the terms of the
21 restraining order were?
22     A.     At that point, it was an emergency
23 restraining order, so it was a 24-hour period. I
24 had the opportunity to appear the following day,

1  which I attempted to do, but it ended up --
2  instead of being within the Fall River District
3  Court, I think it was held at -- I don't know --
4  at the Taunton Probate. What ended up happening,
5  the restraining order was then reinstated for a
6  two-week period, and I appeared at the two-week
7  appearance to protest the restraining order.
8        Q.    **What were the terms of the**
9  **restraining order?**
10       A.    Just to stay away, no visitation
11 with my son.
12       Q.    **Was it a restraining order to stay**
13 **away from Heather as well?**
14       A.    Correct.
15       Q.    **And your son?**
16       A.    Correct.
17       Q.    **For two weeks?**
18       A.    Well, that was the time period for
19 the restraining order. It was modified at the
20 hearing.
21       Q.    **And that was a hearing two weeks**
22 **later?**
23       A.    Correct.
24       Q.    **And how was it modified?**

JOHN P. KIERNAN
November 30, 2004

Page 26

1  A. I was allowed visitation on a
2  weekly basis with my son at the agreed upon
3  location. There was a child support agreement
4  that was made as well.
5  **Q. What was the agreed upon location?**
6  A. It would have been the shopping
7  plaza with the movie theater in North Attleboro.
8  **Q. You had to remain there with your**
9  **son?**
10  A. No, I would go to pick him up at
11  approximately six o'clock on a Friday and have
12  him for the weekend, and then drop him off at the
13  same location.
14  **Q. So was it unsupervised with**
15  **Matthew?**
16  A. Unsupervised as far as --
17  **Q. Was there a requirement that**
18  **somebody else be in the presence of you and**
19  **Matthew?**
20  A. No.
21  **Q. And how long did that modified**
22  **restraining order remain in effect?**
23  A. I believe it remained in effect at
24  least for six months to a year. I'm not entirely

1  sure. We actually got, I think got back together
2  prior to its expiration. I'm not entirely sure.
3      Q.    Prior to this restraining order
4  that your wife obtained in July of 2003, had she
5  ever sought a restraining order against you?
6           MR. McLEOD: Objection.
7      A.    She had also done that in the
8  previous time that we separated, when I was
9  living at the Juniper Road address with her.
10     Q.    And that would have been in or
11 around July of 2001 that she sought a restraining
12 order?
13     A.    Correct.
14     Q.    And did she obtain one at that
15 time?
16     A.    She did.
17     Q.    What were the allegations that she
18 raised in the restraining order to obtain it?
19          MR. McLEOD: Which one?
20          MS. ROMANTZ: Well, let's talk
21 about the July 2001 first.
22     A.    I believe it was physical and
23 mental abuse by me, and that she feared for her
24 life, that's usually what it takes to get one. I

JOHN P. KIERNAN
November 30, 2004

Page 28

1  got a crash course in how restraining orders work
2  in Massachusetts.
3      Q.   Did she allege that you had injured
4  her physically?
5      A.   No, I don't believe so. I believe
6  she said something to the effect that I had
7  either hit her or threatened to hit her in some
8  way, shape or form.
9      Q.   Had you hit her?
10     A.   No.
11     Q.   Had you threatened to hit her?
12     A.   No.
13     Q.   Is it your testimony that if your
14  wife stated in the restraining order that you hit
15  her or threatened to hit her that she was lying?
16         MR. McLEOD:  Objection.
17     A.   I would say that she was more
18  coached into what to do by relatives within her
19  family, one of which is a DSS supervisor.
20     Q.   Is it fair to say that the
21  statement, the allegation that you hit her or
22  threatened to hit her was untruthful?
23     A.   To my recollection of the incident,
24  whatever it was that she was referring to, yes.

JOHN P. KIERNAN
November 30, 2004

Page 29

1   Q.   And in terms of the mental abuse
2   that she alleged, what was the factual basis for
3   that?
4   A.   Could you elaborate? What do you
5   mean?
6   Q.   Did she elaborate on the facts and
7   circumstances which she believed constituted the
8   mental abuse?
9   A.   She probably, to my recollection,
10  notated something within, that was contained in
11  the request for restraining order, something to
12  the effect of he said he wanted to hurt me or
13  whatever, something to that effect. The second
14  time around, if you want to --
15  Q.   We'll get to that.
16  A.   Okay.
17  Q.   Had you ever said that you wanted
18  to hurt Heather Kiernan?
19  A.   No.
20  Q.   Was the restraining order that was
21  issued in July of 2001 against, prohibiting you
22  from having contact with your son as well?
23  A.   Yes, it always seems to work that
24  way, at the very beginning anyway. There's a

1  two-week turnaround because you can't get a court
2  date for two weeks, and then once the hearing
3  occurs after the two weeks, typically in both
4  instances I resumed visitation with Matthew on
5  the weekends.
6      Q.    **Were there any allegations in the**
7  **restraining order of July 2001 that you had been**
8  **physically or mentally abusive to your son?**
9      A.    No. I mean, not to my
10 recollection. She may have accused that, but not
11 to my recollection.
12     Q.    **Okay. And that restraining order**
13 **was issued by whom, do you recall?**
14     A.    It would have been I believe Judge
15 Latini.
16     Q.    **In what court?**
17     A.    Taunton Probate, again. I know one
18 of them was issued by her. I'm not sure exactly
19 which.
20     Q.    **Okay. Well, now let's go to the**
21 **July 2003 restraining order --**
22     A.    Okay.
23     Q.    **-- and tell me what the allegations**
24 **of abuse were in that.**

JOHN P. KIERNAN
November 30, 2004

Page 31

1    A.    She accused me of threatening to
2 cut her voice box out, that one I remember
3 specifically because it was in my recollection
4 outrageous.
5    Q.    Were there any allegations that you
6 had physically injured her?
7    A.    No, as far as I can recall.
8    Q.    Other than the allegation that you
9 had threatened to cut her voice box out, were
10 there any other allegations that you recall?
11    A.    That's the main one that I recall.
12 I don't really remember anything else. That's
13 the one that was striking to me.
14    Q.    And had you threatened to cut her
15 voice box out?
16    A.    No.
17    Q.    Had you made a statement regarding
18 her voice box --
19    A.    No.
20    Q.    -- in any way? And would you say
21 that that allegation in that application for a
22 restraining order was untruthful?
23    A.    As far as that particular quote,
24 yes.

1    Q.    Just going back to the July of 2001
2  restraining order, 'cause I neglected to ask.
3  After the emergency restraining order expired,
4  was the restraining order modified in any way?
5    A.    Similar to the 2003, visitation
6  began and child support payments were set up.
7    Q.    Okay. How long did that
8  restraining order remain in effect?
9    A.    That would have remained in effect,
10 again, anywhere from six months to a year. In
11 that case, we actually did get back together
12 within -- well, from July to November, so, what's
13 that, four months?
14   Q.    Did you get back together prior to
15 the expiration of the restraining order?
16   A.    On the 2001, yes.
17   Q.    Okay. And at that point that you
18 got back together, did Heather Kiernan make any
19 attempts to dissolve the restraining order?
20   A.    It just automatically dissolved. I
21 guess if you don't appear, from what I
22 understand, after the -- you know, if you don't
23 appear on the actual date that it's suppose to
24 expire, at least to my understanding.