JOHN P. KIERNAN
November 30, 2004

Page 33

1  Q.    Did you get back together before
2  the date that you were suppose to appear?
3  A.    On which date?  You mean the 2001?
4  Q.    The 2001.
5  A.    Yeah, because it would have been
6  four months that we got back together.
7  Q.    Okay.  So, in effect, you were back
8  together for two months while the restraining
9  order was still in effect?
10 A.    If it was six months, then, yeah,
11 that would be accurate.
12 Q.    Okay.  So in July of 2003 when you
13 were served with this restraining order, you
14 moved back into your mother's home?
15 A.    Are we talking about 2003 or --
16 Q.    2003.  Is that correct, from Castle
17 Court Estates?
18 A.    Yes.
19       MR. McLEOD:  Objection.
20 Q.    And you resided with your mother
21 for approximately six months at that point?
22 A.    Correct.
23 Q.    And do you know where during that
24 six-month period Heather and Matthew resided?

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

JOHN P. KIERNAN
November 30, 2004

Page 34

1  A. From my understanding, she moved from the Fall River address to Weld Street in New Bedford, although that was not disclosed to me.

4  Q. How did you learn that, then?

5  A. I did research myself.

6  Q. And do you know who she lived with on Weld Street in New Bedford?

8  A. Based on what Heather has since told me and from what her parents have since told me, she lived there with Chris Parrott and Matthew.

12  Q. And what was the reason that in or around January of 2004 you moved out of your mother's home?

15  A. At that point, I found a place to live with a coworker in Taunton, that would have been the Jason that I referred to. There was an additional bedroom in the apartment that I used as Matthew's bedroom when he was there to stay with me.

21  Q. And what was the reason that you moved from that address in Taunton to the Lindsey Street address in Attleboro?

24  A. As time went on, more communication

JOHN P. KIERNAN
November 30, 2004

Page 35

1  began between Heather and myself, and she did
2  come over and visit on weekends when Matthew was
3  with me, and we came to an agreement that was in
4  both of our interests, and we kind of hammered
5  things out as far as what had gone wrong over the
6  past, I don't know, four years, and we started
7  doing family things together again, you know,
8  going to movies, going to the mall, that kind of
9  stuff, and it just made sense at that point, if
10 the opportunity arose, to try and get back
11 together, and so we both began to search out a
12 place to live, probably, I'd say, in May of that
13 year.
14     Q.    During the second separation that
15 you had from your wife which occurred, began in
16 July of 2003, were you legally separated at that
17 time?
18     A.    I don't think we've ever been
19 legally separated. We've been in the process of
20 a full-blown divorce but just never proceeded to
21 move forward with it.
22     Q.    Okay. And when you say a
23 full-blown divorce, did somebody initiate divorce
24 proceedings in a court?

JOHN P. KIERNAN
November 30, 2004

Page 36

1    A.    Yes. That would have been Heather,
2  as far as I can tell.
3    Q.    Okay.
4    A.    I initiated the legal separation, I
5  believe, in 2001, and she initiated the divorce.
6    Q.    **And she initiated a divorce in**
7  **2003?**
8    A.    To the best of my knowledge, yes.
9    Q.    **Were you ever served with divorce**
10 **papers?**
11   A.    No. I did get correspondence from
12 her attorney at the time, but nothing to
13 outline -- we never got to beyond, I guess, what
14 would have been a pretrial situation. I don't
15 think we ever made it beyond that. I don't even
16 think it came to that.
17   Q.    **Okay. And the divorce proceedings**
18 **were occurring in Taunton Probate Court?**
19   A.    They would have, yeah, had they --
20 there were some appearances, also, in the Fall
21 River Family Court.
22   Q.    **And that was related to the**
23 **divorce?**
24   A.    It was more related to just child

JOHN P. KIERNAN
November 30, 2004

Page 37

1  support and visitation agreements, and we had a
2  final meeting, I believe, at the Fall River
3  Family Court just to explain to the court that we
4  weren't moving forward with the divorce at that
5  time.
6        Q.    Has DSS ever been involved with
7  your son Matthew?
8        A.    No.
9        Q.    Mr. Kiernan, can you tell me what
10 your educational background is?
11       A.    I have a Bachelor of Science from
12 Bridgewater State College.
13       Q.    And what year?
14       A.    1994, I believe.
15       Q.    And what was your degree in?
16       A.    It was in sociology with a minor in
17 psychology, and I also have a Master's Degree
18 from the University of Massachusetts, Boston.
19       Q.    In what?
20       A.    Applied sociology with an emphasis
21 in criminology.
22       Q.    And that was obtained when?
23       A.    In 1998, I believe.
24       Q.    Okay. And just taking me from your

time Heather left the house to go to work?

    A.    Somewhere between 9 and 10 a.m.

    Q.    And did you understand she was going directly to work?

    A.    Yes.

    Q.    And did you have any plans with your wife for that evening when she got off work?

    A.    No, not to my knowledge, not that I can recall.

    Q.    Do you know whether your wife had made plans with anybody else for after she got off work?

    A.    Not to my knowledge.

    Q.    Did she indicate to you that she had made plans with anybody else and that she would not come home directly after work?

    A.    No.

    Q.    And what time did you expect your wife back home?

    A.    Anywhere between 3 and 6 p.m.

    Q.    And at some point since May 19th, 2001, have you learned that your wife was not scheduled to work at AMSA on May 19th until 2 p.m.?

JOHN P. KIERNAN
November 30, 2004

Page 68

1   A.   I believe -- I know there was a lot
2  of inconsistencies after I spoke with the
3  detective when we were at the hospital.
4   Q.   Okay. Do you know on May 19th,
5  2001, what time your wife reported to work at
6  AMSA?
7   A.   Do I know what time she --
8   Q.   Reported to work, arrived at AMSA.
9   A.   When I assumed her to arrive or
10  when she actually arrived?
11   Q.   When she actually arrived.
12   A.   No, I don't know.
13   Q.   Do you know as you sit here today
14  where your wife was from the time that she left
15  your house until the time that she arrived at
16  AMSA?
17   A.   No.
18   Q.   Have you ever asked her?
19   A.   I have asked her, but typically we
20  don't get much into it due to her either being
21  emotionally distraught or angry about the whole
22  day, so, no, we've never really touched on that.
23   Q.   So would it be fair to say that
24  you've asked her and she's refused to answer that

1    question?

2           MR. McLEOD: Objection.

3    A.    She's never given me an explanation
4    for the time periods that come into question.

5    Q.    And you have asked her?

6    A.    Yes.

7    Q.    During the day of March 19th while
8    Heather was away from your home and you believed
9    her to be at work, did you hear from her?

10          MR. McLEOD: Objection.

11   A.    No.

12   Q.    Did she call you at all during that
13   day?

14   A.    No.

15   Q.    Did you call her?

16   A.    Yes. Well, I called AMSA.

17   Q.    Okay. And did anybody answer the
18   phone?

19   A.    No one answered the phone.

20   Q.    Okay. And when did you call?

21   A.    I called her somewhere around six
22   o'clock, and then I believe I called again at
23   about 10 p.m., somewhere in that range --

24   Q.    Okay.

1   A.      -- with no one answering the phone.

2   Q.      Either time?

3   A.      Right.

4   Q.      You called on two occasions?

5   A.      Right, to my recollection. It

6   might have been three, but I don't know for sure.

7   Q.      Okay. But the first time being

8   6 p.m., approximately?

9   A.      Approximately. And if I just could

10  add, the reason I called is because it was

11  unusual that I hadn't received a call from her.

12  Q.      On the Saturdays that she had

13  worked prior to May 19th, had you ever called

14  her?

15  A.      Sure.

16  Q.      Okay. And on those Saturdays, had

17  anyone answered the phone?

18  A.      Yes.

19  Q.      And who had answered the phone?

20  A.      Usually it was -- I don't know if

21  it was a Jay or some other person. Maybe it was

22  this Mike person. From what I understood, there

23  were typically three of them there on a Saturday.

24  Q.      When was the next time that you

1  spoke to Heather after she left home on the
2  morning of May 19th, 2001?
3              MR. McLEOD: Objection.
4       A.    That would have been approximately
5  11 p.m. that night.
6       Q.    And tell me about the circumstances
7  under which you spoke to her at that time.
8       A.    She entered our apartment. She had
9  a very distraught look on her face, and she
10 proceeded to tell me that something very bad had
11 happened at work.
12      Q.    What did she say?
13      A.    At that point she was crying, and
14 she said Tony had done something to her, Tony
15 being Francisco.
16      Q.    Did she tell you what Tony had done
17 to her?
18      A.    At first, she didn't, 'cause she
19 was crying so much.
20      Q.    Was she crying when she entered the
21 apartment?
22      A.    Initially she kind of just had a
23 look of like she had seen a ghost, and then when
24 she sat down, she started to cry.

1  Q.   Had you talked to her prior to her
2  sitting down, had you had any conversation with
3  her?
4  A.   All I said was, what happened, tell
5  me what happened.
6  Q.   Okay. Did you ask her where she
7  had been all day?
8  A.   Yes.
9  Q.   Were you angry with her?
10 A.   At that point, no. I wanted to
11 know what was wrong. She was crying.
12 Q.   Okay. Prior to your wife walking
13 in the door at eleven o'clock, were you angry at
14 her for not having called you the entire day?
15 A.   Sure.
16 Q.   And other than calling on two or
17 three occasions to AMSA, had you attempted to
18 find her in any other way?
19 A.   I believe I would have -- I
20 probably tried to call Chris Parrott's cell
21 phone, if I had the number. I probably did
22 somewhere.
23 Q.   Your wife didn't have a cell phone?
24 A.   I don't recall if she did. She

1   probably did.  I might have tried to call her
2   cell phone, too.
3       Q.      Okay.  Did Christina Parrott answer
4   her cell phone?
5       A.      No.
6       Q.      Do you know what time you tried to
7   contact Christina Parrott on her cell phone?
8       A.      It would have had to have been
9   sometime after 6 p.m.
10      Q.      And did your wife answer her cell
11  phone?
12      A.      If I called it, not to my
13  recollection.  No, I would have spoken to her,
14  then.
15      Q.      Did you leave a message on
16  Christina Parrott's cell phone?
17      A.      I don't recall, to the best of my
18  knowledge.
19      Q.      Did you make any other attempts to
20  call, to contact your wife or to find your wife
21  through any other sources?
22      A.      No, I don't think so.
23      Q.      And why did you call Christina
24  Parrott?

    A.    Well, it was the most logical person that would know where she was, based on the fact that she, you know, was a coworker and that they often spent time together outside of work.

    Q.    Okay. And what were you doing in the apartment when Heather returned home on May 19th?

    A.    What was I doing?

    Q.    Mm-hmm.

    A.    I believe I was watching TV. My son was asleep at the time.

    Q.    You hadn't gone to bed?

    A.    No. I knew something was not right, at the very least. At least I was going to find out why she hadn't come home.

    Q.    Okay. Had that ever occurred before, where you had expected your wife, you know, at a certain time and she didn't appear until much later?

    MR. McLEOD: Objection.

    A.    It had happened before.

    Q.    And in those circumstances, where had your wife been?

1   A.    In most cases, either she was out
2   with Chris, or you know, I'd get some other
3   explanation.  I mean, I don't know.  I mean, it
4   was usually a source of argument at times.
5   Q.    That your wife would go out and not
6   let you know where she was going or who she was
7   with?
8   A.    Or that she would just be home
9   late, you know, kind of like I was Mr. Mom.
10  Q.    So your wife comes in.  You said
11  she looked distraught.  She sat down on the
12  couch.  You asked her where she was.  She was
13  crying, and she said something bad had happened.
14  What did she say beyond that?
15       MR. McLEOD:  Objection.
16  A.    At that point, she started to say
17  that Tony did something to her.
18  Q.    Mm-hmm.
19  A.    And mind you that she's saying all
20  this while she's crying and being distraught.
21  She said that Tony had pulled down her pants,
22  Tony had touched her, that he tried to lick her,
23  I guess, and at that point I immediately went to
24  the phone.  She went into the bathroom, and I

```
 1   the first limousine company?
 2        A.    From what I understand, pretty much
 3   the same thing she did for the second which was
 4   more data entry, scheduling, making appointments.
 5        Q.    And does she still work for Emerald
 6   Square Limo Company?
 7        A.    No, she does not.
 8        Q.    And do you know when that
 9   employment ended?
10        A.    That employment ended about two
11   weeks ago.
12        Q.    And do you know why?
13        A.    From what I understand, they let
14   her go, for whatever reason.
15        Q.    And was that a full-time position
16   that she was doing?
17        A.    Yes.
18        Q.    And who takes care of your son
19   while she's working?
20        A.    That would be Lisa Fuller, our
21   day-care provider.
22        Q.    Have you ever sought a restraining
23   order against Heather Kiernan?
24        A.    The first time, only 2001.
```

JOHN P. KIERNAN
November 30, 2004

Page 106

1  Q.	And did you seek that after she
2  obtained one against you?
3  A.	Correct.
4  Q.	And do you recall what the grounds
5  were that you alleged for seeking a restraining
6  order against her?
7  	MR. McLEOD:  Objection.
8  A.	I believe it was for threatening
9  and abusive language towards me.
10 Q.	And were the threats threats of
11 physical violence?
12 A.	Yes.
13 Q.	Do you recall what they were?
14 A.	No.
15 Q.	Were you being truthful when you
16 filled out the restraining order?
17 A.	Yes.  I believe I also mentioned
18 some physical contact as well in the restraining
19 order.
20 Q.	What do you mean by that?
21 A.	That she had attacked me on one
22 occasion.
23 Q.	Had she?
24 A.	Yes.

1   Q.   What did she do?

2   A.   While I was changing Matthew on the
3   changing table, in a heated argument she came and
4   dug her nails into my chest.

5   Q.   When was that?

6   A.   That would have been probably about
7   a couple of days before she filed the restraining
8   order against me.

9   Q.   Mr. Kiernan, have you ever filed a
10  lawsuit against any other person?

11  A.   No.

12  Q.   An entity?

13  A.   I got in a car accident and my --

14  Q.   Insurance company had a lawsuit?

15  A.   No, I got reimbursed what I was
16  suppose to get reimbursed, but it wasn't actually
17  a lawsuit.

18  Q.   Okay.  Have you ever had a lawsuit
19  filed against you?

20  A.   No.

21  Q.   Have you ever been arrested?

22  A.   No.

23  Q.   Charged with a crime?

24  A.   No, but I've had two restraining