# Exhibit C

```
                              Volume: 1
                              Pages:  156
                              Exhibits: Per Index
```

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.                                    SUPERIOR COURT
Indictment No. BRCR2002-0773

**COMMONWEALTH OF MASSACHUSETTS**

vs.

**FRANCESCO CIAMBRIELLO**

BEFORE: CHIN, J.

**TRIAL TRANSCRIPT**

<u>APPEARANCES</u>:

   **Jeanne M. Veenstra, Assistant District Attorney**, Bristol District, 888 Purchase Street, New Bedford, Massachusetts 02740, for the Commonwealth.

   **David R. Ardito, Esq.**, BISIO & DUPONT, 228 County Street, Attleboro, Massachusetts 02703, for the Defendant.

```
                         New Bedford Superior Courthouse
                         New Bedford, Massachusetts
                         Wednesday, November 19, 2003
```

---

MARILYN SILVIA
Official Court Reporter

# INDEX

| Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Heather Kiernan | | | | |
|   by Ms. Veenstra: | 23 | | | 100 |
|   by Mr. Ardito: | | 54 | | |
| Larry Silvestre | | | | |
|   by Ms. Veenstra: | 100 | | | |
|   by Mr. Ardito: | | 102 | | |
| Suzanne Silva | | | | |
|   by Ms. Veenstra: | 103 | | | |
|   by Mr. Ardito: | | 112 | | |
| Michael Pascetta | | | | |
|   by Ms. Veenstra: | 117 | | | |
|   by Mr. Ardito: | | 121 | | |
| John Kiernan | | | | |
|   by Ms. Veenstra: | 127 | | | |
|   by Mr. Ardito: | | 133 | | |
| Christina Parrott | | | | |
|   by Ms. Veenstra: | 135 | | | |
|   by Mr. Ardito: | | 145 | | |

# EXHIBITS

| No. Evid. | Description | Iden. |
|---|---|---|
| 1 | Videotape | 60 |

1  Q. Heather never said that?
2  A. No.
3  Q. She never acknowledged that?
4  A. Yeah.
5  Q. When Christina said Heather had been dragged by her
6     arms, what was Heather's expression? Did she deny
7     it?
8  A. I don't recall.
9  Q. Seems to me --
10         MR. ARDITO: Withdrawn. No further
11 questions.
12         THE COURT: Thank you. Anything further?
13         MS. VEENSTRA: No.
14         THE COURT: You may step down.
15         MS. VEENSTRA: Michael Kiernan. I'm
16 sorry, John. John Kiernan.
17
18              **John Kiernan, Sworn**
19              **DIRECT EXAMINATION**
20 BY MS. VEENSTRA:
21 Q. Good afternoon.
22 A. Good afternoon.
23 Q. Would you please introduce yourself to the members
24    of the jury.
25 A. My name is John Kiernan.

1  Q.  And where do you live, John?
2  A.  I live in North Attleboro.
3  Q.  And are you married?
4  A.  Yes.
5  Q.  And your wife's name is Heather?
6  A.  Yes.
7  Q.  And do you have a child?
8  A.  Yes.
9  Q.  I'm going to bring you back, John, to May of the
10     year 2001, and ask you where you were living at
11     that time?
12 A.  In North Attleboro on Juniper Road.
13 Q.  And who were you living there with?
14 A.  My wife and my four month old son.
15 Q.  Were you working at that time?
16 A.  No, I was not.
17 Q.  Had you been previously employed?
18 A.  Yes.  I had been working for a software company and
19     had been recently laid off.
20 Q.  Was Heather working at that time?
21 A.  She began to take a job at the Armored Motor
22     Services Company.
23 Q.  I'm going to direct your attention, John, to May 19
24     of the year 2001, and ask you whether you recall
25     that day?

1   A.   Yes, I do.
2   Q.   And do you know if you're wife worked that day?
3   A.   She did.
4   Q.   What was her shift, if you recall?
5   A.   Typically she worked Saturday mornings around 10
6        a.m., and she would normally work until the
7        afternoon unless -- otherwise, they had finished
8        the amount of work that was there, she would be
9        home anywhere from 3 p.m. to 6 p.m.
10  Q.   And that particular day, do you know what time she
11       worked?
12  A.   I believe it was about 10 a.m. that she began
13       working.
14  Q.   And would it be fair to say that you were at home
15       taking care of your child?
16  A.   Yes.
17  Q.   Did you expect to hear from Heather that day?
18  A.   Yes.
19  Q.   Did you hear from Heather that day?
20  A.   No.
21  Q.   I'm going to direct your attention to approximately
22       10 p.m., and ask you whether you had some concerns
23       at that time?
24  A.   Yes, I did.
25  Q.   And what were those concerns?

1  A.  I hadn't heard from Heather all day. Typically, I
2      would have at least heard from her at least once
3      within the afternoon. So she would usually just
4      check to see how Matthew was doing at that time.
5  Q.  And you had not heard from her at that point?
6  A.  No, I had not.
7  Q.  What if anything did you do around that time?
8  A.  At that time I became increasingly worried so I
9      called her workplace, the Armored Car Service
10     Company.
11 Q.  What was the result of that telephone call?
12 A.  There was no answer.
13 Q.  Did you do something else?
14 A.  I attempted to contact her friend Chris who she had
15     normally been with, as a friend, as a point of
16     contact, and I tried to call her on her cell phone.
17 Q.  What were the results of those attempts?
18 A.  All I got was her voice mail.
19 Q.  I'm going to direct your attention now to
20     approximately 11 p.m. and ask you whether something
21     happened at that time?
22 A.  At that time my wife ended up coming to the
23     apartment and walking through the door.
24 Q.  And when you saw her, did you notice something
25     different about her demeanor or her appearance?

```
1   A.   When I first saw her she appeared to have seen a
2        ghost herself looking very afraid.
3   Q.   At that point did you have some conversation with
4        your wife?
5   A.   Yes.  I was looking at her and asking what
6        happened, where have you been, you know, I hadn't
7        heard from her.
8   Q.   As a result of your conversation, did you go
9        somewhere?
10  A.   She was in the -- when she entered our living room
11       area, she began to cry and start to explain what I
12       couldn't understand.  She was very emotional.  She
13       started going to the bathroom and I followed her in
14       there, and I continued to ask her what had happened
15       and that's when she began to explain what had
16       occurred at work.
17  Q.   As a result of your conversation, did you make a
18       telephone call?
19  A.   After she explained what had occurred, I placed a
20       call to her parents' house.
21  Q.   And what was the purpose of calling her parents?
22  A.   Once I had determined -- when she explained to me
23       what occurred, I knew I was going to need someone
24       to try and stay with Matthew while Heather had gone
25       to the hospital.
```

1  Q.  And did you in fact call an ambulance?
2  A.  I first spoke with Heather's father once he
3      returned the call after I left a message on the
4      family answering machine, and I also called his
5      cell phone.  I ended up calling the North Attleboro
6      police station.  Upon his arrival, and as I recall,
7      the dispatcher spoke with his commander, and said
8      that the Attleboro police would have jurisdiction
9      over the sexual assault that had occurred.  He also
10     dispatched a North Attleboro ambulance at that time
11     and he said that the ambulance would, on my
12     request, would call ahead to the police to meet us
13     at the hospital.
14 Q.  And did the ambulance arrive?
15 A.  Yes.
16 Q.  And was Heather transported to the hospital?
17 A.  Yes.
18 Q.  Did you accompany her to the hospital?
19 A.  In my car I did.
20 Q.  And did you remain at Sturdy Memorial Hospital
21     while your wife was being examined?
22 A.  Yes.
23 Q.  Subsequent to that, you spoke to the police?
24 A.  I'm sorry.
25 Q.  At some point did you speak to the police?

```
 1   A.   Yes.
 2             MS. VEENSTRA:  I have no further
 3   questions.
 4             THE COURT:  Cross-examination.
 5             MR. ARDITO:  Yes, your Honor.  Could we
 6   first have a side bar?
 7             (Side bar.)
 8             MR. ARDITO:  Your Honor, I want you to be
 9   aware, I have worked with this young man on several
10   cases, he used to be a social worker.  I wanted the
11   Court to be aware of that.  I want the Court to be
12   aware I know him very well, we have worked together
13   on cases.
14             THE COURT:  Okay.
15             (End of side bar conference.)
16                    CROSS EXAMINATION
17   Q.   Very briefly, Mr. Kiernan, you gave a statement to
18        the police department, do you remember that?
19   A.   Yes.
20   Q.   Do you know when you gave that statement?
21   A.   It would have to be two days, approximately two
22        days after the incident.
23   Q.   Monday, the incident happened on a Saturday?
24   A.   Yes.
25   Q.   In that statement -- and you just testified that
```

| | | |
|---|---|---|
| 1 | | your wife called you at least once when she was |
| 2 | | working, correct? |
| 3 | A. | Correct. |
| 4 | Q. | And on that day she didn't call? |
| 5 | A. | Correct. |
| 6 | Q. | And you had a little one at the time, you testified |
| 7 | | to that? |
| 8 | A. | That's correct. |
| 9 | Q. | Four month old baby? |
| 10 | A. | Yes. |
| 11 | Q. | Matthew? |
| 12 | A. | Yes. |
| 13 | Q. | And after you did place a call to AMSA, was that |
| 14 | | after 10 p.m. or before? |
| 15 | A. | It was approximately 10 p.m. when I placed the |
| 16 | | call. |
| 17 | Q. | Do you recall what your wife's hours were that |
| 18 | | Saturday? |
| 19 | A. | No, I do not.  I believe it was somewhere between |
| 20 | | 10 and 6 p.m. |
| 21 | Q. | 10 a.m.? |
| 22 | A. | To 6 p.m. |
| 23 | Q. | Do you recall the time your wife left the house to |
| 24 | | go to work that day? |
| 25 | A. | Yes. |

```
1    Q.   And what time was that?
2    A.   Approximately 10 a.m., from what I can recall.
3    Q.   From what you recall it was in the morning?
4    A.   Yes.
5    Q.   Do you know her hours that Saturday were from two
6         to eight?  Did you know that?
7    A.   No.
8    Q.   But she left at 10:00 in the morning?
9    A.   In the morning.
10   Q.   You're sure of that?
11   A.   Yes.
12   Q.   In your statement to the police, you tell the
13        police that your wife told you she was grabbed and
14        pulled, correct?
15   A.   I believe the term was "dragged."
16   Q.   Dragged.  I'm sorry.  Grabbed and dragged would be
17        the terminology, correct?
18   A.   Correct.
19   Q.   You don't need to this to refresh your memory, you
20        agree with my statement?
21   A.   I agree.
22   Q.   And that grabbed and dragged came from Heather,
23        correct, she told you that?
24   A.   That's what she told me.
25   Q.   You didn't tell the police on your own that she was
```

```
 1            grabbed and dragged?
 2    A.      I wasn't there so I couldn't have said that.
 3    Q.      So Heather had to tell you?
 4    A.      Correct.
 5                    MR. ARDITO:  No further questions.
 6                    THE COURT:  Thank you.  You may step
 7            down.
 8                    MS. VEENSTRA:  Christina Parrot.
 9                  Christina Parrot, Sworn
10                    DIRECT EXAMINATION
11    BY MS. VEENSTRA:
12    Q.      Could you please introduce yourself to the members
13            of the jury.
14    A.      My name is Christina Parrot.
15    Q.      And keep your voice up nice and loud so everybody
16            can hear you.  How old are you?
17    A.      Twenty-eight
18    Q.      And do you know Heather Kiernan?
19    A.      Yes.
20    Q.      How long have you known Heather?
21    A.      Approximately 15 years.
22    Q.      How did you meet?
23    A.      We grew up down the street from each other.
24    Q.      Where was that?
25    A.      In Attleboro.
```

### CERTIFICATE

I, Marilyn J. Silvia, Official Court Reporter, do hereby certify that the foregoing record, Pages 1-1 through 1-156 is a complete, accurate, and true transcription of my stenographic notes taken in the aforementioned matter to the best of my skills and ability.

*[signature: Marilyn Silvia]*

MARILYN J. SILVIA
Official Court Reporter

Please note:

The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or direction of the certifying reporter.