# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

**HEATHER KIERNAN,**

    **Plaintiff,**

        **v.**

**ARMORED MOTOR SERVICES OF
AMERICA, INC.  and FRANCISCO
CIAMBRIELLO,**

    **Defendants.**

**Civil Action No. 10131**

## DEFENDANT ARMORED MOTOR SERVICES OF AMERICA, INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS OF RECORD

Pursuant to Local Rule 56.1, Defendant Armored Motor Services of America, Inc. ("AMSA") submits the following undisputed material facts of record[1]

1.      Up until July 1, 2003, AMSA was in the business of collecting and supplying banks and businesses with money and supplying ATM machines with cash for monetary transactions. (*Declaration of Michael Bucci ("Bucci Decl."), at ¶ 2 , attached hereto at Tab 1 to the Declaration of Allison Romantz).*

2.      On July 1, 2003, AMSA sold all of its assets to Loomis, Fargo & Co. and amended its certificate of incorporation to reflect a name change from "Armored Motor Services of America, Inc." to "Victor Heights Holding Corp."  (*Bucci Decl., at ¶ 3*).

---

[1]     AMSA asserts these facts from the record as undisputed for purposes of this motion only. All exhibits referred to herein are annexed to the Declaration of Allison Romantz in support of Defendant AMSA's motion for summary judgment.

3.      Effective September 30, 2003, Victor Heights Holding Corp. merged with and was subsumed by New Mallard, LLC.  (*Bucci Decl., at ¶ 4*).

4.      In 2001, AMSA operated a vault and cash collection/distribution facility in Attleboro, Massachusetts.  (*Bucci Decl., at ¶ 5*).

5.      At all relevant times, Jason Khoury was the branch manager of AMSA's Attleboro facility.  (*Deposition of Jason Khoury ("Khoury Dep."), at p. 11 , attached hereto at Tab 2 to Declaration of Allison Romantz).*

6.      Prior to becoming the branch manager at AMSA's Attleboro facility, Mr. Khoury was employed for approximately eight years at Loomis Fargo, a competitor of AMSA in the cash collection and distribution business, at a Loomis Fargo vault and cash collection/distribution facility in South Easton, Massachusetts.  (*Khoury Dep., at p. 11*).

7.      Defendant Francesco Ciambriello ("Mr. Ciambriello") was employed as a part-time vault supervisor at AMSA's Attleboro facility, working nights and weekends, between March 12, 2001 and May 20, 2001.  (*Deposition of Francesco Ciambriello ("Ciambriello Dep."), at pp. 59-60 , attached hereto at Tab 3 to Declaration of Allison Romantz; Khoury Dep., at p. 26*).

8.      Mr. Ciambriello was a non-exempt hourly employee at AMSA, earning $11.50 per hour.  *(Bucci Decl. at ¶ 6; Declaration of Jason Khoury ("Khoury Decl."), at ¶ 3 , attached hereto at Tab 4 to the Declaration of Allison Romantz).*

9.      As a part-time vault supervisor, Mr. Ciambriello did not have the authority to hire or fire any employees, nor did he have the authority to discipline employees.  (*Khoury Dep., at p. 30; Bucci Decl., at ¶7; Khoury Decl., at ¶ 6 ).*

10.     As a part-time vault supervisor, Mr. Ciambriello was not responsible for evaluating the

work of employees or scheduling hours of work for any employees. *(Bucci Decl., at ¶¶ 7 and 8; Khoury Decl., at ¶ 4).*

11.    Mr. Ciambriello was not involved in making decisions regarding promotions, demotions or discipline of employees. *(Bucci Decl., at ¶ 7).*

12.    As a data entry clerk, Plaintiff's only duty was to enter the data from the truck deliveries into AMSA's computer system.  Mr. Ciambriello did not assign or direct Plaintiff's work in any way.  Nor was Mr. Ciambriello responsible for reviewing her work once it was completed to make sure it was accurate. *(Khoury Decl., at ¶ 7).*

13.    Although Mr. Ciambriello testified at his deposition that "on the weekends he was the supervisor," he also testified that when he worked during the week he was not the supervisor and that his duties did not change in any way on the weekend from his duties during the workweek when he "was not a supervisor."*(Ciambriello Dep., at p. 61).*

14.    On the weekend, Mr. Ciambriello's duties and responsibilities were to:  send the trucks on the road, make sure they had the correct amount of money and make sure the building was safe and secure. *(Ciambriello Dep., at p. 62; Bucci Decl., at ¶ 9).*

15.    Prior to his hire at AMSA, Mr. Ciambriello worked part-time at Loomis Fargo's South Easton facility and had worked with and under Mr. Khoury at Loomis Fargo for approximately six years. *(Khoury Dep., at p. 17).*

16.    Prior to May 21, 2001, Mr. Khoury had no knowledge of any complaints made by employees of either Loomis Fargo or AMSA of Mr. Ciambriello engaging in any sexually inappropriate behavior. *(Khoury Dep., at p. 97).*

17.    Mr. Ciambriello is not a native English speaker and his fluency in English is admittedly "bad." *(Ciambriello Dep., at p. 49-51).*

18.     Plaintiff Heather Kiernan began employment at AMSA as a part time data entry clerk in the Attleboro facility in April, 2001.  (*Deposition of Heather Kiernan  ("Kiernan Dep."), at 67 , attached hereto at Tab 5 to Declaration of Allison Romantz).*

19.     At the beginning of her employment with AMSA, Ms. Kiernan was provided with a copy of AMSA's sexual harassment policy.  Ms. Kiernan signed an acknowledgment that she had been provided with and was familiar with the company's policy on sexual harassment.  (*See Kiernan Acknowledgement of Receipt of AMSA's sexual harassment policy, attached as Tab 6 to Declaration of Allison Romantz*).

20.     Mr. Ciambriello was also provided with a copy of AMSA's sexual harassment policy at the start of his employment with AMSA.  *(See Ciambriello Acknowledgement of Receipt of AMSA's sexual harassment policy, attached as Tab 7 to Declaration of Allison Romantz).*

21.     AMSA's sexual harassment policy provided two reporting options for employees to report unwelcome harassment.  The policy advised employees to report any allegation of harassment to either his or her supervisor or, to Debbie Gates, Personnel Director, if the complaint involved the employee's supervisor.  *(Id.)*

22.     AMSA provided training on preventing sexual harassment in the workplace to its managers and supervisory staff.  *(See AMSA's sexual harassment training materials, attached as Tab 8 to Declaration of Allison Romantz).*

23.     Prior to May 21, 2001, Mr. Ciambriello had engaged in conduct in the presence of Plaintiff that she found to be sexually inappropriate and offensive. *(Complaint, ¶ 10).* Specifically, Mr. Ciambriello unbuttoned his pants in front of Plaintiff in order to tuck in his shirt.  (*Kiernan Dep., at p. 81-84).*

24.     In addition, the ATM manager with whom Plaintiff shared an office had conversations with others about sexual matters in Plaintiff's presence.  (*Kiernan Dep., at  p. 85).*

25.     Plaintiff did not report the conduct of Mr. Ciambriello or the ATM Manager to the branch manager, to corporate human resources or any other supervisor or manager.  (*Kiernan Dep., at p. 85*).

26.     Plaintiff and Mr. Ciambriello were both scheduled to work on Saturday, May 19, 2001. They were the only two employees who were scheduled to work at the Attleboro facility that day, although several pairs of driver/messengers would be entering the facility in mid to late afternoon to transfer cash that had been collected at customer accounts during the day to the vault. *(Ciambriello Dep., at pp. 60, 66).*

27.     Plaintiff had plans to socialize with her friend, Christina Parrot, after work on May 19, 2001.  Ms. Parrot was a close friend of Plaintiff's who had also recently started working for AMSA in the Attleboro facility.  *(Deposition of Christina Parrott, ("Parrott  Dep."), at pp. 34, 45 and 60 , attached hereto at Tab 9 to Declaration of Allison Romantz; Kiernan Dep., at pp. 119-122, 191).*

28.     During the afternoon of May 19, 2001 while Plaintiff was at work, she arranged with Ms Parrot for Ms. Parrot to meet her at AMSA so that Plaintiff could give Ms. Parrot some money for Ms. Parrot to purchase alcohol that the two intended to drink later that day after Plaintiff finished with work.  *(Kiernan Dep., at pp. 119-122, 127-128).*

29.     When Ms. Parrot arrived at the facility, Plaintiff left the building to meet Ms. Parrot outside in AMSA's parking lot to give her money and smoke a cigarette. (*Kiernan Dep., at pp. 128-129).*

30.     Mr. Ciambriello also left the building to join Plaintiff and Ms. Parrot in smoking a

cigarette outside in the parking lot.  *(Kiernan Dep., at p. 129; Ciambriello Dep.,  at p. 120; Deposition of Christopher Abreu, ("Abreu  Dep."), at p. 77, attached hereto at Tab 10 to Declaration of Allison Romantz*).

31.    When leaving the building, Mr. Ciambriello left the vault unlocked and unattended which was a serious breach of AMSA policy.  *(Khoury Dep., at pp.47, 49).*

32.    After the three finished their cigarettes, Ms. Parrot left to purchase the alcohol and Plaintiff and Mr. Ciambriello returned inside to await the arrival of the trucks. *( Kiernan Dep., at pp. 131-33).*

33.    While Plaintiff and Mr. Ciambriello were in the facility waiting for the trucks to arrive to drop off the money, Plaintiff claims that Mr. Ciambriello sexually assaulted her by kissing and touching her breasts in the dispatch area and then forcing her into the branch manager's office where he performed oral sex on her, digitally penetrated her vagina and exposed his penis to her while requesting that she perform oral sex on him[2].  *(Complaint at ¶¶ 12 and 13; Kiernan Dep., at pp. 136-66 ).*

34.    Plaintiff and Mr. Ciambriello were in the branch manager's office for no more than seven minutes.  *(Abreu Dep., at p. 86).*  When Plaintiff told Mr. Ciambriello that she needed to use the restroom, he stepped aside and Plaintiff left the branch manager's office to go into the ladies' room.  *(Kiernan Dep., at p. 166).*

35.     Because Mr. Ciambriello needed to unlock the door to get back into the dispatch area, he waited for Plaintiff in the break room.  When Plaintiff exited the restroom, Mr. Ciambriello

---

[2]       Although not relevant for purposes of summary judgment, Mr. Ciambriello denies Plaintiff's claim of what occurred in the branch manager's office.  Mr. Ciambriello claims that the two voluntarily went into the branch manager's office and while in the office, they did nothing more than kiss and hug.  Mr. Ciambriello claims that after a short while, Plaintiff broke off the kiss and stated that she "shouldn't be doing this because I'm married."  Mr. Ciambriello states that as soon as Plaintiff expressed her desire to stop, he did and that Plaintiff then left the room to go to the ladies' room.  *(Ciambriello Dep., at pp. 109-12).*

asked Plaintiff whether she wanted a soda from the soda machine and after she declined, two walked back down the hallway, through the money room and back into the dispatch area to continue waiting for the arrival of the trucks. *(Ciambriello Dep., at pp. 112-113, 116; Kiernan Dep., at p. 172, 182-83 ).*

36.     AMSA's Attleboro facility was equipped with numerous "hold up" buttons which will activate a silent alarm to the Attleboro police station when pushed, including one which was located in the dispatch area and one in the branch manager's office.  All of the buttons were prominently marked with a large sign that said "Hold Up Button."  (*Deposition of Edward O'Brien ("O'Brien Dep."), at pp. 91-93, attached hereto at Tab 11 to Declaration of Allison Romantz*).

37.     Plaintiff and Mr. Ciambriello continued to work together for approximately three hours after the sexual assault. *(Ciambriello Dep., at pp. 116, 126).*

38.     Plaintiff never pushed any of the hold up buttons on May 19, 2001 in the hours after the sexual assault which would have alerted the police that there was a problem at the facility and brought them to the facility. *(Khoury Decl., at ¶ 10).*

39.     At least one driver/messenger team (and possibly two or three teams) entered the facility after the alleged sexual assault to transfer cash from their truck to the vault.  Both the driver and the messenger carry a firearm on their person while they work.  Plaintiff did not disclose the sexual assault to any of the drivers and messengers that came into the building, nor did she do or say anything to indicate to them that she was concerned for her safety. *(Kiernan Dep., at pp. 202-04.)*

40.     At some point after the alleged sexual assault, Plaintiff called her friend Christina Parrot on the telephone and asked her to return to the Attleboro facility. *(Kiernan Dep., at p. 184;*

*Ciambriello Dep., at p. 116).*

41.    When Ms. Parrott arrived, Plaintiff again left the facility to meet Ms. Parrot in AMSA's parking lot.  This time, however, Mr. Ciambriello remained inside the building.  *(Kiernan Dep., at p. 189-190; Ciambriello Dep., at pp. 117-18).*

42.    Plaintiff and Ms. Parrot smoked cigarettes while leaning against Ms. Parrot's car.  While outside, Plaintiff told Ms. Parrot that "something had happened" and that she wanted Ms. Parrot to come back into the building with her and remain there with Plaintiff for the remainder of her shift.  (*Kiernan Dep., at p. 190*).  When Ms. Parrot expressed concern about her employment with AMSA if she went into the building when she was not scheduled to work, Plaintiff assured her that Mr. Khoury would not terminate her if Plaintiff spoke to him about why she had requested Ms. Parrot to come into the facility.  *(Kiernan Dep., at p. 194).*

43.    Ms. Parrott went inside and remained with Plaintiff in the building for the remainder of Plaintiff's shift.  *(Kiernan Dep., at pp. 195, 208).*

44.    After Plaintiff finished her work for the day, Ms. Parrot and Plaintiff left the facility.  At the time that they left, Mr. Ciambriello was still inside finishing up his work. *(Kiernan Dep., at p. 208).*

45.    Once outside in AMSA's parking lot, Plaintiff and Ms. Parrot agreed that they would meet up at the Shaw's supermarket in Attleboro and they got into their respective cars and drove off.  (*Kiernan Dep., at pp. 211-12).*

46.    When they got to the Shaw's supermarket, Plaintiff got into Ms. Parrot's car.  Ms. Parrott called Michael Pascetta, another AMSA co-worker, on her cell phone.  Mr. Pascetta invited Plaintiff and Ms. Parrot to visit him at his home in Johnston, Rhode Island.  *(Kiernan Dep., at p. 212*).

47.    Ms. Parrot and Plaintiff drove to Mr. Pascetta's home where they remained for approximately two hours. *(Kiernan Dep., at p. 223).*   During their visit, Ms. Parrot and Plaintiff drank the alcohol that Ms. Parrot had purchased earlier in the day.  *(Kiernan Dep., at p. 221).*

48.    At approximately 11 p.m., Ms. Parrot and Plaintiff left Mr. Pascetta's home.  Ms. Parrot dropped Plaintiff off at her car at the Shaw's supermarket and Plaintiff got into her car and drove home. *(Kiernan Dep., at pp. 225-26).*

49.    When Plaintiff arrived home, her husband asked her where she had been and indicated that he had been trying to reach her for several hours.  At that point, Plaintiff told him that she had been raped at work. *(Kiernan Dep., at p. 226-229).*  Plaintiff failed to disclose to her husband that she had actually left work hours earlier and had gone to Mr. Pascetta's house after leaving work with Ms. Parrott for several hours. (Kiernan D*ep. at pp. 247-248; Deposition of John Kiernan, at pp. 67 and 81 , attached at Tab 12  to Declaration of Allison Romantz).*

50.    After telling her husband that she had been raped, Plaintiff's husband called the Attleboro police to report the matter and also called an ambulance to come and pick up Plaintiff to take her to the hospital.  *(Kiernan Dep., at p. 230).*

51.    The Attleboro police subsequently notified AMSA to report that Plaintiff was claiming to have been raped while at work on Saturday, May 19, 2001 by another employee, Francesco Ciambriello. *(Khoury Dep., at pp. 34-35).*

52.    When AMSA and the police reviewed AMSA's security videotapes for May 19, 2001, AMSA discovered that Mr. Ciambriello had gone outside during his shift and left the vault unlocked and unattended. *(Khoury Dep., at p. 48).*

53.    Branch manager Jason Khoury contacted Francesco Ciambriello on Sunday, May 20, 2001 to advise him that he was suspended from AMSA for three days for leaving the building

with the vault open on May 19, 2001.  (*Khoury Dep, at p. 49, 101; Ciambriello Dep., at p. 141).*

A three day suspension is the discipline that AMSA would typically give for this type of

violation. *(Khoury Dep., at p. 49).*

54.     Mr. Ciambriello was notified after his suspension was completed that his employment

with AMSA had been terminated. (*Khoury Dep., at p. 52)*

Respectfully submitted,

ARMORED MOTOR SERVICES

OF AMERICA,

By its attorneys,

/s/ Allison K. Romantz
Laurence Donoghue (BBO#  130140)
Allison K. Romantz (BBO# 554909)
MORGAN, BROWN & JOY LLP
200 State Street
Boston, MA 02109
617.523.6666

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non registered participants on February 10,
2006.

/s/ Allison K. Romantz
Allison K. Romantz