# TAB 2

```
                                                              1

 1                              VOLUME:  I

 2                              PAGES:   1 to 114

 3                              EXHIBITS: 1 to 7

 4              UNITED STATES DISTRICT COURT

 5               DISTRICT OF MASSACHUSETTS

 6      - - - - - - - - - - - - - - - - - - x

 7     HEATHER KIERNAN,

 8                  Complainant,

 9         v.                         Civil Action

10                                    No. 10131MLW

11     ARMORED MOTOR SERVICES OF

12     AMERICA, INC.,

13                  Respondent.

14      - - - - - - - - - - - - - - - - - - x

15

16

17             DEPOSITION OF JASON J. KHOURY

18                    March 2, 2005

19                     10:10 a.m.

20                 Gillette Corporation

21                   One Gillette Park

22              South Boston, Massachusetts

23

24         Reporter:  Karen A. Interbartolo, RPR
```

Jason J. Khoury                                                    03/02/2005

                                                                           11

1   deposition with anybody?
2       A.   No.
3       Q.   When you were at AMSA for the two-year
4   period, for the approximate two-year period, what was
5   your position?
6       A.   Branch manager.
7       Q.   Was it essentially the same job you had when
8   you were at Loomis Fargo?
9       A.   Yes.
10      Q.   Did you have any other position?
11      A.   No.
12      Q.   And when you were at Loomis the first time
13  during that seven- or eight-year period, what was your
14  position there?
15      A.   Everything, pretty much. Started as -- in
16  the coin department as a messenger, a driver, a vault
17  custodian, supervisor, and then prior to leaving I was
18  an operations manager.
19      Q.   Where physically was your employment when you
20  were at Loomis?
21      A.   9 Bristol Drive, South Easton, Mass.
22      Q.   Is that facility still open?
23      A.   I'm not sure.
24      Q.   And did you always work out of the South

1   Q. Did you have any role in him getting that
2   promotion?
3   A. I don't remember, but I want to say yes. I
4   think, yes.
5   Q. But you don't recall what that role was?
6   A. No.
7   Q. And how long did you work together at Wells
8   Fargo?
9   A. Several years. Five, six years maybe.
10  Q. And prior to that you didn't know each other?
11  A. No.
12  Q. Other than working at Wells Fargo and Loomis,
13  did you two, you and Mr. Ciambriello, socialize outside
14  the work area?
15  A. On one or two occasions we went out for a
16  beer, yes.
17  Q. Where would you go?
18  A. Owen O'Leary's Pub, which was down the street
19  from the base.
20  Q. The base?
21  A. 9 Bristol Drive, South Easton. I'm sorry.
22  Q. Anything else?
23  A. No.
24  Q. Nothing else. Did you ever go over to his

26

1   Q.   But you're not sure?
2   A.   No. I've never seen this before.
3   Q.   Exhibit 2?
4   A.   No. Or, for that matter, I haven't seen 1
5   before either, Exhibit 1.
6              (Exhibit 3 marked
7               for identification.)
8   Q.   Before you is Exhibit 3. Have you seen this
9   document before?
10  A.   No.
11  Q.   Who's Doug Wilson?
12  A.   Doug Wilson was the VP of operations for
13  AMSA.
14  Q.   Where was his office located?
15  A.   Out of Marlborough, Mass.
16  Q.   And who's Debbie Gates?
17  A.   Debbie Gates was the HR -- senior vice
18  president for HR out of New York City.
19  Q.   Does this document, what's been marked as
20  Exhibit 3, refresh your recollection at all as to when
21  Mr. Ciambriello started his employment with AMSA?
22  A.   It says that he started on 3/12 of '01.
23  Q.   Right. But does it refresh your recollection
24  at all as to when he did start or does this document,

30

1         (Exhibit 5 marked
2         for identification.)
3    Q.   Before you is what's been marked Exhibit 5.
4    Have you seen this document before?
5    A.   Yes.
6    Q.   When did you first see it?
7    A.   When it was originated on April 18th of '01,
8    I would think.
9    Q.   Did you interview Heather Kiernan for the
10   position at AMSA?
11   A.   I think so, but I'm not sure.
12   Q.   You were her direct supervisor?
13   A.   No.  She had an immediate supervisor prior
14   to -- She would answer to the vault supervisor or -- at
15   the time.
16   Q.   When you say at the time, at what time?
17   A.   Her job was data entry, so she worked in the
18   vault.  She would have to answer to the vault
19   supervisor, and the vault supervisor answered to me.
20   Q.   Did the vault supervisor have the power to
21   hire and fire her?
22   A.   No.
23   Q.   Who did?
24   A.   I did.

1   Q.   And did he go to that seminar during that
2   couple of months he was there?
3   A.   I don't remember.
4   Q.   Do you know who Lee Ciulla is, C-I-U --
5   A.   Lee Ciulla.
6   Q.   Thank you. Oh, that's how you pronounce it?
7   A.   You spelled it wrong before, by the way.
8   Q.   How did you come to know that there was an
9   incident that took place at AMSA on May 20th of 2001?
10           MR. DONOGHUE: Objection. But go ahead
11  and answer.
12  A.   I received a call from the police department
13  at early hours of the morning.
14  Q.   And who did you speak to at the police
15  department?
16  A.   A dispatcher. I don't know.
17  Q.   When you say early hours of the morning,
18  approximate time?
19  A.   2 o'clock, 3 o'clock in the morning.
20  Q.   Did they call you on your home phone or your
21  cell phone?
22  A.   Home phone, I believe.
23  Q.   And what were you told?
24  A.   That there was a crime at the building, for

1   me to respond immediately.
2       Q.   And what did you do?
3       A.   I responded immediately. And I contacted
4   Doug Wilson, the vice president, as well as the loss
5   prevention manager, who at the time I believe was
6   William Callahan.
7       Q.   Mr. Wilson's office was in Marlborough?
8       A.   Yes.
9       Q.   Mr. Callahan's office would have been where?
10      A.   Wherever.
11      Q.   He didn't have an office?
12      A.   Not really. I think he was out of
13  Marlborough, though, if I had to guess.
14      Q.   When you say you responded, did you then go
15  to AMSA in Attleboro?
16      A.   Yes.
17      Q.   And you spoke with Mr. Wilson and
18  Mr. Callahan prior to going there?
19      A.   I think when I was on the way I called them.
20      Q.   Who's Ed O'Brien?
21      A.   Ed O'Brien was loss prevention as well as
22  Bill Callahan.
23      Q.   So when you arrived at AMSA, what happened?
24      A.   There were police cars in the parking lot.

47

1   his shift?
2       A.   A half hour prior to his shift that he was
3   working the next shift, whatever it was.
4       Q.   But you don't know the time span between the
5   phone call and when he came in?
6       A.   No, I don't.
7       Q.   But he did come in for the next shift?
8       A.   Yes, he did.
9       Q.   At that point had he been arrested?
10      A.   No, I don't think so.
11      Q.   When he arrived at AMSA early for his
12  shift, who else was at AMSA besides you to meet him?
13      A.   Clint Stauff, who was the operations manager,
14  he was there with me.
15      Q.   Anyone else?
16      A.   No.
17      Q.   Was there a meeting?
18      A.   A brief ten-minute discussion, discipline
19  notice given, and Tony was suspended for three days.
20      Q.   And what was he suspended for?
21      A.   Leaving the building unattended, going
22  outside for a cigarette and there was no one inside the
23  building at all. He was suspended for leaving the
24  building unattended.

48

1    Q.    How did you come to find out that he had left
2  the building unattended?
3    A.    From watching the videotapes from the night
4  before.
5    Q.    Who watched the videotapes?
6    A.    The sergeant from the police department, some
7  of the patrolmen, the detectives, loss prevention guy,
8  whoever else was in there.
9    Q.    But you didn't watch them?
10   A.    I think I saw maybe two minutes of it, and it
11 was too crowded.  I mean there were too many people in
12 there, and you couldn't see.  So I went back to the
13 office and talked to Detective Otrondo.
14   Q.    There was a written disciplinary notice given
15 to Mr. Ciambriello?
16   A.    Yes.
17   Q.    And who put that written notice together?
18   A.    I wrote it, and Clint was the witness.
19   Q.    Did somebody tell you that he had left the
20 building?  How did you come to know that he had
21 actually left the building?  Or did you see it yourself
22 on the tape?
23   A.    I'm not sure if somebody told me or I saw it.
24 I think both actually.  I think someone told me, then I

1    reviewed it and saw it.
2        Q.   How long was he outside having a cigarette?
3        A.   A couple of minutes, maybe three or four
4    minutes.
5        Q.   And when somebody goes outside to have a
6    cigarette that's in Mr. Ciambriello's position, is that
7    against company policy?
8        A.   When the vault was open, yes.
9        Q.   How did you know the vault was open when he
10   went outside?
11       A.   Because we have camera coverage inside the
12   vault.
13       Q.   That shows you when the vault is open and
14   closed?
15       A.   Yes.
16       Q.   So, in addition to seeing him outside
17   smoking, you would also need to verify that the vault
18   was open?
19       A.   Yes.
20       Q.   So, in a circumstance like that, a three-day
21   suspension is a typical discipline that one would get
22   for a similar violation?
23       A.   Yes.
24       Q.   Was there any discussion with him about the

52

1   did he -- did Mr. Ciambriello bring his sidearm with
2   him or was it left there at AMSA?
3        A.   No, he brought it with him.
4        Q.   And that day did he have his sidearm with
5   him?
6        A.   I don't know.
7        Q.   Did Mr. Ciambriello ever return to work after
8   that day where he was suspended for three days?
9        A.   No.
10       Q.   When I say return to work, I mean return to
11  AMSA.
12       A.   No.
13       Q.   At some point later was he fired?
14       A.   Yes.
15       Q.   Who fired him?
16       A.   I think I did.
17       Q.   For what?
18       A.   For leaving the vault unattended and breaking
19  company policy.
20       Q.   What was the company policy that he broke?
21       A.   I don't know.  Leaving the building
22  unattended with the vault open would have been the
23  policy.
24       Q.   How soon after the suspension meeting that

1    A.   That's correct.

2    Q.   So she would know that as of this date you

3 were working for AMSA?

4    A.   Yes.

5         MR. MCLEOD:  Objection.

6    Q.   So you don't -- To sum up, you don't really

7 know why your name is on the second page of Exhibit 2?

8    A.   I have no idea.

9    Q.   And you knew Mr. Ciambriello at Loomis.  And

10 did you recommend him for employment at AMSA?

11        MR. MCLEOD:  Objection.

12   A.   We both went at the same time.  I think we

13 had contacted them and we both went and applied.

14   Q.   And did you have any problems with him as an

15 employee of Loomis?

16   A.   No.

17   Q.   And he reported to you for a period of time;

18 is that correct?

19   A.   Yes.

20   Q.   And did you have any problems prior to May of

21 2001, at least did you have any problems with him while

22 he worked for you at AMSA?

23   A.   None, no.

24   Q.   And what were his duties for AMSA?

1   in early?

2      A.   No.

3      Q.   And, when he arrived as scheduled before his
4   shift, did he appear upset or worried at that time to
5   you?

6      A.   No.

7      Q.   And you initially gave him a three-day
8   suspension?

9      A.   Three days or pending investigation. I think
10  it was the exact wording I used.

11     Q.   So had you made a final decision on what type
12  of discipline would be imposed?

13     A.   No.

14     Q.   And so what was Mr. Ciambriello actually told
15  on that day?

16     A.   That he was being suspended for three days
17  pending further investigation.

18     Q.   Was it left that he had a definite return to
19  work date or that you'd be in touch with him?

20     A.   No, that I would be in touch with him.

21     Q.   So, to your knowledge -- well, you didn't
22  communicate to him that he would be able to report to
23  work after three days?

24     A.   No, I did not.