# TAB 3

```
                                                              Page 1
 1                      Volume:  I

 2                      Pages:  1-182

 3                      Exhibits:  1-5

 4            UNITED STATES DISTRICT COURT

 5               DISTRICT OF MASSACHUSETTS

 6   - - - - - - - - - - - - - - - - - - x

 7   HEATHER KIERNAN,

 8              Plaintiff,

 9       v.                              CA No. 10131MLW

10   ARMORED MOTOR SERVICES OF AMERICA, INC.

11   And FRANCESCO CIAMBRIELLO,

12              Defendants.

13   - - - - - - - - - - - - - - - - - - x

14

15         DEPOSITION OF FRANCESCO CIAMBRIELLO

16              Thursday, April 7, 2005

17                    10:00 a.m.

18              McLeod Law Offices, P.C.

19                 77 Franklin Street

20             Boston, Massachusetts  02110

21

22   Reporter:  Carol A. Pagliaro, CSR/RPR/RMR

23

24
```

Page 46

1    A. The top one, the top right.
2    Q. But everything else is in your handwriting?
3    A. Yes.
4    Q. Turning to the second page, A 0284, where it
5    says your name, is that in your handwriting?
6    A. Yes.
7    Q. And the phone number is your handwriting?
8    A. Yes.
9    Q. And the address is in your handwriting?
10   A. Yes.
11   Q. Directing your attention below to where it
12   says Confidential, the words Napoli, Italy is your
13   handwriting?
14   A. Yes.
15   Q. Where it says Have you been convicted of a
16   felony, the response there is in your handwriting?
17   A. Yes.
18   Q. The next question underneath, Have you ever
19   worked for this company under another name, the
20   answer there is in your handwriting?
21   A. Yes.
22   Q. And nothing else here is in your
23   handwriting?
24   A. Yes.

Page 47

1    Q. Directing your attention to the third page
2    of the exhibit, we have already dealt with the
3    bottom part of the page, but is everything above
4    where it says Employment Record, is that all in your
5    handwriting?
6    A. Yes, that's all in my handwriting.
7    Q. And I just want to be clear. You went, and
8    when you filled out the application were you sitting
9    in a particular room when you did that at AMSA?
10   A. The garage. As soon as you walk in the
11   door, the second door there was a little break room
12   over there, and there was a little table I fill out
13   the application.
14   Q. Did someone give you the application?
15   A. Yes.
16   Q. Who gave you the application?
17   A. Cindy.
18   Q. When you got the application was there any
19   handwriting on it or was it totally blank?
20   A. Totally blank.
21   Q. After you filled out the application you
22   gave it to Cindy?
23   A. Yes.
24   Q. But she didn't ask you any questions about

Page 48

1    the application?
2    A. No.
3    Q. Did she ever call you up on the phone and
4    ask you any questions about your application?
5    A. No, she didn't.
6    Q. Did anyone ever call you from AMSA and ask
7    you whether or not -- hold on. Let me finish.
8    Anyone from AMSA ever call you and say, We need more
9    information for your application?
10   A. No
11       (Document marked as Exhibit 2
12       for identification.)
13   Q. You have been handed Exhibit 2. Please take
14   a moment to review it. All set?
15   A. Yes.
16   Q. Have you seen the document that has been
17   marked Exhibit 2 before?
18   A. I don't understand the question.
19   Q. Sure. The document you have just reviewed,
20   have you seen that document before?
21   A. Yes.
22   Q. You have?
23   A. That's my signature.
24   Q. Oh, okay. And it says 3/29/01?

Page 49

1    A. (Nod.)
2    Q. Is that your handwriting?
3    A. No.
4    Q. Do you know whether or not that is when you
5    signed the document?
6    A. I don't remember.
7    Q. Do you remember whether or not you signed
8    this on your first day of employment?
9    A. I don't remember. I don't remember.
10   Q. Do you recall being told about an
11   introductory period of 120 days?
12   A. No.
13   Q. Do you recall being told whether or not
14   there was like a probationary period or something
15   during the first few months of your employment at
16   AMSA?
17   A. I don't remember. I don't remember
18   probation, no.
19   Q. When you left your employment at AMSA in May
20   of 2001, were you under any impression as to whether
21   or not you were still in an introductory period or
22   under probation?
23   A. No.
24   Q. When you came to the U.S. were you fluent in

Francesco Ciambriello                                                                                        04/07/2005

Page 50

1  English?
2    A. Nothing.
3    Q. Nothing. How did you learn?
4    A. Talk to people, read a little bit of paper.
5    Q. No formal training?
6    A. No.
7    Q. Have you ever taken English classes here in
8  the U.S.
9    A. No.
10   Q. How would you describe your reading, your
11 English reading skills?
12   A. Bad.
13   Q. Do you read the paper?
14   A. Yes.
15   Q. English paper?
16   A. Yes.
17   Q. Do you read English books, English written
18 -- books in English?
19   A. No, just newspaper.
20   Q. When you say it's bad, can you tell me what
21 you mean when you say it's bad?
22   A. A lot of time I read some words that I don't
23 understand what it means.
24   Q. Is it fair to say that that is not

Page 51

1  information you tend to volunteer to people? Do you
2  know what I mean?
3    A. I don't understand the question.
4    Q. Without being asked do you tell people that
5  you have, in your words, bad English skills?
6    A. Yes.
7    Q. You do?
8    A. Yes.
9    Q. Without being asked?
10   A. Yes.
11   Q. Did you tell AMSA you had bad English
12 skills?
13   A. No.
14   Q. Was Loomis Wells Fargo aware that you had,
15 in your words, bad English skills?
16       ATTY. ROMANTZ: Objection.
17   Q. Did you tell them?
18   A. No.
19   Q. Are you a citizen of the U.S.?
20   A. Yes.
21   Q. When did you become a citizen?
22   A. '78 or '79.
23   Q. There is like an exam, so to speak, when you
24 are becoming a citizen, isn't there?

Page 52

1    A. Yes.
2    Q. Was that strictly a verbal exam?
3    A. Yes.
4    Q. It wasn't in writing?
5    A. No.
6    Q. Did you go through any preparation course
7  for that examination?
8    A. No.
9    Q. How did you prepare for that examination?
10   A. Nothing. I just went. I just went.
11   Q. How did you know -- how did you know about
12 the information that was going to be given to you on
13 the exam?
14   A. I don't.
15   Q. What branch office of the INS did you take
16 the exam?
17   A. Boston.
18   Q. Do you remember who your examination officer
19 was?
20   A. No.
21   Q. It was a long time ago. How long was the
22 exam?
23   A. 5 minutes.
24   Q. When you signed this document that has been

Page 53

1  marked as Exhibit 2, did you understand it?
2    A. Yes.
3    Q. You did?
4    A. Yes.
5    Q. Did you read it before you signed it?
6    A. Yes.
7    Q. And you understood it?
8    A. Yes.
9    Q. There weren't any words in here that you
10 didn't understand?
11       ATTY. ROMANTZ: Objection.
12   A. No.
13       (Exhibit 3 marked for identification.)
14   Q. What has been put before you has been marked
15 as Exhibit 3. It's a document that has been marked
16 Confidential, as have been Exhibits 1 and 2, which
17 is a part of the defendant's personnel file. If I
18 could direct your attention to the bottom of the
19 page; is that your signature that appears?
20   A. Yes.
21   Q. And the date 2/12/01, is that in your
22 handwriting?
23   A. Yes.
24   Q. And above it is your printed name?

Francesco Ciambriello                                                                04/07/2005

**Page 58**

1  A. Yes.
2  Q. How about when you were at Imperia?
3  A. Yes.
4  Q. Cumberland Farms?
5  A. No.
6  Q. When did you first meet Heather Kiernan?
7  A. When she started to work for AMSA.
8  Q. Do you recall when that was?
9  A. No.
10  Q. What was her job when she started working
11  there, if you know?
12  A. Data entry.
13  Q. Do you know what days she worked?
14  A. Monday through Friday. No, Monday through
15  Saturday.
16  Q. 6 days a week?
17  A. Yes.
18  Q. Do you know what hours she worked?
19  A. Sometime she start in the afternoon.
20  Q. And other times?
21  A. No, I mean Monday -- every day she started
22  in the afternoon and when the place close.
23  Q. What place?
24  A. AMSA.

**Page 59**

1  Q. Oh, she would go in after the place closed?
2  A. No.
3  Q. I'm sorry.
4  A. She start in the afternoon and the shift end
5  when the place close the night.
6  Q. If she worked Monday through Saturday, you
7  were the weekend supervisor, right?
8  A. Correct.
9  Q. Did you 2 only work together on Saturdays?
10  A. Yes.
11  Q. So then you only saw each other one day a
12  week, which was Saturday?
13  A. No. I was working night.
14  Q. You worked at night during the week too?
15  A. Yes, yes.
16  Q. So your position at AMSA, was that a
17  full-time job?
18  A. Part-time.
19  Q. Part-time. And when you were working at
20  AMSA what were your hours?
21  A. Five when the place close.
22  Q. When would that be?
23  A. 9, 10, 11. It depends.
24  Q. What about on the weekends?

**Page 60**

1  A. The weekends it close about 7:00, 8:00,
2  depends when the truck coming in.
3  Q. When did your shift start on the weekend?
4  A. 7:00.
5  Q. In the morning?
6  A. Yes.
7  Q. So you met Ms. Kiernan when she started
8  working at AMSA?
9  A. Yes.
10  Q. Did you know her prior to that at all?
11  A. No.
12  Q. Where was her work station. Where did she
13  physically work at AMSA?
14  A. In the vault.
15  Q. And when you and her were working together
16  was there ever anybody else that worked in the
17  facility with you two?
18  A. Monday to Friday there was 5, 6 people;
19  Saturday we just me and her.
20  Q. The 5 or 6 people that worked Monday through
21  Friday, do you recall who they were?
22  A. Mike, Christopher. It was another 3 people;
23  I don't remember their name.
24  Q. When you mentioned Mike, was that Mike

**Page 61**

1  Pascetta?
2  A. Yes.
3  Q. Did he work Monday through Fridays?
4  A. Yes.
5  Q. Do you know what his job was?
6  A. He was the driver in the day time, and at
7  night he pick up extra hours, he work in the vault.
8  Q. When you worked during the week were you the
9  supervisor?
10  A. No.
11  Q. On the weekends you were the supervisor?
12  A. Correct.
13  Q. Did your duties change when -- strike.
14  Monday through Friday you weren't a supervisor, on
15  Saturday you were, but did your duties change
16  between what you did Monday through Friday and
17  Saturday?
18  A. There was no change.
19  Q. Just change in status and control?
20      ATTY. ROMANTZ: Objection.
21  A. (No verbal response.)
22  Q. Yes? Verbal. You have to speak.
23  A. Yes.
24  Q. Was there a supervisor Monday through

16 (Pages 58 to 61)

Page 62

1  Friday?
2     A. Yes.
3     Q. Who was that?
4     A. Christopher.
5     Q. But do you remember Christopher's last name?
6     A. No, I don't.
7     Q. So he was the supervisor during the week?
8     A. (Nod.)
9     Q. And you were the supervisor on the weekend?
10        ATTY. ROMANTZ: Objection.
11    A. (No verbal response.)
12    Q. Verbal.
13    A. Yes.
14    Q. And so basically you assumed his
15 responsibilities come Saturday and Sunday?
16    A. Yes.
17    Q. What responsibilities were those that you
18 assumed come Saturday and Sunday?
19    A. Send the trucks on the roads, make sure they
20 had correct amount of money, what the boss give the
21 customer, make sure the building was safe.
22    Q. When you say make sure the building was
23 safe, what did that entail?
24    A. Nothing happening.

Page 63

1     Q. As the supervisor would it be your job to
2  make sure, like, the video system was working?
3     A. Yes.
4     Q. Would it be your job to make sure the doors
5  were locked?
6     A. Yes.
7     Q. If somebody wanted to come into the
8  facility, as the supervisor you were the only guy
9  that could let them in?
10    A. Yes.
11    Q. If somebody wanted to leave the facility,
12 same thing, you were the only guy that could let
13 them out?
14        ATTY. ROMANTZ: Objection.
15    A. Yes.
16    Q. During your training period were you ever
17 told about a panic button, or anything like that, at
18 AMSA?
19    A. Yes.
20    Q. What was the panic button or the alarm?
21 What was that, if you know?
22    A. A button in the wall. If something happen,
23 or some robbery, or whatever, you just push the
24 button and all police force coming through.

Page 64

1     Q. Was there any manual that went with that?
2     A. No.
3     Q. Was there written instructions?
4     A. No.
5     Q. Were you ever told that it could be used for
6  anything else?
7     A. No.
8     Q. Strictly if something was going on in the
9  facility that involved a robbery?
10        ATTY. ROMANTZ: Objection.
11    A. Yes.
12    Q. Do you recall when you were first made aware
13 about the panic button?
14    A. After a month.
15    Q. After a month?
16    A. Yes.
17    Q. Ultimately, and I'm mentioning this as a
18 point of reference, there was an incident that took
19 place that led to your termination, and that
20 incident involved you and Heather Kiernan, right?
21        ATTY. ROMANTZ: Objection.
22    A. Correct.
23    Q. And what I'm going to ask you is, How many
24 weekends did you 2 work together alone prior to that

Page 65

1  incident?
2     A. 4, 5, 6. A couple of months.
3     Q. A couple of months?
4     A. Or maybe less. I don't remember exactly.
5     Q. I'm going to direct your attention now to
6  May 19, 2001. What time did you arrive at the
7  facility that day?
8     A. 7:00.
9     Q. When you arrived at 7:00 was anybody else
10 there? Did you relieve anybody or were you the
11 first guy there?
12    A. First guy in the parking lot.
13    Q. Okay. And at what point did Heather Kiernan
14 arrive to work that day?
15    A. Between 2 and 3.
16    Q. Is there a time clock that she would have
17 punched?
18    A. Yes.
19    Q. There was a time clock?
20    A. Yes.
21    Q. Did you also have to punch a time clock?
22    A. No.
23    Q. You would have to let her into the building
24 when she arrived?

Francesco Ciambriello                                                                04/07/2005

## Page 66

1  A. Yes.
2  Q. Between the time you arrived at 7:00 in the
3  morning and the time she arrived in the afternoon,
4  did anybody else who was an employee of AMSA show up
5  to work that day?
6  A. In the morning there were 6, 7 people.
7  Q. Were they all drivers?
8  A. Driver, messenger, and the manager.
9  Q. The manager?
10  A. Yes.
11  Q. The branch manager?
12  A. Yes.
13  Q. Was that Jason Khoury?
14  A. Correct.
15  Q. So he was there that day?
16  A. Yes.
17  Q. What time did he arrive?
18  A. 8:00, 8:30.
19  Q. What time did he leave?
20  A. Oh, he arrived at 7:00. We arrive all
21  together, open the building. He help me get the
22  truck out the door, and then after a little while he
23  left too.
24  Q. So he left at 8:30 in the morning?

## Page 67

1  A. Between 8:00 and 8:30.
2  Q. Did he come back at all during the day?
3  A. No.
4  Q. At some point you testified Heather Kiernan
5  arrived between 2:00 and 3:00 in the afternoon?
6  A. Yes.
7  Q. When she arrived was there anyone else at
8  the facility?
9  A. No.
10  Q. At the time she arrived how long had you
11  been alone, working alone, in the facility?
12  A. 4, 5 hours.
13  Q. And what do you do when you are alone in the
14  facility? Is there like a TV you can watch?
15  A. Just standing by the phone.
16  Q. Is there a television that you can watch
17  that kind of keeps you --
18  A. No.
19  Q. Is there a radio?
20  A. No.
21  Q. What do you do to keep yourself occupied
22  during that 4 to 5 hour period?
23  A. Nothing.
24  Q. Pretty boring? Is it boring?

## Page 68

1  A. Yes, boring.
2  Q. Is there a place that you would typically
3  hang out or would you, during that 4 or 5 hour
4  period, just kind of sit in one location?
5  A. Yes, sit by the phone.
6  Q. So after everyone left, after all the
7  drivers and messengers went out, you were alone for
8  about 4 or 5 hours, and then Heather Kiernan showed
9  up to work?
10  A. Yes.
11  Q. What was she wearing that day?
12  A. I don't remember.
13  Q. Prior to that day had you ever had any
14  discussion with her about her having a baby?
15  A. No.
16  Q. Ever have any discussions with her about her
17  husband prior to that day?
18  A. Yes.
19  Q. So what discussions did you have with her
20  prior to that day about her and her husband?
21  A. She was telling me the husband no love her,
22  he no take care of her, he is really bad, watching
23  video porn, smoke pot.
24  Q. She was saying these things about her

## Page 69

1  husband?
2  A. To me, yes. And she said she wasn't happy
3  and he never make her happy.
4  Q. Anything else?
5  A. And she want a divorce, and she goes over to
6  Jason Khoury, tell him all the time she want a
7  divorce.
8  Q. She did, she told Jason Khoury she wanted a
9  divorce?
10  A. She wanted a divorce because she no happy,
11  husband no take care of her.
12  Q. Was there anything else that she discussed
13  with you about her marriage?
14  A. Yes.
15  Q. What else?
16  A. He watch porn all the time and then he jerk
17  off.
18  Q. So she talked about him watching pornography
19  and masturbating?
20  A. Yes, and he no pay attention to her.
21  Q. Did she ever talk about her son?
22  A. Yes.
23  Q. What did she say about him?
24  A. She asked me a couple of times if she has a

Francesco Ciambriello

04/07/2005

Page 138

1   the money is closed.
2   Q. If you wanted to go outside and have a
3   cigarette with Heather like you did that day, did
4   you need to do anything special in the building?
5   A. No.
6   Q. So you went home that night, had dinner with
7   your wife and your mom, and anything else happen
8   that night?
9   A. No.
10  Q. Went to bed?
11  A. Went to bed.
12  Q. You were on the clock; you were supposed to
13  come in the next morning at 7:00, right?
14  A. The Sunday?
15  Q. Right.
16  A. No.
17  Q. You were off?
18  A. I was supposed to go in at noontime.
19  Q. Noon on Sunday?
20  A. Noon on Sunday.
21  Q. Not 7:00?
22  A. No.
23  Q. How come so late?
24  A. The truck go out from Marlborough and they

Page 139

1   come in Attleboro to drop off some money.
2   Q. So did you get a phone call to come in
3   earlier?
4   A. No.
5   Q. And you went to work the next day?
6   A. Yes.
7   Q. At noon?
8   A. Yes.
9   Q. Was Heather there?
10  A. No.
11  Q. Was she supposed to be there?
12  A. No.
13  Q. Who was working with you that day?
14  A. The plant manager or the manager Jason
15  Khoury.
16  Q. He worked with you that day?
17  A. No, he was there.
18  Q. Oh, he was there. I'm sorry.
19  A. He just was there. There was another guy
20  over there that he was -- I don't know if he is a
21  real supervisor, I don't know what he is. He is
22  some kind of a supervisor, they were both, but they
23  were there.
24  Q. And you went in at noon?

Page 140

1   A. Went at noon.
2   Q. Did you work your whole shift?
3   A. No. I was in there 5 minutes. They told me
4   I was suspended because I was outside smoke
5   cigarette.
6   Q. That's why they told you you were suspended?
7   A. Yes.
8   Q. What else did they tell?
9   A. Nothing else.
10  Q. Nothing else?
11  A. Nothing else.
12  Q. Was Heather Kiernan mentioned at all?
13  A. No.
14  Q. Did they give you anything in writing?
15  A. No.
16  Q. Did you talk -- did you tell -- let me ask
17  you this, You had been working at AMSA for several
18  weeks prior to that, right?
19  A. Yes.
20  Q. Was that the first time you had ever gone
21  outside to have a cigarette?
22  A. Yes, yes.
23  Q. So did you ask them, What did I do wrong?
24  A. They told me, you were outside smoke

Page 141

1   cigarette.
2   Q. And do you have an understanding as to why
3   that was against company policy?
4   A. Yes.
5   Q. What is that?
6   A. You cannot leave the building if nobody is
7   in there. There has to be somebody in there all the
8   time no matter what, so I left the building, I went
9   in the parking lot, I smoke a cigarette; that's why
10  they suspended me.
11  Q. You testified when you come in in the
12  morning at 7:00 in the morning nobody is there.
13  Isn't the building empty when you come in in the
14  morning?
15  A. The alarm is on and everything.
16  Q. So if you wanted to go outside and have a
17  cigarette, you just need to set the alarm?
18       ATTY. ROMANTZ: Objection.
19  A. You can't set the alarm.
20  Q. Why not?
21  A. You cannot set the alarm because you need 2
22  people and 2 code.
23  Q. When you come in in the morning do you have
24  to open the vault?

36 (Pages 138 to 141)

Page 106

1  the way walk through, I only had one hands on her.
2  The right hands I always had like that, then when I
3  walk to the door, I take the hands off, I took my
4  keys, I open the door, we get in.
5      Q. So you had your right hand on Heather's
6  side?
7      A. Yes.
8      Q. And when you unlocked the door you used your
9  right hand?
10     A. Correct.
11     Q. And the door opened from right -- pardon me,
12 from left to right?
13     A. (No response.)
14     Q. Actually, let me back up. Did you have to
15 -- did the door open out or in?
16     A. I am trying to remember.
17     Q. I understand.
18     A. Yes, is open out.
19     Q. And did it open from the left?
20     A. The right.
21     Q. So the right to the left?
22     A. No, like this (indicating).
23     Q. Gesturing from -- the handle was on the
24 left-hand side of the door?

Page 107

1      A. Whatever you want to call it.
2      Q. The lock was on the left side of the door?
3      A. Yes.
4      Q. Okay. Thanks. You used your right hand to
5  do that?
6      A. Yes.
7      Q. Where was Heather standing when you were
8  doing that?
9      A. Besides me.
10     Q. On your left?
11     A. Yes.
12     Q. Where was your left-hand?
13         ATTY. ROMANTZ: Objection.
14     A. It was by my body.
15     Q. You didn't have your hand on her?
16     A. No, no.
17     Q. You opened the door?
18     A. Yes.
19     Q. When you opened the door did she say
20 anything to you?
21     A. No.
22     Q. She didn't say anything, I don't want to go
23 in there, anything like that?
24     A. No.

Page 108

1      Q. And while you were unlocking the door she
2  didn't say I don't want to go in there or anything
3  like that?
4      A. No, she don't say nothing.
5      Q. Prior to that time she didn't say, I don't
6  want to go in there?
7      A. No.
8      Q. Who was the first person to walk into the
9  office?
10     A. She did.
11     Q. Did you have your hand on her at that point?
12     A. No.
13     Q. Did you tell her to get in?
14     A. No.
15     Q. She just went in on her own accord?
16     A. Yes.
17     Q. And you didn't say anything to her at all?
18     A. No.
19     Q. And you followed her in?
20     A. Yes.
21     Q. And you shut door behind you?
22     A. I think the door shut by itself. I don't
23 really remember, but I think the door shut by
24 itself.

Page 109

1      Q. And if you could please describe for me what
2  the interior of the room looked like.
3      A. When you walk in there is a little table,
4  then on the left, on the left side, is file cabinet.
5  On the top is all kind of police car. There is a
6  window, and there is chairs and a desk.
7      Q. And when you walked in what was the next
8  thing that happened?
9      A. We started hugging and kiss, and then --
10     Q. When you say you started hugging, who hugged
11 whom?
12     A. We both were hugging and kiss each other,
13 and then --
14     Q. When you say kiss, was it open-mouthed?
15     A. Yes.
16     Q. Was the tongue involved?
17     A. Yes.
18     Q. Both?
19     A. Yes.
20         (Whereupon the luncheon recess was taken
21         from 1:00 p.m. to 2:00 p.m.)

04/07/2005
Francesco Ciambriello

Page 110

1  AFTERNOON SESSION
2  EXAMINATION, cont'd
3  BY ATTY. McLEOD:
4
5  Q. We had left off where you had walked into
6  the room with Ms. Kiernan and you testified that you
7  began to hug and kiss?
8  A. Yes.
9  Q. How long did that last?
10 A. About 2, 3 minutes, and she said, I can't go
11 through that, I'm a married woman. We stopped, she
12 went in the bathroom, I went in the office where the
13 sitting area, that's it.
14 Q. So it's your testimony that all you did was
15 hug and kiss?
16 A. Yes.
17 Q. You didn't pull her shirt up?
18 A. No.
19 Q. You didn't touch her breasts?
20 A. No, because we were like that. Maybe my
21 chest touch her breasts.
22 Q. You didn't touch her bare breasts?
23 A. No.
24 Q. You didn't bite here?

Page 111

1  A. No.
2  Q. You didn't pull her pants down?
3  A. No.
4  Q. Penetrate her with your fingers?
5  A. No.
6  Q. Did you touch her genitals at all?
7  A. No, I just touch the back like that, we kiss
8  both each other, and that's all that happening.
9  Q. And how long were you in the room?
10 A. 2, 3 minutes, because she said, I'm a
11 married woman, you know, I can no do this. We
12 stopped, went in bathroom, went in office, case
13 closed.
14 Q. Did you, at any time, remove your penis from
15 your pants?
16 A. No.
17 Q. Did you, at any time, take her hand and put
18 it on your penis through your pants?
19 A. No.
20 Q. And how long were you in the office again?
21 A. Two, three minutes.
22 Q. Just two or three minutes?
23 A. That's it. After we started kiss each
24 other, then she say, I'm a married woman, I cannot

Page 112

1  go through this. Okay.
2  Q. Now the videotape would have showed you
3  going into the office?
4  A. Yes.
5  Q. And it would have showed somebody coming out
6  of the office?
7  A. Yes.
8  Q. And would it also have had the time stamped
9  on the tape as the time of day?
10 A. Yes.
11 Q. So she went into the bathroom.
12 A. She went in the bathroom, yes.
13 Q. Was there a separate men's room and ladies
14 room there?
15 A. Yes.
16 Q. Could both of them lock?
17 A. I have no idea. I never been in a woman
18 bathroom. I don't know.
19 Q. Could you lock the men's room, do you know?
20 A. I don't think so, because -- no.
21 Q. Do you have any idea how long she was in the
22 bathroom?
23 A. Two, three minutes, four minutes, no longer
24 than that, because she come out, I was in the soda

Page 113

1  machine, I ask him if she want soda, and she said
2  no.
3  Q. Did you apologize to her at all?
4  A. For what reason?
5  Q. For kissing her, or hugging her, or taking
6  her into the office.
7     ATTY. ROMANTZ: Objection.
8  A. No. There was no reason to apologize.
9  There was no reason to any apology.
10 Q. Why do you say that?
11 A. Why I say that?
12 Q. Mm-mm.
13 A. We both decide to kiss and hugging each
14 other, why is there going to be an apology? For
15 what reason?
16 Q. I'm just asking if you did.
17 A. No.
18 Q. How did she appear to you when she said to
19 you in the office, I don't want to do this, I'm
20 married?
21 A. The way she appeared to me?
22 Q. Yes.
23 A. She said she didn't want to do it, so we --
24 Q. But did she appear upset?

29 (Pages 110 to 113)

Page 114

1   A. No.
2   Q. Did she appear disappointed that she
3   wished --
4   A. No.
5   Q. Let me finish my question. Did she appear
6   disappointed that she couldn't continue what she was
7   doing in the office with you?
8   A. I don't know.
9   Q. Do you think she wanted to continue what was
10  going on in the office but couldn't, because she
11  felt she was -- but she felt she couldn't because
12  she was married?
13       ATTY. ROMANTZ: Objection.
14  A. I don't know.
15  Q. When she said I can't do this I'm married,
16  what was your response?
17  A. I stop. We stop. We stop. She talk -- we
18  stopping kiss and then she say, I'm married, I can't
19  do that anymore, I cannot do this here, so at that
20  time we don't do nothing, so she walk away, she went
21  to the bathroom, I walk away I go to my office. I
22  mean the area, this area over there, whatever you
23  want to call it, the check-in counter.
24  Q. Thank you. It was what I wanted you to call

Page 115

1   it, so that we could make sure that we are in the
2   same -- so basically you went back to the same place
3   you started?
4   A. Yes.
5   Q. But she was in the bathroom?
6   A. Yes.
7   Q. How long did she stay in the bathroom?
8       ATTY. ROMANTZ: Objection.
9   A. Three, four minutes, or something like that.
10  Q. And where did she go when she came out of
11  the bathroom, if you know?
12  A. She walk in the break area.
13  Q. Break area?
14  A. (Nod.)
15  Q. Okay. Is the break area under surveillance?
16  A. Yes.
17  Q. Is the interior of the bathrooms under
18  surveillance?
19  A. I have no clue.
20  Q. Is the hallway leading into the bathrooms
21  under surveillance?
22  A. Yes.
23  Q. So when she went to the break room what did
24  she do?

Page 116

1   A. She went in the break room, she stand there
2   for a little while. I was with the soda machine
3   getting myself a soda. I ask him if she wanted
4   soda. She said, No, I'm all set. Then I go back in
5   the counter and that was it.
6   Q. What time of day was this?
7   A. It could have been maybe 4:00.
8   Q. What happened next that day?
9   A. What happening?
10  Q. Yes, what happened next?
11  A. We back in the area, she made a phone call,
12  call her friend.
13  Q. Who was that, do you know?
14  A. I believe it's Christine. She talked to
15  Christine. She said she coming over, if she wanted
16  to go get a bottle of wine, and Christine coming
17  over --
18  Q. Now do you know Christine?
19  A. Yes, she work over there. She work in the
20  money room. She worked Monday through Friday.
21  Q. She worked with you when you were there?
22  A. No.
23  Q. Did she have a different shift?
24  A. It's a different area.

Page 117

1   Q. A different area, okay. So what happened
2   next?
3   A. She come in, Christine come in in the
4   parking lot, Heather saw with the camera, and she
5   went outside and gave her the money probably for the
6   wine, or they were talking. I don't know. I was
7   inside; I can't hear what it was going on.
8   Q. Let me ask you, when someone is calling --
9   well, let me ask you, when Heather Kiernan was
10  calling out to her friend, was she using an AMSA
11  phone?
12  A. Yes.
13  Q. Is there any special permission she needed
14  to obtain from you to use the outside phone?
15  A. No, no permission.
16  Q. Any employee can use an AMSA phone for
17  personal reasons?
18  A. Yes.
19  Q. They don't need permission from you?
20  A. No.
21  Q. So you saw Christine's car pull into the
22  parking lot on the camera?
23  A. Yes.
24  Q. And Heather went out?

Francesco Ciambriello                                                                                    04/07/2005

Page 118

1  A. Heather went outside.
2  Q. You had to let her out, though, correct?
3  A. Correct.
4  Q. Was that through a buzzer? Did you have to
5  buzz her out, or did you have to go over and
6  physically --
7  A. No, buzz her out.
8  Q. So you let Heather out?
9  A. Yes.
10 Q. How long was Heather in the parking lot with
11 Chris?
12 A. A couple of minutes, 2, 3 minutes, no more
13 than that.
14 Q. Did you watch them on the video camera?
15 A. Yes.
16 Q. Did you see Heather doing anything, or --
17 A. No.
18 Q. Did you see her reach into her pocket?
19 A. No.
20 Q. Did you see her give Christine anything?
21 A. No.
22 Q. And then what happened next after you saw
23 them -- well, actually, let me back up. Did Heather
24 ever get into the car with Christine?

Page 119

1  A. No.
2  Q. Did Christine ever get out of her car?
3  A. I don't remember.
4  Q. What then happened next after you saw them
5  talking?
6  A. Christina left, she come back inside --
7  Q. You buzzed her in?
8  A. I buzzed her in. She come back inside and
9  then Christine come back after a little while, and
10 then they both went -- she went outside and smoke
11 cigarette.
12 Q. Who is she? You have got two she's now.
13 A. Heather. When Christine come back from
14 store, Heather went outside to smoke a cigarette
15 with her.
16 Q. With Christine?
17 A. Christine.
18 Q. How much time had elapsed between Christine
19 going to the store and her coming back?
20 A. 15, 20 minutes.
21 Q. Did Christine have anything in her hand when
22 she arrived at AMSA?
23 A. No, she didn't have nothing.
24 Q. Did Christine come into the building before

Page 120

1  her and Heather were smoking outside?
2  A. No.
3  Q. Did she come into the building after?
4  A. Yes.
5  Q. How long were her and Heather smoking
6  outside?
7  A. Few minutes.
8  Q. Do you know how many cigarettes they
9  smoked?
10 A. I have no idea.
11 Q. At some point you went out to join them, did
12 you not?
13 A. Yes.
14 Q. Was it during that smoking break that you
15 did?
16 A. No.
17 Q. It was during another one?
18 A. Another one, another one.
19 Q. At that time you were a smoker; are you
20 still smoking?
21 A. Yes.
22 Q. How much did you smoke at that time?
23 A. How much smoke what; a day, or --
24 Q. Yes, a day.

Page 121

1  A. Well, 3, 4, 5 cigarette. It depends, you
2  know, feels, and the feeling, and the smoke. I'm
3  not really other smoke; I smoke when I feel like it.
4  Q. But you are not like a pack-a-day smoker?
5  A. A pack I smoke every couple of weeks.
6  Q. Every couple of weeks?
7  A. Yes. You could ask my wife.
8  Q. I don't need to, dude; I'm just impressed.
9  A. I used to smoke 2 a day, 2 pack a day.
10 Q. How long have you been smoking?
11 A. When I was 17; about 40 years.
12 Q. Were you ever a heavier smoker?
13 A. When I was young, yes.
14 Q. When did you start smoking less?
15 A. I don't understand the question.
16 Q. Let me ask you this, When did you start
17 smoking less than a pack a day?
18 A. About 15 years ago.
19 Q. Is there a time of day that you always want
20 to have a cigarette?
21 A. No.
22 Q. So it's not one of those things like in the
23 morning you have got to have one?
24 A. No.

31 (Pages 118 to 121)

Francesco Ciambriello                                              04/07/2005

Page 126

1  behavior when Christine came back?
2      A. No.
3      Q. Everything seemed fine?
4      A. No.
5      Q. No concerns?
6      A. No.
7      Q. You had no worries?
8      A. No. Why I have a worry?
9      Q. I'm just asking the question, okay?
10     A. No, I have no worry.
11     Q. When was your shift over that night?
12     A. Between 7:00, 8:00.
13     Q. Did you leave the facility at the same time
14  Heather did?
15     A. Yes. Me, Christine, and Heather, all 3 we
16  left together, same door, same time.
17     Q. Do you know where they went?
18     A. I have no clue. They went in their car, I
19  went in my truck, and I went home. I don't know
20  where they went. I have no idea.
21     Q. And what did you do that evening?
22     A. I went home and had supper with my wife and
23  my mom.
24     Q. Your mom was visiting?

Page 127

1      A. Yes.
2      Q. Prior to this time, prior to that day, had
3  you ever touched a woman at work like you had
4  touched Heather that day?
5      A. No.
6      Q. No?
7      A. Never.
8      Q. And when you signed what's been marked as
9  Exhibit 4, the Sexual Harassment Policy, you read it
10 before you signed it, right?
11     A. Yes.
12     Q. And you understood it?
13     A. Yes.
14     Q. So let me ask you, Did you think that it was
15 appropriate for you to be touching Heather the way
16 you did that day?
17         ATTY. ROMANTZ: Objection.
18     A. We decided the both of us, so I had no
19 problem, because wasn't just my idea, it was both my
20 idea, so this has nothing to do with that.
21     Q. Well prior to the touching you two were
22 having discussion about her husband's sexual
23 behavior, weren't you?
24     A. Yes.

Page 128

1      Q. Did you not think that was inappropriate?
2          ATTY. ROMANTZ: Objection.
3      A. No.
4      Q. Why not?
5      A. Because she was no happy home. Her husband
6  no made her happy. She always was upset. She
7  didn't want to be with her husband, so I no have no
8  problem. Also it wasn't just my idea, it was both
9  my idea.
10     Q. So you were talking about your own sexual
11 experiences as well?
12     A. No, I never talk. No, no, no.
13     Q. You weren't talking about your marital
14 sexual issues or experiences, were you --
15         ATTY. ROMANTZ: Objection.
16     A. No.
17     Q. -- with Heather.
18         You say that you read Exhibit 3 --
19 sorry, Exhibit 4, and if I could direct your
20 attention towards the bottom of the page where it
21 says Confidential, although there is this certain --
22 it's this one -- there is a number of bulleted
23 points, and I'm just directing you beginning where
24 it says, While; While it is not possible to list all

Page 129

1  of those circumstances which constitute sexual
2  harassment, the following are some examples, and
3  then it lists several examples, and the one example,
4  the one that is second from the bottom, is
5  discussion of one's sexual activities; do you see
6  that?
7      A. Yes.
8      Q. So it was your testimony that Heather was
9  discussing her sexual activities about her husband,
10 right?
11         ATTY. ROMANTZ: Objection.
12     A. Correct.
13     Q. And you, when she was having these
14 discussions with you, you were acting as her
15 supervisor, correct?
16         ATTY. ROMANTZ: Objection.
17     A. Yes.
18     Q. And yet you took no action at all to suggest
19 that her discussions violated that policy that you
20 signed off that is marked as Exhibit 4?
21         ATTY. ROMANTZ: Objection.
22     A. I think, I'm no remember too sure, but a
23 couple of times I spoke to my night supervisor, his
24 name Chris, I don't know his last name, to talk to

33 (Pages 126 to 129)