UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS AT BOSTON
_____

HEATHER KIERNAN,

        Plaintiff,

-v-                                     CIVIL NO.  04-10131 RBC

ARMORED MOTOR SERVICE OF
AMERICA, INC., and
FRANCESCO CIAMBRIELLO

        Defendants.
_____

**PLAINTIFF HEATHER KIERNAN'S MEMORANDUM OF FACTS AND LAW
IN SUPPORT OF HER MOTION FOR SANCTIONS AND
OTHER RELIEF OR IN THE ALTERNATIVE, MOTION FOR BIFURCATION
AGAINST THE DEFENDANTS ARMORED MOTOR SERVICE OF AMERICA
INC. AND FRANCESCO CIAMBRIELLO
<u>FOR SPOLIATION OF EVIDENCE</u>**

**<u>Background</u>**

Plaintiff Heather Kiernan began her employment with the Defendant

Armored Motor Service of America (AMSA) on or about April 10, 2001.  At the

time, the Plaintiff had just given birth to her son, and her husband had found

himself unemployed within two weeks after his birth.

On Saturday, May 19, 2001, Plaintiff went to work.  Her supervisor that

day was the Defendant Francesco Ciambriello (Ciambriello).  The complaint

alleges that Ciambriello raped the Plaintiff on that day.

As this was a weekend, it was acceptable for Ciambriello to wear casual

clothes rather than the regular uniform worn during the week.  He carried a side

arm, and was the only person present on that shift who could grant access to the

building, or to let someone out.

The shift began with Ciambriello making crude remarks to Plaintiff, and him attempting to massage her shoulders, and grabbing her breasts from behind, all of which Plaintiff tried to fend off.[1]  These actions culminated with Ciambriello taking Plaintiff into the office of Jason Khoury, the Branch Manager, where the rape eventually occurred.  This is the only inner room in the AMSA facility that was not under video surveillance.  In the office, Ciambriello bit the Plaintiff and penetrated her digitally, among other things.  Not surprisingly, Ciambriello and AMSA have remarkably different perceptions of the events, namely, that the sexual activity between Plaintiff and Ciambriello was consensual, and AMSA even goes so far to say that it was "welcome."[2]

Plaintiff's shift concluded at approximately 8:00 pm.  The incident was reported to police, and within a few hours of the report, police were on the premises conducting an investigation.

Early morning the next day, AMSA voluntarily surrendered 3 tapes depicting the Plaintiff and Ciambriello to the Attleboro police.  Exhibit B, Otrando Deposition, at 37-39; Exhibit C, O'Brien Deposition, p. 31-32.  AMSA did not request any receipt for the 3 tapes, nor did they require a warrant.  Id. The evidence indicates that they were freely turned over in furtherance of the police investigation of this horrible crime.  Id.  According to testimony, the tapes show Plaintiff walking with Ciambriello towards the door and Kiernan is heard saying that she did not want to go into the room.  Id., See also Exhibit F, Transcript pp.

---

[1] Plaintiff alleges that Ciambriello engaged in other crude conduct at other times besides the day of May 19, 2001.

[2] The other allegations of inappropriate sexual conduct (see paragraph 10 of the Complaint) are denied.

14-16.  Undoubtedly, the depiction of Plaintiff being lead into a room by her supervisor who was wearing a side arm where he would rape her, and then the audio of the tape revealing that she did not want to go into the room with him supports the Plaintiff's claims that the sexual activity was not consensual.

On the evening of May 22, 2001, three days after the attack, Ciambriello was called to the Attleboro Police station by the lead investigating detective on the case, John Otrando.  Exhibit B, Otrando, at 51.  During questioning, Ciambriello denied having contact with Kiernan, and according to Otrando, appeared nervous.  Otrando asked him a number of specific questions relative to the rape allegations.   Ciambriello gave nothing more than complete and unqualified denials.  Finally, when Detective Otrando told that despite Ciambriello's denials, there was videotaped evidence the supported the allegations, Ciambriello's response was "…are you going to go ahead and arrest me?"  At that point, Detective Otrando accepted Ciambriello's invitation and arrested him.  He posted bail that night.  Exhibit B, Otrando, 53-63.

On May 23, 2001 he was arraigned in the Attleboro District Court.  Exhibit B, Otrando, at 62.

Shortly thereafter Plaintiff filed a workers compensation claim.  See Generally, Exhibit A.  Plaintiff was represented by counsel.  See Exhibit I, Affidavit of Gary Orlacchio.  The insurance carrier, the Hartford, had been in communication with her counsel's office as well as the employer.  Exhibit A, 9, 18.  According to the workers compensation counsel, liability was being

contested at the onset, and the first conciliation conference was initially

scheduled for August 18, 2001.[3]  Exhibit A, 8.

AMSA had a video security system.  As found by the New Bedford

Superior Court:

> The images from the security camera are displayed on VCR-type
> monitors in a small room by the manager's office.  This is a
> multiplex display, with each screen displaying nine frames.  The
> result is that there are multiple images from many camera on the
> same video tape.  The tape machine is set to cover a specific
> amount of time – 8, 12, 24, 48 hours – and then the images will be
> recorded at intervals that result in a two hour tape being filled at the
> end of that time period.  The AMSA machines were set to cover at
> least an eight hour shift.  This means that there is not true
> continuous coverage but, more importantly for this case, it means
> that each of the six video tapes over the same period of time, albeit
> recording from different camera.  There is also an audio recording.
>
> See Findings of Fact, Conclusions of Law and Order on Motion to
> Dismiss, Commonwealth vv. Ciambriello, BRCR 2002-0773 (1-2),
> p. 2.  Exhibit H.

AMSA's former Security Director admitted at his deposition that the tapes

were "important to [AMSA] not only for this particular case but [if there were a]

customer's dispute."  Exhibit C, O'Brien, at 35, 41-46.  In describing why there

might be a dispute, he testified that if a customer claims that they sent AMSA

"$100,000 and [AMSA] show[s] 20 [thousand], we got to be able to provide the

tape, otherwise, we're looking at paying the customer."  Id.

---

[3] Documents obtained from the Hartford (the workers compensation carrier) confirm that AMSA
was aware of the potential for a claim and was aware of the surveillance tapes.  Ex.A, 6,  The
Hartford was very concerned about liability – even referring to the claim as "expensive."  Exhibit
A, 16.  In an internal memorandum dated July 5, 2001, Hartford's counsel told the Hartford that
one of the witnesses would be Kiernan "as to facts."  Ex. A, 2. As of July 11, 2001 the Hartford
was aware of the videotapes and what they depicted.  On July 31, 2001, Kiernan was under
surveillance.  Ex.A, 11-14.

There were three other tapes in AMSA's custody.  Detective Otrando contacted AMSA to discuss retrieving them, and was told in August 2001 for the first time that he required a "warrant" or "subpoena."  He obtained one.  When he arrived to pick up the tapes, he signed off on a receipt indicating that tapes had been retrieved on that date <u>and</u> in May, the morning after the incident.  The receipt was prepared by Jason Khoury.  Exhibit B, Otrando, 40-44.

There is no dispute that the surveillance system does not generate tapes which can be viewed on a standard VHS player.  Both the Bristol County District Attorney (DA) and Attorney Ardito attempted to view the tapes at the DA's office, but discovered that the visual depictions were not helpful.  On December 4, 2002, David Ardito and Assistant District Attorney (ADA) Christopher Abreu[4] went to AMSA's facilities to view the tapes.  Exhibit O, Affidavit of David Ardito.[5]  This is where the tapes were last seen.

Abreu took the tapes to AMSA where he met Ardito in the parking lot.  They both entered the building together.  See Exhibit G, Abreu Deposition, generally  pp. 13-16.[6]  From there, they went to Khoury's office, then to the video room.  <u>Id</u>., at 23.  They stayed approximately two hours.  <u>Id.,</u> at 21.  When they entered the room viewing room (where the equipment was), Abreu handed the tapes to Edward O'Brien, then Director of Security for AMSA.  <u>Id.,</u> at 26-28.  They

[4] Abreu was not the lead ADA on the case at the time.  He was asked to cover this task for another ADA.  Abreau Deposition, p. 12.

[5] At the time of this meeting, the contested workers compensation claim had been resolved, and Kiernan had filed her MCAD Complaint.

[6] Abreu did not go to AMSA to investigate the events of May 19, but rather to view the tapes and report his findings back to the DA's Office.  <u>Id.,</u> at 103.  It was also to give Ardito a chance to review the tapes.  <u>Id.</u>

viewed more than one tape. <u>Id.</u>  Among the things, Abreu saw Ciambriello move from the area he was working, and saw him and Kiernan walking to Khoury's office. <u>Id.</u>, at 34.  The audio clearly noted someone saying "I'm not going in there." <u>Id.</u>, at 34, and 39-40, 55-56, 73-74; see also, Exhibit G, notes.[7]  Abreu knew that this tape was going to be used during the criminal trial but the tape needed to be formatted so it could be shown to a jury using a standard VCR. <u>Id.</u>, at 56.

Ardito also wanted to see the tapes.  Abreu, at 30.  While they were watching the tapes, Abreu was trying to get Ardito to stipulate to what they were viewing. <u>Id.</u>, at 43-44.  Ardito acknowledged hearing Kiernan's protests. <u>Id.</u>, at 75.

He also testified that in any other case, it would have been appropriate to take the tapes with him following the viewing. <u>Id.</u>, at p. 18.  However, he admitted that in this particular case, "the only way [he] would have left them [at AMSA] is because nobody had the technology to tape them at a frame where they would watch it on any regular VCR." <u>Id.</u>  At that time, the DA's office did not have at its disposal any other equipment or vendor available to it to decode the tapes. <u>Id.</u>, at 46-48.  If the technology had been available, there would have been no need to go to AMSA to view the tapes. <u>Id.</u>, at 57.

Ardito and Abreu left the building together, with no one else. <u>Id.</u>, 50-52.  In a memo written in June 2002  to ADA Jeanne Veenstra, the lead ADA on the

---

[7] The voice was a female voice, and it is undisputed that Kiernan and Ciambriello were the only people in the facility during the time in question.  See Abreu, at 34-35.  Additionally, AMSA employee O'Brien told Det. Otrando that he too heard the comment.  Otrando, p. 80-81.

case who would ultimately take the case to trial, Abreu told her that he knew

AMSA "….still has tapes of the incident." Id., at 61-62.[8]  See also, Exhibit G.

This was based on knowledge he had at the time. Id., at 96-97.  Abreu also

testified that if he left them at AMSA, it would have been to have AMSA make

copies.  Id., at 55, 81.[9]  However, Abreu cannot definitely testify if he left them

there.  Id.   Ardito later told him that he could not remember if Abreu had tapes in

this hands.  Id., 65-66.

In a letter dated February 20, 2003, Ardito sent a letter directly to AMSA

stating the following:

> Through counsel I have requested a copy of the video tape from
> the time …..Kiernan checked into the building to the time she
> checked out of the building….I ask….that you kindly provide this
> office with same as soon as possible as I am due into court on
> behalf of (Ciambriello).
>
> Exhibit N, Ardito letter.

In a letter dated February 27, 2003 to Ardito, AMSA's counsel Allison

Romantz stated the following:

> As I previously indicated to you, AMSA provided all of the takes
> from its security system on the date in question to the Attleboro
> Police.  Enclosed is a copy of the receipt statement from Detective
> John Orlando [sic] from the Attleboro police acknowledging his
> receipt of the tapes.
>
> While I am uncertain as to why the district attorney is representing
> to you that the Commonwealth is not in possession of the tapes,

---

[8] Based on this memorandum it would appear that the year in Attorney Ardito's (Exhibit O)
affidavit is not correct.  Although this is only an assumption, since Attorney Ardito represented
that he and/or his assistant carefully reviewed his calendar to determine the date.

[9] AMSA's former Director of Security was unclear on any discussion of copying the tapes.
However, it appears from his testimony that he left open the possibility that such a discussion did
occur.  O'Brien, 81-82.

<u>this receipt shows that the police have been in possession of the tapes since August 17, 2001</u>.

Exhibit J, Romantz letter, [emphasis added].

In a fax dated March 4, 2003, Ardito told Veenstra "….the Attleboro Police Department has the video that we have been looking for."  Ardito Fax.

In a letter dated March 18, 2003, ADA Veenstra reply replied to the fax.  In pertinent part, she states:

As you …know, ..tapes were unable to be viewed on standard equipment and arrangements were made to view the tapes at the AMSA facility.  ….  <u>As I had previously informed you, former assistant district attorney Abreu has indicated that he did not take any tapes when he left AMSA.  You indicated that you didn't see him leave with any tapes.  You indicated that you didn't take the tapes from AMSA.  Obviously I was not there can cannot explain where the tapes are.  It is possible that they were left at the AMSA facility.</u>

Exhibit M, Veenstra letter, [emphasis added] and see Affidavit of Jeanne Veenstra, Exhibit P.

In the criminal case, Ardito claimed that the tapes – which he himself viewed – were <u>exculpatory evidence lost by the Commonwealth.</u>  See Exhibit Q, Affidavit of David Ardito dated July 30, 2003, [emphasis added].

The jury acquitted Ciambriello on the rape count of the indictment, and was split on the issue on Assault and Battery.  Ciambriello ultimately plead to a reduced charge of simple assault and battery, avoiding a second trial.


## **<u>ARGUMENT</u>**

1. <u>Both Defendants Should Be Sanctioned For Spoliation of Evidence</u>.

"The destruction of relevant evidence . . . has a pernicious effect on the truth-finding function of our courts." Wiedmann v. Bradford Group, Inc., 444 Mass. 698, 705 (Mass. 2005)[citing: Fletcher v. Dorchester Mut. Ins. Co., 437 Mass. 544, 553, 773 N.E.2d 420 (2002). "The doctrine of spoliation allows a court to impose sanctions and remedies for the destruction of evidence in civil litigation, "based on the premise that a party who has negligently or intentionally lost or destroyed evidence known to be relevant for an upcoming legal proceeding should be held accountable for any unfair prejudice that results." Id. [citing: Keene v. Brigham & Women's Hosp., Inc., 439 Mass. 223, 234, 786 N.E.2d 824 (2003)]. "The doctrine is based on the premise that a party who has negligently or intentionally lost or destroyed evidence known to be relevant for an upcoming legal proceeding should be held accountable for any unfair prejudice that results." Keene v. Brigham & Women's Hosp., Inc., 439 Mass. At 234, 786 N.E.2d at 832-833. (Mass. 2003)[citing: Fletcher v. Dorchester Mut. Ins. Co., 437 Mass. at 549-550, 773 N.E.2d 420 (2002); Kippenhan v. Chaulk Servs., Inc., 428 Mass. 124, 127, 697 N.E.2d 527 (1998); and Nally v. Volkswagen of Am., Inc., 405 Mass. 191, 197-198, 539 N.E.2d 1017 (1989).

The fact that the MCAD complaint was not filed until November 14, 2001, or that this litigation was not commenced until January 20, 2004, because

> [s]anctions may be appropriate for the spoliation of evidence that occurs even before an action has been commenced, if a litigant ……..knows or reasonably should know that the evidence might be relevant to a possible action. See Nally v. Volkswagen of Am.. Inc., supra at 197-198; Lewy v. Remington Arms Co., 836 F.2d 1104, 1112 (8th Cir. 1988); Fire Ins. Exch. v. Zenith Radio Corp., 103 Nev. 648, 651, 747 P.2d 911 (1987). The threat of a lawsuit must be sufficiently apparent, however, that a reasonable person in the spoliator's position

> would realize, at the time of spoliation, the possible importance of the
> evidence to the resolution of the potential dispute.
>
> Kippenhan v. Chaulk Servs., 428 Mass. at 127 (1998) [emphasis
> added].

The litigant must have some reason to believe that the evidence might be relevant. "To be relevant, evidence must have some tendency to prove or disprove a particular fact, and that particular fact must be material to an issue in the case." Gath v. M/A-COM, Inc., 440 Mass. 482, 489-490 (2003)[citing: Poirier v. Plymouth, 374 Mass. 206, 210, 372 N.E.2d 212 (1978); P.J. Liacos, M.S. Brodin & M. Avery, Massachusetts Evidence § 4.1, at 108 (7th ed. 1999) (Liacos)]. Once the litigant knows "'the evidence might be relevant to a possible action' [there is a] duty to preserve such evidence in the interests of fairness." Fletcher v. Dorchester Mut. Ins. Co., 437 Mass. at 550 (Mass. 2002)[citing: Kippenhan v. Chaulk Serve., Inc., 428 Mass. at 127].

In this case, as neither Defendant can claim that the taped evidence was not relevant to any of the factual issues presented in this case, they had an obligation to preserve the tapes.

    a.   Ciambriello

Ciambriello's testimony reflects part of his defense strategy in this case: consent. During his deposition, he was asked how the decision was made to go to Jason Khoury's office:

> Q. Was her breathing heavier?
> A. Normal.
> Q. Did she attempt to pull away from you?
> A. No.
> Q. And she said keep going?
> A. Yes.

Q.      And what was the next thing that happened?

A.      We decide to go to -- get up, go to Jason's office.  We walk through the hallway, and went in --

Q.      Stop right there.  I'll go back to that, but when you say we decided, what do you mean?

A.      We both decide.

Q.      How was the decision made?

A.      Excuse me?

Q.      How was the decision made?

A.      We go to Jason's office.

Q.      Who suggested it?

A.      We both said same time.

Q.      So you both decided to go into Jason's office?

A.      Yes.

Q.      You both said it at the same time?

A.      Yes.

Exhibit E, Ciambriello Deposition, pp. 89-90 [emphasis added].

Q.      But you had testified you had both said at the same time --

A.      Yes, yes.

Q.      -- you had both said at the same time, Let's go into Jason's office?

A.      Yes.

Q.      So was it before or after that that she said, Not right now?

A.      First we say we go to Jason's office.

Q.      You both do?

A.      We both do, so we said that, and then after a second she say, Oh, no right now, and then she changed her mind again.

Q.      How much time had elapsed before her saying no right now and her, as you have testified, changing her mind?

A.      Maybe in a minute.

Q.       Did she do anything during that minute; was she working, doing anything?

A.      No, we didn't do nothing.  It was nothing.  We just sit down and do nothing.  We get up, we supposed to go, then she said, No right now, then she change her mind, we go in.  That's how it happening. [sic]

Id., at 104-105.

Throughout his deposition Ciambriello testified that Kiernan initiated

sexual conversations, spoke ill of her husband, and complained that her husband

did not work, was home all the time, was a "lazy bum" and that he would "watch porn all the time and then ….jerk off." Id., 69-70.  These discussions were not limited to that day, but happened over a period of time prior to May 19.  Id.., 128-134.  Certainly, the audio of the discussions would have been available on the tapes that both Ciambriello and AMSA would want to preserve.  Yet they did not.

Additionally, Ciambriello was asked the following question:

> Q.    So while you were rubbing her shoulders and her back, you knew at least 2 or 3 cameras were looking at you?
> ATTY. ROMANTZ:  Objection.
> A.    Yes.
> Q.    That didn't bother you?
> A.    No.
>
> Id.,  94-95.

But that's not all.  Ciambriello also testified;

> Q.    And at no time did she say to you I don't want to go in there?
> ATTY. ROMANTZ:  Objection.
> A.    No.
> Q.    If she had said to you, I don't want to go in there, would it have been appropriate for you to go into that room with her?
> ATTY. ROMANTZ:  Objection.
> A.    No.
>
> Id., at 137.

Kiernan's alleged behavior and demeanor (some of which predates May 19, 2001) that supports Ciambriello's (and AMSA's) consent defense was being recorded and Ciambriello (and presumably AMSA) knew it was being recorded.  Yet despite this – where are those tapes?  Where is the evidence that Ciambriello was looking for such helpful and undeniably exculpatory evidence

after his arrest?  It does not exist.  Yet now, with the tapes missing, Ciambriello and AMSA want to maintain a consent defense.

Despite his testimony that he would have recognized and respected Kiernan's wishes to not go into the room, Ciambriello's testimony that it was a joint decision is the opposite of what the ADA and Otrando testified they heard on the now missing tapes.[10]  No other tapes or visual depictions of the Plaintiff were disclosed by either party.   Even those other tapes are completely unaccounted for despite an existing civil claim (workers compensation), and insurer who understood the value (and/or the negative impact) of the tapes on the claim, as well as a pending criminal charges, in addition to a company policy that required retention of the tapes for a period of time.  Perhaps most importantly, there is not a scintilla of evidence that Ciambriello sought the tapes to assist in the defense of a criminal charge that could have put him behind bars for a long, long time.

That he did not search him out, coupled with the underlying company policy, and Ciambriello's (and AMSA's) defense of "consent" requires a sanction.

b.    AMSA

AMSA has aggressively litigated the issue of consent.  In fact, in its answer by claimed that the Plaintiff welcomed the sexual attack.  Defendant's Answer, paragraph 13.  While AMSA has many – if not most – of the same problems on spoliation that are elaborated above, the greater problem with AMSA is its peculiar reliance on the August 17, 2001 "receipt."

---

[10] Otrando also testified to that effect at the Motion to Dismiss hearing in the New Bedford Superior Court.  See Transcript, p. 16.

While the receipt and testimony confirm that the Attleboro police removed the tapes from AMSA on May 20 and August 17, 2001, it is undisputed that on December 4, 2002, those tapes found their way back onto AMSA's property, back into AMSA's equipment, and indeed, in AMSA's control.  By this time, the MCAD Charge had been filed.[11]

Abreu testified that he handed the tapes to O'Brien who ran the equipment.  Thus, to claim that the AMSA surrendered custody and control of the tapes as of August 17, 2001, clearly implying that this day is the last day the tapes were seen by any one at AMSA, is simply disingenuous.

The facts of this case parallel a case from the 8th Circuit.  In rejecting the reliance on a document retention policy as a justification for destroying documents, the 8th Circuit stated:

> ….[I]f the corporation knew or should have know that the documents would become material at some point in the future, then such documents should have been preserved.  Thus <u>a corporation cannot blindly destroy documents and expect to be shielded by a seemingly innocuous document retention policy.</u>
>
> <u>Lewy v. Remington Arms. Co., Inc.</u>, 836 F.2d 1104,1112 (8th Cir. 1988)[citing <u>Gumbs v. International Harvester, Inc</u>., 718 F.2d 88, 96 (3rd Cir. 1983).

In following this same analysis, AMSA cannot rely on the "receipt" as evidence that it did not lose the tapes.  Indeed, it is entirely possible that a fact finder could determine that taking all of the testimony into account, the tapes were left at AMSA either accidentally, or with the intent for AMSA to make copies for the parties (<u>since the testimony reveals that at the time, only AMSA could</u>).  If

---

[11] AMSA's Position Statement and Answer to the MCAD Charge was filed on January 14, 2002.

those tapes were left at AMSA, then AMSA caused their spoliation.  If that is the case, they must be not only precluded from pursuing their "consent" defense but also must be sanctioned for what would ultimately amount to a reckless and profoundly callous disregard for Kiernan's civil rights.

    2. <u>The Sanctions Options</u>

"A judge has broad discretion to make evidentiary rulings, including the power to exclude evidence that would unfairly prejudice an opposing party.  <u>Gath v. M/A-COM, Inc</u>., 440 Mass. 482, 488 (Mass. 2003) [citing: <u>Nally v. Volkswagen of Am., Inc</u>., 405 Mass. 191, 197, 539 N.E.2d 1017 (1989)]. In a case involving spoliation, exclusion of evidence both sanctions the party responsible for destroying certain evidence and remedies the unfairness that such spoliation created.  <u>Id.,</u> [citing <u>Kippenhan v. Chaulk Servs., Inc</u>., 428 Mass. 124, 127, 697 N.E.2d 527 (1998); <u>Fletcher v. Dorchester Mut. Ins. Co</u>., 437 Mass. 544, 550, 773 N.E.2d 420 (2002)."

In this case, Ciambriello and AMSA should be precluded from presenting any testimony that the sexual acts inflicted on Plaintiff were consensual.

These sanctions should include, but not be limited to:

    a.    a preliminary comment to the jury by the court that AMSA destroyed important evidence that might have sent Ciambriello to prison for rape;

    b.    permitting Plaintiff's counsel to comment on the spoliation in opening statements;

    c.    permitting Plaintiff's counsel to comment on the spoliation and AMSA's aggressive posture on the issue of consent in the closing statements;

      d.      a comment to the jury by the court that AMSA destroyed important evidence and AMSA's aggressive posture on the issue of consent in the closing statements.

Additionally, a default judgment should not be ruled out.  The evidence thus far obtained reveals that AMSA, and its insurer, knew that the tapes were valuable and important prior to August 17, 2001, and further, that Kiernan's claim could be "expensive."  Ciambriello has made a number of factual representations claiming that Kiernan invited the conduct, and acted in a manner on that day and in the days prior that might lead a reasonable person to conclude she consented. Despite those claims, there is no evidence of any attempt made by AMSA or Ciambriello to copy the tapes before giving them to the police, and instead, relied only on the "receipt."[12]

AMSA's reliance on the receipt is disingenuous since it is undeniable that the tapes were back on AMSA property long after August 17, 2001.  If they were left there – either accidentally or intentionally – AMSA had control of them regardless of a receipt that says they were retrieved on August 17, 2001.

Assuming AMSA is the party who caused the spoliation, it is perfectly logical to conclude that AMSA did so with the full knowledge that without the evidence, a criminal conviction of Ciambriello would be difficult, and a civil action less "expensive."  If so, it undoubtedly fits the definition of a reckless and callous disregard for Kiernan's civil rights.  Such a finding justifies the entry of a default judgment or alternatively, a strongly worded jury instruction on punitive damages.

---

[12] Indeed, AMSA's own policy – to protect itself against claims made by customers – would <u>require</u> them to make a copy of the tapes before giving them to the police.

3.  <u>If Sanctions cannot be awarded now, then bifurcation is necessary</u>

The Court may find that there does not exist sufficient undisputed facts to support a finding of spoliation to proceed to trial with an imposition of an appropriate sanction.  As credibility of the parties and witnesses are always an issue for a fact finder, Plaintiff believes that the issue of spoliation should be tried before a full trial on the merits of the case.

Pursuant to Fed.R.Civ.P. 42 (b), "to avoid prejudice…[the court] may order a separate trial of ….. any separate issue…"   The decision to bifurcate is within the discretion of the trial court.  <u>Lindsey v. Prive Corp.</u>, 161 F.3d 886, 892 (5th Cir. 1998); <u>Quintanilla v. City of Downey</u>, 84 F.3d 353, 356 (9th Cir. 1996), <u>cert denied</u>, 519 U.S. 1122, 117 S.Ct. 972, 136 L.Ed.2d. 856 (1997).

In this case, AMSA has aggressively, and at times (from Plaintiff's perspective) gratuitously litigated the issue of consent.   However, Plaintiff maintains that if the tapes were not lost and/or destroyed, Ciambriello might not be a free man today.  Indeed, if the tapes were not missing, the lack of consent might have already been established by a New Bedford Superior Court jury.  After all, it is important to remember that one of the key elements missing from the tape was Kiernan's voice stating "No. No. I do not want to go in there" (or words to that effect) as well as the time Kiernan spent in the room.

As New Bedford Superior Court Justice Nonnie Burnes commented in denying Ciambriello's Motion to Dismiss the Indictments:

> A jury watching these tapes could question whether that time was
> sufficient for the alleged assault to occur.  The lost tapes also raise

important questions about Kiernan's credibility. While Kiernan claims that a friend visited her inside the building after the assault occurred, the friend is not present on any of the recordings. Because the defense in this case is consent of the victim, <u>evidence that tends to damage Kiernan's credibility could benefit the defendant</u>.

See Exhibit H, Findings of Fact, Conclusions of Law and Order on Motion to Dismiss, Commonwealth vv. Ciambriello, BRCR 2002-0773 (1-2), p. 5.[13]

Trying the factual questions surrounding the spoliation claim, along with the merits of the entire case, could unfairly and irreparably prejudice the Plaintiff. Indeed, a juror could question Kiernan's credibility, which would be unfair if at the same time the jury was questioning whether AMSA is at fault for missing evidence that might resolve the credibility issue, or at the very least, provide some objective (and since the tape shows the very day of the attack, contemporaneous) guidance.

Perhaps most importantly, without bifurcation of the issue, the Defendants have the "roll of the dice" that any defendant in their position would hope to get. As stated previously, "[t]he destruction of relevant evidence . . . has a pernicious effect on the truth-finding function of our courts." <u>Wiedmann v. Bradford Group, Inc.</u>, <u>supra</u> at 705. This axiom forms the foundational policy supporting the doctrine of spoliation. To give these Defendants the opportunity to a full defense, without a prior full and fair determination on the issue of spoliation, would not only be unfair and prejudicial, but could potentially reward a party who may have wanted to ensure the truth never got out.

---

[13] The Bristol County Superior Court also found that the lost tapes prejudiced the Commonwealth's case against Ciambriello. See footnote 3, p. 6. Exhibit H.

Accordingly, for all of those reasons, this issue should be bifurcated, with a separate fact finding trial.[14]

## CONCLUSION

For all of the foregoing reasons, the Plaintiff respectfully requests that her Motion for Sanctions be GRANTED or in the alternative, that the issue of spoliation be bifurcated.

Respectfully submitted:
HEATHER KIERNAN

DATED:        February 10, 2006

/s/  William J. McLeod
William J. McLeod, BBO 560572
McLEOD LAW OFFICES, PC
77 Franklin Street
Boston, MA  02110
617.542.2956/phone
617.695.2778/fax
wjm@mcleodlawoffices.com

---

[14] In the Local Rule 7.1(A)(2). conference with Attorney Ardito, he agreed that the case should be bifurcated on this issue.