# Exhibit A

UNITED STATES DISTRICT COURT
District of Massachusetts

**Heather Kiernan**

**v.** **Civil Action No. 2004-10131-RBC**

**Armored Motor Services of America**

**AFFIDAVIT OF RECORDS**

This will verify that the attached are true and accurate copies of documents and/or information relating to the claim file for Heather Kiernan, for claim number 977 C 29072. The documents and/or information produced herewith are kept and maintained in the ordinary course of business of Hartford Fire Insurance Company, including its affiliates, and were either prepare by persons with knowledge of the facts recorded, or communicated to the recording person or persons by someone with knowledge of those facts.

**FURTHER AFFIANT SAYETH NAUGHT.**

Nathaniel Miller
Hartford Fire Insurance Company
And its Affiliates

STATE OF CONNECTICUT)
) SS:
COUNTY OF HARTFORD )

Sworn to before me this 28th day
of March, 2005

Notary Public
My Commission Expires:
7/31/09

CAROL S. GEYER
NOTARY PUBLIC
MY COMMISSION EXPIRES JULY 31, 2009

*Law Office of*
**PAMELA STORM**

**MEMORANDUM**

| | | | |
|---|---|---|---|
| **To:** | Laura Scougall, Hartford, CT Claims Office | **Date:** | 7/5/01 |
| **From:** | Christine M. Harding, Boston Legal | **Phone:** | (617) 556-0200 |
| **Subject:** | Heather Kiernan vs. Armored Motor Service | | |
| **File #:** | 977 C 29072 | | |

**ATTORNEY'S SUIT ANALYSIS**

**1. Statement of Facts**

-employee alleges stress/psych injury as a result of sexual assault by supervisor on 5/19/01. Supervisor has criminal charge pending against him and no longer works for insured.

**2. Theories of Compensability/Defenses**

-Liability.
-Disability.
-Causal Relationship-is the stress injury a predominant contributing cause of any disability.

**3. Witnesses**

-Employee-as to facts.
-Christine Parrott and Mike Paschetta-co-employees who will state employee reported it to them that night.

**4. Injured and Injuries**

-Employee 22 year old data entry clerk. Meds not available-other than disability slip signed by some provider. Alleges anxiety/depression.

**5. Other Insurers**

N/A

**6. Recommendations and Conclusions**

-Obtain Recorded statement of Christine Parrott. & Mike Paschetta

Law Office of
Pamela Storm
10 Post Office Square, Suite 1155
Boston, MA 02109

**Pre-Trial and/or Suit Disposition Report**

| To: Laura Scougall, Hartford CT WC Claim Ofc. | | From: David G. Sullivan, Boston Legal | | Date: 7/11/01 |
|---|---|---|---|---|
| Claim Number: 977 C 29072 | Title: Heather Kiernan v. Armored Motor Service | | | |
| Court: Department of Industrial Accidents Fall River | | For Plaintiff: Timothy O'Leary | | |
| Judge: Conciliator Colleen Cox | | For Defendant: David G. Sullivan | | |
| Reserve | Settlement Authority | | | |
| Offer | Demand | Judge's Rec. | Disposition: Held by conciliator. | |

1) **<u>Summary of the Case</u>:** This is a claim for total disability benefits from 5/19/01 to date and continuing for this 22- year-old data entry clerk who worked for Armored Motor Service for approximately six weeks prior to an alleged injury date of 5/19/01. The employee alleges that she was sexually assaulted at the workplace by a supervisor – Tony Ciambriello.

Information received from the employer prior to conciliation indicated that they have videotape of the employee and Ciambriello walking into a manager's office. The office cannot be viewed by the company surveillance camera. After 15 minutes they were both seen leaving the office together. Kiernan entered the ladies room and Ciambriello walked toward the soda machine. The employer, who viewed the videotape prior to it being taken by Attleboro police, indicated that all appeared fine but due to the distance they were from the camera, it was hard to tell. A short time later Kiernan came out of the ladies room and used the phone and called a co-employee Christina Parott who was not working that day but came to meet with Kiernan after her request.

At approximately 8:00 all parties left the building together with the two women going to their own vehicles and Ciambriello to his.

Subsequent investigations by William Callahan, security manager of the insured, spoke with Christina Parott who advised that she was at home taking a nap when she received a telephone call from Kiernan who sounded upset and wanted to speak with her. She went and met with Kiernan at the insured and Kiernan immediately told her that she had been sexually assaulted by Ciambriello and did not know what to do. Parott stayed with her through the rest of her shift to discuss the matter further. They left without incident and they went to another co-employee Michael Paschetta's home and arrived there at approximately 9:00. They told Paschetta about the assault and they discussed whether Kiernan should report it or not.

Parott confirmed to the employer's investigator that since the incident Kiernan has been very visibly upset and having problems coping.

The investigator could not speak with Michael Paschetta as he was in the hospital for an unrelated matter.

Prior to the conciliation Laura Scougall advised me that the employee had called the employer on July 6, 2001 and stated that, against the advice of her attorney, she planned to return to work on Monday, July 9th. However, on July 9th she called and advised them that at her attorney's suggestion, she was not going to return to work as she had planned.

2) **Disposition at Court:** At the DIA today, I spoke with Attorney Tim O'Leary regarding this matter and he produced the attached packet of medicals which include the Sturdy Memorial Hospital rape kit, and notes of Cheryl Gottesman, M.D. from 6/01/ through 7/10/01. They also included two disability notes signed by Dr. Gottesman on 7/10/01 and 6/12/01 finding the employee presently totally disabled.

Attorney O'Leary, prior to going to see the conciliator, did not have a lot to say about the employee failing to return to work, and I felt at this point, as I still felt his medicals were inadequate, I would keep this information for use at a later time.

We went before conciliator Cox and he gave the following history:

The employee is married and at the time of the injury had a 3 month-old son and had just been working for the employer for six weeks as a data entry person at $9.50 per hour for times 40 hours. She had a prior incident with Tony Ciambriello who came into her office at one point (on a prior date although the specific date was not identified) and he dropped his pants, tucked in his shirt and put on his gun belt. At that time she asked him "shouldn't you do that in the bathroom?" and he said "why, if I can do it here?" She was afraid to report this to her supervisor, as her supervisor is friends with Ciambriello.

On Saturday May 19, 2001, the employee alleges (through Attorney O'Leary's file, as the employee was not present today), that she arrived at the work place at 2:30 in the afternoon and Tony was there who let her in and then locked the doors. Tony had told her that he had been out drinking until 4:00 a.m. that morning at the JukeBox. He advised her that he was doing his usual routine that day.

The employee allegedly made some popcorn, and a truck arrived, and she began to put in data entry information. She states that Tony followed her into her office and as she was putting in the information in her computer, Tony leaned forward, leaning against her stating that he was trying to "learn" but he had no questions about what she was doing. She was sitting sideways, and alleges that Ciambriello started massaging her shoulder and pulled her towards him. Ciambriello put his hand up her shirt and bra and then tried to unzip her jeans and unhook her bra. She alleges that she stood up and protested, but he dragged her by her right arm to the boss's office during which time she protested. He pulled her into the office, pulled her pants down, pulled his pants down, and proceeded to digitally and orally penetrate her. It is alleged that she had bite marks and bruises as a

result of this encounter. He then told her that he wanted her to "suck it." She said, "I have to go to the bathroom" and left the room, and locked it, cried and was terrified. She thought he would kill her. A co-employee "Chris" was called by the employee who came into work and told her what had happened and they left together. They went from work to "Mike's house" where she had one glass of wine, was nervous and scared, and they all discussed the matter. She states that she went home at 11:00 o'clock, told her husband, and they called her parents to come and baby-sit. They called the North Attleboro police and an ambulance brought her to Sturdy Memorial Hospital where a rape kit was executed.

The Sturdy Memorial emergency room care notes state time in 1:09 a.m. and reason for visit "sexual assault." The remainder of the document is difficult to read.

The notes of Dr. Gottesman state that she is suffering from anxiety and is unable to work as a result of the incident.

I argued to the conciliator that the medicals do not meet the standard requirement of the statute that the alleged work incident was a "predominant contributing cause" to any mental stress condition. In the notes of Attleboro Medical Associates dated 5/4/01 it states under other concerns that "S/P vandalized car last week." Attorney O'Leary indicated that apparently she did have her car vandalized and didn't know if it had anything to do with the rape incident and the fact that Mr. Ciambriello was apparently out on bail. My argument to the conciliator was that certainly the vandalized car could have had something to do with something totally unrelated to the work incident and she might have had other things going on in her life which was causing her stress. I therefore argued that in order for the case to be sent forward to conference, they would need a medical clearly using the "predominant contributing cause" language. I also argued that the treatment notes where she is currently treating (according to Attorney O'Leary – New Hope Counseling Center) should be obtained. Attorney O'Leary argued that as this is a rape, he does not know if those medicals will be released. I argued that she has the burden of proof, and she should have a right to get those medicals.

Conciliator Cox suggested that Attorney O'Leary try to get those medicals, but recognized that he might have a problem with that due to the sensitive nature of same. She agreed that a statement regarding "predominant contributing cause" would certainly be helpful at this point. She indicated that she would hold the matter until she could get some additional medicals from Attorney O'Leary whom said he would attempt to get same.

3)    **Recommendations:** I would suggest that you may want to obtain a recorded statement of Christina Parott as well as Mike Paschetta to see if they again verify the employee's allegations.

I would also suggest that any videotape the employer has of the employee's workstation be scoured to see if they show the initial assault, which occurred at the employee's desk on 5/19/01. According to the file information, Ciambriello is no longer working for the insured and a criminal prosecution against him for rape is still pending. Given the sympathetic nature of this incident, and the fact that right now it appears to be verified by two co-employees, this may be a difficult case to get around once the employee has met their burden regarding "predominant contributing cause."

Very truly yours,


David G. Sullivan

DGS:jb
07/16/01

*Law Office of*
**PAMELA STORM**

**MEMORANDUM**

| | | | |
|---|---|---|---|
| **To:** | Laura Scougall, Hartford, CT Claims Office | **Date:** | 7/16/01 |
| **From:** | David G. Sullivan | **Phone:** | (617) 556-0200 |
| **Subject:** | Heather Kiernan v. Armored Motor Service | | |
| **File #:** | 977 C 29072 | | |

Laura:

Please be advised that Conciliator Colleen Cox will be sending out new notices for a continued conciliation in August. We will advise you of the exact date.

In the meantime Attorney O'Leary was to try to get an affidavit regarding the "predominant contributing cause" from the medical provider and he will continue attempts to get medical records from New Hope Counseling Center.

Additionally, he is going to explore the possibility, if the employee does feel able to return to work, of a possible closed period which we would only possibly agree to do so on a non-prejudicial basis. I can discuss this matter further with you if that is something they can consider doing.

Very truly yours,

David G. Sullivan

DGS/jrn

07-17-01/jrn

PLOYEE: HEATHER L KIERNAN
PLOYER: ARMORED MOTOR SVC
ATTLEBORO, MA 02703
SURER : HARTFORD INSURANCE COMPANY

DEPT OF INDUSTRIAL ACCIDENTS
30 THIRD STREET
1ST FLOOR
FALL RIVER, MA 02720

JURY DATE : 05/19/01
ARD NUMBER: 02147501

FORM : 003
DATED: 07/17/01

LSS
01 WBR MF 4530
CMH
977 C 29072
m diary 10m
faxed to virginia payton
7/20/01

HARTFORD INSURANCE COMPANY
C/O PAMELA STORM
10 POST OFFICE SQ,SUITE 1155
BOSTON, MA 02109

A Conciliation on a CLAIM request has been scheduled for the following parties in the above referenced case on 08/15/01 at 11:00 AM to take place at the FALL RIVER regional office:

HEATHER L KIERNAN (MOVING PARTY)
REPRESENTED BY: GARY W ORLACCHIO ESQ

HARTFORD INSURANCE COMPANY
REPRESENTED BY: CHRISTINE M HARDING ESQ

If you intend to bring a representative, please notify him/her of location, date and time. Conciliations should be completed in one hour.

YOU MUST BRING MEDICAL REPORTS AND OTHER DOCUMENTARY MATTER, SUCH AS PAY STUBS AND MEDICAL BILLS RELEVANT TO THE CASE. FAILURE TO DO SO WILL LEAD TO A WITHDRAWAL OR PREVENT YOU FROM BRINGING UP THIS INFORMATION AT A LATER DATE.

Failure of the party filing the Claim or Discontinuance request to attend a Conciliation may result in automatic withdrawal by the Department.

Failure of the party responding to the Claim or Discontinuance request to attend the Conciliation may cause the matter to be referred to an Administrative Judge, and could result in a reduction of attorney's fee or increase the referral fee, and could prevent the introduction of evidence at later proceedings.

Please use the Board Number shown above when calling for further information about the case.

Call 508-676-3406 if you have questions or other problems.

RECEIVED
JUL 20 2001
LAW OFFICES OF
PAMELA STORM

*** PLEASE DISREGARD ANY PREVIOUS NOTICES ***

*Law Office of*
**PAMELA STORM**

**MEMORANDUM**

| | | | |
|---|---|---|---|
| **To:** | Laura Scougall, Hartford CT WC Claim Ofc. | **Date:** | 07/13/01 |
| **From:** | David G. Sullivan, Boston Legal | **Phone:** | (617) 556-0200 |
| **Subject:** | Heather Kiernan v. Armored Motor Service | | |
| **File #:** | 977 C 29072 | | |

Laura:

On today's date I heard from Attorney Tim O'Leary who indicated he had just been advised by New Hope Counseling that they are not going to release the employee's records as they are a rape crisis center. He indicated that as far as he knows that is the only psychologist she is treating with currently. I questioned him again about the fact that the employee did not return to work upon her attorney's instructions, as at this point it appears we are not going to get the additional medicals from the counseling center. He stated that he is still waiting to verify with the female paralegal in his office, who has been dealing with this employee, whether in fact that is totally accurate.

Given the fact that he is not going to apparently get these medical records, and as he is still verifying the information about the return to work, it was agreed that we would ask Conciliator Cox to reschedule the conciliation rather than just hold it. I have a call into Conciliator Cox for a new date.

In speaking with Attorney O'Leary, he inquired whether, if the employee is ready, willing and able to return to work, whether Hartford might be agreeable to pay a closed period on the matter. I advised him we would only be willing to do so if we could so on a nonprejudicial basis. At this point it appears the only way we could do that would be by a separate §19 agreement which we would have to get approved by either a conciliator or a judge. Attorney O'Leary advised that he would follow up with his paralegal and also with the employee and see if that is an avenue we could pursue.

If we can resolve the matter on a nonliability basis for a closed period, I would suggest that might be the best route to go at this point. I will keep you advised.

Very truly yours,

David G. Sullivan

DGS:jb
07/16/01

William A. Bolton (FL, ME, NH & MA)
Patricia C. Fraizer (ME, NH & MA)
Christine M. Harding (RI & MA)
Steven R. Kruczynski
Charles E. Miracle
Joseph W. Murphy (NH & MA)
Kathleen E. Nelson (RI & MA)
Benjamin A. Pushner (CT, DC, RI & MA)
John H. Stevens (MN, NH & MA)
Pamela Storm
David G. Sullivan (RI & MA)

*Law Office of*
PAMELA STORM
10 POST OFFICE SQUARE, SUITE 1155
BOSTON, MASSACHUSETTS 02109

Telephone: (617) 556-0200
Fax: (617) 482-2643

July 30, 2001

Attorney Timothy O'Leary
Shalhoub & Orlacchio
150 Charles Street
Boston, MA 02114

| RE: | Employee: | Heather Kiernan |
|---|---|---|
| | Employer: | Armored Motor Service |
| | Insurer: | Hartford Insurance Group |
| | Date of Injury: | 5/19/01 |
| | Insurer File No: | 977 C 29072 |

Dear Attorney O'Leary:

When we last discussed the above matter, I had indicated to you that the employee had contacted Armored Motor Service about wanting to return to work, and then called on her scheduled date of return indicating that she had been advised not to return to work.

Please advise whether this is a matter which might lend itself to a possible agreement for a closed period on a non-prejudicial basis.

This matter has been rescheduled for conciliation on August 15, 2001. Please advise prior to that time if you would like to further discuss this matter.

Very truly yours,

David G. Sullivan
DGS/ef

CC: Laura Scougall Hartford W/C Claims

155

July 31, 2001

The Hartford
27 Ledge Rd.
N. Chelmsford, MA 01863

ATTN: Tim Pomerleau

| RE: | FILE#: | 97729072C |
|---|---|---|
| | Insured: | Armor Motor Car of America |
| | Claimant: | Heather L. Kiernan |
| | D.O.L.: | 5/19/01 |
| | NEI #: | 11696 |
| | Claim Rep: | Laura Scougal |

---

P.O. Box 185
S. Weymouth, MA 02190
888-545-5449
781-335-8965
Fax 781-335-9723

**LOSS:** On May 19, 2001 it is alleged that Heather Kiernan suffered from stress while under the employment of Armor Motor Car of America.

**ASSIGNMENT:** On June 29, 2001 we received your request to conduct an investigation with regard to the claimant, Heather Kiernan. Specifically, we were requested to conduct a ten-hour surveillance to document the claimant's employment status and or leisure activities.

**CLAIMANT INFORMATION:** The claimant's address was provided as 47 Juniper Rd. Unit B-3 in North Attleboro, MA; her date of birth as 8/4/78; her Social Security number was provided as 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; and her telephone number was provided as (508) 695-4773.

**SURVEILLANCE:**

**July 13, 2001:** On this day, at 11:00 a.m., I arrived in the area of the claimant's residence.

Upon arrival, I observed the residence to be within a large apartment complex and building B is the last building on the right. The buildings are all brick.

I then proceeded around the side of the claimant's building and observed the claimant's silver Ford Taurus bearing MA Registration 9075HB present in the parking lot.

I then set up a suitable position for surveillance to keep the area under observation.

**11:52 a.m.** At this time, I observed several females in their mid to late 20's, as well as several children in the back of the claimant's building.

I elected to conduct a neighborhood inquiry.

**NEIGHBORHOOD INQUIRY:** Upon approaching these individuals, I first clarified that none of these individuals were the claimant. I was then able to learn that they were somewhat familiar with the claimant on a neighborly basis. They confirmed that the claimant resides at the file address, along with her husband. They then pointed to her vehicle, indicating that was her vehicle. They said that they usually see the claimant's vehicle at home the majority of the time and they said that they did not believe the claimant to be employed.

After learning this information, I discreetly discontinued my conversation and returned to my surveillance vehicle.

**2:30 p.m.** At this time, I observed some landscaping workers.

I elected to exit my vehicle and approach these individuals to engage them in conversation.

Upon approaching these individual, they stated that they were not familiar with the claimant.

I then returned to my surveillance vehicle.

**3:00 p.m.** At this time, I placed a discreet phone call to the claimant's residence.

Upon dialing (508) 695-4773, I learned that this number did not accept private calls.

**3:30 p.m.** At this time, with no activity on behalf of the claimant, I discontinued my surveillance and departed the area.

**SURVEILLANCE:**

**July 17, 2001:** On this day, at 6:00 a.m., I returned to the area of the claimant's residence.

Upon arrival, I observed the claimant's vehicle parked in the same position as during our previous surveillance.

I then set up a suitable position for surveillance to keep the area under observation.

**10:30 a.m.** At this time, I placed a discreet phone call to the claimant's residence.

Upon placing my call and unblocking my telephone number, I was greeted by an answering machine. Momentarily, the claimant interrupted the answering machine and answered the phone.

As it was merely my intention to verify the claimant's presence, I discreetly ended my conversation and departed the area.

**11:30 a.m.** At this time, with no activity on behalf of the claimant, I discontinued my surveillance and departed the area.

**July 20, 2001:** On this day, at 6:00 p.m., I arrived in the area of the claimant's residence.

Upon arrival, I observed the claimant's vehicle present in the same position as previously observed.

I then set up a suitable position for surveillance to keep the area under observation.

**6:21 p.m.** At this time, a male in his 20's, believed to be the claimant's husband, entered the claimant's vehicle and departed the area.

**6:37 p.m.** At this time, the claimant's husband arrived back at the residence. He exited the vehicle, carrying several items and entered the residence through the back door.

**8:45 p.m.** At this time, with no activity on behalf of the claimant, I discontinued my surveillance and departed the area.

## SUMMARY:

As a result of our investigation, we have found no indication that the claimant is employed in any capacity

During our afternoon surveillance efforts on July 13, 2001, we found the claimant within her residence and inactive. We were able to speak with the claimant's neighbors, who confirmed that the claimant resided at the file address with her husband and her child. They stated that they did not believe she was employed, as her vehicle is usually always present.

On July 17, 2001, we conducted a morning surveillance and found the claimant within her residence and inactive.

During our evening surveillance on July 20, 2001, we found the claimant within her residence and inactive. We did observe the claimant's husband departing the area briefly and then returning with several items.

## CLOSING:

At this time, it appears we have completed this assignment as requested.

If your review of this report suggest additional measures be pursed, please contact our office and we will do so upon receipt of your request.

Very truly yours,

William Kenney
Special Investigator

Tracy Ellison
President

Cc: Laura Scougal

Law Office of
Pamela Storm
10 Post Office Square, Suite 1155
Boston, MA 02109

**Pre-Trial and/or Suit Disposition Report**

| To: Laura Scougall, Hartford CT WC Claim Ofc. | | From: Joseph W. Murphy | | Date: 09/19/01 |
|---|---|---|---|---|
| Claim Number: 977 C 29072 | Title: Heather Kiernan v. Armored Motor Service | | | |
| Court: Department of Industrial Accidents Fall River | | For Plaintiff: Timothy O'Leary | | |
| Judge: Conciliator Colleen Cox | | For Defendant: Joseph W. Murphy | | |
| Reserve: Unknown | Settlement Authority: None | | | |
| Offer: None | Demand: None | Judge's Rec.: Dispute Resolution | Disposition: Pending | |

1) **Summary of the Case:** For background on this matter, please review the 7/11/01 report of Attorney Sullivan of this office, and subsequent correspondence.

2) **Disposition at Court:**. The matter was on for a continued conciliation on 9/12/01, having been continued from the last time in order to give claimant's counsel an opportunity to obtain the medical report with the necessary language that the alleged injury at work is the "predominant contributing cause" of the claimant's present disability. Attorney O'Leary did obtain such documentation and provided it to the conciliator, along with the Sturdy Memorial Hospital medical records, including the results of the confidential police "rape kit."

Those medicals are reproduced and attached to this report for your use, and of course, it has been requested that we handle these records with extra care given the confidential nature of the contents.

The medicals provided do indeed make reference to the history as it has been previously related, namely that the claimant was sexually assaulted at work by a coworker, and that she has had medical treatment thereafter of a psychiatric nature. Dr. Joel Friedman, a clinical psychologist, has offered a diagnosis of post traumatic stress disorder, and is treating Kiernan with individual psychotherapy and marital therapy, and offers the opinion that Ms. Kiernan is presently totally disabled as a result of the assault at work.

The claimant was present at the conciliation, with a female friend and her 7 month-old baby boy. The claimant came into the conciliation, so that she could address the allegation that she had called the employer on 7/6/01 indicating that she would return to work Monday, but then subsequently called and said that she would not be returning to work because she had been told by her lawyer not to. Kiernan stated at conciliation that she denies having made that statement, but that on 7/6/01 she did go to her place of employment to talk with her boss there. She states that Jay and Cindy at Armored Motor Service took her into the office of Jay, - 15 -1 is where the rape had taken place, and told

Kiernan that she could come back to work on Monday. They told her that they would again schedule her to work on weekends, which is to say that she would be expected to work alone with one other man in the office, the same situation that led to her rape (alleged rape?) on 5/19/01. She indicated that she really said nothing in the meeting, because she was so "freaked out" just being in the room. She states that she later did call the office and spoke with Cindy and told her that she was not comfortable returning to work on Monday. She again denied claiming that her lawyer had told her not to return to work.

If we are going to rely on the representation that the lawyer told Kiernan not to RTW, we will need to know specifically who heard the statement from Kiernan to the effect alleged, and we should get it in writing as to what was said and to whom about returning to work, and whether the lawyer comment was made.

Kiernan indicated at conciliation that her assailant had not yet gone to trial, but that a 10/26/01 pretrial is scheduled. She indicates that the assailant's ex-wife did have a TRO out on him, and she also indicated that the assailant apparently made his bail ($50,000.00?) because she has seen him out driving his car at least four times in the area.

Although there was some discussion earlier of this matter winding up as a closed period of disability, that does not appear to be the case now. Attorney O'Leary requested and Conciliator Cox agreed to send the matter on to dispute resolution, where it should arrive in three to four months.

3) **Recommendations:** As above, I recommend an explicit signed statement from the person who took the phone call in which Kiernan alleges that her lawyer told her not to return to work.

As I'm sure you have already considered, the outrageous nature of the assailant's behavior, as alleged, and the consistent reporting of same by the claimant victim, makes the claimant a very sympathetic figure in this claim, and in the absence of any true defense, this could be potentially expensive for the Hartford. I cannot recommend that you obtain an IME to assess the claimant's psychiatric response to the assault, since I cannot imagine that any psychiatrist would not sign on to the PTSD diagnosis in light of the allegations. My strong recommendation is that earnest attempts be made to settle this case prior to a judicial determination, without liability if possible, but with liability if necessary.

Very truly yours,

Joseph W. Murphy

JWM/jb
09/18/01

YEE: HEATHER L KIERNAN
OYER: ARMORED MOTOR SVC
ATTLEBORO, MA 02703
URER : HARTFORD INSURANCE COMPANY

DEPT OF INDUSTRIAL ACCIDENTS
30 THIRD STREET
1ST FLOOR
FALL RIVER, MA 02720

JURY DATE : 05/19/01
ARD NUMBER: 02147501

FORM : 003
DATED: 08/15/01

977C29072
LSS
cmH
01WBRMF4830

HARTFORD INSURANCE COMPANY
C/O PAMELA STORM
10 POST OFFICE SQ,SUITE 1155
BOSTON, MA 02109

A Conciliation on a CLAIM request has been scheduled for the following parties in the above referenced case on 09/12/01 at 10:00 AM to take place at the FALL RIVER regional office:

HEATHER L KIERNAN (MOVING PARTY)
REPRESENTED BY: GARY W ORLACCHIO ESQ

HARTFORD INSURANCE COMPANY
REPRESENTED BY: CHRISTINE M HARDING ESQ

If you intend to bring a representative, please notify him/her of location, date and time. Conciliations should be completed in one hour.

YOU MUST BRING MEDICAL REPORTS AND OTHER DOCUMENTARY MATTER, SUCH AS PAY STUBS AND MEDICAL BILLS RELEVANT TO THE CASE. FAILURE TO DO SO WILL LEAD TO A WITHDRAWAL OR PREVENT YOU FROM BRINGING UP THIS INFORMATION AT A LATER DATE.

Failure of the party filing the Claim or Discontinuance request to attend a Conciliation may result in automatic withdrawal by the Department.

Failure of the party responding to the Claim or Discontinuance request to attend the Conciliation may cause the matter to be referred to an Administrative Judge, and could result in a reduction of attorney's fee or increase the referral fee, and could prevent the introduction of evidence at later proceedings.

Please use the Board Number shown above when calling for further information about the case.

Call 508-676-3406 if you have questions or other problems.

RECEIVED
AUG 17 2001
LAW OFFICES OF
PAMELA STORM

*** PLEASE DISREGARD ANY PREVIOUS NOTICES ***

**Scougall, Laura (CLAIM, Claims)**

**To:**          d; .gates@amsaarmored.com
**Cc:**          Seamans, Sharon M (CLAIM, Claims)
**Subject:**     Heather Kiernan

Hi Debbie,
Just thought I'd let you know that the update on Heather is really nothing at this point. I had relayed our authority to counsel and their advice was to hold off on extending an offer because we'd look too anxious and that would drive up the price of the file. I agreed with this reasoning so we've put everything on hold until we receive a date for the conference. We went to a conciliation in September and don't believe that we'll get a date until December/January. I'll let you know when a date comes in and before we begin with the negotiations. If you have any other questions, just give me a call. 866-542-3330.
Laura

THE COMMONWEALTH OF MASSACHUSETTS
DEPARTMENT OF INDUSTRIAL ACCIDENTS
600 WASHINGTON STREET
BOSTON, MA 02111

# AGREEMENT FOR REDEEMING LIABILITY BY LUMP-SUM SETTLEMENT UNDER M.G.L. CH152

For Injuries occurring on or After November 1, 1996

EMPLOYEE: Heather Kiernan — AMOUNT OF LUMP SUM $20,000.00

EMPLOYER: Armored Motor Service of America Inc — TOTAL DEDUCTIONS $ 3,855.00

INSURER: The Hartford — NET TO CLAIMANT $ 16,145** see below deduction #7

BOARD NUMBER 021475-01 — TOTAL PAYMENTS $20,000.00 (Weekly Benefits Plus Lump-Sum)

DATE OF INJURY 5/20/01

CHECK WHERE APPLICABLE

( ) Liability has been established by acceptance or by standing decision of the Board, the Reviewing Board, or a court of the Commonwealth and this settlement shall not redeem liability for the payment of medical benefits and vocational rehabilitation benefits with respect to such injury.

(X) Liability has not been established by acceptance or by standing decision of the Board, Reviewing Board or a court of the Commonwealth and this settlement shall redeem liability for payment of medical benefits and vocational rehabilitation benefits with respect to such injury.

(x) In addition to the lump-sum, the insurer agrees to pay all outstanding reasonable and related medical bills incurred as of this date.

( ) The employee is currently receiving a cost-of-living adjustment.

DEDUCTIONS From lump-sum amount as stated above, the amounts listed below will be deducted and paid directly to the following parties:

| | NAME | ADDRESS |
|---|---|---|
| 1. $ 2,850.00 Lawyer's Fee | Gary W. Orlacchio, Esq. | 150 Charles Street, Boston MA 02114 |
| 2. $ 5.00 Lawyer's Expenses | Gary W. Orlacchio, Esq. (Please attach documentation) | 150 Charles Street, Boston MA 02114 |
| 3. $ Liens | (Please attached discharges) | |
| 4. $ Inchoate Rights | (Please attached discharges) | |
| 5. $ 1,000.00 Section 36 | Heather Kiernan | 4980 North Main St, Bldg 2, Apt 3, Fall River MA 02720 |
| 6. $ | | |

For payment of Permanent Partial loss of function benefits under M.G.L. Ch. 152, Section 36

DEPARTMENT OF INDUSTRIAL ACCIDENTS
DIVISION OF DISPUTE RESOLUTION
APPROVED
FEB - 5 [illegible]
by [signature]
Administrative Judge
in Accordance with Mass. G.L. c. 152

** For payment of Permanent Partial loss of earning capacity over the duration of the employee's life expectancy of 57.4 years in the weekly amount of $5.41 per week, in accordance with the decision of Sciarotta v. Bowen.

faxed 2/7/02 cc: file

# Exhibit B

Volume: I
Pages: 1-120
Exhibits: 1-5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
NO. 04-10131 MLW

- - - - - - - - - - - - - - - - - - - - - - - x

Heather Kiernan,
Plaintiff,

CERTIFIED ORIGINAL
LEGALINK BOSTON

v.

Armored Motor Service of America, Inc.
and Francesco Ciambriello,
Defendants.

- - - - - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF JOHN OTRANDO
Tuesday, May 24, 2005
10:15 a.m.
MORGAN BROWN & JOY, LLP
200 State Street
Boston, Massachusetts 02109-2605

Reporter: Lori-Ann London, RPR

A P P E A R A N C E S:

MCLEOD LAW OFFICES
By William J. McLeod, Esquire
77 Franklin Street
Boston, Massachusetts 02110
617.542.2956
Appearing for the Plaintiff

MORGAN BROWN & JOY, LLP
By Laurence J. Donoghue, Esquire
200 State Street
Boston, Massachusetts 02109-2605
617.523.6666
Appearing for Armored Motor Service of America

DAVID R. ARDITO, ESQUIRE
Bates Building Suite 215A
7 North Main Street
Attleboro, Massachusetts
508.431.2222
Appearing for the Deponent

INDEX

| DEPOSITION OF: | PAGE |
| --- | --- |
| JOHN OTRANDO | |
| EXAMINATION BY MR. McLEOD | 4 |
| EXAMINATION BY MR. DONOGHUE | 97 |
| EXAMINATION BY MR. McLEOD | 109 |
| EXAMINATION BY MR. DONOGHUE | 116 |
| EXAMINATION BY MR. McLEOD | 117 |

X

EXHIBITS

| NO. | | PAGE |
| --- | --- | --- |
| 1 | Arrest Report | 9 |
| 2 | Videotape | 23 |
| 3 | Receipt for six tapes | 39 |
| 4 | Videotape | 65 |
| 5 | Videotape | 92 |

upset, concerned; that's to my best recollection.

Q Okay. Did he -- did he -- I'm going to turn this off. Did he appear -- did you have any concerns about his actions that night that he might --

A No.

Q -- take -- he might go after the alleged attacker or anything like that?

A No.

Q Okay. Now, you looked at videotapes in the video room -- we're back at AMSA now -- you looked at videotapes in the video room, and that process took approximately how long?

A Approximately a half hour, approximate.

Q Okay. And what happened after you looked at the videotapes?

A After speaking with everyone involved, looking over the building and observing the tapes, I had taken three of the tapes into evidence.

Q Now -- and then you left the facility?

A Yes.

Q Okay. When you were viewing the tapes, at any time did you see Mr. Ciambriello sitting down with Miss Kiernan in the office area?

A Yes.

Q And did you view Mr. Ciambriello touching or massaging her in any way?

A In regards to touching, they were walking down the hallway of the money room. He was to her left; he had his right arm around her back in the waist/buttock area. The best that I recall it was a few seconds of tape that I observed them pass by a camera that was in the money room, it appeared to be mounted high, and then walking down a hallway to go into Jason Khoury's office. He was in close proximity. I believe he had his hand on her, guiding her into the office.

Q My question, though, I was focussing on the time when they were sitting down together. Did you ever see him touching her?

A Where they were seated at the dispatch desk?

Q Um-hm.

A No, that was a tough angle because I believe the camera was mounted high coming down, and you really -- you might have seen the legs, but you couldn't see what they were doing. They

were both seated there, though.

Q So you took three tapes that night?

A Yes.

Q Were they of three different angles?

A No, they were -- I believe there are a total of six tapes that are used. I had taken three. I believe they were D, E, and F, and those primarily were the angles that showed Mr. Ciambriello walking with and guiding Miss Kiernan through the -- the money room into the back office, as well as I believe showed her -- him speaking with her at her desk and outside of the building as well.

Q Okay. When you -- when you took the tapes that night, you didn't have a warrant, right?

A That's correct.

Q Okay. And did you leave a receipt or anything for AMSA that night?

A No, I did not.

Q Okay.

MR. McLEOD: If I could have this marked, please.

(Document marked as Exhibit No. 3.)

Q I'm placing before you what's being marked as Exhibit 3. Do you recognize this document?

(Document exhibited to witness.)

A Yes, I do.

Q What is it, please?

A It is a receipt that I signed for six tapes. It was given to me by I believe Jason Khoury. That is, after I received -- I had taken D, E, and F, and several days later I obtained a -- I believe it was a subpoena from the district attorney's office, and they handed over tapes A, B, and C.

Q Is this the only receipt that you signed off on?

A Yes.

Q Is there any reason why you didn't give AMSA a receipt on May -- on the morning of May 20th?

A No.

Q Whose -- strike.

That's your signature that appears at the bottom?

A Yes.

Q Is there anything else on this document that is in your handwriting?

A The date.

Q When you signed this document, it had already been drafted for you?

A Yes.

Q And do you know who drafted it for you?

A It was presented to me by Jason Khoury, I believe. I am not sure. It wasn't drafted in my presence, so I do not know who drafted it.

Q Okay. Now -- and you said you had obtained a subpoena in August of 2001 from the district attorney's office?

A Yes.

Q It was a subpoena for those videotapes?

A The remaining tapes, yes.

Q The remaining three?

A Yes.

Q A, B, and C -- A, B, and C?

A Yes, that's correct.

Q Is it procedure when obtaining materials, documents or things, via subpoena that you leave a receipt?

A I'm not sure what the proper procedure

would be. This is the first subpoena I've -- I did in reference to obtaining tapes. So I don't know if it's common practice to sign a receipt for that.

Q Did you have to confer with anyone, any of your superiors or anyone at the police department, about signing this receipt?

A No, Jason Khoury just informed me that they just wanted a receipt indicating that I had those tapes.

Q Now, when you served -- strike that.

Who was responsible for obtaining the subpoena from the district attorney's office?

A I believe it was Christopher Markey.

Q And did you request that subpoena from the district attorney's office?

A I conferred with him about the case, and he -- yes, I believe I had asked -- I spoke with him about it and I had requested a subpoena because I believe I had talked to AMSA about getting the other tapes, and they talked about getting a subpoena for the remaining tapes.

Q AMSA wanted a subpoena for the remaining tapes?

A To the best of my recollection, yes.

Q They were unwilling to disclose them voluntarily?

MR. DONOGHUE: Objection, but go ahead.

A To the best of my knowledge, they had asked that I get a subpoena for the remaining three tapes.

Q They didn't ask for a subpoena on the morning of May 20th, though, did they?

A No.

Q Did -- were you told why they wanted a subpoena?

A I don't recall.

Q Now, you -- when you left AMSA on the morning of May 20th, you had an understanding as to what was on tapes D, E, and F -- sorry -- A, B, and -- on A, B, and C, the tapes you didn't take on May 20th, and just so we're clear here, you took A, B, and C -- let me strike it, just so the record is clear.

You took D, E, and F on May 20th, and then A, B, and C were by subpoena in August of 2001?

A Correct.

Q Okay. When you left AMSA's premises on May 20th, 2001, did you have an understanding as to what was on tapes A, B, and C?

A No.

Q How did you come to learn about the existence of tapes A, B, and C?

A I realized that there were six tapes in all. In viewing the tapes that night, primarily from what I was told by people present, that the scenes that we were viewing that night were on D, E, and F, so that's why I had taken tapes D, E, and F and left A, B, and C.

Q When did you first contact AMSA about obtaining tapes A, B, and C?

A I assume it was just prior to August 17th. It was maybe a week or two prior to that date.

Q Okay. How did you go about serving the subpoena on AMSA?

A I responded -- I went to the front door, I spoke with Jason Khoury, I gave him the subpoena and he had handed me the receipt.

Q He didn't let you in the facility?

but he seemed -- he was agreeable to it, from what I recall, and he came down to the station.

Q He didn't ask why you wanted to see him?

A I don't recall specifically what he asked.

Q He wasn't residing in Attleboro, right?

A No.

Q So how soon after that phone conversation did he arrive at the Attleboro Police Department?

A My records don't indicate what time I called him, so I cannot get an accurate time on the delay, but my report does indicate that he arrived at the station on May 22nd at approximately 7:30 p.m.

Q Can you give me an approximation as to how much time elapsed?

A I don't recall.

Q Okay. So when he arrived, who met him?

A He informed the dispatcher that he was there to see me. They informed me that a gentleman was in the lobby asking for me. I went and greeted him in the hallway and I brought him up to an interview room.

A No.

Q And when you were interviewing him, were you sitting or standing?

A I was seated.

Q Across from him?

A Yes, I was.

Q Was the meeting tape recorded?

A No, it was not.

Q And what was he wearing?

A I cannot accurately tell you what he was wearing. My best description would be casual clothing. He didn't strike -- I don't recall that he was dressed up for the occasion to meet me. He was in casual clothing.

Q Was he unclean; was he well groomed?

A From my recollection, yes, it doesn't strike me that he was outrageously unkept; he just appeared to be in casual clothing.

Q There wasn't anything particularly remarkable about his appearance?

A That's correct.

Q Okay. Can you then tell me what you started discussing with him?

A In referring to my report, I advised him

of his rights under the Miranda decision and allowed him to read those rights, and he signed the form indicating that he understood them.

Q Did he ask you why he was being read his Miranda rights?

A He may have said -- questioned as to what was going on; he may have asked that question; I don't recall specifically if he did, though.

Q Was there -- did you detect any reservation when he was signing --

A No.

Q -- off on the Miranda rights?

A No.

Q Okay. So he signed off on his Miranda rights?

A Yes.

Q And then what happened?

A I began questioning.

Q Okay. What were you questioning?

A I asked him if he was working on that day, who he was working with, if anything had occurred while he was working with Miss Kiernan.

Q And his response was...

A He replied no.

Q Okay. And did you -- at this stage of the questioning did you notice any change in his demeanor, any change from when -- how he was when he first arrived?

A As the questioning went on, I did notice him becoming nervous, fidgety, seated upright, nervousness, with his hands, reluctance to look me in the eye.

Q Now, was he looking you in the eye when he first arrived?

A When I greeted him, I shook his hand in the hallway; he seemed -- he didn't appear remarkably nervous in the hallway, no.

Q Okay. Did he appear remarkably nervous when you sat him down in the meeting room on the second floor?

A Initially, no. I believe when the questioning started he had gotten more nervous.

Q And he -- one of the things you said was he wasn't looking you in the eye, right?

A That's correct.

Q What else was he -- what else -- what other behavior was he exhibiting that led you to

believe he was getting more nervous?

A He was fidgety with his hands; he would rock back and forth.

Q The chair that he was sitting in, did it have wheels on it or casters?

A No, it just has four legs.

Q Was he -- could you tell whether or not he was pushing back in the chair, that one or two of the legs was moving up off the floor?

A No, I don't recall it was -- it wasn't that remarkable, no.

Q Okay. Anything else that was going on that led you to believe he was becoming nervous?

A Just when talking to him his speech had picked up a little bit.

Q What do you mean by that, when you say his speech had picked up a little bit?

A Talking a little quickly, quick responses, things of that nature.

Q Did his face get red?

A I don't recall.

Q Did you notice any perspiration?

A I don't recall that.

Q Any shaking or trembling of hands --

A Yes.

Q -- or facial features?

A Facial features, I'm not sure. I noted his hands.

Q They were trembling?

A Actually, he was -- he appeared to be nervous. He kept, you know, either collapsing them, you know, or rocking them back and forth, something like that.

Q Now, prior to today's deposition, you had an opportunity to review -- let me strike that.

In preparation for today's deposition, did you review your arrest report which was marked as Exhibit 1?

A Yes, I did.

Q Okay. If I could direct your attention, Exhibit 1, page 6, in the second to the last paragraph, the very last sentence, it states: At one point Ciambriello told the detective -- that would be you, right?

A Yes.

Q Quote, Are you going to arrest me? Go ahead, lock me up, close quote. Did I read that

correctly?

A Yes, you did.

Q Can you tell me how that came about or help me have some context on that remark, please?

A I started questioning -- we went into the interview room. I immediately advised him of his rights under Miranda. I had asked him if he was working that day. He indicated he was working. I asked him with who. He informed me that it was Heather or -- I don't know if he gave me the last name or not. I asked him if anything remarkable had occurred on that day. He said no, nothing had occurred.

Then I started to go over some of the statements that Miss Kiernan had given me. I went over her statement, asking him, Did you ever have a conversation in regards to smoking marijuana? And he said, No, I never did that. I go, Did you ever tell her that it made you horny? And he said, No, I never said that. He denied making such a statement. Then I went through other statements she had given to me about him talking about cocaine usage; that he had never tried it; friends had tried it; indicated that

it makes, from what he was told, you want to have sex all night. He indicated that he had never made those comments to Miss Kiernan. And then I went on to ask him if he ever placed his hands upon her in any way. He said no.

I then informed him that -- he was aware that there were 16 cameras recording 24 hours a day, and that I had him on camera placing his hands upon her in the money room, walking down the hallway going to the back office, which was Jason Khoury's office. He denied going into the office. Again, he stated he never touched her. He denied all the statements that I had made in reference to Miss Kiernan's report.

Q Just so I'm clear here, after you told him you saw him on tape with his hands on her, he still denied --

A Yes.

Q -- he even touched her?

A Yes, that's correct.

Q Okay. Okay. And then we were -- I was -- you were leading up to the comment where he said, Are you going to lock me up?

A Yes. Yes, there were other statements

as well, talking about bringing movies into work and wine and soda cups and making some lewd comments to Miss Kiernan, as well as making a statement in Italian saying, Tu abbia bella faccia, which she stated to me says, You have a beautiful face. I asked him if he had ever told her that, and he denied ever having those types of conversations or making any type of those comments or putting his hands on her in any way.

Q Did you ever hear those comments on the videotapes?

A No.

Q Okay. So then at some point he said, Are you going to lock me up?

A That's correct.

Q Did he just blurt that out?

A No, he -- he started -- he was getting nervous. I -- I confronted him about his nervousness; I confronted him about his untruthfulness. I said, Listen, I know you're lying to me. I says, You're very nervous. You're ringing your hands. And I just confronted him with that. And then he just kind of blurted out, Hey, I'm not going to go to work there anymore.

He says, I'm through there. And then he said, Go ahead, lock me up.

Q You had said to him, I know you're lying?

A Yes.

Q And you had confronted him with the statements that were made contrary to what --

A Yes.

Q -- he was saying? But when he said, Lock me up, did it -- before he said that, did he have an understanding as to, if you know, as to what he would be locked up for?

MR. DONOGHUE: Objection.

Q Oh, you can answer.

MR. DONOGHUE: That's just for the record. I'm sorry.

A I wasn't sure if there was -- I'm waiting for --

MR. DONOGHUE: That's for the record. You can go ahead and answer the question.

A Did he know what he was going to be locked up for?

Q Yeah, if you know.

A Not to my knowledge, I didn't -- not to

my knowledge.

Q So during that meeting, did he ever say she consented or words to that effect?

A Did he ever say that?

Q Yeah.

A No, he never -- no, he denied everything.

Q Did you ever have any subsequent interviews with him?

A No.

Q And was he bailed out that night?

A I believe they put $500 cash, the magistrate. Unknown if he -- I believe from my -- I believe that he was -- posted bail. It shows that there was $500 cash bail that was set by Magistrate Clark. It doesn't indicate whether he was released or not in my paperwork --

Q Okay.

A -- so I can't give an accurate -- I don't know if he obtained bail that night.

Q How soon after the arrest was he arraigned?

A He was arraigned on 5/23.

Q And did you attend the arraignment?

A No, I did not.

Q Now, you still had the three videotapes --

A Yes.

Q -- D, E, and F?

A Yes.

Q Now, at what point did you -- strike that.

At any point did you view D, E, and F after you had taken them from the facility on May --

A I couldn't view them, no.

Q Why?

A Because it's a multiplex system, and at the police department all I have is a standard VHS.

Q When you say multiplex, what do you mean?

A Multiplex means there's numerous screen. It's -- from my understanding, it's a time-lapsed tape that has -- there could be 12 to 16 frames on one screen, and you'd need a specific multiplex system to view it.

Q Okay.

the arrest, right?

A Yes.

Q Okay. And so when you were referring to the card, the time that is put on here is to reflect the most accurate time that the arrest took place, correct?

A Yes.

Q Okay.

MR. McLEOD: Thank you. Nothing further.

MR. DONOGHUE: Nothing further.

(Off record at approximately 12:45 p.m.)

C E R T I F I C A T E

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS

I, Lori-Ann London, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:

That, JOHN OTRANDO, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness to the best of my knowledge, skill, and ability.

I further certify that I am neither related to, nor employed by, any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal of office this 7th day of June 2005.

Lori-Ann London

CERTIFIED ORIGINAL
LEGALINK BOSTON

Lori-Ann London, RPR
Notary Public

My commission expires: 7-1-2005

E R R A T A  S H E E T

I, JOHN OTRANDO, the within-named deponent do hereby certify that I have read the foregoing transcript of my testimony, and further certify that said transcript is a true and accurate record of said testimony (with the exception of the following corrections listed below):

| Page | Line | Correction |
| --- | --- | --- |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |
| ____ | ____ | ____________________ |

Signed under the pains and penalties of perjury this      day of                    , 2005.

____________________

JOHN OTRANDO

# Exhibit C

CERTIFIED ORIGINAL
LEGALINK BOSTON

Volume: I
Pages: 1-105
Exhibits: None

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-10131 RBC

- - - - - - - - - - - - - - - - - - - - - x

HEATHER KIERNAN,
Plaintiff

vs.

ARMORED MOTOR SERVICE OF AMERICA, INC.
and FRANCESCO CIAMBRIELLO,
Defendants

- - - - - - - - - - - - - - - - - - - - - x

DEPOSITION OF EDWARD O'BRIEN
Thursday, June 16, 2005 - 9:59 a.m.
McLeod Law Offices
77 Franklin Street
Boston, Massachusetts

- - - - - - - - -

Reporter: Maureen J. Manzi, CSR

APPEARANCES:

*** MCLEOD LAW OFFICES
(BY WILLIAM J. McLEOD, ESQ.)
77 Franklin Street
Boston, Massachusetts 02110
(617) 542-2956
Counsel for the Plaintiff

*** MORGAN BROWN & JOY, LLP
(BY ALLISON K. ROMANTZ, ESQ.)
200 State Street
Boston, Massachusetts 02109
(617) 523-6666
Counsel for the Defendant, Armored Motor Service of America, Inc.

I N D E X

EDWARD O'BRIEN
BY MR. McLEOD 4, 93
BY MS. ROMANTZ 84

E X H I B I T S

- NONE -

A. He called me and stated that he was with the police department, and that there was an alleged incident of sexual assault at our Attleboro location.

Q. Was he calling you from the Attleboro location, if you know?

A. Yes. Yeah. And I asked him, you know, basically what allegedly occurred. So he gave me -- he told me a short synopsis of what occurred. And the police were there and requesting videotapes as evidence.

Q. What did he tell you occurred?

A. Well, I don't recall, but there was an alleged rape or a sexual assault that took place there the night before.

Q. And he said that the police were requesting tapes?

A. Yes.

Q. Have they been provided tapes at that point?

A. No. No.

Q. Was he calling you just to relay information or was he requesting authority to do anything from you?

A. Yeah, both.

Q. What kind of authority was he requesting?

A. Whether I'd authorize the release of the tapes.

Q. And did you?

A. Yes.

Q. Did he describe what was on the tapes or what tapes were being released?

A. Yes. Right. Well, as best I recall, I asked him after he gave me a synopsis of what allegedly happened had he viewed any of the tapes at all, and he stated that he had. And I believe he said that he saw that they did go into the manager's office. But also he advised me at one point Ciambriello went outside the building with I believe Heather Kiernan and another person. At that point he created an egregious security violation by going outside the building. There was nobody left inside in charge of the building. So based on that he was ultimately suspended that day, if not the next day for security violations.

Q. Were you told during that conversation with Mr. Callahan, that phone call you received at 6 a.m. in the morning, that Mr. Ciambriello was seen outside the building?

Q. Who prepared the authorization?

A. I'm sure Bill Callahan.

Q. I'm sorry?

A. I'm sure Bill Callahan. He came back after that and requested the remaining tapes, and we had to make out another authorization that he had taken the first tapes and the remaining tapes, and he signed off on that.

Q. Why was an authorization created the second time including the same information that would have been as you've testified in the authorization when he picked up the tapes the first time?

A. At the time I don't know if I could locate the first authorization. So I wanted to make sure that they were signing for all of them. And so it would have been all the systems A, B, C, D, E and F, so I had documentation that the police had all the tapes. The tapes are important to us not only for this particular case but customer's dispute, there's a customer dispute that they send us $100,000 and we show 20, we got to be able to provide the tape, otherwise we're looking at paying the customer. So that particular reason was another critical reason. But at the time we went ahead and did it.

privilege.

MR. McLEOD: Just for the record I wasn't going to ask them.

MS. ROMANTZ: I know. He was starting to tell you what we talked about.

Q. After the incident, when was the first time that you spoke with any attorney representing AMSA, any attorney?

A. I don't recall. I really don't. I think it may have been you at one point, but I don't recall if there was another attorney, no.

Q. Was there any investigator that AMSA hired with regard to this claim that you spoke to after the incident?

A. Not that I know of, no.

Q. You testified that the tapes were important to AMSA.

A. Um-hmm.

Q. The tapes of the incident were important to AMSA?

A. Um-hmm.

Q. Why were they important to AMSA?

A. Customer disputes. Through that one branch we pass an enormous amount of money that we're

responsible for. We don't own it. We just transport it. So if we're missing a bag for 50, 100,000, a transporter for 2,000,000, the customer -- we may process at that time I'm guessing 15 to 30,000 deposits in a month at that location, just bags that are opened up that have the potential to be a customer loss, a dispute. And if we can't provide the tape, we have to pay. So in a three month period of time, we're passing through anywhere from 45 to 90,000 bags just be counted, never mind what's gone through there. And we're liable to the customer. They can come back at any time and say, oh, you didn't bring us that bag; you didn't drop it off; you didn't get it. I mean, it's an enormous amount of quality control liability. That was the major concern with these tapes.

Q. I note your testimony from before where you said that you tape over the tapes after 90 days. Is the 90 day period because by that time nobody's going to make a complaint?

A. At that point we had a contract, a major contract with a customer that required us to keep them for 90 days in case they wanted to dispute them. We would typically have 100 days worth of

tapes. Ninety days was a requirement across all the company. We standardized it across the company. A minimum of 90 days we had to keep them. After that by contract. If a customer came back six months from now and it was a national account, they may come in and say we want to see the tape and we may not have them. But the customer may request it. But three months was the standard that we'd be able to provide them with a tape.

Q. Typically how on an average, if you can tell me, at what point would a complaint arise such as like for missing funds or shortage or something like that, a few days, a week, a couple weeks, a month?

A. No. Typically when a customer reconciled their accounts for the month. So if they did it the first or the second week of the next month, they may see they didn't get credit for a deposit. So they'd call us up. Or in many cases, every day we'd count -- a big customer would be Fleet at the time -- and we'd count their deposits that we picked up at all their branches, and we'd send them any discrepancies that we found in the deposits, and they would notify their customers. A customer may want to dispute that right away. They may not pick

up on it for a couple of weeks. Then they would send in a film request. They had one whole unit that would do that for Fleet. It operated out of Hartford, Connecticut and they would send in film requests. So our people at our branches, they would be able to go in, pull up the tape, find the transaction out of those 16 cameras and then retape it onto another blank tape and be able to send it off. And that was part of our contract. If we couldn't do that, we had to pay.

Q. Is it fair to say then based on your testimony that a customer dispute would probably arise no more than four to six weeks after a tape had been -- after the day of the taping?

MS. ROMANTZ: Objection. You can answer.

Q. She just needs to say it for the record.

MS. ROMANTZ: I'm just saying it for the record.

A. Say what?

Q. She needs to say it for the record. Oh, I'm sorry. Is it safe to say that -- I'll strike the question and rephrase it.

Is it safe to say that a customer

dispute would arise approximately four to six weeks, within a four to six week period following the tape if taking into account that it would come up usually when the customer reconciled their monthly accounts?

MS. ROMANTZ: Same objection.

A. I couldn't say. I never did a study of it. I just know what contracts we were held to. You know, the standard is 90 days. That was part of our standard by contract, that we had to have these available.

Q. What contract required the 90 days at that time?

A. Specific?

MS. ROMANTZ: If you know.

A. Fleet. That was Fleet.

Q. And did that provision, that 90 day provision remain in effect until AMSA's merger with Loomis?

A. Yes.

Q. Assuming hypothetically you start doing work for Finagle A Bagel and they require you to keep the tapes for 120 days, in a situation like that is that how long the tapes are kept is for 120 days?

A. If it was agreed upon when we negotiated the

contract, then they would contact me or us and say we need to extend the amount of tapes that we're rotating through.

Q. Now, if there were a customer that disputed a particular tape and you needed to provide the customer with a tape of that day say of the money room or something, would that tape be made on the premises?

A. Yes.

Q. There was equipment there to do that?

A. Yes.

Q. Now, would it be made in terms of giving them a raw tape like the police took that day or would it be made in terms of giving them a specifically formatted tape so that you're not looking at garbledy gook, video garbledy gook?

A. It would be made so -- the words you used.

Q. Garbledy gook.

A. Formatted. It would be -- the tape would be played back through the multiplexer to undigitize it, for lack of a better word, and just -- one of the cameras could be brought up on a monitor, a typical TV monitor. And then from the output of the monitor it would just tape on a monitor, on a

Q. Ultimately responsible for the branch?

A. Yeah, for all that.

Q. I'm all set.

MS. ROMANTZ: Great. I am, too.

(Whereupon, at 12:09 p.m., the deposition of Edward O'Brien adjourned.)

E R R A T A S H E E T

I, EDWARD O'BRIEN, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed below):

| Page | Line | Correction |
|---|---|---|
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |
| ______ | ______ | ______________________________ |

Signed under the pains and penalties of perjury this _____ day of ______________________, 2005

______________________________

EDWARD O'BRIEN

COMMONWEALTH OF MASSACHUSETTS
MIDDLESEX, ss.

CERTIFIED ORIGINAL
LEGALINK BOSTON

I, Maureen J. Manzi, Certified Shorthand Reporter and Notary Public, CSR #135093, duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 16th day of June, 2005 the person hereinbefore named, who was by me duly sworn to testify to the truth and nothing but the truth of their knowledge touching and concerning the matters in controversy in this cause; that they were thereupon examined upon their oath, and their examination reduced to typewriting under my direction and that the deposition is a true record of the testimony given by the deponent.

In Witness Whereof, I have hereunto set my hand and affixed my seal this 26th day of June, 2005.

Maureen J. Manzi

Notary Public
My Commission Expires:
January 17, 2008