# Exhibit D

1

1                                Volume:    I

2                                Pages:     1-109

3                                Exhibits: 1-3

4

5                  UNITED STATES DISTRICT COURT

6             FOR THE DISTRICT OF MASSACHUSETTS

7

8                       C.A. No. 04-10131

9

10   - - - - - - - - - - - - - - - - - - - - x

11   HEATHER KIERNAN,

12              Plaintiff          CERTIFIED ORIGINAL
                                   LEGALINK BOSTON
13   vs.

14   ARMORED MOTOR SERVICE OF AMERICA, INC. and

15   FRANCESCO CIAMBRIELLO,

16              Defendants

17   - - - - - - - - - - - - - - - - - - - - x

18        DEPOSITION OF CHRISTOPHER W. ABREU

19       Thursday, June 2, 2005 - 10:15 a.m.

20            MORGAN BROWN & JOY, LLP

21          200 State Street - 11th Floor

22             Boston, Massachusetts

23               - - - - - - - - -

24   Reporter:  Maureen J. Manzi, CSR

1    APPEARANCES:

2    ***   MCLEOD LAW OFFICES

3             (BY WILLIAM J. MCLEOD, ESQ.)

4             77 Franklin Street

5             Boston, Massachusetts  02110

6             (617) 542-2956

7             Counsel for the Plaintiff

8

9    ***   MORGAN BROWN & JOY, LLP

10            (BY ALLISON K. ROMANTZ, ESQ.)

11            200 State Street - 11th Floor

12            Boston, Massachusetts  02109-2605

13            (617) 523-6666

14            Counsel for the Defendant, Armored Motor

15            Service of America, Inc.

16

17

18

19

20

21

22

23

24

3

1                          I N D E X

2    CHRISTOPHER W. ABREU

3    BY MR. MCLEOD              4, 90, 103, 106

4    BY MS. ROMANTZ             68, 98, 105

5

6

7

8

9                        E X H I B I T S

10   Exhibit 1, notes........................ 31

11   Exhibit 2, series of e-mails............ 59

12   Exhibit 3, Working Detectives Tape

13   6/20/2003............................... 86

14

15

16

17

18

19

20

21

22

23   *Exhibit 1 and 2 included in the transcript.

24   *Exhibit 3 retained by Attorney Romantz.

1    even.  I remember it being a healthy stack of

2    videotapes.

3        Q.  Did you have any understanding as to what

4    the status of the proceedings were against the

5    defendant at that time?

6        A.  No.

7        Q.  Did you know whether or not he had already

8    been indicted?

9        A.  No.

10       Q.  When you were given the tapes, did you

11   already have an appointment to meet Mr. Ardito at

12   the facility?

13       A.  Yes.

14       Q.  How was that appointment made?

15       A.  It must have been made by Chris Markey or

16   Chris Saunders.

17       Q.  So you didn't make it?

18       A.  No.  I was just told that -- I was just

19   asked if I could go watch the tapes at a certain

20   time with David.

21       Q.  And have you met Mr. Ardito prior to that

22   day?

23       A.  Yes.

24       Q.  Had you worked with him on other cases?

14

1      A.   Yes.

2      Q.   Had you worked with him on this case?

3      A.   No.

4      Q.   After you took the tapes -- let me back up.

5  When you took the tapes, where physically were you?

6      A.   In the Attleboro District Court office.

7      Q.   When you went to AMSA, did you take your

8  car?

9      A.   Yes.

10     Q.   What kind of car was that at the time?

11     A.   It was a '96 BMW.

12     Q.   And you drove to AMSA?

13     A.   Yes.

14     Q.   In the car?

15     A.   Yes.

16     Q.   Where were the tapes in the car when you

17  were driving?

18     A.   Within my possession.

19     Q.   Front seat, back seat, trunk?

20     A.   Front seat probably I think.

21     Q.   Did you have a briefcase with you?

22     A.   Yes.

23     Q.   Any other bags or --

24     A.   No.

1    Q.   No.  Did you drive right to AMSA?

2    A.   Yes.

3    Q.   When you drove to -- pardon me.  When you

4    arrived at AMSA, who did you meet and where were

5    they?  Who was the first person you met and where

6    were they?

7    A.   I don't totally recall.  It might have been

8    I met with David outside.

9    Q.   You say might have been.

10   A.   I'm not totally sure.  And then we went in.

11   I don't know who we met or how we got in.  It was I

12   probably met David outside.

13   Q.   And you and Mr. Ardito walked into the

14   facilities together?

15   A.   Yes.

16   Q.   Did you have to buzz or hit a doorbell or

17   anything like that to get in?

18   A.   I think so because I think it was a metal

19   door with a camera outside of it.

20   Q.   Did you have to sign in?

21   A.   I don't recall so.

22   Q.   And who did you meet when you walked into

23   the facility?

24   A.   I met with somebody from the security

1    Department from there.  I don't recall his name.

2         Q.   Jason Cory, does that ring a bell?

3         A.   No.

4         Q.   Did you have to show any identification when

5    you arrived?

6         A.   Not that I recall.

7         Q.   Did Mr. Ardito?

8         A.   Not that I recall.

9         Q.   And you didn't sign anything?

10        A.   Not that I recall.

11        Q.   In preparation for the deposition, did you

12   talk to anyone today?

13        A.   No, I haven't.

14        Q.   When was the last time you spoke with Mr.

15   Ardito concerning this case?

16        A.   It was at the motion, at the criminal trial.

17        Q.   The motion hearing?

18        A.   (Witness nodded affirmatively.)

19        Q.   So you met somebody from security?

20        A.   Yeah.

21        Q.   And you knew they were from security because

22   why?

23        A.   They must have introduced themselves to me

24   as the security representative.

1  you brought them back?

2      A.  Well, I can only say this.  On any normal

3  case, there's no question I would have taken them

4  back to keep a chain of custody.  In this case, the

5  only way I would have left them there is because

6  nobody had the technology to tape them at a frame

7  where they could watch it on any regular VCR.

8      Q.  Let me ask you this.  When you say take them

9  back, what I'm trying to figure out is were you

10  going to be handing them to Mr. Saunders, putting

11  them in his office, putting them in a room that was

12  for films that was ceased, something?  What was the

13  procedure, if anything?

14      A.  In my normal course, I would have just put

15  them back in his office.

16      Q.  And he had his own office, he wasn't in a

17  cube or anything like that?

18      A.  He had his own office.  We all had our own

19  office.

20      Q.  How long had you known Mr. Ardito up to that

21  time?

22      A.  Tough to say.  Maybe a year.  Maybe I had

23  some cases when I was in Taunton.  And I saw him

24  regularly when I was in Attleboro.

1      A.  I know it wasn't a suit.  Maybe pants and a
2   shirt.
3      Q.  Other than this gentleman that you met at
4   the door, did you meet anybody else at the facility
5   that day that was employed by AMSA arguably?
6      A.  Not that I recall.  I mean, there were other
7   people I believe there.  But did I specifically meet
8   with anybody, no, I don't recall.
9      Q.  You weren't introduced to anybody else?
10      A.  I don't recall being introduced to anybody
11   else.
12      Q.  How long were you at the facility that day?
13      A.  To the best of my memory, maybe a couple of
14   hours.  Maybe an hour.  Between an hour and two
15   hours.
16      Q.  Now, did you go over there in the afternoon?
17      A.  Yes.
18      Q.  What day of the week was it?
19      A.  I don't recall.
20      Q.  That morning you would have done
21   arraignments or something in the district court?
22      A.  I think I was actually in the trial side.
23   So basically in a typical morning if I'm in the
24   trial side, I would take all my matters and be

23

1    Q.   With all these trials, did you have to work
2    weekends?

3    A.   No.   I would bring stuff home at times.

4    Q.   What time would you typically get in the
5    office in the morning?

6    A.   8:00.

7    Q.   What time would you leave?

8    A.   5:00.

9    Q.   When you arrived at the facility and you
10   were met by the security individual and Mr. Ardito
11   was with you, what was the next thing that happened?

12   A.   I believe we went to this individual that we
13   met with, this security agent at his office.  The
14   only thing I remember about this office is he had
15   some toy police cruisers in his office.  That sticks
16   in my head.  And then after we left his office, we
17   went to watch the videotapes.

18   Q.   Did you play with the cruiser?

19   A.   I just found it out of the head toy cruisers
20   in his office.  I didn't have a chance to play with
21   them.

22   Q.   And then you went to the room where you
23   viewed the tapes?

24   A.   Yes.

1    with the security gentleman, Mr. Ardito was with

2    you?

3         A.   Yes.

4         Q.   Did you sit down?

5         A.   I don't think we sat down, no.

6         Q.   You had the tapes with you though?

7         A.   Oh, yeah.

8         Q.   Were they wrapped up?  Were they in an

9    envelope or anything like that or were they kind of

10   just bound by rubberband?

11        A.   Just by rubberband from what I remember.

12        Q.   Did you have any understanding as to how the

13   D.A.'s office came into possession of these tapes?

14        A.   At that point in time, I did not.  I later

15   learned.

16        Q.   What did you later learn?

17        A.   That the Attleboro detectives confiscated

18   it.

19        Q.   Do you know whether or not they confiscated

20   them all at once or on different occasions?

21        A.   I don't recall.

22        Q.   After this day, was that your one and only

23   involvement with the case other than testifying at

24   the motion hearing?

Christopher W. Abreu
06/02/2005

27

1      A.   Yes.

2      Q.   Now, did you take -- strike that.   When you

3  started watching the tapes -- let me back up even

4  more.   When you walked into the room, what did you

5  do with the tapes?

6      A.   I believe they had either letters or numbers

7  on them, either A, B, C or 1, 2, 3.   And with that

8  and we just started putting different tapes in to

9  see which one was relevant to what we wanted to

10  watch.

11      Q.   Did you have an understanding as to what it

12  was you wanted to watch?

13      A.   Yes.

14      Q.   When you say we were putting them in, who

15  was putting them in the VCR?

16      A.   I believe I had the stack of tapes and I

17  just gave them to the security representative to try

18  looking for the ones that would show the parties

19  involved in this case.

20      Q.   Did you look at more than one tape?

21      A.   Yes.

22      Q.   So you had the stack of -- did you say it

23  was five or six or four or five tapes?

24      A.   I just remember it being a stack.   Either

1    four or five or six.

2        Q.    So you had a stack of tapes?

3        A.    Yes.

4        Q.    And then you would hand off a tape to the

5    security guy?

6        A.    Um-hmm.

7        Q.    He would stick it in the VCR?

8        A.    Um-hmm.

9        Q.    You might or might not watch it for a bit

10    depending on what was on there?

11        A.    Um-hmm.

12        Q.    You watched more than one tape?

13        A.    Right.

14        Q.    When you went to grab the second tape from

15    the stack to hand to the security guy, what happened

16    to the first tape or what happened to the tape you

17    were watching, did he give it back to you?

18        A.    When he took it out, I don't recall.  Either

19    he gave it back to me or he just put it down on the

20    side.

21        Q.    Did you watch all of the tapes?

22        A.    I believe we would put -- I believe we put

23    in all the tapes just to see if there was anything

24    pertaining to the incident, but he could quickly

1    A.   Well, basically I knew I was looking for

2    just -- if I recall right, there were only two

3    people in the establishment, and I just wanted the

4    tapes that depicted where they were during this

5    alleged incident.

6    Q.   And did you communicate that to him at some

7    point or --

8    A.   Oh, yeah.

9    Q.   When was that?

10    A.   While we were putting the tapes in.

11    Q.   It wasn't in his office?

12    A.   No, I don't think so.

13    Q.   Did Mr. Ardito have any discussions during

14    this time while you were watching the tapes?  What

15    was he doing?

16    A.   Well, he also wanted to see certain

17    segments.  Basically from what I recall, the tapes

18    that we were looking for were tapes where they

19    initially were working together.  Wherever they

20    moved, okay, you might have to put a different tape

21    in because we wanted to keep that chain of whatever

22    they were doing.  We might have to go through two or

23    three tapes to get to that.

24    Q.   You wanted to watch it in sequence?

1  strengthen my thoughts that the tape was actually

2  divided, okay, into six screens.  So with this

3  security system you had -- if you wanted to put up

4  frame 16, you would type up 16 or hit a button for

5  16, and frame 16 at that time for tape D would come

6  up on the screen.

7        Q.   You said the screen was divided into six?

8        A.   I think so.  Six or four.  I just remember

9  him pulling up different segments of a screen, to

10  the best of my knowledge.  I don't have a perfect

11  memory of it, but that's what I think.

12        Q.   To the right of number 16 there's a space it

13  appears and then quotation marks.

14        A.   Um-hmm.

15        Q.   What does that say, please?

16        A.   "I'm not going in there."

17        Q.   Does that refresh your recollection as to

18  what you saw on the tapes?

19        A.   Oh, yes, I remember.

20        Q.   What was it, please?

21        A.   Well, on this frame of the tape, the alleged

22  defendant at the time, they had gotten up from an

23  area where they had been working and they began

24  walking.  And if I remember right, suddenly you hit

39

 1    hands around her waist vicinity, then they walked

 2    down the hallway together.  You could only see the

 3    back of their heads.  And then they went to another

 4    dead spot, camera angle.  You couldn't see them

 5    anymore.  Then we had to go to another tape to

 6    continue that chain.

 7        Q.   You mean other than D and F?

 8        A.   No.  We had to go from tape D to tape F --

 9        Q.   Okay.  Thanks.

10        A.   -- to keep that chain of where they were

11    walking to.  That tape F then shows them walking

12    into an office.

13        Q.   Was there audio on that tape?

14        A.   I don't recall hearing any audio.  Well,

15    what I recall, these tapes were very, very bad as

16    far as audio goes.  You could not really hear much

17    of anything.  Okay.  And that's why the "I'm not

18    going in there" kind of jumped out at me because I

19    want to say that's one of the only statements I

20    heard on the tape.

21        Q.   Then you have underneath 17:40:31 under

22    letter F?

23        A.   Um-hmm.

24        Q.   What does that time represent?

40

1     A.   That would be the time that I recall that

2   she left the office on the videotape.

3     Q.   And underneath that it says 17:34:02?

4     A.   Correct.

5     Q.   With an arrow in -- what's that handwriting?

6     A.   "In office."

7     Q.   "In office"?

8     A.   Yes.

9     Q.   What does that mean?

10    A.   I don't recall.

11    Q.   Is that when you saw them go into the

12  office?

13    A.   I don't recall.

14    Q.   On tape F you couldn't hear any audio at

15  all?

16    A.   No.

17    Q.   When you saw her leave the office, did you

18  see at some point the defendant leaving the office?

19    A.   I believe he left the office sometime after

20  her.  She left first.

21    Q.   What was the time span between her leaving

22  and him leaving?

23    A.   Maybe a minute or two.  A few minutes.  It

24  wasn't that long.

1    there any radios going or anything like that?

2             MS. ROMANTZ:  Just to clarify.  When he

3    was watching the videos or while --

4        Q.  While you were watching the videos.

5        A.  While I was watching the videos, was

6    anything going on.  I believe people were working,

7    but my attention wasn't drawn to anything specific.

8        Q.  Was the door open or closed?

9        A.  I don't recall.

10       Q.  Was the room windowed?

11       A.  The room where I was watching the

12   videotapes?

13       Q.  Um-hmm.

14       A.  No.

15       Q.  This might seem stupid.  But was it hot in

16   there with all that equipment?

17       A.  I don't recall.

18       Q.  You were in there for a couple of hours in

19   that room?

20       A.  An hour, a little more than an hour.

21       Q.  What kind of conversation was going on in

22   the room while you were watching the tapes?

23       A.  We were basically just trying to, David and

24   I to agree on what we heard to make sure we were

1  seeing and observing the same thing.

2      Q.  Did you ask him if he agreed with the

3  statement "I'm not going in there"?

4      A.  I'm not sure, but I know I heard it.

5      Q.  When you say you were having these

6  discussions about whether or not you could agree or

7  disagree in terms of what you were seeing on the

8  tapes, you were having those discussions

9  contemporaneous with the viewing?

10     A.  Correct.

11     Q.  Are the notes that have been marked as

12  Exhibit 1, do they reflect some of the subject

13  matter that you were discussing with Mr. Ardito at

14  that time?

15     A.  Not so much what I was discussing with Mr.

16  Ardito.  But what I was doing is just because this

17  was just a quick initial viewing of the tapes, what

18  I was doing was anything that I found somewhat

19  compelling, I would write down.  So I would -- and I

20  just wrote these notes down to give back to Chris

21  Saunders so he could then give them to Chris Markey

22  and just go to those tapes to look at those points.

23     Q.  With regard to the notes.  Were you going to

24  be preparing any report or memorandum or anything?

46

1    day?

2         A.   I'm not sure.

3         Q.   Is this the only page of notes you gave to

4    Mr. Saunders?

5         A.   I'm not sure.

6         Q.   And let me qualify it.  Did you give these

7    notes to Mr. Saunders?

8         A.   I don't recall.  I either just left them in

9    his office with the videotapes if I had them.  I

10   just don't recall.  If I had brought the videotapes

11   back like I think I would have, this would have been

12   left with the videotapes, folded up and thrown on

13   top of with the elastic.

14        Q.   The reason why you had gone to AMSA that day

15   is because you didn't have the equipment to look at

16   the videotapes?

17        A.   Correct.

18        Q.   Did you have any understanding that day as

19   to how you'd go about having the tapes, for lack of

20   a better term, decoded or formatted in such a way

21   that they could play on a normal VCR?

22        A.   Well, I knew that they had to be -- you had

23   to get a regular VCR and tape it off of the time

24   lapse VCR while it was playing in its time lapse

1    mode, and that's what you would have to do to make a
2    copy of the tape.

3        Q.   Right.  But to make it so that it's visible
4    on a regular VCR without having to schlep, for lack
5    of a better term, to go to this armored motor place
6    and look at it there?

7        A.   That's what you would have to do, is to copy
8    it off of the time lapse VCR, and that's the only
9    way you'd be able to record a certain segment of it.
10   First you'd have to pull down a certain screen you'd
11   want, play it and then tape off of that VCR that's
12   being played.

13       Q.   Let me ask you this.  Did the D.A.'s office
14   have at its disposal at this time any facility or
15   any technology that could have taken a copy of those
16   videotapes and formatted them in such a way that
17   they could be played on a regular VCR?

18            MS. ROMANTZ:  Objection.

19       A.   At that time I don't think the D.A.'s office
20   had anything that could either play them or record
21   them.  If they had, then Mr. Ardito would have met
22   with Chris at New Bedford to watch the tapes instead
23   of us having to go to the security facility.

24       Q.   Are you aware that at some point the tapes

1   were sent out to REACT in Raynham?

2       A.   I am not.

3       Q.   Have you ever worked with REACT?

4       A.   No, I have not.

5       Q.   What was the last scene you saw on the

6   videotapes on that day when you were viewing them?

7       A.   I don't recall.  It may have been when they

8   were outside in the parking lot and then they came

9   back inside or she came back inside.

10      Q.   On that day did you have any understanding

11  as to whether or not there were any civil claims

12  against AMSA?

13      A.   I knew nothing.  I wasn't -- I knew -- I

14  wasn't even sure if the defendant was indicted

15  regarding this case.

16      Q.   Did Mr. Ardito make any remark that the

17  company was being sued or was going to be sued or

18  there were claims against the company of any kind?

19      A.   No.

20      Q.   Did the security official that you met with,

21  did he make any reference to that?

22      A.   Not that I recall.

23      Q.   Now, in terms of the room itself, if you

24  could describe for me -- strike.  Were you and Mr.

50

1      A.   Actually I believe he was on my right.

2      Q.   And when you were taking notes, you were

3   doing it off of your lap?

4      A.   Right.

5      Q.   Mr. Ardito was doing the same thing?

6      A.   I believe so.

7      Q.   Where was the security guy standing?

8      A.   Straight ahead.

9      Q.   So his back was to you?

10     A.   He was more turned at an angle facing us,

11  and then he would put a tape in and he would kind of

12  face us again while we were watching the tapes.  So

13  he could also watch the tapes while the three of us

14  -- well, the three of us were all watching the

15  tapes.  So that way he could get an angle at it

16  also.  If he didn't feel this was something specific

17  to the alleged incident, he would either try a

18  different frame or try a different tape.  So he was

19  standing if I remember right most of the time.

20     Q.   And you kept all the tapes and you were

21  handing them off to him one by one?

22     A.   I don't recall if I just put them down and

23  he kept trying or if I handed him one by one.  I

24  don't recall.

51

1       Q.   Put them down where?

2       A.   Either on the shelf or on the floor.  I

3    don't recall.

4       Q.   Now, when he would take the tapes out, what

5    would he do with them?

6       A.   He'd put them in the VCR.

7       Q.   When he took the tapes out of the VCR, what

8    would he do with them?

9       A.   I don't recall.  He either gave them to me

10   or he put them down somewhere on the table or some

11   box or something like that on the shelf.

12      Q.   Where was the table?

13      A.   I don't recall there being a table.  I just

14   don't know what he did with the tapes afterwards.

15      Q.   Where was the shelf?

16      A.   The units that house all the VCRs?

17      Q.   Yes.

18      A.   Perhaps there was space there.  I really

19   don't recall what happened to the tapes.

20      Q.   After you stopped watching the tapes, what

21   did you then do at the facility?

22      A.   We basically just shook hands and left.

23      Q.   Who's "we"?

24      A.   Mr. Ardito, I and the security consultant,

1      and then we left the facility.

2          Q.   Did you use the `facilities, get a soda?

3          A.   No.

4          Q.   Play with the police cars?  No.  Okay.

5               And did you and Mr. Ardito leave the

6      building together?

7          A.   Yes.

8          Q.   Did the security person leave with you?

9          A.   No.

10         Q.   Did he walk you to the door?

11         A.   I don't recall.

12         Q.   Were you required to sign out or check out

13     or go through any kind of protocol?

14         A.   You didn't have to sign out or check out.  I

15     don't recall that.  But you had to be buzzed out or

16     the door would not open.

17         Q.   Who buzzed you out?

18         A.   I don't know.

19         Q.   And were you and Mr. Ardito talking during

20     this time period?

21         A.   Yes.

22         Q.   And what were you talking about?

23         A.   I don't recall.

24         Q.   Were you talking about what you saw on the

1    comings and goings at that time?

2        A.   No.

3        Q.   The entranceway where you would have entered

4    into the D.A.'s office at that time, was it under

5    video surveillance?

6        A.   No.

7        Q.   Did you bring the tapes back?

8        A.   I don't recall.  I think I did, but maybe I

9    didn't.  Like I said, the only reason I would have

10   left the tapes there would be to copy them.  But I

11   still don't see myself doing that.

12       Q.   Was there any discussion about AMSA making

13   copies of the tapes for you?

14       A.   I don't remember, that's the thing.

15       Q.   Was there any discussion about AMSA saying,

16   you know, we'll get these tapes formatted for you in

17   such a way so you can play them on a normal VCR or

18   something along those lines?

19       A.   I don't remember.  I don't know.  I just

20   remember leaving.  I would think that I had the

21   tapes.  But it was so long ago, I just have no idea.

22       Q.   Well, in sitting in the office and viewing

23   the tapes, did you have any understanding as to,

24   especially with regard to the comment "I'm not going

1    A.  Yeah.

2    Q.  There was no discussion between you and the

3  security person that day concerning whether or not

4  they could do it for you?

5    A.  I don't recall.

6    Q.  Because you weren't aware of any technology

7  available to the D.A.'s office that could do it?

8    A.  Right.

9    Q.  If that technology had been available, would

10  you needed to have to go to AMSA that day?

11              MS. ROMANTZ:  Objection.

12    A.  I don't think so, no.

13    Q.  Now, you say you would have brought them

14  back to Mr. Saunders' office?

15    A.  Correct.

16    Q.  Any reason why you wouldn't have brought

17  them back to Mr. Markey's office?

18    A.  His office is in New Bedford.

19    Q.  And you say that if you did bring them back,

20  you would have left them on his desk?

21    A.  Or -- he also had a bookshelf I remember in

22  his office.  So either on his desk or in his office.

23    Q.  After you viewed the tapes, did you see Mr.

24  Saunders that day?

1      A.   I don't recall.

2      Q.   Did you see Mr. Saunders' secretary that

3    day?

4      A.   We all had the same secretaries.

5      Q.   So did you see her?

6      A.   I don't recall.

7      Q.   What was her name?

8      A.   Well, there was a Janice who was in charge

9    of our victim witness advocates, and she was the

10   only.  And then we had a Julie.  Julie George who

11   was basically the person who handled a lot of the

12   phone calls, stuff like that.

13     Q.   Was Julie the one who wrote the Post-it note

14   that's marked on Exhibit 1?

15     A.   Yes, I think she was.

16     Q.   Okay.  Thanks.  If I understand you

17   correctly, you don't recall if you spoke to Mr.

18   Saunders that day?

19     A.   I don't recall.

20     Q.   When was the first time you spoke to Mr.

21   Saunders concerning your viewing the videotapes at

22   AMSA?

23     A.   I'm not sure when it was.  I just basically

24   told him -- I know at one point after I viewed them,

61

1    It states Original Message?

2         A.   Correct.

3         Q.   Is that an e-mail from you?

4         A.   Yes, it appears that way.

5         Q.   Can you tell me what the initials BRI mean?

6         A.   That simply means Bristol, Bristol County.

7         Q.   It states, "Ms. Veenstra, check out the

8    Attleboro file.  I think I had written a memo about

9    my visit."  Is the written memo that you referred to

10   the document marked as Exhibit No. 1?

11        A.   I think so.

12        Q.   Any other memorandum?

13        A.   I don't think I would --

14        Q.   It says "Let me know."  And then the next

15   sentence.  "I also know that the facility still has

16   tapes of the incident."  Did I read that correctly?

17        A.   Um-hmm.  Yes, you did.

18        Q.   How did you know they did?

19        A.   Must have been to my memory at that time.

20        Q.   In June of 2002?

21        A.   Yes.

22        Q.   When you left the facility that day, did

23   they tell you they still had tapes or copies of the

24   tapes?

1        A.   No.   Like I said, even at that time in --

2    when I first learned that the tapes were missing, I

3    had no idea.  Me saying that, "I also know that the

4    facility still has tapes about the incident," I'm

5    not sure what that's pertaining to.  But like I

6    said, I don't remember ever specifically if I left

7    with the tapes, left some tapes there.  I just don't

8    know.

9        Q.   But you wouldn't have made the

10   representation that the facility still had tapes

11   unless you believed it was true?

12              MS. ROMANTZ:   Objection.

13       A.   Correct.

14       Q.   Now, at this time were you in New Bedford,

15   that's where you were working at the time in June of

16   2002?

17       A.   Yes.

18       Q.   Was Mr. Saunders working in New Bedford at

19   that time?

20       A.   I'm not sure.  I know he was in Attleboro

21   for a period of time after I left, and then

22   ultimately he did go to New Bedford District Court,

23   but I'm not sure when.

24       Q.   And how about Mr. Markey, was he in New

65

1       Q.   Other than your conversation with Mr. Ardito

2    on that day, did you have any discussions with Mr.

3    Ardito concerning this case after that day?

4       A.   No.

5       Q.   Do you recall ever having any discussions

6    with Mr. Ardito in court where you asked him didn't

7    you see me leave with the tapes or anything like

8    that?

9       A.   I'm sure I asked him, and he didn't

10   remember.

11      Q.   Do you recall when that was?

12      A.   Actually when I first heard of this, I

13   probably called him up at his office, and I remember

14   having a conversation with him about the tapes if I

15   remembered, and he had no idea either.   It was too

16   long ago.

17      Q.   So he couldn't tell you whether or not you

18   left with the tapes or not?

19      A.   Yeah.   He doesn't remember whether I had the

20   tapes in my hand, in my briefcase or if I left them

21   there.   He had no idea.

22      Q.   You had a briefcase with you that day?

23      A.   Yes.

24      Q.   Was it a rinky-dink briefcase like the one

1    I've got here or was it expandable and could hold

2    lots and lots of things?

3        A.   It was a leather briefcase, black leather

4    briefcase.  Nothing -- it wasn't expandable to a

5    huge point.

6        Q.   When you arrived at AMSA, you didn't have

7    the tapes in a briefcase?

8             MS. ROMANTZ:  Objection.

9        A.   I don't think I did, no.

10       Q.   Did you bring your briefcase in with you?

11       A.   I think I did.

12       Q.   And did you have it with you in the office?

13       A.   Yes.  I wouldn't have left it.

14       Q.   And when you were in the video room, did you

15   have it with you there?

16       A.   Yes.

17       Q.   Where would it have been?

18       A.   It would have been either to my right or to

19   my left.

20       Q.   If Mr. Ardito was on your right, would it

21   have been in between you?

22       A.   I don't recall.

23       Q.   Was it in between you?

24       A.   I don't recall.

1   around her body?

2       A.  Yes.

3       Q.  And did you see where his right hand was?

4   Was it placed somewhere on I guess that would be on

5   the right side of her body?

6       A.  It wasn't actually touching from what I

7   remember.  It was almost like guiding somebody

8   through.  Okay.

9       Q.  The hand wasn't actually touching or the

10  whole arm wasn't touching?

11      A.  The whole arm wasn't touching nor the hand.

12  It was basically guiding somebody through a hallway.

13      Q.  If Heather Kiernan described that walk down

14  the hallway as her being dragged by Mr. Ciambriello,

15  would you agree with that characterization?

16      A.  No.

17      Q.  And again, it was from the back so you

18  couldn't see any facial expressions?

19      A.  Correct.

20      Q.  And you said that you heard a voice say,

21  "I'm not going in there."  Was that exactly the

22  words that you heard?

23      A.  "I'm not going," yes.

24      Q.  "I'm not going in there"?

1        A.   Correct.

2        Q.   Are you positive it was I'm not going in

3    there as opposed to I'm not going in there now let's

4    say?

5                  MR. MCLEOD:   Objection.

6        A.   No.   From what I recall, it was definitely

7    "I'm not going in there."

8        Q.   And what was the response?

9        A.   I did not hear any response from what I

10   remember.

11       Q.   Was there a response?

12       A.   I don't think so.

13       Q.   I guess what I'm trying to figure out is.

14   Was that the only statement that was made or was

15   that simply a statement that somehow you were able

16   to hear but there was other communication between

17   the two of them that wasn't being picked up on the

18   audio?

19       A.   It's really tough to say because the audio

20   was so bad.   I heard that statement because it was

21   directly under the camera and it picked up that

22   statement as clear as a bell.   Whether there was

23   something that was said at a point further from the

24   camera, there may have been.   I did not hear it on

1   the tape.

2       Q.  And do you recall having a conversation with

3   David Ardito and the security consultant who was

4   there, you know, along the lines of did you hear

5   that?

6       A.  Yeah.

7       Q.  And was there acknowledgment on the part of

8   Mr. Ardito confirming that he also heard that?

9       A.  Yes.

10      Q.  And what about from the security consultant?

11      A.  I'm not sure.  There may have been.

12      Q.  Did you rewind the tape and listen to it

13  again just to confirm that you heard it correctly?

14      A.  I think we did.

15      Q.  Do you recall how many times you listened to

16  it or rebacked up for that portion?

17      A.  No more than once or twice.

18      Q.  And as you sit here today, you have a clear

19  recollection that Mr. Ardito agreed with some

20  statement that you made summarizing what it was that

21  Heather Kiernan said --

22      A.  Yes.

23      Q.  -- or what -- it was a female voice?

24      A.  Correct.

1   Knowing that they would be evidence in a criminal

2   matter, would it be your normal procedure to leave

3   that evidence somewhere, for use of a better word,

4   the chain of custody would be broken?

5              MR. McLEOD:  Objection.

6       A.  Normally, no.  Like I said, the only thing

7   that was different in this case is that at the time

8   we didn't have the capabilities of taping it.  The

9   only reason I would have left the tapes there was

10  for them to make a copy of the tapes, something that

11  we could view.

12      Q.  If you left the tapes there meaning so that

13  AMSA could make copies of the tapes?

14      A.  Correct.

15      Q.  Would there be any way if you left them

16  there to prevent AMSA or somebody who got ahold of

17  them from altering the tapes in any way?

18             MR. McLEOD:  Objection.

19      A.  If I had left them there?

20      Q.  Yes.

21      A.  I'm sure anybody could do anything with

22  them.

23      Q.  Or erase them?

24      A.  Correct.

1      A.  I believe so of this significance, right.

2      Q.  At the time you took the tapes to AMSA, did

3  you have any understanding as to how the D.A.'s

4  office had gotten in possession of the tapes?

5      A.  No.

6      Q.  Were you aware of whether a receipt had been

7  issued by anyone to AMSA for those tapes?

8      A.  No.

9      Q.  You have no idea whether or not those tapes

10  were voluntarily turned over without a Subpoena?

11      A.  No.

12      Q.  In directing your attention to what was

13  marked as Exhibit 2.  This is an e-mail that was

14  drafted, it appears to be drafted by you on Monday,

15  June 17th, 2002.

16      A.  Correct.

17      Q.  Do you have any reason to dispute that date?

18      A.  No.

19      Q.  It appears to be a true copy of your e-mail?

20      A.  Could be, yes.

21      Q.  And here we are sitting in June of 2005,

22  three years later?

23      A.  Correct.

24      Q.  Would it be fair to say that your memory in

1    June of 2002 was fresher than it is now?

2        A.   Sure.

3        Q.   Yes?

4        A.   Yes.

5        Q.   And I believe I asked you this before.   When

6    you say "I also know that the facility still have

7    tapes of the incident," you base that on knowledge

8    that you had at the time?

9        A.   Correct.

10       Q.   Other than what you've testified that Mr.

11   Ardito mentioned about the tapes, did he say

12   anything else about what he was viewing on the tapes

13   during that viewing?

14       A.   Nothing that I recall out of the ordinary.

15   Just basically what we were viewing, and making sure

16   that we both saw the same things.

17       Q.   I know in your notes that are marked as

18   Exhibit 1 you didn't mention that the defendant's

19   sidearm was not in a holster, that it was tucked in

20   his pants.

21       A.   Um-hmm.

22       Q.   Is there any reason why that wasn't noted?

23       A.   No.

24       Q.   And you said it was in his left side?

1    On the bottom of the page it says CTS.  Do you know

2    what CTS refers to?  I'm referring to Exhibit 2.

3         A.   I do not.  I did not write that.

4         Q.   And ATDC, do you know what that means?

5         A.   No, I do not.

6         Q.   Okay.  Thanks.  I have nothing further.

7                   (Whereupon, at 12:08 p.m., the

8    deposition of Christopher Abreu adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1               E R R A T A   S H E E T

2        I, CHRISTOPHR ABREU, do hereby certify that I

3   have read the foregoing transcript of my testimony,

4   and further certify that it is a true and accurate

5   record of my testimony (with the exception of the

6   corrections listed below):

7   Page        Line              Correction

8   _____      _____      _____

9   _____      _____      _____

10  _____      _____      _____

11  _____      _____      _____

12  _____      _____      _____

13  _____      _____      _____

14  _____      _____      _____

15  _____      _____      _____

16  _____      _____      _____

17  _____      _____      _____

18  _____      _____      _____

19

20  Signed under the pains and penalties of perjury this

21  _____ day of _____, 2005

22

23          _____

24              CHRISTOPHER ABREU

109

1   COMMONWEALTH OF MASSACHUSETTS

2   MIDDLESEX, ss.

3        I, Maureen J. Manzi, Certified Shorthand

4   Reporter and Notary Public, CSR #135093, duly

5   commissioned and qualified in and for the

6   Commonwealth of Massachusetts, do hereby certify

7   that there came before me on the 2nd day of June,

8   2005 the person hereinbefore named, who was by me

9   duly sworn to testify to the truth and nothing but

10  the truth of their knowledge touching and concerning

11  the matters in controversy in this cause; that they

12  were thereupon examined upon their oath, and their

13  examination reduced to typewriting under my

14  direction and that the deposition is a true record

15  of the testimony given by the deponent.

16       In Witness Whereof, I have hereunto set my

17  hand and affixed my seal this 17th day of June,

18  2005.

19

20

21  *Maureen J. Manzi*

22  Notary Public

23  My Commission Expires:

24  January 17, 2008      **CERTIFIED ORIGINAL**
                          **LEGALINK BOSTON**

# Exhibit E

1

1                           Volume:  I

2                           Pages:  1-182

3                           Exhibits:  1-5

4              UNITED STATES DISTRICT COURT

5                 DISTRICT OF MASSACHUSETTS

6     - - - - - - - - - - - - - - - - x

7     HEATHER KIERNAN,

8                    Plaintiff,

9         v.                          CA No.  10131MLW

10    ARMORED MOTOR SERVICES OF AMERICA, INC.

11    And FRANCESCO CIAMBRIELLO,

12                    Defendants.

13    - - - - - - - - - - - - - - - - x

14

15           DEPOSITION OF FRANCESCO CIAMBRIELLO

16                Thursday, April 7, 2005

17                     10:00 a.m.

18                McLeod Law Offices, P.C.

19                  77 Franklin Street

20              Boston, Massachusetts  02110

21

22    Reporter:  Carol A. Pagliaro, CSR/RPR/RMR

23

24                                CERTIFIED ORIGINAL
                                  LEGALINK BOSTON

1    A P P E A R A N C E S:

2         MCLEOD LAW OFFICES, P.C.

3         By William J. McLeod, Esq.

4         77 Franklin Street

5         Boston, Massachusetts   02110

6         617-542-2956

7         Counsel for the Plaintiff

8      MORGAN, BROWN & JOY LLP

9         By Allison K. Romantz, Esq.

10        200 State Street

11        Boston, Massachusetts 02109

12        617-523-6666

13        Counsel for the Defendant

14        Armored Motor Services of America, Inc.

15     LAW OFFICE OF ATTY. DAVID R. ARDITO

16        By David R. Ardito, Esq.

17        Bates Building Suite 215A

18        7 North Main Street

19        Attleboro, Massachusetts   02703

20        508-431-2222

21        Counsel for the Defendant

22        Francesco Ciambriello

23

24

3

1                          I N D E X

2     EXAMINATION OF:                              PAGE

3     FRANCESCO CIAMBRIELLO

4     By Atty. McLeod                                    4

5

6

7

8

9

10

11                     E X H I B I T S

12    NO.                                          . PAGE

13     1   Copy of the application submitted to

14        AMSA                                       40

15     2   Introductory Period Memo                  48

16     3   Smoking Policy                            53

17     4   Sexual Harassment Policy                   56

18     5   Attleboro Police Department Statement

19        of Rights                                155

20

21

22      *Original exhibits attached to original

23     transcript.

24

4

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | Stipulation |
| 3 | It is stipulated by and between counsel |
| 4 | for the respective parties that Motions to strike |
| 5 | and objections, except those as to form, are |
| 6 | reserved until the time of trial.  It is further |
| 7 | stipulated that the witness may sign the deposition |
| 8 | under the pains and penalties of perjury, rather |
| 9 | than before a notary public, within 30 days of |
| 10 | receipt by his attorney. |
| 11 | FRANCESCO CIAMBRIELLO |
| 12 | a witness called for examination by counsel for the |
| 13 | Plaintiff, being first duly sworn, was examined and |
| 14 | testified as follows: |
| 15 | DIRECT EXAMINATION |
| 16 | BY ATTY. McLEOD: |
| 17 | Q.   Could state your name for the record, |
| 18 | please? |
| 19 | A.   Francesco Ciambriello. |
| 20 | Q.   And because I have seen it spelled |
| 21 | differently, and it could be my fault, too, could |
| 22 | you please spell your first name for me? |
| 23 | A.   The first name is F R A N C -- S C E -- S |
| 24 | O -- C O, something like... |

1  husband?

2      A.  To me, yes.  And she said she wasn't happy

3  and he never make her happy.

4      Q.  Anything else?

5      A.  And she want a divorce, and she goes over to

6  Jason Khoury, tell him all the time she want a

7  divorce.

8      Q.  She did, she told Jason Khoury she wanted a

9  divorce?

10     A.  She wanted a divorce because she no happy,

11  husband no take care of her.

12     Q.  Was there anything else that she discussed

13  with you about her marriage?

14     A.  Yes.

15     Q.  What else?

16     A.  He watch porn all the time and then he jerk

17  off.

18     Q.  So she talked about him watching pornography

19  and masturbating?

20     A.  Yes, and he no pay attention to her.

21     Q.  Did she ever talk about her son?

22     A.  Yes.

23     Q.  What did she say about him?

24     A.  She asked me a couple of times if she has a

1    divorce if she can take the baby.

2        Q.   Anything else?

3        A.   She tell me she smoke pot, you know.

4        Q.   Was there anything else that Heather

5    discussed about her personal life with you?

6        A.   No.

7        Q.   Did you know how old her son was?

8        A.   No.

9        Q.   Did she talk about anything about her

10   husband not working?

11       A.   Yes.

12       Q.   What did she say about that?

13       A.   She said her husband he doesn't have a job,

14   he no work, he is home all the time, he is a lazy

15   bum, he can't find a job.

16       Q.   Did she say anything about why she was

17   working?

18       A.   No.

19       Q.   Did she ever say anything about what it was

20   like to have a baby?

21       A.   No, no.

22       Q.   Did you two ever have any physical contact

23   prior to May 19, 2001?

24       A.   Physical contact, yes.

```
 1        Q.  And you reached around the front?

 2        A.  Yes.

 3        Q.  And then what happened?

 4        A.  She say, Keep going, I'm feeling good.  I

 5   said, What do you mean keep going?  She say, You

 6   know what you are doing.

 7        Q.  Was she breathing heavier?

 8        A.  Huh?

 9        Q.  Was her breathing heavier?

10        A.  Normal.

11        Q.  Did she attempt to pull away from you?

12        A.  No.

13        Q.  And she said keep going?

14        A.  Yes.

15        Q.  And what was the next thing that happened?

16        A.  We decide to go to -- get up, go to Jason's

17   office.  We walk through the hallway, and went in --

18        Q.  Stop right there.  I'll go back to that, but

19   when you say we decided, what do you mean?

20        A.  We both decide.

21        Q.  How was the decision made?

22        A.  Excuse me?

23        Q.  How was the decision made?

24        A.  We go to Jason's office.
```

 1      Q.  Who suggested it?

 2      A.  We both said same time.

 3      Q.  So you both decided to go into Jason's

 4  office?

 5      A.  Yes.

 6      Q.  You both said it at the same time?

 7      A.  Yes.

 8      Q.  Were you both looking at each other when you

 9  said it?

10      A.  Yes, yes, we said we go to Jason's office.

11      Q.  Now let me ask you this, the video room,

12  that's where all the video equipment is that has the

13  tapes of the surveillance?

14      A.  Where?

15      Q.  I don't know, that's what I'm asking you.

16      A.  One more time.  I don't catch you; you go

17  too fast.

18      Q.  I'm sorry.  The video room, was there a room

19  that had the video equipment that had the tapes of

20  the surveillance of, like, the outside and the

21  garage?

22      A.  Mm-mm.

23      Q.  There was?

24      A.  There was a separate room.

1    Q.  The exterior cameras, did they move at all?

2    A.  I don't know.  I don't know.

3    Q.  As part of your responsibilities as weekend

4    supervisor, you wouldn't be monitoring the videos of

5    the surveillance, would you, or would you?

6    A.  Excuse me?

7    Q.  Sorry.  I'll strike it.  As part of your

8    duties would you be monitoring what was coming in on

9    the security cameras?  Would you be monitoring --

10   looking at videos, a TV that had the video of the --

11   A.  You mean look at the screen?

12   Q.  Yes.

13   A.  Yes.

14   Q.  Was that a split screen or was it one area?

15   A.  One area, just outside.  Just outside the

16   building you can look.  That's it.

17   Q.  How many cameras were in the room that you

18   and Heather were in?

19   A.  I think 2, 3.

20        ATTY. ROMANTZ:  Objection.

21   Q.  Sorry, you said two or three?

22   A.  At least 2, 3 camera.

23   Q.  So while you were rubbing her shoulders and

24   her back, you knew at least 2 or 3 cameras were

1  looking at you?

2         ATTY. ROMANTZ:  Objection.

3     A.  Yes.

4     Q.  That didn't bother you?

5     A.  No.

6     Q.  And when you were rubbing her breasts over

7  her shirt, the fact that you were being videotaped

8  didn't bother you?

9         ATTY. ROMANTZ:  Objection.

10    A.  No.

11    Q.  At that time you were married, correct?

12    A.  Yes.

13    Q.  Were you wearing a wedding band at the time?

14    A.  Yes.

15    Q.  And can I ask you, please, why you were

16  rubbing the breasts, over her shirt, of an employee

17  while you were a weekend supervisor as a married

18  man?  Why were you doing that?

19         ATTY. ROMANTZ:  Objection.

20    A.  She asked me to do it.

21    Q.  And you didn't refuse?

22    A.  No.

23    Q.  And the fact you are a married man didn't

24  factor into your decision-making process at all?

1      A.   Jason's office.

2      Q.   Where was she when she said that?

3      A.   When we get up.

4      Q.   In the office, in that check counter room?

5      A.   Check-in counter.

6      Q.   But you had testified you had both said at

7  the same time --

8      A.   Yes, yes.

9      Q.   -- you had both said at the same time,

10  Let's go into Jason's office?

11      A.   Yes.

12      Q.   So was it before or after that that she

13  said, Not right now?

14      A.   First we say we go to Jason's office.

15      Q.   You both do?

16      A.   We both do, so we said that, and then after

17  a second she say, Oh, no right now, and then she

18  changed her mind again.

19      Q.   How much time had elapsed before her saying

20  no right now and her, as you have testified,

21  changing her mind?

22      A.   Maybe in a minute.

23      Q.   Did she do anything during that minute; was

24  she working, doing anything?

1        A.   No, we didn't do nothing.  It was nothing.

2   We just sit down and do nothing.  We get up, we

3   supposed to go, then she said, No right now, then

4   she change her mind, we go in.  That's how it

5   happening.

6        Q.   Then so you unlocked --

7        A.    -- the door.

8        Q.    -- Jason's office?

9        A.    -- office.

10       Q.   And the keys, did you keep them in your

11   pocket or was it like on a key belt thing?

12       A.   Like it was in a key ring.

13       Q.   That was on the belt?  Was it on like your

14   belt or by the --

15       A.   Snap.

16       Q.   Snap.  Those are the company keys?

17       A.   Yes.

18       Q.   And what hand -- did you use both hands to

19   unlock the door?

20       A.   I use right hand unlock the door.

21       Q.   Where was your left hand?

22       A.   My hand was somewhere on myself.

23       Q.   So did you take it off of Heather Kiernan?

24       A.   I only had one hands on Heather Kiernan all

1    Q.   Did you not think that was inappropriate?

2         ATTY. ROMANTZ:  Objection.

3    A.   No.

4    Q.   Why not?

5    A.   Because she was no happy home.  Her husband

6    no made her happy.  She always was upset.  She

7    didn't want to be with her husband, so I no have no

8    problem.  Also it wasn't just my idea, it was both

9    my idea.

10   Q.   So you were talking about your own sexual

11   experiences as well?

12   A.   No, I never talk.  No, no, no.

13   Q.   You weren't talking about your marital

14   sexual issues or experiences, were you --

15        ATTY. ROMANTZ:  Objection.

16   A.   No.

17   Q.   -- with Heather.

18        You say that you read Exhibit 3 --

19   sorry, Exhibit 4, and if I could direct your

20   attention towards the bottom of the page where it

21   says Confidential, although there is this certain --

22   it's this one -- there is a number of bulleted

23   points, and I'm just directing you beginning where

24   it says, While; While it is not possible to list all

129

1    of those circumstances which constitute sexual

2    harassment, the following are some examples, and

3    then it lists several examples, and the one example,

4    the one that is second from the bottom, is

5    discussion of one's sexual activities; do you see

6    that?

7        A.  Yes.

8        Q.  So it was your testimony that Heather was

9    discussing her sexual activities about her husband,

10   right?

11           ATTY. ROMANTZ:    Objection.

12       A.  Correct.

13       Q.  And you, when she was having these

14   discussions with you, you were acting as her

15   supervisor, correct?

16           ATTY. ROMANTZ:    Objection.

17       A.  Yes.

18       Q.  And yet you took no action at all to suggest

19   that her discussions violated that policy that you

20   signed off that is marked as Exhibit 4?

21           ATTY. ROMANTZ:    Objection.

22       A.  I think, I'm no remember too sure, but a

23   couple of times I spoke to my night supervisor, his

24   name Chris, I don't know his last name, to talk to

1    Jason, because Heather, she had a mouth full.

2         Q.   I don't know what you mean by mouth full.

3         A.   She was tell all these things, that's mean a

4    mouthful, to me, yes.

5         Q.   When did you have that discussion?

6         A.   That was about 2, 3 weeks before it

7    happened, a couple of weeks before it happened.

8         Q.   What prompted you to have that discussion?

9         A.   I don't understand that.

10        Q.   Why did you talk to Chris about him talking

11   to Jason about Heather's behavior and what she was

12   talking about?

13        A.   Why I talk to Jason?  Because it was not

14   right for me at one certain point to hear all this

15   stuff.

16             ATTY. McLEOD:  Could you read that

17   answer back, please.

18             (Answer read.)

19        Q.   So you spoke to Chris, he was your

20   supervisor during the week, and you asked him to

21   speak to Jason?

22        A.   Yes.

23        Q.   Do you know if he did?

24        A.   Well, I don't have no idea.

1    Q.  But, nevertheless, at that time you were

2  concerned about the things Heather was talking

3  about?

4            ATTY. ROMANTZ:  Objection.

5    A.  No really; I was no concern about it.

6    Q.  Okay.

7    A.  I was no concern about it.  You know, I

8  figure we were friends and she needed somebody to

9  talk.  That's what I assume.

10    Q.  I'm confused then.  If you weren't concerned

11  about it, then why did you report it to Chris?

12    A.  (No verbal response.)

13    Q.  Sorry.

14    A.  I no was concern.  I just tell Chris to --

15  you know, what mouth she had.

16    Q.  But why did you tell Chris is my question.

17  That's what I'm trying to get to.

18    A.  Why?

19    Q.  Mm-mm.

20    A.  I don't know about why I tell him.

21    Q.  You don't know why?

22    A.  No.

23    Q.  But you weren't concerned?

24    A.  No.

1     Q.  But did you want it to stop?

2     A.  Yes.

3     Q.  You did?

4     A.  Yes.

5     Q.  Is that why you went to Chris to talk to him

6  about it, because you wanted it to stop?

7     A.  No, I wanted Heather have a little bit of

8  clean mouth.

9     Q.  You wanted her to stop talking about her

10  husband?

11     A.  Yes.

12     Q.  Was there anything else that you wanted

13  Heather to stop doing which is why you went to

14  Chris?

15     A.  That's the only reason I went to Chris.

16     Q.  Because you wanted her to stop talking about

17  her husband?

18     A.  Yes.

19     Q.  Was it about her husband in general or was

20  it just about the sexual things that she was talking

21  about with you that you wanted to stop?

22     A.  In general.

23     Q.  In general.  You wanted her to stop in

24  general talking about her husband.  So if she came

1    in and said something fairly innocent about her

2    husband, such as my husband bought me this sweater,

3    that is not something you cared to hear about?

4        A.  No, that's a different story with the

5    sweater with other activity going on.  That like --

6        Q.  What I had ask you was, Did you want her to

7    stop talking about her husband in general or just

8    stop talking about her husband with regard to his

9    sexual activities, and your response was in general.

10       A.  Yes, meaning general what?

11       Q.  Anything, or just one issue, the sexual

12   activity such as before we were talking --

13       A.  No, in general.  I don't want to hear her

14   outside problem.

15       Q.  On that morning -- not that morning, but on

16   that day, May 19, when she came into the office --

17   when she came into AMSA, did she have anything to

18   say about her husband?

19       A.  Yes.  She say he was an asshole, all of this

20   stuff, nothing really new, same record over and over

21   again.

22       Q.  And that came approximately a couple of

23   weeks after you had talked to Chris hoping that

24   would stop, right?

1      A.   Yes.

2      Q.   How did you feel about that?

3      A.   How did I feel about that?

4      Q.   Mm-mm.

5      A.   If I told him something once, I'd have to

6  tell him again.

7      Q.   Before Heather arrived that day did you have

8  any knowledge as to whether or not Chris had spoken

9  to Heather or Jason -- let me finish -- or whether

10  or not Jason spoke to Heather about what you had

11  spoken to Chris about?

12            ATTY. ROMANTZ:  Objection.

13      A.   I never heard anything.

14      Q.   Did you ever meet Heather's husband?

15      A.   No.

16      Q.   Did you form any opinions about Heather's

17  husband?

18      A.   No.

19      Q.   So let me ask, Did you think that Heather's

20  comments about her husband weren't appropriate for

21  the workplace?

22      A.   Yes.

23      Q.   You didn't think they were appropriate?

24      A.   Yes, you could say that.

137

1    activity.  There was her and me; both were.  She

2    want to do that, she want to be -- I assume, I

3    understand, probably she started the shoulder for go

4    some other place.

5        Q.  And as I recall, because as you are

6    testifying, she wanted to go in that room with you,

7    right?

8        A.  Yes.

9        Q.  And at no time did she say to you I don't

10   want to go in there?

11           ATTY. ROMANTZ:  Objection.

12       A.  No.

13       Q.  If she had said to you, I don't want to go

14   in there, would it have been appropriate for you to

15   go into that room with her?

16           ATTY. ROMANTZ:  Objection.

17       A.  No.

18       Q.  When you are at AMSA you can't smoke inside?

19       A.  Some people smoke in the garage, the break

20   room, some people they go outside.  It depends.

21       Q.  But if you were to go outside the building

22   you need to secure the vault; is that what you need

23   to do?

24       A.  The vault is already secure.  The part of

Francesco Ciambriello                                    04/07/2005

180

    1        A.  No.

    2              ATTY. McLEOD:  I don't have any other

    3    questions at this time.  Based on the issues with

    4    the joint defense agreement that has just been

    5    raised, I will suspend, in the event that I'm able

    6    to get further inquiry on the meeting that took

    7    place yesterday, but other than that I think we are

    8    done.

    9

   10

   11

   12

   13

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

181

1              C E R T I F I C A T E

2    I, FRANCESCO CAMBRIELLO, do hereby certify that I

3    have read the foregoing transcript of my testimony,

4    and further certify that said transcript is a true

5    and accurate record of said testimony (with the

6    exception of the following corrections listed

7    below):

8    Page      Line          Correction/Reason

9    _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17

18

19        Signed under the pains and penalties of perjury

20   this _____ day of _____, 2005.

21

22                    _____

23                    FRANCESCO CAMBRIELLO

24

Francesco Cambriello                                      04/07/2005

182

1    Commonwealth of Massachusetts

2    Suffolk, ss.

3        I, Carol A. Pagliaro, Registered Professional

4    Reporter and Notary Public in and for the

5    Commonwealth of Massachusetts, do hereby certify

6    that FRANCESCO CAMBRIELLO, the witness whose

7    deposition is hereinbefore set forth, was duly sworn

8    by me and that such deposition is a true record of

9    the testimony given by the witness to the best of my

10   skill and ability.

11       I further certify that I am neither related to,

12   nor employed by, any of the parties in or counsel to

13   this action, nor am I financially interested in the

14   outcome of this action.

15       In witness whereof, I have hereunto set my hand

16   and seal this 25th day of April, 2005.

17

18

19                                      CERTIFIED ORIGINAL
                                        LEGALINK BOSTON
20       _____

21   Carol A. Pagliaro, RMR

22   Notary Public

23   CSR No. 123293

24   My commission expires April 28, 2011

# Exhibit F

Volume:     1
Pages:      83
Exhibits:   3

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss.                    SUPERIOR COURT
No. BRCR2002-0773

COMMONWEALTH OF MASSACHUSETTS

vs.

FRANCESCO CIAMBRIELLO

BEFORE:  Burnes, J.

Motion to Dismiss

APPEARANCES:

Jeanne M. Veenstra, Assistant District Attorney,
Bristol District, 888 Purchase Street, New Bedford,
Massachusetts 02740, for the Commonwealth.

David R. Ardito, Esq., 228 County Street,
Attleboro, Massachusetts 02730, for the Defendant.

New Bedford Superior Courthouse
New Bedford, Massachusetts
August 25, 2003

LORI R. SAULNIER
Official Court Reporter
Certified Shorthand Reporter

---

I N D E X

| Witnesses | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| John Otrando | | | | |
| by Ms. Veenstra: | 9 | | 32 | |
| by Mr. Ardito: | | 23 | | 34 |
| Christopher Markey | | | | |
| by Ms. Veenstra: | 35 | | | |
| by Mr. Ardito: | | 42 | | |
| Christopher Abreu | | | | |
| by Ms. Veenstra: | 43 | | | |
| by Mr. Ardito: | | 53 | | |
| Russell Castro | | | | |
| by Ms. Veenstra: | 55 | | 63 | |
| by Mr. Ardito: | | 61 | | 63 |
| Louis Pacheco | | | | |
| by Ms. Veenstra: | 64 | | | |
| by Mr. Ardito: | | 71 | | |

E X H I B I T S

| No. | Description | Iden. | Evid. |
|---|---|---|---|
| 1 | Receipt | | 22 |
| 2 | Tape | | 30 |
| 3 | Affidavit | | 43 |

---

3

P R O C E E D I N G S

1    THE CLERK:  #16 on the list, Francesco
2  Ciambriello with Mr. Ardito, Ms. Veenstra.
3    THE COURT:  Yes.  Good morning.
4    MS. VEENSTRA:  Good morning.
5    MR. ARDITO:  Good morning.
6    THE COURT:  Mr. Ardito, this is your
7  motion to dismiss?
8    MR. ARDITO:  Yes, it is, judge.
9    THE COURT:  Do either of you want to be
10  heard in opening?  I've read both the motion and
11  the opposition.  Do I need to know anything more
12  before you start?
13    MR. ARDITO:  I don't believe so, your
14  Honor.
15    THE COURT:  Okay.  Why don't we --
16    MS. VEENSTRA:  Judge, I just suggest I
17  think that, as the Court knows, the balancing
18  test is going to require the Court to determine
19  the culpability of the Commonwealth, and I would
20  expect to elicit some evidence on that.  It also
21  needs to determine the potential exculpatory
22  value and the nature of that evidence and the
23  materiality of it.  So, I would expect to offer
24  testimony on those two prongs, and then obviously

---

4

1  it will be up to the Court to determine what the
2  potential prejudice to the defendant will be; and
3  that obviously will be arguments of counsel.
4    THE COURT:  Right.  I also notice, Ms.
5  Veenstra, there is a letter from you to Mr.
6  Ardito saying that there were three tapes
7  that were retrieved?
8    MS. VEENSTRA:  Yes, your Honor.
9    THE COURT:  I'd be interested in
10  knowing -- and I'm sure you will elicit this --
11  how many there were to start with, what these
12  tapes covered, what they --
13    MS. VEENSTRA:  Absolutely, your Honor.
14  I think that the number of witnesses will be able
15  to give your Honor the best picture possible of
16  what was depicted, what happened to the tapes,
17  how many there were initially, what happened to
18  them, what the Commonwealth has retained
19  possession of, and what those tapes depicted.
20    THE COURT:  Okay.  All right.
21    MR. ARDITO:  Your Honor, may I use the
22  podium?
23    THE COURT:  Yes, certainly.
24    MR. ARDITO:  Your Honor, as stated in
25  my brief, we believe that the lost tapes are

5

1    paramount to our defense.  Reason being is if you
2    just look quickly -- and I know your Honor hasn't
3    had time, but there's certain things that were
4    elicited in the grand jury indictment were
5    actually shown on those tapes, because I
6    witnessed the tapes with one of counsel's
7    witnesses.  For example, Officer Otrando, I
8    believe -- and my sister will probably elicit
9    that -- says that in interviewing one of the
10   witnesses, a Ms. Parrott, Ms. Parrott in her
11   sworn statement says that the client was dragged
12   into the room.  It's right in the minutes of the
13   grand jury.  I've seen the tape.  They walked
14   into the room.  We have a copy of that tape of
15   them walking.  Officer Otrando says when asked
16   whether or not my client's left hand was free, he
17   says he did not have a good look.  We have a tape
18   today, and you can see them both walking down the
19   aisle toward where this alleged incident took
20   place.  Well, certainly if a jury was to view the
21   entire tape the way I viewed the tape, it
22   certainly contradicts everything that was
23   mentioned not only in the grand jury indictment,
24   but the police reports.
25            For example, there's a clear picture --

6

1    this is not a contradiction, but it certainly
2    goes to the state of mind.  There was a clear
3    picture of the alleged victim standing outside
4    the building smoking a cigarette with a friend
5    that she called up to take her over a bottle of
6    wine.  I think that picture in itself -- this is
7    hours later -- sends a message, and I need that
8    message to be shown to a jury.
9            This is a consent defense.  We're
10   saying that they walked down the aisle, went into
11   the room for five minutes, came out.  There was a
12   picture of her very clear walking out of that
13   room heading towards the ladies room.  I seen
14   it.  There was no distress.  There was no putting
15   herself together.  There was none of that.  I
16   need to show that to a jury.  That's the whole
17   case.  If I was to show this tape to a jury, I
18   probably wouldn't even have to cross-examine
19   witnesses.  That's how telling this tape was.
20   And for the Commonwealth not to have the tape
21   today puts us in a terrible position because now
22   we have testimony that's going to be very very
23   hard to cross-examine.
24            With the tape itself, it clearly shows
25   that if anything at all was done -- and that was

7

1    out of the view of the camera.  And according to
2    Officer Otrando, he said he timed it.  It was
3    about five minutes that they were in this room.
4    It clearly shows that there was no distress, no
5    one was in any pain.
6            There's another part of the video that
7    shows them having a coke after.  Mr. Ciambriello
8    asked Ms. Kiernan if she wanted something to
9    drink.  They were in a waiting room.  All of
10   this, you know, hours and hours and hours of tape
11   that are missing right now are paramount to our
12   defense.  To allow this case to go on without
13   this tape, it certainly prejudices my client.
14           You know, I don't want to recite case
15   law, in this case what was said or that case.
16   You have that in front of you.  But I seen this
17   tape.  And from the onset I believe that if I had
18   this tape, there wouldn't have been a problem.
19   Reason why we couldn't get the tape is it was
20   shot over some type of security system where
21   there was several different cameras taking place
22   at the same time, and we needed -- it had to be
23   seen at AMSA the place where the alleged incident
24   took place; and that's where myself and at that
25   time Assistant District Attorney Saunders went to

8

1    go view the tape.  We only stood there for a
2    couple of hours, and what we saw was enough to
3    let me believe this is paramount.  This is what I
4    need to show a jury.  This is how my client gets
5    exonerated of these indictments.
6            The only thing I have today is a
7    five -- two minute walk showing Mr. Ciambriello
8    and the victim walking to the alleged place of
9    the incident, which I'm sure we're going to show
10   your Honor.  And even that video contradicts
11   testimony in the grand jury report.  Without that
12   video, your Honor, we are extremely prejudiced,
13   extremely prejudiced.  It just -- we just need
14   it.  It showed other armored personnel coming
15   in.  One particular personnel truck was very --
16   came in after the alleged incident.  So, if Ms.
17   Kiernan was really in distress, she was two feet
18   away.  The camera showed her two feet away from
19   this armored guard.
20           THE COURT:  Well, I assume that I'm
21   going to hear from him.
22           MR. ARDITO:  You are.  You are.  But I
23   think the picture itself -- the day of reality
24   TV, the picture itself is what I need a jury to
25   see.  That's gone.  I mean when I cross-examine

1   Ms. Kiernan and I asked her hypothetically, you
2   know, why didn't you ask this person for help, I
3   don't know what her answer's going to be.  But if
4   I could show that on television, if I could show
5   a jury here's this man, he's armed, here's Ms.
6   Kiernan, there's Mr. Ciambriello, and ask that
7   question then --
8          THE COURT:  Okay.  I think you've made
9   a showing --
10         MR. ARDITO:  Thank you, judge.
11         THE COURT:  -- that you need it.
12         MR. ARDITO:  Desperately.
13         THE COURT:  Let's see what the
14  Commonwealth has to show why you don't.
15         MS. VEENSTRA:  The Commonwealth would
16  call Sergeant John Otrando.
17         THE COURT:  Okay.
18              JOHN OTRANDO, Sworn
19         THE WITNESS:  Morning, your Honor.
20              DIRECT EXAMINATION
21  BY MS. VEENSTRA:
22  Q.  Would you please introduce yourself for the
23      record.
24  A.  Yes.  My name's John Otrando.  I'm a sergeant
25      with the Attleboro Police Department.

1          THE COURT:  You can sit down.
2   Q.  How long have you been with the Attleboro Police
3       Department?
4   A.  Fifteen years.
5   Q.  Sergeant Otrando, I'd like to direct your
6       attention to the year 2001, in the month of May,
7       and ask you whether you began an investigation
8       with regard to an alleged rape at an armored car
9       facility?
10  A.  Yes, I was involved in that.
11  Q.  And what is the name of that facility?
12  A.  It's AMSA, Armored Motor Services of America, I
13      believe.
14  Q.  And directing your attention to the early morning
15      hours of May 20th in the year 2001, did you go to
16      that location in furtherance of your
17      investigation?
18  A.  Yes, I did.
19  Q.  And do you know who you were with or who was
20      present at that location when you went there?
21  A.  Yes.  I believe it was Officer Castro, Officer
22      Larsen, and a civilian from AMSA Edward O'Brien.
23      There was also another gentleman there.  His name
24      escapes me at this time, from AMSA.
25  Q.  And would that name be contained in your police

---

1       report, detective?
2   A.  It may be.
3          MS. VEENSTRA:  Your Honor, may he
4       refresh his memory?
5              THE COURT:  Yes.
6              THE WITNESS:  It may be contained in
7       the initial incident report.
8   Q.  I direct your attention to Page 2 approximately
9       halfway down.  A little more than halfway down.
10  A.  Jason Khoury.
11  Q.  And that would be K-H-O-U-R-Y?
12  A.  That's correct.
13  Q.  Did you and other members of your police
14      department have an opportunity to take a look at
15      that facility at that time?
16  A.  Yes, we did.
17  Q.  And did you have an opportunity at that time to
18      view some surveillance equipment?
19  A.  Yes, we did.
20  Q.  As best you can, can you describe the nature of
21      that equipment and that surveillance system for
22      the Court?
23  A.  It's a small room by the manager's room.  There
24      are various screens in front of you, monitors,
25      and there's like a VCR type system.  I believe it

1       contains six VCRs.  The system they told me was a
2       multiplex tape system where on each screen you
3       would see nine frames, and they informed me that
4       the entire facility was monitored by video
5       camera, and there's also recorded audio.
6   Q.  So, if I understand you correctly, there are a
7       number of screens, and within those screens there
8       are a number of frames?
9   A.  That's correct.
10  Q.  And you said that the entire facility is
11      monitored.  Is the entire facility monitored?
12  A.  Everything except for the supervisor's office
13      which was informed to me to be Jason Khoury's
14      office.
15  Q.  And where specifically within AMSA did the
16      alleged rape take place?
17  A.  Inside Jason Khoury's office.
18  Q.  Did you have an opportunity while visiting that
19      facility to view what was depicted on those
20      surveillance tapes?
21  A.  Yes, I did.
22  Q.  Could you describe what you saw to the Court?
23  A.  One portion -- I observed one portion of the tape
24      shows Heather Kiernan and Francesco --
25  Q.  And would that be the alleged victim?

13

1  A.  Yes.  The alleged victim Heather Kiernan,

2      Francesco Ciambriello, and another female

3      identified later as Christina Parrott outside the

4      facility, appeared to be smoking cigarettes

5      outside.

6           THE COURT:  All three of them outside?

7           THE WITNESS:  All three were outside,

8      yes.

9  Q.  And did you hear any audio, specifically with

10     regard to what was depicted outside?

11  A.  No, I did not.

12  Q.  Could you, sergeant, see any facial expressions

13     on any one of these three people that were

14     outside?

15  A.  No, I could not.

16  Q.  Did you make any other observations of what was

17     depicted on the tapes?

18  A.  Yes.  There was another section where it showed

19     Heather Kiernan at her desk, and Francesco

20     Ciambriello was speaking with her by her desk.

21     They appeared to be in some sort of

22     conversation.  He was in the room by her desk.

23  Q.  And when you said that they appeared to be

24     involved in some sort of conversation, could you

25     hear what was said?

---

14

1  A.  I could not make out what was said, no.

2  Q.  And again, were you able to determine any facial

3     expressions that stood out to you?

4  A.  No, I could not.

5  Q.  Did you make any other observations of what was

6     depicted on the tapes?

7  A.  Yes.  There was another section of the tape where

8     Francesco Ciambriello was walking side by side

9     with the victim Heather Kiernan.  He was to her

10     left.  He had his right arm around her -- the

11     waist, buttocks area.  His left arm I could not

12     see where it was.  I know it wasn't down by his

13     side.  It was into his right side, and he was

14     walking along with her through what they told me

15     was the money room.

16  Q.  And you said that his left hand was where?

17  A.  His left hand was on the right side of his body.

18     It wasn't down by his side.  It was like this,

19     but I couldn't see where it was.  And his right

20     hand was around her waist, buttocks area.

21  Q.  As best you can, describe the angle of that view

22     of them walking down the corridor.  Would that be

23     a view of their backs, their sides, their

24     fronts?  Could you describe that to the Court?

25  A.  Their left side.  I had the view of their left

---

15

1     side.  If the camera was situated here higher up

2     on the wall, it was coming down.  So, I could see

3     his left side very clearly, and the tape only

4     lasted a few seconds.

5  Q.  Did you hear any audio in viewing that portion of

6     the tape?

7  A.  No, I did not.

8  Q.  At some later time -- and I'll get to that more

9     completely later, but at some later time did you

10     have some communication with Edward O'Brien

11     regarding that audio?

12  A.  Yes, I did.

13  Q.  Can you describe that to the Court?

14  A.  At this time when I viewed the tapes, there was a

15     humming noise coming from the audio where a lot

16     of -- there was feedback or whatever you would

17     call it.  So, a lot of the audio was inaudible.

18     When the tapes were viewed later, I had a chance

19     to speak with Edward O'Brien who was present at

20     that second viewing.  He informed me that that

21     feedback or that humming noise was gone and that

22     he could hear some of the statements that were

23     made by the victim.

24  Q.  Okay.  Do you know what he said he heard on that

25     tape?

---

16

1           MR. ARDITO:  Objection, your Honor.

2     Hearsay.

3           THE COURT:  Well, I think she can have

4     it on this for this motion.

5           MR. ARDITO:  For the record.

6  Q.  Did he tell you what he heard on that tape?

7  A.  Yes.  He informed me that he could hear Heather

8     Kiernan state, "No.  No.  I don't want to go back

9     there."

10  Q.  But you didn't hear that?

11  A.  No, I did not.

12  Q.  And you were not present at that second viewing;

13     is that correct?

14  A.  That's correct.

15  Q.  Now, you said that you saw them coming down the

16     hallway.  Did you see where they went when they

17     went down the hallway?

18  A.  Yes.  After they went through the money room,

19     they went down a longer hallway.  They went

20     through the money room and took a right down a

21     long hallway.  Then I observed them from a

22     different camera that again was positioned -- say

23     it was up here.  They took a right, and the

24     camera was at their back leading down to Jason

25     Khoury the supervisor's office.

17

1  Q. And what happened once they got to that office?
2     Did you see --
3           THE COURT: Let me just interrupt.  You
4     said you were looking at them from the back?
5           THE WITNESS: Yes, your Honor.
6           THE COURT: Okay.
7  Q. Let me ask you while looking at them from the
8     back, did you make any observations of Mr.
9     Ciambriello's hands?
10 A. He had his arm around the victim in the same
11    manner I mentioned before, the waist, buttocks
12    area.
13 Q. What hand would that be?
14 A. His right hand.
15 Q. And when you say waist, buttocks area, sir, is it
16    low on the buttocks, or is it in the waist?
17 A. It's -- well, I'd say the hip area.  Yes, right
18    around that area.  To the back.
19 Q. And did you see what happened once they got to
20    that door?
21 A. I observed them enter the supervisor's office.
22 Q. Who went in first; do you remember?
23 A. I believe it was Heather Kiernan.
24 Q. And did you continue -- did that door close?
25 A. Yes, it did.

18

1  Q. Did you continue to watch?
2  A. Yes, I did.
3  Q. And at some point did that door open?
4  A. Yes, it did.
5  Q. Can you estimate for the Court about how much
6     time elapsed while that door was closed?
7  A. I'd have to say several minutes.
8  Q. And when you say several minutes, five, ten,
9     fifteen?  As best you can estimate.
10 A. Estimate, five.
11 Q. And when you see that door open, what else did
12    you see?
13 A. I observed Heather Kiernan exit and turn left.
14 Q. And do you know where she went to?
15 A. From later speaking with her, she informed me
16    that she had gone to the female's bathroom.
17 Q. Did you see her go to the bathroom?
18 A. No.  I just observed her exit and head in that
19    general direction.
20 Q. Did you make any observations of her demeanor or
21    her facial expression as she exited that office?
22 A. No, I did not.
23 Q. Was the angle such that you would see the front
24    of her?
25 A. Yes.

19

1  Q. Now, is that, sergeant, basically what you saw
2     depicted on those tapes that evening initially
3     starting your investigation?
4  A. That is correct.
5  Q. That evening did you seize some video tapes?
6  A. Yes, I did.
7  Q. How many video tapes did you seize on May 20th in
8     the early morning hours?
9  A. Three.
10 Q. And were those labeled in any way?
11 A. Yes, they were.
12 Q. How were they labeled?
13 A. D -- the letter D, E, and F.
14 Q. And at some point did you have some conversation
15    with an assistant district attorney Christopher
16    Markey?
17 A. Yes, I did.
18 Q. And did some of that conversation revolve around
19    those video tapes that you seized?
20 A. Yes.
21 Q. And were some arrangements made for the viewing
22    of those video tapes?
23 A. Yes.
24 Q. Can you describe what happened to the Court?
25 A. ADA Markey asked me if he could get those tapes

20

1     in order to view them to make copies of them to
2     further the case.  So, my recollection is that I
3     brought them up to New Bedford and dropped them
4     off to ADA Markey.
5  Q. And that would be three tapes?
6  A. Yes.
7  Q. And at some point did you have some conversation
8     with Assistant District Attorney Markey to
9     retrieve other tapes?
10 A. Yes.
11 Q. And what other tapes were you asked to retrieve?
12 A. The three remaining tapes that were left in
13    AMSA's possession.
14 Q. And how were those labeled?
15 A. A, B, and C.
16 Q. Okay.  Do you know if this was before or after
17    you turned over the original tapes labeled D, E,
18    and F?
19 A. I'm not sure.
20 Q. But you're sure that you gave him tapes D, E, and
21    F?
22 A. Yes, I am sure about that.
23 Q. And you were instructed to go and retrieve A, B,
24    and C?
25 A. That is correct.  He gave me a subpoena.

21

1   Q. And did you retrieve A, B, and C?
2   A. Yes, I did.
3   Q. And do you still retain -- let me ask you this.
4       Did A, B, and C ever leave your custody?
5   A. No, they did not.
6   Q. Well, at some point were they forwarded to the
7       Raynham Police Department?
8   A. Yes. Correct.
9   Q. Okay. Are they -- subsequent are they now back
10      in your possession?
11   A. Yes, they are.
12   Q. Do you know whether there were some arrangements
13      made between Assistant District Attorney Markey
14      and counsel for the defendant and AMSA to view
15      those tapes?
16   A. Yes, there were.
17          THE COURT: Which tapes are we talking
18      about? A, B, and C or D, E, and F?
19          MS. VEENSTRA: D, E, and F.
20   A. Yes, there were arrangements made.
21   Q. And were you present?
22   A. No, I was not present.
23   Q. Did you ever receive back tapes D, E, and F?
24   A. No, I did not.
25   Q. I'm going to show you what appears to be a

22

1      handwritten receipt and ask you if you recognize
2      it?
3   A. Yes, I do.
4   Q. What do you recognize that to be, Sergeant
5      Otrando?
6   A. I recognize this to be a receipt. I believe it
7      was consigned by Jason Khoury the supervisor at
8      AMSA and signed by myself. I signed this the
9      second time I went back to pick up Tapes A, B,
10      and C, and he indicates on here that I had seized
11      Tapes D, E, and F initially.
12          MS. VEENSTRA: I'd ask that this be
13      marked as an exhibit.
14          MR. ARDITO: No objection, your Honor.
15          THE COURT: It may be marked.
16          (The receipt was marked Exhibit No. 1
17      and received into evidence.)
18   Q. Now, at some point did you ask an Officer Castro
19      of your police department to assist you?
20   A. Yes, I did.
21   Q. And was he actually one of the responding
22      officers in this investigation anyway?
23   A. Yes, he was.
24   Q. What did you ask Officer Castro to do?
25   A. I gave him custody of the tapes and asked him to

23

1      go to the REACT organization which is headed by
2      Deputy Chief Pacheco of the Raynham Police
3      Department so that he may view the tapes, extract
4      whatever information was available.
5          THE COURT: Which tapes are we talking
6      about here?
7          THE WITNESS: Those were A, B, and C,
8      your Honor.
9          THE COURT: All right.
10   Q. And does the Raynham Police Department have some
11      special equipment with which to view this type of
12      evidence?
13   A. Yes. It's through REACT.
14          MS. VEENSTRA: If I could have one
15      moment, your Honor?
16          THE COURT: Uh-huh. While you're
17      thinking, let me just ask, you have A, B, and C
18      now. What you don't have is D, E, and F?
19          THE WITNESS: That's correct, your
20      Honor.
21          MS. VEENSTRA: I have no further
22      questions of this witness, your Honor.
23          THE COURT: Counsel.
24          CROSS EXAMINATION
25   BY MR. ARDITO:

24

1   Q. Detective, did you view A, B, and C?
2   A. I viewed the tapes. I can't say specifically if
3      it was A, B, and C. From what Edward O'Brien
4      informed me, that the views that we saw that day
5      were on A, B, and C. They have six VCRs, and
6      they're all set up, and he informed me that what
7      we were viewing was on A, B, and C. And I
8      observed portions of it. I didn't view the whole
9      tape from say 3:00 in the afternoon until 11:00,
10      but there were portions of A, B, and C I viewed,
11      yes.
12   Q. And on Tapes A, B, and C, do you recall how many
13      hours of tape they were?
14   A. No, I do not recall.
15   Q. So, there was six tapes total; am I correct?
16   A. Yes, sir.
17   Q. And the facility outside of the supervisor's
18      office was completely surrounded by cameras,
19      correct?
20   A. I don't know if it's accurate to say it's
21      completely surrounded by cameras. Some cameras
22      view it like -- I wouldn't say it's completely
23      surrounded. There are cameras that, you know,
24      can view it. But to say it's completely
25      surrounded, I don't believe so.

25

1  Q. But someone working an eight hour shift would
2     constantly be on camera, would they not?  Or the
3     facility would be on camera?
4  A. Yes, yes.
5  Q. We have what the police transcribed for us on a
6     VCR of Tapes A, B, and C?
7  A. Yes.
8  Q. Did you view that?
9  A. Yes, I did view that.
10 Q. And there's less than three minutes on that tape;
11    isn't that true?
12 A. If you're telling me that.  I didn't time it.
13 Q. But that tape only shows them walking down a
14    room; isn't that true?  It shows -- I believe it
15    shows the victim talking to someone, and then her
16    and Mr. Ciambriello walking down a room; isn't
17    that true?
18 A. Walking down a hallway, and there's some
19    conversation in there, some interaction.
20 Q. But that's all that tape shows?
21 A. I don't know if they were completely viewed to
22    extract everything out of those three tapes.  I
23    can't say that that's a final product from
24    examining all eight hours from all three tapes.
25    From whatever portion they viewed, that's on that

26

1     tape.
2  Q. But that's the size of it though?  That's all we
3     have right now?
4  A. Right now, yes.
5            THE COURT:  Let me just interrupt you.
6     Are these tapes labeled by the camera that took
7     the tape, that took the image?
8            THE WITNESS:  No.  On each tape -- from
9     what I recall, I believe it's a multiplex
10    system.  So, there's nine cameras on each tape.
11    So, I don't know if that means there would be
12    fifty some odd cameras.
13           THE COURT:  I see.
14           THE WITNESS:  I don't know.
15           THE COURT:  And the tapes are from the
16    six screens on which these nine -- each of which
17    has nine images on it; is that right?
18           THE WITNESS:  Yes.  There's six VCRs
19    and each VCR shows nine, I believe, different
20    cameras.
21           THE COURT:  Okay.  And these tapes are
22    the ones that came from the VCR?
23           THE WITNESS:  Yes.
24           THE COURT:  And this three minutes or
25    whatever that counsel is asking you about, did

27

1     somebody extract information or extract images
2     off these tapes?
3            THE WITNESS:  Off A, B, and C, yes,
4     your Honor.
5            THE COURT:  Who did that?
6            THE WITNESS:  That was Deputy Chief
7     Pacheco from the Raynham Police Department.
8            THE COURT:  And do you know what his
9     instructions were, what he was to take off the
10    tape?
11           THE WITNESS:  He went there with
12    Officer Castro who I gave custody of the tapes
13    to, and they were asked to extract whatever they
14    could out of the tapes.  They spent eight hours
15    looking and extracting information.  From what
16    they imparted to me, they were unable to
17    complete -- they weren't able to go through the
18    whole eight hour shift, your Honor, from each
19    tape.  That's a portion of what they have now.
20    There's still more work to do which could be
21    extracted.
22           THE COURT:  The extraction was any
23    images of either the defendant or Ms. Kiernan?
24           THE WITNESS:  Yes.
25           THE COURT:  Okay.

28

1  Q. I'm sorry, detective.  Prior to you seeing this
2     tape, you testified earlier and also at the grand
3     jury that the first tape was from the back of the
4     room; is that correct?
5  A. Well, the first tape I saw -- well, which part
6     are you asking me about?
7  Q. Well, when you investigated the alleged crime
8     originally, when you went to answer the first
9     tape, you saw -- you testified that it was from
10    the back; that the camera was behind; isn't that
11    true?
12 A. I don't know which position you're asking me
13    about.  There's one part where they're going down
14    the hallway where the camera is from the back.
15 Q. That's what you testified to?
16 A. Yes.
17 Q. Yes, because you knew this was available.  This
18    new tape wasn't available then?
19 A. No, sir, it was not.
20 Q. Have you seen this new tape?
21 A. Yes, sir, I have.
22 Q. And it clearly shows them walking?  You have a
23    frontal view now, correct?
24 A. Yes, sir, you do.
25 Q. Was there any dragging in this tape?

29

1  A.  I didn't see any dragging, sir.

2  Q.  Any pushing?

3  A.  I didn't see any pushing, no.

4  Q.  Was there any -- was the alleged victim trying to

5      stop at any time?

6  A.  I didn't observe that.

7  Q.  You didn't observe that.  Is it your testimony

8      they're just freely walking down into this room,

9      correct?

10 A.  I wouldn't testify that she was freely brought

11     down to the room.

12         MR. ARDITO:  Your Honor, may I show

13     this tape?

14         THE COURT:  Sure.  Do you want it at

15     this point, or do you want it when this

16     officer -- at this point or when this officer is

17     completed?  Do you want it now?

18         MR. ARDITO:  Well, I'd like to have him

19     testify to what --

20         THE COURT:  Okay.

21         MS. VEENSTRA:  It might be clearer,

22     your Honor.

23         THE COURT:  All right.

24         MS. VEENSTRA:  I'd ask that this be

25     marked as Exhibit 2.

30

1          THE COURT:  Okay.

2          (The tape was marked Exhibit No. 2 and

3      received into evidence.)

4          THE OFFICER:  There's no volume on

5      this.

6          MR. ARDITO:  I'm sorry?

7          THE OFFICER:  There's no volume.

8          MR. ARDITO:  Actually there was some

9      conversation.

10         (The tape was played).

11 Q.  Detective, do you know whose voice that is in the

12     background?

13 A.  No, I do not.

14 Q.  Do you know who put that soda there?

15 A.  It appears to be Heather Kiernan in one of the

16     voices appears to be her.

17 Q.  And does it appear that there are more than two

18     voices?  Who is that?

19 A.  Heather Kiernan.

20         MR. ARDITO:  Your Honor, I just -- the

21     detectives then do some further work.  It's a

22     repeat of what was visually depicted, and I'll

23     leave that for the Court to view.

24         THE COURT:  Okay.  Did you have

25     questions now?

31

1          MR. ARDITO:  Well, I believe this is

2      another shot of what took place.  You see them

3      walking.

4          THE COURT:  What?

5          MR. ARDITO:  This is another of the

6      stroll down the -- right here.  Can you stop

7      that?  Sorry, judge.

8          MS. VEENSTRA:  Would you like me to

9      rewind it just a little bit?

10         THE COURT:  Yeah.

11         MS. VEENSTRA:  It appears to depict

12     some shadows and then the two walking down the

13     hallway.

14         THE COURT:  Right.  Okay.  When they

15     get in the frame, if you can stop it there.

16         THE OFFICER:  Pause?

17         THE COURT:  Okay.  Counsel, you have

18     questions?

19         MR. ARDITO:  Thank you, judge.

20 Q.  Where is Mr. Ciambriello's left arm in this

21     photograph?

22 A.  By his side.

23 Q.  Not around her body as you earlier testified?

24 A.  I had testified that her right hand -- that his

25     right arm was around her body.

32

1  Q.  And did you not say that his left arm appeared to

2      be around her?

3  A.  No.  I testified that in the shot where they went

4      through the money room, that I couldn't see --

5      from what I recall of that tape, I couldn't see

6      his left hand.  So, it would lead me to believe

7      that it was towards the right-hand side of his

8      body.  It wasn't down by his side like it is

9      here.

10 Q.  Clearly it was by his side when they walked in?

11 A.  That's correct.

12 Q.  No struggle to your --

13 A.  No.

14         MR. ARDITO:  Okay.  No further

15     questions, judge.

16         THE COURT:  Okay.  Ms. Veenstra.

17             REDIRECT EXAMINATION

18 BY MS. VEENSTRA:

19 Q.  Detective Otrando, is this the money room?

20 A.  No.  From my understanding, I may be wrong, but

21     the money room is the initial -- I think it was

22     just before this, that door that opened.  I

23     said -- when I spoke about the money room was

24     when the camera was up here high.  Mr.

25     Ciambriello had his right arm around her side,

1　and they were walking through that -- by that
2　camera.  Then they went through a door, down this
3　long hallway.  That's the long hallway that I saw
4　from the back on that second camera.  I don't
5　believe that's the money room.  I could be
6　mistaken.
7　Q. Okay.  And the other portion of this tape,
8　sergeant, which appears to show the alleged
9　victim drinking a soda; do you know when in time
10　that was with regard to the alleged rape?  Do you
11　know if that was before or after the alleged
12　rape?
13　A. I'm not sure.  I'd have to check.
14　Q. The time?
15　A. Yeah.
16　　　　MS. VEENSTRA:  May I, your Honor?
17　　　　THE COURT:  You may.
18　Q. Do you see --
19　A. In the lower right hand corner it says 1900.  So,
20　I would have to say that would be after the
21　incident.
22　Q. And would it be fair to say that the alleged
23　victim was working alongside of the defendant at
24　that time?
25　A. That's correct.

1　Q. Did it appear from information you received that
2　there were employees that actually delivered
3　money to that location after the alleged
4　incident?
5　A. That's correct.
6　Q. Is it your belief that that is what is depicted
7　on that portion of this tape?
8　A. Yes.
9　　　　MS. VEENSTRA:  I have no further
10　questions.
11　　　　MR. ARDITO:  Just brief recross.
12　　　　　RECROSS EXAMINATION
13　BY MR. ARDITO:
14　Q. Detective, you interviewed my client, correct?
15　A. That's correct.
16　Q. And in interviewing him, you noticed he has a
17　very heavy heavy Italian accent; is that true?
18　A. Yes.
19　Q. And you heard a voice besides the alleged victim
20　on that tape; isn't that true?  Another voice
21　just now?
22　A. Yes.
23　Q. And that other voice wasn't Mr. Ciambriello,
24　correct?  There was a third voice?
25　A. I heard two other male voices.

1　Q. Two other males voices, correct?  And you're
2　saying -- you're testifying that this based on
3　the time took place after the alleged assault,
4　correct?
5　A. Yes, from the time, yes.
6　　　　MR. ARDITO:  All right.  No further
7　questions, your Honor.
8　　　　THE COURT:  Okay.  Thank you very
9　much.  You may step down.
10　　　　THE WITNESS:  Thank you, your Honor.
11　　　　MS. VEENSTRA:  The Commonwealth would
12　call Christopher Markey.
13　　　　THE COURT:  Okay.
14　　　　CHRISTOPHER MARKEY, Sworn
15　　　　THE WITNESS:  Morning, your Honor.
16　　　　DIRECT EXAMINATION
17　BY MS. VEENSTRA:
18　Q. Could you please state your name for the record?
19　A. Christopher Markey, M-A-R-K-E-Y.
20　Q. How are you employed?
21　A. I'm an assistant district attorney for Bristol
22　County.
23　Q. I'd like to direct your attention to the month of
24　May in the year 2001 and ask you whether you had
25　an opportunity to review an alleged rape

1　regarding a defendant Francesco Ciambriello?
2　A. Yes, I did.
3　Q. And do you know who the lead investigator was on
4　that case?
5　A. Detective John Otrando from the Attleboro Police
6　Department.
7　Q. And at some point did you receive information
8　from Sergeant Otrando regarding information
9　regarding some surveillance tapes at the location
10　of the alleged rape?
11　A. Yes.
12　Q. Were you aware of whether some of that
13　surveillance activity had already been viewed by
14　Sergeant Otrando?
15　A. Yes.
16　Q. And how did you know that?
17　A. I believe he made mention of it to me, and I said
18　that we needed to get -- we should get someone --
19　we should get those tapes and obtain the tapes.
20　Q. And at some point do you know if Sergeant Otrando
21　seized some tapes initially in the investigation?
22　A. I'm unsure if he seized them right off the bat,
23　but I know I had conversation with him to get
24　more tapes or get tapes; but he may have had some
25　right then that we were making plans.  I'm not

1  sure of that.
2  Q. And at some point did you have some communication
3     with defense counsel Mr. Ardito regarding viewing
4     some tapes?
5  A. Yes, I did.
6  Q. And were some arrangements made to meet with
7     counsel to look at those tapes?
8  A. We made arrangements to have him view the tapes
9     at our office in New Bedford at 888 Purchase
10    Street on the fifth floor because we have some
11    video equipment that we can use to look at tapes.
12 Q. At some point did you receive some tapes from
13    Sergeant Otrando?
14 A. Yes.  I believe I went to the Attleboro Police
15    Department, picked those up, and brought those
16    back to New Bedford.
17 Q. Do you know how many you seized?
18 A. I believe I had two or three.
19 Q. And you brought those back to New Bedford for the
20    purpose of trying to view those on equipment that
21    the district attorney's office had?
22 A. Yes.  I was waiting.  I made arrangements with
23    Mr. Otrando -- I mean the attorney for the
24    defendant to do it some afternoon I believe it
25    was.

1  Q. And did you in fact attempt to do that?
2  A. Yes.  Mr. Ardito came down, went to my office,
3     and then two offices away is the video room where
4     we would have that equipment.  We went in there.
5     We put the tape in, and we didn't have the proper
6     equipment to view it.  Everything was kind of
7     going really fast.  As a result of that, I think
8     Mr. Ardito stayed for a little bit longer to view
9     and see if he could make any adjustment.  I
10    remember I was doing something else in my
11    office.  So, I just went to my office for a
12    little bit, and then Mr. Ardito came over, and we
13    just -- he said, "It's not going to work."  I
14    said, "Okay.  We'll go up to the armored car
15    place and view the tapes there, and we'll make
16    arrangements there."
17 Q. And that would be to view those tapes on the
18    actual equipment that it was taped on?
19 A. Yes.
20 Q. And so, your attempts to view it at the district
21    attorney's office were unsuccessful?
22 A. That's correct.
23 Q. And Mr. Ardito left?
24 A. Mr. Ardito left.  I kept the tapes, and then I
25    went to Attleboro District Court office and -- or

1     our office.  I think we were trying to make
2     arrangements to watch the video with Mr. Ardito
3     again because at that point it was going to be my
4     case; and what happened was I don't think --
5     there was some mix-up in communication between
6     the two of us, and we didn't go that afternoon.
7     I kept the tapes there.  I gave them to Assistant
8     District Attorney Chris Saunders.  I said, "Look,
9     I can't -- I'm not going to come back up here.
10    Why don't you look at the tapes", because he was
11    going to end up doing the probable cause
12    hearing.  And I left them in the Attleboro
13    District Court office.
14 Q. And that would have been two, maybe three tapes?
15 A. Two, maybe three tapes, and that was some time if
16    I remember correctly in the Summer of 2001.
17 Q. And you said that the purpose of that was so that
18    Christopher Saunders could then meet defense
19    counsel at the facility, the work place facility?
20 A. That's right.  What happened in the meantime was
21    it was decided that Chris was going to
22    actually -- Chris Saunders was going to actually
23    handle the case.  It was going to be his first
24    Superior Court case.  He was going to do the
25    probable cause hearing and do everything.  Some

1     time towards the end of Summer of 2001 we made
2     that decision.  So, I said, "Just you keep it and
3     handle the case."
4            THE COURT:  When you said you left the
5     tapes in the Attleboro District Court office,
6     that's the DA's office?
7            THE WITNESS:  Yeah, that's right.  At
8     120 North Main Street.
9  Q. And did you have some conversation with Mr.
10    Saunders about the fact he would be handling the
11    case?
12 A. I did, and I said that he would be handling it.
13    I had talked to his supervisor, and he said it
14    would be fine for him to handle it; and at that
15    point, you know, I'd check up on it once in a
16    while.  Hey, what's going on with this case?  And
17    then at some point, I don't know when it was, but
18    I know when the case was pending, the defendant
19    either became ill or was involved in some
20    accident, and they continued the case over for a
21    significant amount of time because of a serious
22    injury to the defendant.  I remember that.  But
23    that's basically how I remember ending it at that
24    point.
25 Q. And do you know whether Chris Saunders ever

**Page 41**

1    viewed those tapes with defense counsel at AMSA?

2  A.  I don't know if he ever viewed it. I heard later

3    that Chris Abreu had viewed the tapes, and he's

4    another assistant DA attorney who worked in the

5    Attleboro District Court. That's the last --

6  Q.  Now, did you ever receive those two or three

7    tapes back?

8  A.  No.

9  Q.  Did you ever take possession of any other tapes

10    seized by the Attleboro Police Department?

11  A.  No.

12  Q.  Would it be fair to say that some time in June of

13    2002, the case was assigned to me to prosecute?

14  A.  Excuse me?

15  Q.  Would it be fair to say --

16  A.  Yes, it was. For you, yes.

17  Q.  Can you report, Mr. Markey, whether a diligent

18    search of your office has been able to turn up

19    those tapes?

20  A.  I went through every box and every unmarked video

21    that I have in my office to check to see if it

22    could be any relation to this case, and the

23    videos that I viewed and went through did not

24    have any correspondence to this case.

25        MS. VEENSTRA: I have no further

**Page 42**

1    questions of this witness.

2        THE COURT: Mr. Ardito.

3        MR. ARDITO: Very briefly, judge.

4    Thank you.

5             CROSS EXAMINATION

6  BY MR. ARDITO:

7  Q.  The last time you saw the tapes was when you

8    delivered them to the Attleboro district

9    attorney's office, correct?

10  A.  That's correct.

11  Q.  And you yourself never viewed the tapes in your

12    office, correct?

13  A.  The only -- I think I did for about two minutes

14    when we -- you and I were sitting there in that

15    office; and all it did was kept -- you couldn't

16    understand anything on it.

17        MR. ARDITO: No further questions.

18        MS. VEENSTRA: No further questions of

19    this witness.

20        THE COURT: Thank you, Mr. Markey.

21        THE WITNESS: Thank you, judge.

22        MS. VEENSTRA: At this time, your

23    Honor, I would offer an affidavit of Christopher

24    Saunders. He was unavailable today due to a

25    medical appointment.

**Page 43**

1        MR. ARDITO: I have no objection, your

2    Honor.

3        THE COURT: Okay.

4        MS. VEENSTRA: I have shared that with

5    counsel.

6        THE COURT: All right.

7        MS. VEENSTRA: I'd ask that that be

8    marked as an exhibit.

9        THE COURT: Okay.

10        (The affidavit was marked Exhibit No. 3

11    and received into evidence.)

12        MS. VEENSTRA: The Commonwealth would

13    call Christopher Abreu.

14          CHRISTOPHER ABREU, Sworn

15           DIRECT EXAMINATION

16  BY MS. VEENSTRA:

17  Q.  Could you please state your name for the record?

18  A.  My name is Christopher Abreu.

19  Q.  And could you spell your last name, please?

20  A.  It's A-B-R-E-U.

21  Q.  And how are you employed, sir?

22  A.  I am currently employed at the law offices of

23    G.M. Rego. I'm an attorney.

24  Q.  And were you formerly an assistant district

25    attorney in Bristol County?

**Page 44**

1  A.  Yes, I was.

2  Q.  And for how long were you employed with the DA's

3    office?

4  A.  For approximately five years from 1997 to 2002,

5    September.

6  Q.  And at some point were you assigned to the

7    Attleboro District Court district attorney's

8    office?

9  A.  Yes, I was.

10  Q.  And do you know your approximate time of service

11    for that office?

12  A.  I was there for approximately seven months, and I

13    believe I left in February of 2002 and was

14    transferred to New Bedford.

15  Q.  And at some point during your time with the

16    Attleboro District Court district attorney's

17    office, did you become aware of a case that was

18    pending, Commonwealth vs. Francesco Ciambriello?

19  A.  Yes, I was.

20  Q.  And at some point were you asked to assist

21    Assistant District Attorney Saunders?

22  A.  Yes, I was.

23  Q.  And can you describe that to the Court, please?

24  A.  Well, I believe it was a day where ADA Saunders

25    had a trial, and my trials had pled out. So, he

45

1    asked me if I would simply go view a tape at an
2    armored car employment place.
3    Q.  And were there some specific plans as to who was
4        supposed to go to that facility?
5    A.  Yes.  I was told that Attorney Ardito would be
6        there and also the security supervisor would be
7        there to watch the tapes with us.
8    Q.  And did you receive some tapes to bring to that
9        location?
10   A.  I believe so, yes.
11   Q.  Do you recall how many tapes you received?
12   A.  I want to say at least two, maybe more than two.
13   Q.  Do you believe it was as many as six?
14   A.  Possibly.  It's tough to say.  But more than two.
15   Q.  More than --
16   A.  Maybe three.
17   Q.  Okay.  Do you recall whether those tapes were
18       labeled in any way?
19   A.  I do recall that they were labeled with letters
20       in black marker, I believe, with a circle around
21       it.
22   Q.  Did you in fact go to AMSA and meet with defense
23       counsel for the purpose of viewing the tapes?
24   A.  Yes, I did.
25   Q.  And you brought the tapes with you?

46

1    A.  Yes.
2    Q.  Did you meet a member or an employee of AMSA at
3        that location?
4    A.  Yes, I did.
5    Q.  Do you remember his name?
6    A.  I believe it was O'Brien, but I'm not totally
7        sure.
8    Q.  Okay.  Do you remember what he looked like?
9    A.  White male.  I'd say in his late thirties,
10       possibly thinning hair, maybe glasses, 180
11       pounds.
12   Q.  And was he able to assist you in viewing those
13       tapes with counsel?
14   A.  Yes.  We went into the -- like it was a viewing
15       room where all the cameras were, and we put a few
16       video tapes in and did watch some segments of the
17       tapes.
18   Q.  As best you can recall, can you describe what was
19       depicted on the tapes that you saw at AMSA?
20   A.  From my recollection, the beginning of the tapes
21       were basically a male and a female sitting down.
22       It seemed like they were doing some work in a
23       room, and you really couldn't hear anything on
24       the tapes.  And that was for a lengthy period of
25       time.  I don't recall, but it was more than an

47

1        hour possibly.  And at some point in time, they
2        get up.  And what we had to do was you had to
3        change different views of the cameras because
4        each camera was actually on the screen.  So, we'd
5        be watching one segment.  That would be them
6        sitting down.  And there would be noise, and you
7        really didn't hear anything, but you'd just see
8        some movement.  And then we would ask to see
9        another angle of the camera, and then that camera
10       angle would come up.  So, at one point in time
11       they did get up from original location where they
12       were talking.  You didn't hear anything.  And
13       then they walked into a hallway.  And I do recall
14       when they entered that hallway, I recall the
15       female saying, "I don't want to go back there."
16       I also recall the male had his hand not so much
17       around her waist, but towards her backside,
18       walking with her.  And I recall that he did have
19       a firearm tucked in the belt in his back.
20   Q.  So, your view of the walking of the hallway as
21       best you can describe it, is that a forward view,
22       a backward view, or a combination with side?  As
23       best you can describe it.
24   A.  The view that I remember is it's -- the view was
25       going forward down the hallway, and they were

48

1        entering the hallway, and that's how I could see
2        his hand placement and also see the firearm
3        tucked in the back of his pants.
4    Q.  And when you say that it was tucked in the back
5        of his pants, is that in the back, or on the
6        side, or --
7    A.  It was just tucked into the back of his belt
8        area.
9    Q.  Would that be on his left side or his right side?
10   A.  I recall his left side.
11   Q.  And when you say that he was walking down the
12       hallway with her, where was her body positioned?
13       Was it on his right side or his left side?
14   A.  She was on his right side.
15   Q.  And you said that you heard some words uttered?
16   A.  Yes.
17   Q.  Did you -- were you able to see any specific
18       facial expressions or obvious signs of demeanor?
19   A.  No, I don't recall that.
20   Q.  On either the male or the female?
21   A.  Yeah.  Nothing.
22   Q.  Did you see what was depicted once they get down
23       the hallway?
24   A.  They entered a room, but that's all that happened
25       at that point.  Once they entered the room, you

1    didn't see anything. I was told there were no
2    cameras in that room.
3    Q.  Okay. So, do you -- were you able to see how the
4    door gets opened?
5    A.  I don't recall.
6    Q.  And did that door -- when you say that you can't
7    see, you don't see anything after that? The door
8    closes?
9    A.  Yes.
10   Q.  Did at some point that door open?
11   A.  Yes. I believe it was approximately five minutes
12   after that. I believe it was like a short period
13   of time. Maybe five minutes. The female exited
14   first, and then the male exited some time after
15   that.
16   Q.  Again, did you see -- were you able to, or do you
17   recall any obvious signs of demeanor or facial
18   expressions?
19   A.  No.
20   Q.  On either of the two parties?
21   A.  No. It was just walking from that room, first
22   the female and then later the male.
23   Q.  And were you able to hear anything on that tape?
24   A.  No.
25   Q.  That portion of the tape?

1    A.  No.
2    Q.  In viewing those tapes, did you have an
3    opportunity to see anything that was depicted on
4    the outside of the building?
5    A.  Yes. I do recall the female and the male later
6    smoking outside in the parking lot together.
7    Q.  And do you know if that was later in time than
8    what was -- according to the tape than what was
9    depicted as them going into the room?
10   A.  It was after the room. It was later in time.
11   Q.  And you say that you saw who outside smoking?
12   A.  The male and the female.
13   Q.  Anybody else?
14   A.  Not at first. At first I believe if my
15   recollection is correct, it was just the male and
16   the female smoking outside. Then the male went
17   inside again.
18            THE COURT: Was this the same male that
19   you'd seen on the tape before?
20            THE WITNESS: Yes.
21            THE COURT: Okay.
22            THE WITNESS: And the male and female
23   were outside smoking. At one point the male went
24   inside. Then if my recollection is correct,
25   another party actually went to that location. I

---

51

1    saw a car pull up. There was some conversation,
2    and later the female went back into the building.
3    Q.  And you said that another party arrived. Would
4    that be male or female?
5    A.  I don't recall. I just remember a car.
6    Q.  Did you see some interaction between the alleged
7    victim and that party who arrived?
8    A.  Yes.
9    Q.  Outside the building?
10   A.  Yes.
11   Q.  And then the alleged victim returned inside?
12   A.  Yes.
13   Q.  Can you describe, if you can -- you went to the
14   facility to view these tapes?
15   A.  Yes.
16            THE COURT: Ms. Veenstra, just for a
17   second. You said you described some interaction
18   between this person who arrived and the woman
19   outside. What did you see?
20            THE WITNESS: It was just basically the
21   female walking up to that car, and I don't recall
22   if she went in the car or not, or if that person
23   from that car got out to talk. I just remember
24   some interaction taking place.
25            THE COURT: Okay.

52

1    Q.  Can you describe what, if any, security measures
2    were in place that you became aware of that day?
3    A.  Well, it was a very secure facility. That's one
4    of the reason I actually remember going there and
5    viewing it. Because you had to be buzzed in a
6    couple of doors to get into the building. And
7    they had cameras in numerous places around, and
8    also I still remember that they had actually a
9    fingerprint entry. To get into a certain room,
10   you had to have the correct fingerprint to enter
11   the room. It was a pretty secure facility.
12   Q.  And now, do you recall seeing anything else
13   depicted on the tapes during your viewing at
14   AMSA?
15   A.  Not that I recall.
16   Q.  And so, at some point yourself, counsel, and the
17   employee of AMSA finished viewing those tapes; is
18   that right?
19   A.  Yes.
20   Q.  And did you leave with those tapes?
21   A.  I don't recall. I believe that I would have left
22   with the tapes. At the time the only reason I
23   would have left the tapes there was to provide
24   copies for the defense counsel and for the
25   district attorney's office because at the time we

53

1     did not have the technology to make copies, but I
2     still don't think I would have done that.  I
3     think I would have brought the tapes back to the
4     office, but I'm unsure.
5   Q. So, you don't have a specific memory of what
6     happened to those tapes?
7   A. No.  The only thing I remember is actually going
8     there and viewing the tapes.
9          MS. VEENSTRA: I have no further
10     questions of this witness.
11          THE COURT: Mr. Ardito.
12          MR. ARDITO: Yes.
13          CROSS EXAMINATION
14  BY MR. ARDITO:
15   Q. We viewed those tapes together, correct?
16   A. Yes.
17   Q. And we were there just about a couple of hours;
18     isn't that true?
19   A. Yep, that's correct.
20   Q. So, we really didn't get to see all the tapes?
21   A. No, we did not.
22   Q. You stated on the direct examination that another
23     person pulled up, and there was some interaction?
24   A. Correct.
25   Q. Do you remember seeing on any of the tapes that

54

1     person inside the facility?
2   A. I don't recall that.
3   Q. You testified on direct examination that before
4     the alleged incident you saw Mr. Ciambriello and
5     the alleged victim sitting together working?
6   A. Correct.
7   Q. During that period of time when you saw them
8     sitting together working, did you see Mr.
9     Ciambriello attack her in any way, shape, or
10     form?
11   A. I did not see any type of struggle taking place.
12   Q. Do you recall seeing a video -- do you recall
13     seeing on the video some time after the alleged
14     incident Mr. Ciambriello and the alleged victim
15     in a cafeteria type setting having a soda?
16   A. I don't recall that.
17          MR. ARDITO: No further questions,
18     judge.
19          THE COURT: Ms. Veenstra?
20          MS. VEENSTRA: Nothing further of this
21     witness.
22          THE COURT: All right.  Thank you very
23     much.
24          THE WITNESS: Thank you.
25          THE COURT: You may step down.

55

1          MS. VEENSTRA: Russell Castro.
2          RUSSELL CASTRO, Sworn
3          THE WITNESS: Good morning.
4          THE COURT: Good morning.
5          DIRECT EXAMINATION
6  BY MS. VEENSTRA:
7   Q. Could you please introduce yourself for the
8     record?
9   A. Russell Castro, C-A-S-T-R-O.
10   Q. And how are you employed, sir?
11   A. Employed with the City of Attleboro.  Police
12     officer.
13   Q. And how long have you been a police officer with
14     the City of Attleboro?
15   A. Approximately ten years.
16   Q. I'd like to direct your attention, Officer
17     Castro, to the month of May in the year 2001, and
18     ask you whether you were dispatched along with a
19     number of other officers to AMSA located in the
20     City of Attleboro?
21   A. Yes.  Originally Sturdy Hospital.
22   Q. Okay.  And at some point did you respond to AMSA?
23   A. Yes.
24   Q. And what other officers, if you recall, also
25     responded to that location?

56

1   A. Officer Larsen and Detective Otrando.
2   Q. At that time did you have an opportunity to view
3     the facility and some video surveillance?
4   A. Yes.
5   Q. Can you describe as best you recall what you saw
6     depicted on the video surveillance?
7   A. On the video surveillance we seen the male and a
8     female, Mr. Ciambriello and Kiernan the female --
9   Q. The alleged victim?
10   A. -- the alleged victim walking through a room.  I
11     believe it was the money processing room.  At
12     that point the male had his right arm around her
13     backside, lower back, upper buttocks, walking
14     through the room.  Then on another view, more of
15     a back view, they walk down a hallway with the
16     hand on the back and entering an office; and
17     several minutes later, the female exited the
18     office and went to the left.
19   Q. Can you estimate, if you can, about how long they
20     were in that office?
21   A. I'd say less than four minutes.
22   Q. Did you ever see any tape which -- or segment or
23     portion of a tape which may have depicted the
24     inside of that office?
25   A. No.

57

1    Q.   Did you hear any words that were spoken when
2         viewing that tape?
3    A.   Not that I recall.
4    Q.   Did you note any obvious facial expressions or
5         expressions of demeanor on either the alleged
6         victim or Mr. Ciambriello?
7    A.   No, I did not.
8    Q.   Now, I'm going to direct your attention to later,
9         much later in the investigation. Were you asked
10        by Sergeant Otrando of your department to bring
11        some tapes to the Raynham Police Department,
12        specifically Deputy Chief Louis Pacheco?
13   A.   Yes.
14   Q.   And do you know what the purpose of that was?
15   A.   For further investigation to try to get any other
16        information out of the tapes.
17   Q.   And did you bring some tapes to Deputy Chief
18        Pacheco?
19   A.   Yes, I did.
20   Q.   And how many did you bring?
21   A.   Three.
22   Q.   And were they labeled?
23   A.   I believe they were labeled.
24   Q.   And how were they labeled?
25   A.   A, B, and C.

58

1    Q.   And did you have an opportunity to work with
2         Deputy Chief Pacheco and view those tapes?
3    A.   Yes.
4    Q.   And can you -- let me ask you. Was he able to
5         retrieve some images from those tapes?
6    A.   Yes.
7    Q.   And do you know if those were then transferred
8         onto a videotape?
9    A.   Yes, they were.
10   Q.   And do you know if a copy of that videotape was
11        provided to me?
12   A.   I brought it back to Sergeant Otrando, and I
13        believe he's given it to you, yes.
14   Q.   And did you have an opportunity to view that
15        tape?
16   A.   Yes, I did.
17   Q.   And can you describe what, if anything, was
18        depicted on the tape? What was depicted? What
19        did you see?
20   A.   The tape that was made?
21   Q.   Yes.
22   A.   In the first scene you're going to see -- I
23        believe it's like the cashiers room where they
24        check out. The trucks will come in and go. I
25        believe that's the room it is. You're going to

59

1         see a reflection in door number 1's window of a
2         symbol of a male and a female walking through
3         that room. The male has his arm around that
4         female's backside.
5    Q.   Did you see anything else depicted on that tape?
6    A.   Yeah. Several minutes later they were seen
7         walking down a hallway. I refer to it as a money
8         cashing room because there was all counting
9         machines there, and the male and the female were
10        walking down the corridor. The male has his arm
11        around the backside of the victim; and then as
12        they're coming off the screen, you can see the
13        hand, his left hand come up to the elbow.
14   Q.   Okay. And that was depicted on the tape?
15   A.   Yes.
16   Q.   Now, you said that you saw a similar scene at the
17        night -- on the night of the alleged incident; is
18        that right?
19   A.   Yes.
20   Q.   What is the difference between those two
21        depictions of the two of them coming down that
22        hallway? What was the difference between them?
23   A.   On this one here they're coming at the camera.
24        The one that I viewed at the scene, they were
25        walking -- the camera was the backside of them,

60

1         more toward the backside of them.
2    Q.   Okay. While walking down that hallway -- strike
3         that. Did you notice or -- describe what else
4         was depicted on that tape.
5    A.   Later on, I believe it was like 1900 hours, the
6         female, the alleged victim comes up, puts a soda
7         can on the door rim. It's like a shelf on door
8         #2, I believe it was. And several minutes later
9         she walks back to that, and it appears that the
10        defendant's checking in or cashing out a truck,
11        because you can hear -- you can't really hear,
12        but you can hear the money banging on the counter
13        in one of the volumes; and then the alleged
14        victim is standing to the left at door 2 which is
15        probably like three to four feet from door 1, and
16        she's handing the alleged defendant looks like
17        rubber bands to strap the money.
18   Q.   Would it be fair to say they appear to be working
19        together?
20   A.   Yes.
21   Q.   Did it appear or sound as if there was more than
22        the alleged victim and Mr. Ciambriello in that
23        immediate vicinity?
24   A.   Yes.
25   Q.   There were more than those two voices?

1   A.  I don't know the voice, but you can believe
2       that there's two males there and the female.  I'd
3       have to view it.
4   Q.  The original tapes that you brought to Raynham
5       Police Department Deputy Chief Pacheco, were
6       those subsequently given back to you?
7   A.  Yes.
8   Q.  And you said that -- or strike that.  Did you
9       turn those over to someone?
10  A.  Yes, I did.
11  Q.  Who did you turn those over to?
12  A.  I returned them back to Sergeant Otrando.
13              MS. VEENSTRA:  If I could have one
14      moment, your Honor?  I have no further questions
15      of this witness.
16              THE COURT:  Mr. Ardito.
17                  CROSS EXAMINATION
18  BY MR. ARDITO:
19  Q.  Detective, did you happen to see any tape of
20      them -- when I mean them, I mean Mr. Ciambriello
21      and Ms. Kiernan.  Did you ever see any tape of
22      them working together?
23  A.  Just that one at the end of that made tape by
24      Chief Pacheco.
25  Q.  And which tape -- could you describe that?  I'm

1       not sure --
2   A.  It was -- they were at the two doors that I just
3       described, door 2 and door 1.  She appeared to be
4       handing him elastics.
5   Q.  And that was the one that allegedly they're
6       working together after the incident?
7   A.  Yes.
8   Q.  Nothing prior to?
9   A.  Not to my recollection, no.
10  Q.  Did you see any video or any tape of another
11      woman in the building?
12  A.  I did not, no.
13  Q.  Did you see the video of the alleged victim
14      leaving the area where she alleged the assault
15      took place?
16  A.  On the night of it happening?
17  Q.  Yes.
18  A.  The night of it happening, they left I guess it
19      was the office area.  They left the office area.
20      She left the office area.
21  Q.  And isn't it true it was a clear picture of her
22      leaving?  She was walking towards the camera?
23  A.  She walked out and took a left.
24  Q.  And you could see her very plainly?
25  A.  I could see her.  I couldn't see her face if

1       that's what you're asking me.
2   Q.  All right.  What about her clothes?
3   A.  I don't recall her clothes.
4   Q.  You can't tell us if her clothes were ripped or
5       torn --
6   A.  No.
7   Q.  -- or together, not together?
8   A.  No, I don't have --
9   Q.  You have no recollection?
10  A.  No.
11              MR. ARDITO:  No further questions,
12      judge.
13              THE COURT:  Ms. Veenstra?
14                  REDIRECT EXAMINATION
15  BY MS. VEENSTRA:
16  Q.  Let me ask you, Officer Castro, if her clothes
17      had been disheveled in any way, would you have
18      noticed it?
19  A.  From that view, probably not, in my recollection.
20  Q.  Okay.
21              MR. ARDITO:  Redirect, your Honor?
22              THE COURT:  Yep.
23              MR. ARDITO:  Recross.
24                  RECROSS EXAMINATION
25  BY MR. ARDITO:

1   Q.  Is it your testimony, detective, that on a rape
2       case if you have a video of someone walking away
3       from the incident, you're not looking at that
4       person?
5   A.  I couldn't see with the clarity of the film, to
6       my recollection, and I only seen the tape for a
7       short time.  I'm not the investigating detective.
8   Q.  So --
9               MR. ARDITO:  No further questions.
10              THE COURT:  Okay.
11              MS. VEENSTRA:  Nothing further.
12              THE COURT:  Thank you very much.  You
13      may step down.
14              MS. VEENSTRA:  Deputy Chief Louis
15      Pacheco.  Your Honor, I would be offering this
16      evidence just to describe the technology for the
17      Court.
18              THE COURT:  Okay.
19                  LOUIS PACHECO, Sworn
20                  DIRECT EXAMINATION
21  BY MS. VEENSTRA:
22  Q.  Could you please introduce yourself for the
23      record?
24  A.  My name is Louis, L-O-U-I-S, Pacheco,
25      P-A-C-H-E-C-O.  I'm a police officer in the Town

1    of Raynham, and I currently hold the rank of
2    deputy chief.
3    Q. How long have you been with the Raynham Police
4       Department?
5    A. Approximately thirty years.
6    Q. And let me ask you, what is REACT, R-E-A-C-T?
7    A. REACT is a Regional Electronic and Computer
8       Crimes task force stationed in Raynham.  It has
9       about twenty-eight different agencies involved,
10      and we deal with computer and video forensics.
11   Q. And what is a multiplex system, if you can?
12   A. Basically it's recording; and when talking about
13      video, it's recording multiple images on the same
14      tape from different cameras.
15   Q. And would that be a normal videotape that it's
16      recorded on?
17   A. Could be, yes.
18   Q. If one tried to view a videotape in which a
19      number of images were depicted on that same tape,
20      what would one see?
21   A. If you used a normal VCR, you'd see a fast
22      collage of pictures go by the screen.
23   Q. Would it be fair to say that they may not be
24      decipherable?
25   A. They wouldn't be until you slowed the speed up on

1       the VCR, yes.
2    Q. And is it more involved than just slowing it, or
3       do you have to isolate, or can you describe what,
4       if any, procedure you would go through to
5       retrieve images?
6    A. Well, basically a video image is laid down at
7       30 -- 29.97 frames per second when you watch a
8       regular video, normal regular video.  Obviously
9       the tapes are only two hours long.  So, if you
10      want to put multiple cameras on, you can't keep
11      thirty frames per second because the tape would
12      only last two hours for one camera and more for
13      more cameras.  So, the technology of a multiplex
14      system picks certain frames which are made from
15      two fields, the odd and the even, and lay them
16      down on the videotape as it runs depending on --
17      and how many frames you get laid on depends on
18      how long the time lapse is.  So, if you had your
19      tape on for forty-eight hours, you're taking a
20      two hour tape and laying down forty-eight hours
21      of pictures.  If you have your system set up for
22      twenty-four hours, then you're putting
23      twenty-four hours of pictures on two hours.
24               THE COURT:  And how does the machine
25      pick the frame?  Is it a time issue, or is it by

1    if there's movement?
2              THE WITNESS:  It's generally a time
3    issue, your Honor.  However, it could be set by
4    the operator.  Different systems -- for instance,
5    if you had a camera setting up in this particular
6    courtroom, you may want the camera that's got the
7    witness on it more than the camera that's taking
8    the back of the thing.  So, you adjust it so so
9    many frames get recorded from that camera.
10   Depending on how the system is set up, you could
11   adjust it manually.  Most just rotate around.  A
12   frame, a frame, a frame, a frame.
13   Q. So, with those systems, is it fair to say that
14      you may not have or probably would not have
15      continuous coverage of one particular location?
16   A. Absolutely true.
17   Q. At some point, deputy chief, were you asked to
18      assist Sergeant --
19               THE COURT:  Let me just ask another
20      question before you go from that.  So, if you
21      have a system where you've let's just say put in
22      a two hour tape to take an eight hour shift, that
23      tape is going to cover the whole eight hours, but
24      it's going to record the frames as it has been
25      told to pick those frames?

1              THE WITNESS:  Yes, as it's been told to
2    depict them, and so many frames to make it fill
3    the eight hours.
4              THE COURT:  Right.
5              THE WITNESS:  So, if it was a
6    twenty-four hour tape, you'd have less frames.
7    You'd have one frame, for instance, every three
8    seconds.  If it was forty-eight, you'd have one
9    frame every six seconds.
10             THE COURT:  So, if you have a system
11   like the one that was involved in this case where
12   there are six VCR screens that you can look at of
13   these cameras taking the videos, and they're
14   recording however they're set up on the time,
15   each of those screens is going to cover -- the
16   tapes for those VCRs is going to cover the period
17   that it's set for?  Am I making myself clear?
18             THE WITNESS:  It will cover the period
19   of time, and depending on the settings of the
20   unit, which I never saw, it would -- how many
21   frames you get per second.  So, you could get --
22   you're supposed to get 29.97 frames per second.
23   As you extend that tape over two hours, that
24   drops down to -- some systems you only get one
25   frame every ten seconds.

69

1    THE COURT: But you could cover -- you
2    could set it to cover eight hours or twenty-four
3    hours or forty-eight hours?
4    THE WITNESS: Yes, ma'am. Yes, your
5    Honor.
6    THE COURT: Okay.
7  Q. And do you know what, if any, setting was in
8    place with regard to an alleged incident at
9    Armored Motor Services of America in May of 2001?
10 A. I have no personal knowledge of what the settings
11   were or anything. I may -- you may get some
12   information off of the tape that we did.
13   However, those are adjustments that are made at
14   the system. You would have to go to the scene
15   and look.
16 Q. And you were actually asked by the Attleboro
17   Police Department to assist them in retrieving
18   some images; is that right?
19 A. Yes, I was.
20 Q. And were you able to retrieve some images which
21   appear to depict a male and female walking down a
22   hallway at that location?
23 A. Yes, I did.
24 Q. And were you also able to retrieve some
25   depictions of a female working near a door with a

70

1    soda and some voices in the background?
2  A. Yes, I was.
3  Q. And were you working with three tapes when asked
4    to assist?
5  A. Yes.
6  Q. Were those tapes ultimately returned to the
7    Attleboro Police Department?
8  A. Yes.
9  Q. And you were able to provide a videotape of the
10   images that you were able to retrieve?
11 A. Yes. Generally at REACT what we do is the police
12   officers bring the tape in, make an appointment
13   to bring the tape in. We digitize the tape. So,
14   we take it from an analog signal to a digital
15   signal. Once you have it as a digital signal,
16   it's a data base, and you can play it, put it
17   back. You don't destroy the tape. On a regular
18   tape if you pause a regular tape or you do
19   anything with it, you're actually destroying the
20   tape, because the heads are still spinning, but
21   the tape's stopped. So, you're wearing off the
22   oxide. So, by digitizing it allows you to work
23   on it, you know, ad infinitum.
24   THE COURT: Do you recall what period
25   of time -- what the hours over which these --

71

1    that these tapes covered?
2    THE WITNESS: I don't recall that right
3    now, your Honor.
4    THE COURT: Do you recall whether they
5    were -- they each covered the same amount of
6    time?
7    THE WITNESS: The section that I looked
8    at, that I was asked to examine was relatively
9    the same amount of time, the same day and the
10   same hour.
11   THE COURT: On each tape?
12   THE WITNESS: On each tape.
13   THE COURT: Okay.
14   MS. VEENSTRA: I have no further
15   questions of this witness.
16   THE COURT: Mr. Ardito.
17   MR. ARDITO: Very briefly, judge.
18   CROSS EXAMINATION
19 BY MR. ARDITO:
20 Q. You were able to transcribe -- transpose one copy
21   of the tape for the Attleboro police, correct?
22 A. I didn't hear the question.
23 Q. I'm sorry. You were able to make a copy?
24 A. Yes. I changed the original tape to digital and
25   then played the digital back onto a VCR, which

72

1    you can have more copies or whatever you want.
2  Q. And during this process you were able to view the
3    three tapes that the Attleboro police took to
4    your office, correct?
5  A. Pieces of them. I didn't view the whole thing.
6  Q. You didn't view the whole thing?
7  A. No.
8  Q. And in your work, the only thing you were able to
9    copy for the Attleboro police was a couple
10   walking down an aisle?
11 A. That was what they had asked me to reproduce,
12   yes, sir.
13 Q. And there was a little conversation with the
14   alleged victim and a soda can and some voices in
15   the background, correct?
16 A. Yes, sir.
17 Q. There was nothing else on those tapes?
18 A. Not that I saw, sir.
19   MR. ARDITO: No further questions.
20   THE COURT: Ms. Veenstra?
21   MS. VEENSTRA: I have nothing further.
22   THE COURT: Thank you very much.
23   Anything further, Ms. Veenstra?
24   MS. VEENSTRA: No, your Honor.
25   THE COURT: Commonwealth rests?

1    MS. VEENSTRA: Yes, your Honor.

2    THE COURT: Mr. Ardito, anything

3    further?

4    MR. ARDITO: Just a closing regarding

5    the motion to dismiss, your Honor.

6    THE COURT: Okay. Why don't I hear

7    you.

8    MR. ARDITO: Briefly, again, we've

9    heard testimony from Chris Abreu the

10   Commonwealth's witness. He was the assistant

11   district attorney that at the time viewed the

12   tapes with myself. He testified under direct

13   examination that he saw Ms. Kiernan and Mr.

14   Ciambriello working together at a bench and then

15   get up and leave. In the grand jury

16   investigation, in this report she states that --

17   and I'm sure she's going to testify to -- that he

18   began his assault while they were sitting down.

19   That he had his arms around her, he had his legs

20   around her, he was unbuttoning her blouse, he was

21   biting her, he was massaging her. We just heard

22   from the district attorney who said that he would

23   have testified that that would have happened,

24   that they were working together, they got up, and

25   they left. It's issues like that that make the

---

1    losing of this tape so prejudiced.

2    Again, on the tape and ultimately grand

3    jury testimony, Ms. Kiernan calls a friend of

4    hers who arrives. And we heard testimony that

5    Mr. Saunders -- Mr. Abreu saw this young lady

6    show up, and they were outside. The tape clearly

7    showed that they were smoking outside, and they

8    described that in their grand jury testimony.

9    Then this young lady goes into the building with

10   the alleged victim, and they're all sitting

11   together. Then this lady leaves of course, and

12   the rest is not on the tape. The tapes clearly

13   showed when we saw them that there was a

14   cafeteria where Mr. Ciambriello asked her for

15   soda, and she says she -- she says in the grand

16   jury report that that never happened. Yet we saw

17   her with a can of soda after the incident.

18   These tapes are vitally important to

19   any defense we have. You couldn't possibly

20   cross-examine any witness thoroughly unless we

21   had these tapes. They show a completely

22   different picture. They show the demeanor which

23   was asked for, and I state that in my motion when

24   one of the grand jurors asked the police what was

25   her facial expression like. I disagree with the

---

1    detective. I mean it was clear when she left the

2    ladies room. Certainly I would think a jury

3    would want to see this four or five minute

4    interlude, what she looked like when she walked

5    out; and the camera was clearly on her face,

6    clearly on her body. She turned into the camera

7    and walked to the ladies room. Without these

8    tapes, we are crippled, judge. We need these

9    tapes to try the case.

10   Now, if they were lost by the police

11   department, if there was a mishandling between

12   the district attorney's office and the police

13   department, then so be it. This case should be

14   dismissed. There is case law. I cite case law.

15   This case should not go forward. You've

16   handcuffed us.

17   THE COURT: Mr. Ardito, what I

18   understood from these witnesses is that the tapes

19   that you do have or the piece that you do have

20   covers the whole period of time when she was --

21   when Ms. Kiernan and Mr. --

22   MR. ARDITO: It's Ms. Kiernan and Mr.

23   Ciambriello, your Honor.

24   THE COURT: -- Ciambriello were at the

25   facility that night. It just doesn't give the

---

1    same views that you're talking about.

2    MR. ARDITO: No, your Honor.

3    THE COURT: Do you agree with that?

4    MR. ARDITO: No, I disagree. The views

5    we're talking about are on the three tapes that

6    were never transcribed.

7    THE COURT: No, no, no, I understand

8    that. What you're saying is there were views on

9    other tapes --

10   MR. ARDITO: Correct.

11   THE COURT: -- that were not

12   transcribed. But these tapes that they do have

13   and were transcribed cover the same period of

14   time.

15   MR. ARDITO: They can't, because there

16   are other people in the other tapes. How can

17   they cover the same period of time?

18   THE COURT: I understood Chief Pacheco

19   to say that the way this system works, each of

20   the tapes that he looked at covered the same

21   period of time before and after the alleged

22   assault.

23   MR. ARDITO: Then --

24   THE COURT: But they don't show what

25   you say the other tape shows. So, they don't

77

1  show the same views, but they cover the same
2  period of time. You say that's not correct?
3       MR. ARDITO: I disagree, because I know
4  what I saw. We saw other tapes.
5       THE COURT: But do you understand my
6  question? .
7       MR. ARDITO: Yes. Yes, and I disagree
8  with the chief.
9       THE COURT: Okay. All right.
10      MR. ARDITO: How is that possible, your
11 Honor? He's showing us he transcribed a period
12 of time that they were working, that they walked
13 from room 1 to room 2 and down the aisle. Then
14 he goes back to I believe it's 1900 and -- I
15 forgot the exact time -- where again she's
16 working with another person. Where is -- I mean
17 he himself testified that if there were any
18 images, he would have picked them out.
19      THE COURT: That's what I'm saying.
20 The views that you say you saw are not on these
21 tapes.
22      MR. ARDITO: Correct.
23      THE COURT: But that doesn't mean that
24 it doesn't cover the whole period of time that
25 you're concerned about. These tapes cover the

78

1  same period of time.
2       MR. ARDITO: Yes.
3       THE COURT: Okay.
4       MR. ARDITO: Yes.
5       THE COURT: All right. Okay.
6       MR. ARDITO: Now I understand.
7       THE COURT: Ms. Veenstra.
8       MS. VEENSTRA: Thank you, your Honor.
9  I'd ask your Honor not to dismiss this case. I
10 know that counsel is asking for a dismissal. I'd
11 suggest that that is a drastic remedy in a case
12 in which it comes down -- the central issue in
13 this case is what happened when they went into
14 that room and were in that room for five
15 minutes. That has always been the issue in this
16 case, and that is the central issue.
17      The cases that talk about dismissal is
18 when the defendant is foregone from any possible
19 defense or a theory of defense. Counsel has
20 suggested I know to me that this is an issue of
21 consent, and the issues that he raises for
22 reasons to need the tape, your Honor, I believe
23 are adequately addressed in my motion. It is
24 much conduct that the alleged victim herself has
25 already testified to under oath. For example, if

79

1  the witness says as she initially did to the
2  police that she was dragged into that room, she
3  testified before the grand jury that she was not
4  in fact dragged. I believe she indicated that
5  she was guided. She cannot now come before any
6  court and reasonably be expected to say that she
7  was dragged. The alleged victim in this case
8  actually admitted that she was allowed outside by
9  the defendant who had to buzz her out to smoke
10 and talk with her friend. That is not something
11 she can now deny. So that, the issue -- the
12 depiction on the tape of them walking down the
13 hallway I'd suggest is important. The depiction
14 of her talking and working with the defendant
15 after the alleged incident is very important to
16 the defendant obviously. Those important
17 depictions will be before the fact finder.
18      Counsel suggests a very drastic
19 remedy. I suggest to the Court that there are
20 less drastic remedies. If this Court were to
21 find that some remedy -- this defendant needs
22 some remedy to get a fair trial, the cases that
23 the Commonwealth and I believe the defendant
24 cite, there are other alternatives. The Court
25 can obviously consider suppression of any of that

80

1  testimony, any testimony regarding what was
2  depicted on the tapes like the tapes never
3  existed. Tactically for a defendant I would
4  suggest that that would be his call. Or the
5  Court's. There is I think possible based on
6  testimony here that there may be a way to
7  stipulate as to what was depicted on those tapes
8  and put that before the fact finder. Counsel has
9  not suggested to me -- and I think he may be in a
10 difficult position because he may be a witness,
11 but he has not suggested to me that what was --
12 what has been described as depicted is different
13 than his recollection. So that, a stipulation
14 may be possible. Counsel with a stipulation
15 could also have curative or a sort of instruction
16 by the Court that any discrepancy or doubt as to
17 what was depicted on the missing evidence would
18 be in the defendant -- would need to be in favor
19 of the defendant. And counsel could lastly argue
20 that the Commonwealth has lost evidence.
21      So, I'd suggest that the remedy counsel
22 seeks here is drastic, and I'd ask the Court not
23 to dismiss the case, but allow this case to go to
24 trial and to allow the alleged victim her day in
25 court. Thank you.

81

1      THE COURT:  Thank you very much.

2      MR. ARDITO:  Your Honor, I have a last

3 minute motion -- I don't know if it reached the

4 Court -- regarding --

5      THE COURT:  I'm sorry.  What?

6      MR. ARDITO:  I'm sorry, your Honor.  I

7 filed a last minute motion last week knowing we

8 were going to be here today about a gag order.

9 Apparently I've got every TV station in the

10 neighborhood in the State of Rhode Island and

11 Massachusetts contacting both the defendant

12 and -- the victim is giving interviews about how

13 these lost tapes are going to hurt her in a civil

14 lawsuit.  I filed a motion.  I'd like to have

15 this stop.  It's bad enough we don't have the

16 tapes.  Now she's out there saying she'll never

17 get a fair trial.  So, if there's any way we

18 could --

19      THE COURT:  Okay.  Ms. Veenstra, do you

20 have a position on this?

21      MS. VEENSTRA:  Your Honor, I don't.  I

22 can tell the Court that there have been a number

23 of statements.  This case has garnered some

24 press.  We are scheduled for trial on September

25 9th.  I'd leave that to the Court's discretion.

---

82

1      THE COURT:  Okay.  I don't have it in

2 the file, but we'll find it, and I'll rule on it.

3      MR. ARDITO:  Thank you, judge.

4      THE COURT:  Okay.

5      (The Court recessed at 11:50 a.m.)

---

83

## CERTIFICATE

      I, Lori R. Saulnier, Official Court
Reporter, do hereby certify that the foregoing
record, Pages 1 through 82, is a complete,
accurate, and true transcription of my
stenographic notes taken in the aforementioned
matter to the best of my skills and ability.


_Lori R. Saulnier_
LORI R. SAULNIER
Official Court Reporter


Please Note:

  The foregoing certification of this transcript
does not apply to any reproduction of the same by
any means, unless under the direct control and/or
direction of the certifying reporter.