UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS AT BOSTON

_____

HEATHER KIERNAN,

       Plaintiff,

-v-                                                 CIVIL NO. 04-10131 RBC

ARMORED MOTOR SERVICE OF
AMERICA, INC., and
FRANCESCO CIAMBRIELLO

       Defendants.

_____

**PLAINTIFF HEATHER KIERNAN'S RESPONSE TO THE
DEFENDANT ARMORED MOTOR SERVICES OF AMERICA, INC.'S
<u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>**

Pursuant to Local Rule 56.1, the Plaintiff the above captioned matter hereby responds to the Defendant Armored Motor Services of America (AMSA's) statement of undisputed material facts:

1. There is no dispute.

2. There is no dispute.

3. There is no dispute.

4. There is no dispute.

5. There is no dispute.

6. There is no dispute.

7. No dispute, however, Ciambriello's "vault supervisor" title and responsibilities were only the weekends.  <u>Khoury Deposition,</u> p. 30 (See Exhibit A, Affidavit of William J. McLeod, and Exhibit C,

1

Deposition of Jason Khoury). He was hired as a "supervisor" but held the title of "weekend supervisor." Id., at 27-28. Ciambriello controlled the facility in Branch Manager Jason Khoury's absence (which in this case was the weekends). Id., 30-31, 97-98. In addition, he has control over the facility. You cannot just walk in. You have to be buzzed in. Parrott Deposition, 66, 71-72, 143-144, (See Exhibit A, Affidavit of William J. McLeod, and Exhibit D, Deposition of Christina Parrott); Kiernan I Deposition, (See Exhibit A, Affidavit of William J. McLeod, and Exhibit E, Deposition of Heather Kiernan) 77-78, 109.

8. No dispute.

9. No dispute.

10. Disputed. The statement directly contradicts Khoury's deposition testimony. Khoury testified that as the weekend vault supervisor, Kiernan "answer[ed] to the vault supervisor." Khoury, Exhibit C, 30-31. On the weekends, that was Ciambriello. Id. In addition, Kiernan testified that additional job duties included going into the vault to verify that the money bags were in there. Kiernan I, Exhibit E, at 71

11. No dispute.

12. Disputed. The statement directly contradicts Khoury's deposition testimony. Khoury testified that as the weekend vault supervisor,

Kiernan "answer[ed] to the vault supervisor." <u>Khoury,</u> Exhibit C, 30-31.

13. No dispute as to what Ciambriello testified. However, Ciambriello controlled the facility in Branch Manager Jason Khoury's absence (which in this case was the weekends). <u>Id</u>., 30-31, 97-98.

14. No dispute as to Ciambriello's testimony. However, on the weekends, Ciambriello was the only supervisor on the premises, and the only person who controlled who was permitted on the premises. He ran the building in the absence of the branch manager. <u>Id</u>., at 97-98.

15. No dispute.

16. No dispute. However, according to Ciambriello, AMSA was aware of Kiernan's supposed violations of the sexual harassment policy. <u>Ciambriello Deposition</u> (See Exhibit A, Affidavit of William J. McLeod, and Exhibit F, Deposition of Francesco Ciambriello) at 68-70, 127-130.

17. No dispute.

18. No dispute.

19. No dispute.

20. No dispute.

21. No dispute.

22. No dispute. However, there is no evidence that any of this training was provided to Ciambriello.

3

23. No dispute. However, Plaintiff also was present when other AMSA employees also engaged in inappropriate behavior of a sexual nature, which she spoke about with Jason Khoury. <u>Kiernan I</u>, Exhibit E, at 86. Khoury met with Plaintiff to "make sure [she] was not offended by the" conduct and remarks. <u>Id.</u> Kiernan told Khoury that she was "a life guard, ….[and] was kind of use [sic] to people talking like that…". <u>Kiernan I</u>, Exhibit E, at 86.

24. No dispute. However, Plaintiff also was present when other AMSA employees also engaged in inappropriate behavior of a sexual nature, which she spoke about with Jason Khoury. <u>Kiernan I</u>, Exhibit E, at 86. Khoury met with Plaintiff to "make sure [she] was not offended by the" conduct and remarks. <u>Id.</u> Kiernan told Khoury that she was "a life guard, ….[and] was kind of use [sic] to people talking like that…". <u>Kiernan I</u>, Exhibit E, at 86.

25. Disputed. While the topic of Mr. Ciambriello did not come up, she did speak with the branch manager about the ATM manager's comments. <u>Kiernan I</u>, Exhibit E, at 86. Khoury met with Plaintiff to "make sure [she] was not offended by the" conduct and remarks. <u>Id.</u> In addition, by this time, Ciambriello had complained to management about Kiernan. <u>Ciambriello</u>, Exhibit F, pp. 129-132.

26. No dispute.

27. No dispute.

28. No dispute.

4

29. No dispute.

30. No dispute.

31. Disputed. While this is to what Khoury, the branch manager testified to, there are no documents confirming the existence of this allegedly important policy. For example, the AMSA employee handbook, which Ciambriello acknowledged receiving a copy of, does not mention of this allegedly important policy. In fact, there is no document confirming the existence of this policy at all. Two memos – one from Jason Khoury and the other from Edward O'Brien dated May 20, 2001 do not refer to Ciambriello's violation of this purported policy.

32. No dispute.

33. No dispute.

34. Disputed. The exact time the parties were in the room cannot be definitely determined but would have been confirmed on the now missing tapes.

35. Disputed. The pages cited by the Defendant AMSA do not appear to support the assertion that "[b]ecause Mr. Ciambriello needed to unlock the door to get back into the dispatch area, he waited for Plaintiff in the break room." On p. 116 of Ciambriello's deposition, he speaks of being at the soda machine, and then going back the counter. There are no reasons given as to why he was waiting for Plaintiff in the break room. <u>Ciambriello,</u> Exhibit F, p. 116. There is

5

no dispute to the following: "When Plaintiff exited the restroom, Mr. Ciambriello asked Plaintiff whether she wanted a soda from the soada machine and after she declined, [the] two walked back……into the dispatch area."

36. Plaintiff does not dispute the testimony of O'Brien. However, neither Plaintiff, nor even Ms. Parrot were aware of any such security system. Parrott, Exhibit D, p. 48-49; Kiernan I, Exhibit E, p. 78. Indeed, Ms. Parrott testified that she was not aware of the hold up buttons "until after this happened. I was never told that when I was hired or while I was employed." Parrott, Exhibit D, p. 49.

37. No dispute. However, O'Brien testified that the vault could not be left unattended because Ciambriello would not be able to respond to trucks calling on the radio. O'Brien Deposition, (See Exhibit A, Affidavit of William J. McLeod, and Exhibit G, Deposition of Edward O'Brien), p. 37.

38. No dispute. However, Plaintiff was not aware the hold-up buttons even existed. Neither did Ms. Parrot. Parrot, Exhibit D, pp. 48-49; Kiernan I, Exhibit E, p. 78.

39. Disputed. The pages cited by Defendant do not provide support for the following factual assertions: "Both the driver and the messenger carry a firearm on their person while they work." Plaintiff testified that she "believed" they were armed. Kiernan I,,

6

Exhibit E, at 105.  Plaintiff does not dispute that she said nothing about the rape to the drivers who came to the facility.

40. No dispute.

41. No dispute.

42. No dispute.  However, in supplementing these facts.  Parrott testified that Kiernan "came outside and she came to my car and when she was walking she said don't make any facial expressions, don't make any expressions but I have to tell you something.  And she told me Tony had assaulted her.  She didn't get into great detail at the time, she was very uncomfortable about it she said." Parrott, Exhibit D, p. 62.  Kiernan appeared upset. Id., at 63.  Additionally, Parrott asked Ciambriello "it is was okay that [she] was in there" and "he said it was fine." Parrott, Exhibit D, p. 69-70.

43. No dispute.

44. No dispute.

45. No dispute.

46. No dispute.

47. No dispute.

48. No dispute.

49. No dispute.  However, Kiernan also testified that she was afraid of telling her husband she had been raped – specifically what his reaction would be especially since they had an infant. Kiernan, Exhibit E, p. 220-221.

7

50. No dispute.

51. No dispute.

52. No dispute.

53. No dispute. However, at the time of the suspension, there was "probably nothing" more that needed to be done in furtherance of any investigation. <u>Khoury</u>, Exhibit C, p. 109-110. "I think they knew he was going to be terminated." <u>Id.</u> Khoury claims however it was "probably to check the policy to make sure it was a termination offense." <u>Id.</u>

54. No dispute. However, at the time of the suspension, there was "probably nothing" more that needed to be done in furtherance of any investigation. <u>Khoury</u>, Exhibit C, pp. 109-110. "I think they knew he was going to be terminated." <u>Id.</u> Khoury claims however it was "probably to check the policy to make sure it was a termination offense." <u>Id.</u>

> Respectfully submitted:
> HEATHER KIERNAN

DATED:   February 28, 2006

> /s/ William J. McLeod
> William J. McLeod, BBO 560572
> McLEOD LAW OFFICES, PC
> 77 Franklin Street
> Boston, MA  02110
> 617.542.2956/phone
> 617.695.2778/fax
> wjm@mcleodlawoffices.com

8