UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS AT BOSTON

_____

HEATHER KIERNAN,

         Plaintiff,

-v-                                        CIVIL NO. 04-10131 RBC

ARMORED MOTOR SERVICE OF
AMERICA, INC., and
FRANCESCO CIAMBRIELLO

         Defendants.

_____

**PLAINTIFF HEATHER KIERNAN'S MEMORANDUM OF FACTS AND LAW
IN SUPPORT OF HER OPPOSITION TO THE
MOTION FOR SUMMARY JUDGMENT FILED BY THE DEFENDANT
<u>ARMORED MOTOR SERVICE OF AMERICA INC.</u>**

      Plaintiff in the above captioned matter hereby submits this memorandum of facts and law in support of her opposition to the Defendant Armored Motor Service of America, Inc.'s (AMSA's) motion for summary judgment.

<u>**Background**</u>

      This case stems from the Plaintiff Heather Kiernan's allegations that her supervisor, Defendant Francisco Ciambriello sexually harassed and raped her on May 19, 2001 while employed at AMSA. Defendant AMSA seeks summary judgment based on its claim that: (1) Ciambriello was not Kiernan's supervisor; (2) there is no evidence that AMSA knew or should have known about the alleged harassment or that it failed to take prompt and effective remedial action; and (3) even if AMSA cannot prevail on the first two grounds, liability is precluded based on the <u>Faragher/Ellerth</u> affirmative defenses.

The disputed facts that Plaintiff raises in support of her opposition are mentioned throughout this memorandum as well as her Local Rule 56.1 statement.

## **Argument**

Under Rule 56, a party is entitled to Summary Judgment when there is "no genuine issue as to material fact and.... the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d. 265 (1986).  A "genuine" issue exists where the evidence before the Court is of such a nature that a reasonable fact finder could return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52, 106 S.Ct 2505, 2510-12, 91 L.Ed.2d 202 (1986). Whether a fact is "material" depends on the substantive law in a given case. A fact that might affect the outcome of a case is "material." Id., at 248, 106 S.Ct. at 2510.

In ruling on a Motion for Summary Judgment, the Court cannot find facts. The Court's role is narrowly limited to assessing whether there is a disputed issue of material fact. Id., at 249, 106 S.Ct. 2510, 91 L.Ed.2d. 202. Even if material facts are not disputed, if reasonable minds may disagree on their inferences to be drawn from those facts, summary judgment is inappropriate. Tao v. Freeh, 27 F.3d 635, 638 (DC Cir. 1994)(citations omitted); and see In re Varrasso, 37 F.3d 760, 763-764 (1st Cir. 1994)(citations omitted).

In that same vein, summary disposition precludes any evaluation of credibility by the court. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. at 2513. Therefore, in this case the evidence of the Plaintiff will be

2

believed as true, all doubts and reasonable inferences shall be resolved against the Defendant AMSA and all evidence will be construed in the light most favorable to the Plaintiff. Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456, 112 S.Ct. 2072, 2076, 119 L.Ed.2d 265 (1992); Anderson v. Liberty Lobby, 477 U.S. at 255, 106 S.Ct. at 2513.

1. **Ciambriello was a Supervisor for the purposes of establishing liability under Title VII**

Relying on Noviello v. City of Boston, AMSA maintains that Ciambriello was not a supervisor. Noviello v. City of Boston, 398 F.3d 76 (1st Cir. 2005). Yet the "question of whether an employee is a supervisor in the relevant sense is itself factual in nature." Noviello v. City of Boston, 398 F.3d at 95 (citing: Hrobowski v. Worthington Steel Co., 358 F.3d 473, 478 (7th Cir. 2004)). The facts in this case dictate a different conclusion.[1]

   a. **Actual Authority**

Ciambriello was not a "supervisor in name only." Defendant's Opposition Memorandum, p. 5. While Ciambriello could not hire, fire or discipline the Plaintiff, he had one important job function: absolute control. He had control over the facility that the Plaintiff worked in and control over everyone inside that facility.

He was the supervisor on AMSA's premises on May 19, 2001, and the only one. AMSA concedes that Ciambriello admitted that fact in his deposition.

---

[1] While Plaintiff contends there are disputed facts, it appears that AMSA's argument that Ciambriello is not a supervisor is based on facts that are omitted from its analysis. Plaintiff believes that as a matter of law, Ciambriello is considered a supervisor based on the unique and undisputed facts presented by this case.

3

Additionally, Ciambriello's supervisor (the Branch Manager) testified that he was the "weekend supervisor." Khoury, Exhibit C, p. 27-28. Indeed, he was "hired as a supervisor." Id.

Khoury's testimony only further illustrated Ciambriello's control over the Plaintiff on May 19, 2001. Kiernan answered to Ciambriello on the weekends. Khoury, Exhibit C, p. 28-31.[2] Moreover, Ciambriello "ran the building in [Branch Manager Jason Khoury's] absence." Khoury, Exhibit C, at 97-98.

The facts of this case are similar to those in Messina v. ARAServe, Inc., 906 F.Supp. 34 (D.Mass 1995). In Messina, the employee was a cook in a commercial kitchen and was subjected to verbal harassment from a co-worker as well as the Executive Chef. Id., 906 F.Supp. at 35-36. The employer argued that liability could not be found against it because the Executive Chef was not a supervisor of the employee (he did not have the power to hire and fire Messina). Id. In reserving the issue for the jury, the court noted that the Executive Chef had control over the production of food, including that food produced by the Messina. Id.

---

[2] Q.  You were [Heather Kiernan's] direct supervisor?
A.  No.  She had an immediate supervisor prior to -- She would answer to the vault supervisor or -- at the time.
Q.  When you say at the time, at what time?
A.  Her job was data entry, so she worked in the vault.  She would have to answer to the vault supervisor, and the vault supervisor answered to me.
Q.  Did the vault supervisor have the power to hire and fire her?
A.  No.
Q.  Who did?
A.  I did.
Q.  When you say answer to the vault supervisor, what do you mean?
A.  As far as her duties, as far as shift schedule, hours.
Q.  And the vault supervisor, was that somebody who was physically there -- Strike.  Who was the vault supervisor?
A.  On the weekend it was Tony Ciambriello.

Khoury, Exhibit C, pp. 30-31 (emphasis added).

4

"The key to determining supervisory status is the degree of authority possessed by the putative supervisor." Newell v. Celadon Security Services, Inc. et al., 2006 U.S.Dist LEXIS 3413, See Exhibit B.  "…[W]here an employer has conferred supervisory authority on an employee, regardless of the actual tile given the employee, there may be strict liability on the part of the employer even if the supervisor is not the victim's direct supervisor." Id., (citing Morehouse v. Berkshire Gas, Co., 989 F.Supp. 54, 64 (D.Mass 1997); Messina v. ARAServe, Inc., 906 F.Supp. 34, 37 (D.Mass 1995)).  "This is consistent with the reality that 'although co-workers or even outsiders may be capable of creating a sexually harassing work environment, it is the authority conferred upon a supervisor by the employer that makes the supervisor particularly able to force subordinates to submit to sexual harassment." Id., (citing College-Town v. Massachusetts Comm'n Against Discrimination, 400 Mass at 166, 508 N.E.2d at 593).

The two primary factors that dictate the actual authority in this case are (1) the fact that Kiernan reported to Ciambriello while performing of her weekend job duties; and (2) when Branch Manager Jason Khoury was not in the building on the weekends, Ciambriello was in absolute control of the facility.  Indeed, there was no one physically present in the facility on the weekends (and certainly not on May 19, 2001) who possessed greater authority and control over the Plaintiff, the facility she worked in and anyone else who was occupying it than the co-Defendant Francesco Ciambriello.  Assuming that, as a matter of law, these facts do not support the conclusion that Ciambriello was a supervisor for the purposes

of Title VII, a jury could reasonably find that based on these facts, Ciambriello was Healther Kiernan's supervisor on May 19, 2001.

### b. Apparent Authority

If no reasonable juror could find that Ciambriello had actual authority, a jury could find that Ciambriello had apparent authority over the Kiernan.

In some cases, "an employee may be deemed to be a supervisor under the doctrine of apparent authority." Newell v. Celadon Security Services, Inc., 2006 U.S.Dist.LEXIS 3413, p. 6, Plaintiff's Exhibit B.

> "[A]s the [U.S.] Supreme Court recognized in Ellerth, the 'scope of employment does not define the only basis for employer liability under agency principles. In limited circumstances, agency principles impose liability on employers even where employees commit torts outside the scope of employment. The principles are set forth in the much-cited § 219(2) of the Restatement of Law, (Second), Agency, which provides, in relevant part, that the 'master' may be liable where:… (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.
>
> Id., citing Burlington Indus., Inc. v. Ellerth, 524 U.S 742 at 758, 118 S.Ct. at 2267 (1998) (quoting Restatement (Second) of Agency § 219(2)(d)).

"In the usual case, a supervisor's harassment involves the misuse of actual power, not the false impression of its existence." Burlington Indus., Inc. v. Ellerth, 524 U.S. at 759, 118 S.Ct. at 2268 (citing Restatement (Second) of Agency § 6).

The principles in Ellerth are "viewed…..as a direction to 'interpret Title VII based on agency principles." Pa. State Police v. Suders, 542 U.S. 129, 144, 124 S.Ct. 2342, 2353 (2004). "The Restatement (Second) of Agency (1957)

(hereinafter Restatement), the Court noted, states (in its black-letter formulation) that an employer is liable for the acts of its agent when the agent 'was aided in accomplishing the tort by the existence of the agency relation.' Id,. (citing Burlington Indus., Inc. v. Ellerth, 524 U.S., at 758, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (quoting Restatement § 219(2)(d)).

Certainly, if there is a "'false impression that [Ciambriello] was a supervisor, when he in fact was not, [Plaintiff's] mistaken conclusion must be a reasonable one." Newell v. Celadon Security Services, Inc., 2006 U.S.Dist. LEXIS 3413, p. 6, Plaintiff's Exhibit B. In this case, a jury could reasonably find that the mistaken conclusion was reasonable.

Ciambriello held the title of weekend supervisor. In his job, he carried a side arm, clearly a marker of authority. See e.g. Commonwealth v. Caracciola, 409 Mass. 648, at 654-655, 569 N.E.2d 774 (1991); Commonwealth v. Chavis, 415 Mass. 703 at 704 (wearing of gun, badge viewed among signs of authority. He had control of the facility. Kiernan had to report to Ciambriello while she was performing her job duties on the weekends.

While Ciambriello did not have the authority to hire and fire, he possessed the exclusive authority to allow employees to exist and enter the building. Indeed, he had control of the building that Plaintiff occupied in the performance of her job duties. Anyone wishing to obtain access to the building had to go through him. Anyone wishing to leave the building had to go through him.[3]

---

[3] There is nothing in the record to suggest any other means of entering and exiting the buildling. While AMSA intimates that Kiernan could have availed herself of some "hold-up" button (and by implication claim it was another means by which Kiernan could have sought assistance) neither

7

Indeed, when Ms. Parrott, Kiernan's long time friend, came to stay with her after the attack, she had to ask Ciambriello for his permission to do so. Parrott, Exhibit D, pp. 143-144; see Plaintiff's Rule 56.1 Response, paragraph 7.

For all of these reasons, a jury could find that Ciambriello could be deemed by the jury as a supervisor for the purposes of liability under Title VII.

## 2. **AMSA has not sustained its burden on the Faragher/Ellerth Affirmative Defense[4]**

In support of its argument that AMSA is protected by the Faragher/Ellerth affirmative defense, AMSA makes two claims: (1) it had a policy against sexual harassment as well as a policy outlining the procedures for complaining about sexual harassment; and (2) "….AMSA removed Mr. Ciambriello from the workplace immediately upon learning of Plaintiff's report to the police." Opposition Memorandum, pp. 8-9.

Even if it has been demonstrated that the offending employee is a supervisor, the employer can avoid liability under Title VII by demonstrating two elements under the Faragher/Ellerth defense: "First the employer must show that it exercised reasonable care to prevent and correct promptly the harassment. Second the employer must show that the employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." Newell v. Celadon Security Services, Inc.,

---

Kiernan, nor Christina Parrot knew anything about such a button – or what it was allegedly intended to do in this instance. See Plaintiff's Rule 56.1 Response, p. 36.

[4] Plaintiff's response to AMSA's argument that it did not know nor should it have known about the harassment is also incorporated into this section.

8

2006 U.S.Dist.LEXIS 3413, pp. 4-5 (citing Noviello v. City of Boston, 398 F.3d 76, 94-95 (1st Cir. 2005), Plaintiff's Exhibit B.[5]

As stated herein, Ciambriello speaks broken English, is difficult to understand, and the evidence that he read and understood the contents of the policy that he signed off on is based on his incredulous testimony.[6] See Defendant AMSA's Rule 56.1 Statement, paragraph 17.

Additionally, Ciambriello claims that despite reading, and understanding the sexual harassment policy and despite his horrible English speaking and reading skills, he thought Plaintiff was violating the policy, and even complained about it.

Ciambriello claimed that Plaintiff was discussing her husband's sexual behavior, which is clearly not permissible by the policy. Ciambriello, Exhibit F, pp. 68-70, He testified that he complained to management. Id., at 129-130.[7] He

---

[5] The Faragher/Ellerth defense is not available under Massachusetts Law. Thus, Defendants' motion has no affect on Plaintiff's claims under Chapter 151B of the General Laws. Newell v. Celadon, 2006 U.S.Dist.LEXIS 3414, p. 5 (citing: College-Town, Div. of Interco, Inc. v. MCAD, 400 Mass 156, 162-169, 508 N.E.2d 587, 591-194 (1987)). See also Messina v. ARAServe, Inc., 906 F.Supp. 34 at 37 (D.Mass 1995) ("an employer is unconditionally liable for sexual harassment by its supervisors under Chapter 151B.").

[6] At his deposition, Ciambriello was asked the following: "How would you describe your reading, your English reading skills?" His response: "bad." Ciambriello, Exhibit F, at p. 50. "A lot of time I read some words that I don't understand what it means." Id. He admitted not telling AMSA about his poor English skills. Id., at 51. In addition, when he signed the policy acknowledgment, there was no discussion about the contents of the information, nor was anything explained to him. Id., at 57. Notwithstanding Ciambriello's admittedly bad English speaking and reading skills, he testified that he understood the sexual harassment policy and read it. Id., at 127. His only reading in English is the newspaper. Id., at 50. While there is no direct evidence to the contrary, the facts indicate that his testimony is self-serving and in light of the number of conflicting statements in the records, calls for a jury to determine the credibility of the statement.

[7] ….[A] couple of times I spoke to my night supervisor, his name Chris, I don't know his last name, to talk to Jason, because Heather, she had a mouth full.
Q. I don't know what you mean by mouth full.
A. She was tell all these things, that's mean a mouthful, to me, yes.
* * *
Q. When did you have that discussion?

complained to management because he wanted Kiernan to stop talking about her husband.  Id., at 132.[8]  Thus, according to Ciambriello, AMSA management was aware of Kiernan's violations of the sexual harassment policy.  Id., and see Defendant AMSA's Tab 57, Document 59, AMSA's Sexual Harassment Policy filed on February 10, 2006, Section II.

Thus, to follow Ciambriello's version of events, AMSA knew that there was inappropriate conduct afoot (although it was Kiernan that was engaged in it) and pursuant to AMSA's own policy, AMSA should have been conducting an investigation into Kiernan's nefarious ways as well as her interactions with Ciambriello.  See Defendant AMSA's Tab 57, Document 59, AMSA's Sexual Harassment Policy filed on February 10, 2006, Section III ("All complaints of harassment must be investigated promptly….").

Ciambriello's inability to grasp the English language, along with his interesting version of events raise credibility issues as to what AMSA's policy was and if it was enforced or even taken seriously.

---

A.  That was about 2, 3 weeks before it happened, a couple of weeks before [the events of May 19, 2001] happened.

Ciambriello, Exhibit F, p. 129-130.

[8] Q.  But did you want it to stop?
A.  Yes.
Q.  You did?
A.  Yes.
Q.  Is that why you went to Chris to talk to him about it, because you wanted it to stop?
A.  No, I wanted Heather have a little bit of clean mouth.
Q.  You wanted her to stop talking about her husband?
A.  Yes.

Ciambriello, Exhibit F, p. 132.

This intriguing factual dispute is amplified by Kiernan's testimony. Kiernan testified that Khoury apparently heard inappropriate comments being made in the workplace and in Kiernan's presence. Kiernan I, at 86. Khoury met with Plaintiff to "make sure [she] was not offended by the" conduct and remarks. Id. Kiernan told Khoury that she was "a life guard, ….[and] was kind of use [sic] to people talking like that…". Kiernan I, Exhibit E, at 86. In addition, she also said:

> I told him that some of the things were said were offensive but lots of things go on like that around me, and I just kind of brushed [it] off, and I didn't dwell on it.
>
> Id.

Such was the case in Messina. Mr. Messina admitted joking with his harassers, a fact that the employer argued proved that he did not find the sexual conduct subjectively offensive. Messina v. ARAServe, Inc., 906 F.Supp. at 37.[9] The court rejected the argument "finding that a victim of pervasive sexual innuendo and vulgar joking may participate in order to 'fit in' and to defuse offensive milieu"). Messina v. ARAServe, Inc., 904 F.Supp. 34 at 37(citing Cardin v. Via Tropical Fruits, Inc., 1993 U.S.Dist.LEXIS 16032 (S.D.Fla. 1993)).

Kiernan's testimony on this issue raises important factual issues as to whether the Plaintiff was engaging in behavior as a coping mechanism in a hostile work environment. It also raises a more important factual issue: what did AMSA know about its sexually charged environment prior to the rape? These factual issues require a denial of AMSA's Summary Judgment request.

---

[9] Among the offensive conduct that Messina complained of was being referred to as "Chucky sucky", as well as crude comments such as "Where have you been? Dropping a load in someone's mouth?" Messina v. ARAServe, Inc., 906 F.Supp. at 35.

11

More troubling however is the claim that "the evidence demonstrates that immediately upon learning of the alleged harassment, AMSA took prompt and effective action to ensure that any harassment ended." Defendant's Opposition Memorandum, pp. 7-8. AMSA concedes (in a footnote) that it did not suspend and ultimately terminate Ciambriello because of the rape, nor because he could not longer carry a firearm and perform the essential functions of his job.[10] See Defendant's Opposition, p. 8, fn. 4. Instead, they contend that Ciambriello was terminated because be purportedly broke an allegedly important company policy by smoking outside the building, leaving the vault unattended.

Khoury had supposedly learned about Ciambriello leaving the vault unattended and seeing him smoking outside the building by viewing videotapes.[11] Khoury, p. 49. Ciambriello was called into work the morning of May 20, 2001, and told by Khoury he was under suspension for the security violation.[12] Id., p. 100-101. He was terminated three days later: after he was arrested and arraigned for the rape of Heather Kiernan.

It is well settled that "'an employer is liable for sexual harassment perpetuated by an employee …, unless the employer can show it took appropriate steps to halt the harassment.' Messina v. ARAServe, Inc. 906

---

[10] A condition of Ciambriello's bail was for him to surrender his gun.

[11] These tapes have also vanished.

[12] There are absolutely no documents confirming that Ciambriello was aware of this important security policy. There are also no documents describing how the important security policy is defined. For example, what does "unattended" mean? Does it mean going out side to smoke (which is the act giving rise to Ciambriello's termination) or does it mean going behind a closed door in an office that is not under video surveillance to have sexual relations with another person? See Plaintiff's 56.1 Response to Statement of Undisputed Material Facts, paragraph 31. See also, O'Brien, p. 37 (leaving the building unattended - with the vault open - means you cannot answer the radio).

F.Supp. at 38.   The employer's "response '<u>must be calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made</u>."  See <u>Newell v. Celadon Security Services, Inc.</u>, 2006 U.S.Dist LEXIS 3413, p. 8 (emphasis added) (Plaintiff's Exhibit B) (citing: <u>Vazquez v. Am.Home Prods.Corp.</u>, 2005 U.S. Dist LEXIS 39932, No. Civ. 01-2126 (RLA, 2005 WL 2001299 at 10 (D.P.R. Aug. 19, 2005)(other citations omitted)); see also <u>Ellison v. Brady</u>, 924 F.2d 872, 883 (9th Cir. 1991)(the employer's remedy should be reasonably calculated to end harassment and persuade potential harassers to refrain from unlawful conduct); see also <u>Yamaguchi v. United States Dep't of the Air Force</u>, 109 F.3d 1475, 1482 (9th Cir. 1997) (remedial measures must include disciplinary action).

There is absolutely no evidence that the AMSA's removal of Ciambriello was "calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations [were] made." <u>Id.</u>  In fact, Khoury and O'Brien both testified that Ciambriello was terminated for a supposedly grave security violation – leaving the money unattended, rather than raping the Plaintiff.  <u>Khoury</u>, pp. 52-53.  AMSA sent no message to the Plaintiff, to Ciambriello or for that matter, to any other AMSA employee that Ciambriello's conduct was unacceptable.  The message it did send: lock up the money in the vault if you want to smoke, lest you be fired.  "<u>Employers send the wrong message to potential harassers when they do not discipline employees for sexual harassment.</u>"  <u>Ellison v. Brady</u>, 924 F.2d at 882 (emphasis added).[13]

---

[13] To this day, Ciambriello contends he did nothing wrong on the May 19, 2001.  His machinations of innocence and consent are only fueled by AMSA's stated reasons for termination.   The fact

13

If AMSA had terminated Ciambriello for the rape, or for the past sexual harassment, or both, it could have done so. Indeed, if it had done so it might have sustained this element under Faragher/Ellerth.

Instead, AMSA terminated Ciambriello for what appears on its face to be an innocuous and completely undocumented company policy, and now seeks to cloak itself in the protective blanket offered by Faragher/Ellerth by claiming that it complied with Title VII while at the same time, arguing that the sexual acts Defendant Ciambriello inflicted on Heather Kiernan were "welcome",[14] "consensual", or did not happen at all.[15]

Title VII requires a company to take remedial action against the perpetrators of sexual harassment and there is a long case history supporting this premise. However, the fundamental principles of Title VII as well as Faragher and Ellerth are perverted beyond recognition when AMSA clouds what the law encourages it to do (by taking prompt remedial action) with a "smoke screen."[16]

---

that Ciambriello denied the conduct does not relieve AMSA of its obligation to publicly condemn the conduct. Fuller v. City of Oakland, Cal., 47 F.3d 1522, 1529 (9th Cir, 1995)("An employer whose sole action is to conclude that no harassment occurred cannot in any meaningful sense be said to have 'remedied' what happened. Denial does not constitute a remedy.").

[14] See Defendant AMSA's Answer to the Complaint, paragraphs 12 and 13.

[15] See generally, paragraph 13, Defendant Armored Motor Service of America Inc,'s Motion to Reopen Discovery for the Limited Purpose of Deposing Delken Dry Cleaners, Document no. 50, filed November 11, 2005.

[16] Plaintiff also believes that these facts and this argument further reveals AMSA's concerns of liability for Ciambriello's actions as early as May 20, 2001, the morning after the attack. Thus, it lends support to Plaintiff's claim for sanctions against AMSA and Ciambriello for spoliation of evidence it was duty bound to preserve.

If Ciambriello was only a co-worker and if there was no prior knowledge of any sexual harassment or of a sexually charged atmosphere, the protective blanket offered by Faragher/Ellerth gave AMSA the opportunity to fire Ciambriello for sexually harassing and raping Kiernan without the concern that the termination itself amounted to an acknowledgment of liability under Title VII.

That they did not choose such an obvious and undeniably more productive road requires a denial of their Summary Judgment request.

## Conclusion

For all of the foregoing reasons, the Plaintiff respectfully requests that the Court deny the Motion for Summary Judgment filed by AMSA, and that the Court enter any additional relief that the Court deem equitable, just and proper.

                                        Respectfully submitted:
                                        HEATHER KIERNAN

DATED:    February 27, 2006

                                        /s/ William J. McLeod
                                        William J. McLeod, BBO 560572
                                        McLEOD LAW OFFICES, PC
                                        77 Franklin Street
                                        Boston, MA  02110
                                        617.542.2956/phone
                                        617.695.2778/fax
                                        wjm@mcleodlawoffices.com