# Exhibit C

CERTIFIED ORIGINAL
LEGALINK BOSTON

1

1

          VOLUME:  I

2

          PAGES:  1 to 114

3

          EXHIBITS:  1 to 7

4

     UNITED STATES DISTRICT COURT

5

       DISTRICT OF MASSACHUSETTS

6

- - - - - - - - - - - - - - - - x

7

HEATHER KIERNAN,

8

         Complainant,

9

  v.              Civil Action

10

              No. 10131MLW

11

ARMORED MOTOR SERVICES OF

12

AMERICA, INC.,

13

         Respondent.

14

- - - - - - - - - - - - - - - - x

15

16

17

     DEPOSITION OF JASON J. KHOURY

18

        March 2, 2005

19

         10:10 a.m.

20

      Gillette Corporation

21

      One Gillette Park

22

   South Boston, Massachusetts

23

24

   Reporter:  Karen A. Interbartolo, RPR

2

APPEARANCES:


     MCLEOD LAW OFFICES

     By William J. McLeod, Esquire

     77 Franklin Street

     Boston, Massachusetts 02110

     (617) 695-2777

     Counsel for the Complainant


     MORGAN, BROWN & JOY, LLP

     By Laurence J. Donoghue, Esquire

     200 State Street

     Boston, Massachusetts 02109-2605

     (617) 523-6666

     Counsel for the Respondent Armored Motor Services

     of America, Inc.

1                           I N D E X

2     EXAMINATION OF:                              PAGE

3     JASON J. KHOURY

4

5       Direct Examination by Mr. McLeod              4

6       Cross-Examination by Mr. Donoghue            96

7       Redirect Examination by Mr. McLeod          100

8

9

10                        E X H I B I T S

11    NO.                                          Page

12

13    1         Applicant Reference Check/            18

14              Verbal

15    2         AMSA Written Reference Form          22

16    3         Memorandum dated 3/15/01             26

17    4         Authorization Form                   28

18    5         Introductory Period Memorandum       30

19              dated 4/16/01

20    6         Handwritten Letter dated             62

21              8/17/01

22    7         Letter dated 2/20/03                 67

23

24    *Original exhibits retained by Mr. McLeod.

Jason J. Khoury                                                      03/02/2005

4

1                       P R O C E E D I N G S

2

3                       JASON J. KHOURY

4

5    having been satisfactorily identified and duly sworn by

6    the Notary Public, was examined and testified as

7    follows:

8

9                       DIRECT EXAMINATION

10   BY MR. MCLEOD:

11        Q.    Could you state your name for the record?

12        A.    Jason Khoury.

13        Q.    Mr. Khoury, my name is Bill McLeod.  I

14   represent Heather Kiernan in a case that she's brought

15   against Armored Motor Services of America and Francesco

16   Ciambriello.

17              I'm going to be asking you some questions

18   today.  You're under oath.  You need to give me verbal

19   answers.  The court reporter can't take down shakes of

20   the head or anything like that.

21              You're going to have an opportunity to review

22   your deposition transcript and make whatever changes.

23   Is that something that you'd like to do?

24        A.    Yes.

1    as far as you know, accurately reflect when he started?

2         A.    I guess this is accurate.  I don't recall

3    exactly what day he started.

4         Q.    And it states here that he was approved for

5    part-time employment?

6         A.    Yes.

7         Q.    Was he working part time at Loomis Wells

8    Fargo when you two were working together prior to AMSA?

9         A.    Yes, he was.

10         Q.    And did he have a full-time job in addition

11    to that?

12         A.    Yes, he did.

13         Q.    Where was his full-time job at that time?

14         A.    I'm not sure of the place, but it was making

15    cabinets, wooden cabinets.

16         Q.    And, to your knowledge, did he keep that job

17    when he went to AMSA?

18         A.    Yes.

19         Q.    And that was a full-time position?

20         A.    Yes.

21         Q.    What was his shift going to be, if you know,

22    when he was hired by AMSA?

23         A.    Definitely weekends, as a weekend supervisor,

24    Saturday and Sunday, and I think he worked one day

1   during the week for four hours.

2        Q.   So he was hired as a supervisor?

3        A.   Yes.

4        Q.   Was that a step up from where he was over at

5   Loomis Wells Fargo?

6        A.   Yes.

7                  (Exhibit 4 marked

8                  for identification.)

9        Q.   Before you is what's been marked as Exhibit

10   4, which appears to be an authorization form for the

11   criminal records released from Rhode Island, and it

12   appears that Mr. Ciambriello signed it and it is dated

13   4/26/01.   Under what circumstances would an employee or

14   prospective employee of AMSA need to sign this document

15   in order to get employment or keep their employment at

16   AMSA?

17        A.   Prior to being hired.

18        Q.   Prior to being hired.   Do you know why this

19   would have been signed more than a month after

20   Mr. Ciambriello's hire date in March of 2001?

21        A.   Not really, unless he was applying for a

22   Rhode Island license to carry a firearm.

23        Q.   His position, however, was in Attleboro,

24   correct?

1   A.   Yes.

2   Q.   Did his position require him to travel to

3   Rhode Island?

4   A.   If he was on a route truck, yes.

5   Q.   So, then, as a supervisor, did his duties

6   encompass him being on a truck?

7   A.   Sometimes, yes.

8   Q.   How often?

9   A.   Not often.  Once a month maybe if someone was

10  to call in or -- call in or something.

11  Q.   So this document which has been marked as

12  Exhibit 4 is used for the purposes of getting a gun

13  permit, not for the purposes of getting a

14  pre-employment criminal background check?

15  A.   I'm not sure.

16  Q.   When Mr. Ciambriello was at AMSA Wells Fargo,

17  did he have -- did he carry a weapon?

18  A.   Yes.

19  Q.   And, to your knowledge, did he have a proper

20  permit to carry the weapon while he was employed there?

21  A.   Yes, he did.

22  Q.   And did he have it the entire time he was

23  there?

24  A.   To the best of my knowledge, yes.

1                    (Exhibit 5 marked

2                    for identification.)

3        Q.    Before you is what's been marked Exhibit 5.

4   Have you seen this document before?

5        A.    Yes.

6        Q.    When did you first see it?

7        A.    When it was originated on April 18th of '01,

8   I would think.

9        Q.    Did you interview Heather Kiernan for the

10  position at AMSA?

11       A.    I think so, but I'm not sure.

12       Q.    You were her direct supervisor?

13       A.    No.  She had an immediate supervisor prior

14  to -- She would answer to the vault supervisor or -- at

15  the time.

16       Q.    When you say at the time, at what time?

17       A.    Her job was data entry, so she worked in the

18  vault.  She would have to answer to the vault

19  supervisor, and the vault supervisor answered to me.

20       Q.    Did the vault supervisor have the power to

21  hire and fire her?

22       A.    No.

23       Q.    Who did?

24       A.    I did.

1    Q.   When you say answer to the vault supervisor,
2    what do you mean?

3    A.   As far as her duties, as far as shift
4    schedule, hours.

5    Q.   And the vault supervisor, was that somebody
6    who was physically there -- Strike.  Who was the vault
7    supervisor?

8    A.   On the weekend it was Tony Ciambriello.

9    Q.   And was Ms. Kiernan hired to work any
10   particular shift or shifts?

11   A.   It was part time some weekends and some
12   nights.

13   Q.   Who would have made the decision to hire her?

14   A.   I would have.

15   Q.   Was there any pre-employment screening that
16   needed to be done prior to her starting her work after
17   you made the decision to hire her?

18   A.   I believe just a normal background check,
19   Mass. and Rhode Island criminal checks and reference
20   checks from other jobs, yes.

21   Q.   Are those tasks that you would perform?

22   A.   No.   My administrative assistant would have
23   done that, Cindy Coleman.

24   Q.   And does this refresh your recollection at

1    reviewed it and saw it.

2        Q.   How long was he outside having a cigarette?

3        A.   A couple of minutes, maybe three or four

4    minutes.

5        Q.   And when somebody goes outside to have a

6    cigarette that's in Mr. Ciambriello's position, is that

7    against company policy?

8        A.   When the vault was open, yes.

9        Q.   How did you know the vault was open when he

10   went outside?

11       A.   Because we have camera coverage inside the

12   vault.

13       Q.   That shows you when the vault is open and

14   closed?

15       A.   Yes.

16       Q.   So, in addition to seeing him outside

17   smoking, you would also need to verify that the vault

18   was open?

19       A.   Yes.

20       Q.   So, in a circumstance like that, a three-day

21   suspension is a typical discipline that one would get

22   for a similar violation?

23       A.   Yes.

24       Q.   Was there any discussion with him about the

1    did he -- did Mr. Ciambriello bring his sidearm with

2    him or was it left there at AMSA?

3         A.   No, he brought it with him.

4         Q.   And that day did he have his sidearm with

5    him?

6         A.   I don't know.

7         Q.   Did Mr. Ciambriello ever return to work after

8    that day where he was suspended for three days?

9         A.   No.

10        Q.   When I say return to work, I mean return to

11   AMSA.

12        A.   No.

13        Q.   At some point later was he fired?

14        A.   Yes.

15        Q.   Who fired him?

16        A.   I think I did.

17        Q.   For what?

18        A.   For leaving the vault unattended and breaking

19   company policy.

20        Q.   What was the company policy that he broke?

21        A.   I don't know.  Leaving the building

22   unattended with the vault open would have been the

23   policy.

24        Q.   How soon after the suspension meeting that

1    you had with him was he terminated?

2         A.    I don't know.  A week or two maybe.

3         Q.    Now, your typical work week at AMSA during

4    that time period, was it Monday through Friday?

5         A.    I think it was Monday through -- Mine?

6         Q.    Yes.

7         A.    Yes.

8         Q.    So, the morning you met with Mr. Ciambriello

9    and put him on suspension, was there somebody else

10   there that was ready to assume his duties that day?

11        A.    Yes, Clint.

12        Q.    I'm sorry?

13        A.    Clint Stauff was there.

14        Q.    What then did you do that workday or that

15   day?

16        A.    I think I went home.

17        Q.    When you were at home that day, did you speak

18   with anybody concerning the allegations that were being

19   made?

20        A.    I don't think so.

21        Q.    When did you next speak to somebody

22   concerning the allegations?

23        A.    Probably my next regular workday I would have

24   probably followed up with Doug Wilson or Bill Callahan

97

1      A.    That's correct.

2      Q.    So she would know that as of this date you

3   were working for AMSA?

4      A.    Yes.

5            MR. MCLEOD:  Objection.

6      Q.    So you don't -- To sum up, you don't really

7   know why your name is on the second page of Exhibit 2?

8      A.    I have no idea.

9      Q.    And you knew Mr. Ciambriello at Loomis.  And

10  did you recommend him for employment at AMSA?

11           MR. MCLEOD:  Objection.

12     A.    We both went at the same time.  I think we

13  had contacted them and we both went and applied.

14     Q.    And did you have any problems with him as an

15  employee of Loomis?

16     A.    No.

17     Q.    And he reported to you for a period of time;

18  is that correct?

19     A.    Yes.

20     Q.    And did you have any problems prior to May of

21  2001, at least did you have any problems with him while

22  he worked for you at AMSA?

23     A.    None, no.

24     Q.    And what were his duties for AMSA?

1       A.    As a weekend supervisor, he would open the
2    vault and check in all the liabilities, run the
3    building in my absence, and close the building at the
4    end of the night.  He was there from open to close.
5       Q.    And you didn't work on weekends generally?
6       A.    No.
7       Q.    And how about the operations manager; was he
8    working on weekends?
9       A.    No.  He had weekends off as well.
10      Q.    And do you know if it was Loomis's practice
11   at the time you became employed by Loomis, I guess the
12   first time, to do criminal background checks?
13      A.    Right from the beginning they've always done
14   background checks, yes.
15      Q.    And I think you testified that
16   Mr. Ciambriello worked Saturday, Sunday, and one day
17   during the week?
18      A.    Definitely weekends, and his days during the
19   week were --
20      Q.    And what time would the facility be open on
21   weekends?
22      A.    I think around 7 -- 6 or 7 in the morning
23   until close, which could be at 7 o'clock; it could have
24   been at 9 o'clock.  Different times.

1   time you were called in you at some point after that

2   had a conversation with Mr. Ciambriello where you told

3   him to come in a little early for his next shift.  Do

4   you recall that testimony?

5       A.   Yes.

6       Q.   And that was a very short discussion; is that

7   correct?

8       A.   Yes.

9       Q.   And did Mr. Ciambriello appear nervous or

10  upset at all during that discussion?

11      A.   Not at all, no.

12      Q.   Did he ask you why you were calling him in?

13      A.   Yes.

14      Q.   And what did you tell him?

15      A.   I'm sorry.  He didn't ask me on the phone

16  why.  When he got there and I disciplined him, the

17  explanation was in the discipline that he left the

18  building unattended to go out for a cigarette and the

19  vault was left open and I was going to have to suspend

20  him.

21      Q.   But, during the phone conversation, did he

22  appear upset or worried at all?

23      A.   No.

24      Q.   And did he ask you why you were calling him

101

 1   in early?

 2        A.   No.

 3        Q.   And, when he arrived as scheduled before his

 4   shift, did he appear upset or worried at that time to

 5   you?

 6        A.   No.

 7        Q.   And you initially gave him a three-day

 8   suspension?

 9        A.   Three days or pending investigation.  I think

10   it was the exact wording I used.

11        Q.   So had you made a final decision on what type

12   of discipline would be imposed?

13        A.   No.

14        Q.   And so what was Mr. Ciambriello actually told

15   on that day?

16        A.   That he was being suspended for three days

17   pending further investigation.

18        Q.   Was it left that he had a definite return to

19   work date or that you'd be in touch with him?

20        A.   No, that I would be in touch with him.

21        Q.   So, to your knowledge -- Well, you didn't

22   communicate to him that he would be able to report to

23   work after three days?

24        A.   No, I did not.

1    Q.    -- pending further investigation?

2    A.    Yes.

3    Q.    Further investigation of what?

4    A.    It was just a standard line that would be put

5    in when you'd discipline someone.

6    Q.    You would never suspend somebody for a set

7    period of time?

8    A.    Yes.

9    Q.    You would?

10    A.    Yes.

11    Q.    Under what circumstances?

12    A.    A tardiness.  You're suspended for one day

13    based on your tardiness, and any other further actions

14    could result in termination.  I think that was always

15    on the end of every -- the fine print on a document.

16    Q.    How did you come to know that the vault was

17    open when he was outside having a cigarette?

18    A.    From the videotape.

19    Q.    Now, you viewed that prior to suspending him,

20    correct?

21    A.    Either I viewed it or someone showed -- I

22    think Eddie showed me that.

23    Q.    Prior to -- Sorry.

24    A.    Someone showed me that, told me that and

110

1    showed me that, yes, because I remember him

2    walking -- Yes, I remember viewing the videotape with

3    him outside the building, and no one else was inside

4    the building.

5        Q.   And that was prior to your meeting with him

6    where you suspended him?

7        A.   Yes.

8        Q.   So then what, then, needed to be

9    investigated?  In other words, you suspended him

10   pending investigation.  What more needed to be done?

11       A.   Probably nothing.  I think they knew at that

12   time that he was going to be terminated.

13       Q.   Say that again.

14       A.   I think that they knew that that was going to

15   be a termination for leaving the building unattended.

16   Maybe to check the policy to make sure that it was a

17   termination offense.

18       Q.   When you say "they," who's "they"?

19       A.   Debbie Gates and Doug Wilson.

20       Q.   Where would they check; do you know?

21       A.   The policy procedures handbook.

22       Q.   Is it like a standard operating procedures

23   manual or something like that?

24       A.   Yes, a handbook that all employees would sign

112

1   Mr. Ciambriello had been terminated from his

2   employment?

3        A.   I don't know.

4        Q.   And did she specifically mention anything

5   concerning the incident?

6        A.   No.

7             MR. MCLEOD:  I have no further

8   questions.  Because of the issue that we objected to,

9   we'll suspend.

10            MR. DONOGHUE:  Yes, that's fine.

11  Subject to that --

12            MR. MCLEOD:  Yes, subject to that, we're

13  concluded.

14            MR. DONOGHUE:  And I have no further

15  questions.

16               (Whereupon the deposition

17               was concluded at 12:10 p.m.)

18

19

20

21

22

23

24

113

1                         C E R T I F I C A T E

2

3          I, JASON J. KHOURY, do hereby certify that I have

4    read the foregoing transcript of my testimony, and

5    further certify that said transcript is a true and

6    accurate record of said testimony with the exception of

7    the following corrections listed below:

8    Page      Line              Correction

9    _____    _____     _____

10   _____    _____     _____

11   _____    _____     _____

12   _____    _____     _____

13   _____    _____     _____

14   _____    _____     _____

15   _____    _____     _____

16   _____    _____     _____

17   _____    _____     _____

18   _____    _____     _____

19   _____    _____     _____

20   _____    _____     _____

21          Signed under the pains and penalties of perjury

22   this _____ day of _____, 2005.

23                           _____

24                           JASON J. KHOURY

114

1    COMMONWEALTH OF MASSACHUSETTS

2    SUFFOLK, SS.                          CERTIFIED ORIGINAL
                                          LEGALINK BOSTON

3

4         I, Karen A. Interbartolo, Registered Professional

5    Reporter and Notary Public in and for the Commonwealth

6    of Massachusetts, do hereby certify that JASON J.

7    KHOURY, the witness whose deposition is hereinbefore

8    set forth, was duly sworn by me and that such

9    deposition is a true record of the testimony given by

10   the witness.

11

12        I further certify that I am neither related to nor

13   employed by any of the parties in or counsel to this

14   action, nor am I financially interested in the outcome

15   of this action.

16

17        In witness whereof, I have hereunto set my hand

18   and seal this 15th day of March, 2005.

19

20

21

22                      Notary Public

23                      My commission expires

24                      March 9, 2012