# Exhibit D

Page 1

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3

4                    C.A. No. 04-10131-RBC

5

6  *************************************

7  HEATHER KIERNAN,                    *

8            Plaintiff                 *

9  vs.                                 *

10 ARMORED MOTOR SERVICE OF AMERICA,   *

11 INC., and FRANCESCO CIAMBRIELLO,    *

12            Defendants               *

13 *************************************

14

15     DEPOSITION OF:  CHRISTINA PARROTT

16            MORGAN, BROWN & JOY

17             One Boston Place

18           Boston, Massachusetts

19        December 16, 2004   10:00 a.m.

20

21

22              GAYLE OHMAN

23       CERTIFIED SHORTHAND REPORTER

24                #1353S94

CHRISTINA PARROTT
December 16, 2004

Page 2

1   APPEARANCES:

2

3   Representing the plaintiff:

4       MCLEOD LAW OFFICES, P.C.

5       77 Franklin Street

6       Boston, MA   02110

7       BY:   WILLIAM J. MCLEOD, ESQ.

8       (617) 542-2956

9

10  Representing Armored Motor Service:

11      MORGAN, BROWN & JOY

12      One Boston Place

13      Boston, MA   02108

14      BY:   ALLISON K. ROMANTZ, ESQ.

15      (617) 523-6666  FAX 367-3125

16

17

18

19

20

21

22

23

24

CHRISTINA PARROTT
December 16, 2004

Page 3

```
 1                    I N D E X
 2   WITNESS:          CHRISTINA PARROTT
 3
 4   EXAMINATION BY:                    PAGE:
 5   Ms. Romantz                        5/149/153
 6   Mr. McLeod                         140/151
 7
 8   EXHIBIT                                  PAGE
 9
10                (None offered)
11
12
...
24
```

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Providence, RI   Manchester, NH

1      (Deposition commenced at 10:20 a.m.)

2

3      CHRISTINA PARROTT, Deponent, having been

4  duly sworn, deposes and states as follows:

5

6           MS. ROMANTZ:  Before we start this

7      deposition we're going to put a couple of

8      thing on the record.  First, Bill, do you

9      want to agree to the usual stipulations?

10          MR. MCLEOD:  Sure, yes, agree to

11     the usual which are all objections except

12     as to form and motions to strike reserved

13     until the time of trial.  The witness will

14     have the option of reading and signing her

15     deposition, but we will waive the signing

16     in front of a notary within 30 days.

17          MS. ROMANTZ:  Within 30 days.

18          MR. MCLEOD:  Of receipt, sorry.

19     And just to note that according to my

20     watch that the time is approximately

21     10:25.  The reason we're starting is it's

22     my understanding that Mr. Ardito, who

23     represents Mr. Ciambriello, called this

24     morning, his office called saying he was

CHRISTINA PARROTT
December 16, 2004

Page 48

```
 1      Q.    At any time during your employment
 2  with AMSA were you ever given any training on
 3  building security?
 4      A.    No.  Well, what does that -- I knew
 5  we had video cameras.
 6      Q.    Were you ever given any training on
 7  what you should do if you were in the facility
 8  and it was robbed?
 9      A.    No.
10      Q.    Were you ever given any information
11  about the video cameras?
12      A.    I knew in the money room where they
13  were located.
14      Q.    Were you aware that there were what
15  I'm going to call holdup buttons located
16  throughout the Attleboro facility that if
17  somebody pushed them it would trigger an alarm
18  to the Attleboro police station?
19          MR. MCLEOD:  Objection.
20          THE WITNESS:  No, not until after
21      this happened.  I was never told that when
22      I was hired or while I was employed.
23      Q.    (By Ms. Romantz)  did you ever see
24  a button in the money room that was red in color
```

1  and had a sign directly above it that said
2  holdup button?
3      A.    Not that I remember.
4      Q.    Did you ever go into the vault?
5      A.    Once or twice.
6      Q.    Did you ever see a holdup button in
7  there?
8      A.    I never paid attention. I never
9  looked.
10     Q.    Did you have any personal knowledge
11 as to whether Heather was aware that there were
12 holdup buttons located throughout the facility?
13         MR. MCLEOD: Objection.
14         THE WITNESS: To my knowledge she
15     did not.
16     Q.    (By Ms. Romantz) Did you ever have
17 a conversation with her?
18     A.    No, I never had a conversation
19 with her.
20         MR. MCLEOD: Just also to remind
21     you both wait for her to finish the
22     question before you answer.
23         THE WITNESS: Sorry.
24         MR. MCLEOD: Okay.

```
 1      A.      Just asked if I could come down
 2   there. She didn't say anything over the phone,
 3   just asked if I could come down.
 4      Q.      And what did you say?
 5      A.      I said that was fine, and I was
 6   down there within a minute.
 7      Q.      Did you drive down there?
 8      A.      Yes, I live right down the street.
 9      Q.      Can you tell me what happened when
10   you got there?
11      A.      She had come outside and she came
12   to my car and when she was walking she said
13   don't make any facial expressions, don't make
14   any expressions but I have something to tell
15   you. And she told me Tony had assaulted her.
16   She didn't get into great detail at the time,
17   she was very uncomfortable about it she said.
18      Q.      Did she actually --
19      A.      She told me -- I'm sorry.
20      Q.      Let me finish.
21      A.      She told me she did not want me --
22   did not want him to know -- I'm sorry -- that I
23   knew anything that she was telling me anything.
24   Because apparently there's a camera that sees
```

Page 63

1   out in the parking lot so he may have been
2   watching on the video camera.
3       Q.   Where were you when Heather made
4   this statement to you?
5       A.   Right up outside of my car.  I was
6   standing outside of my car.
7       Q.   And were you facing the facility,
8   the AMSA facility?
9       A.   I believe I was facing -- her back
10  was towards it I believe.  I believe that's how
11  it was.  I don't recall.
12      Q.   And did she use that word
13  assaulted?
14      A.   I don't recall the exact words she
15  used.
16      Q.   Did she tell you specifically what
17  it was that he had done?
18      A.   He had not at that time, no.  I'm
19  sorry.
20      Q.   Did she appear upset to you?
21      A.   Yes.
22      Q.   Can you describe her appearance
23  that led you to believe she was upset?
24      A.   The way her voice sounded like she

1  really -- she didn't really say anything else.
2  I don't know what she was thinking of.
3      Q.    Did you agree to go back in with
4  her?
5      A.    I asked her if it was okay because
6  I wasn't scheduled to work, she said don't worry
7  about it.
8      Q.    How long was it that you were in
9  the parking lot with Heather having this
10 conversation?
11     A.    Ten minute tops possibly, I'm not
12 positive though.
13     Q.    And then the two of you went into
14 back into the facility together?
15     A.    Yes, he let us back in.
16     Q.    When you say he let us back in --
17     A.    He has to buzz -- we went to the
18 building you can't just walk in, you have to be
19 buzzed.
20     Q.    Did he come to the door?
21     A.    No, it's a buzz over by the desk.
22 He doesn't come to the door.
23     Q.    What did you do when you went into
24 the facility?

1  dispatch desk someone was sitting in that chair.

2      Q.    Someone sitting at the dispatch
3  desk?

4      A.    They were using the chair. They
5  weren't actually at the desk, they turned that
6  chair I believe.

7      Q.    Did you have any conversations with
8  Tony at that time?

9      A.    I don't remember.

10      Q.    How long was it that you were all
11  in that dispatch area, or the area in front of
12  the vault room?

13      A.    I don't remember. I can't say a
14  specific time because I don't remember how long
15  it was.

16      Q.    Was it more than an hour?

17      A.    I don't believe so.

18      Q.    Was it more than a half hour?

19      A.    Maybe a half hour. I really don't
20  remember how long I was there for.

21      Q.    During the time that you were in
22  the facility was there any conversation between
23  Tony and Heather that was non-work related? And
24  by that I mean any conversation other than Tony

CHRISTINA PARROTT
December 16, 2004

Page 70

1    reading off names or Heather reading off names?
2        A.    Not that I remember.  I don't
3    remember.
4        Q.    Did Tony say anything to you when
5    you were in the facility?
6        A.    I asked if it was okay that I was
7    in there.  He said that was fine.  We didn't
8    really have a conversation, I just wanted to
9    make sure it was okay I was in the facility, and
10   I wouldn't be in trouble for it.
11       Q.    How did he appear to you?
12       A.    I don't know?
13             MR. MCLEOD:  Objection.
14             THE WITNESS:  I don't know how his
15       normal appearance is -- I don't.
16       Q.    (By Ms. Romantz)  Did anything seem
17   out of the ordinary?
18       A.    I don't think he was wearing his
19   glasses which he normally does, but I don't
20   recall.  It was so long ago I really don't
21   remember exactly.
22       Q.    Do you recall whether or not he was
23   wearing a holster with a gun?
24       A.    I believe so, but I'm not

CHRISTINA PARROTT
December 16, 2004

Page 71

1  positive. I don't remember. Normally they did
2  when they were in the building.
3     Q.    At any time while you were in the
4  parking lot with Heather did Tony ever come out
5  and join the two of you in conversation?
6         MR. MCLEOD:  Objection. Just so
7     we're clear we're talking about --
8         MS. ROMANTZ:  At any time that day.
9         MR. MCLEOD:  At any time that day?
10        THE WITNESS:  That day any time?
11 Yes, he did.
12    Q.    (By Ms. Romantz)  When was that?
13    A.    I don't recall which time it was,
14 but he did come out at one point and have a
15 cigarette. I think -- no, actually, can I
16 change something?
17    Q.    Sure.
18    A.    When we were having that
19 conversation he came out and had a cigarette and
20 we all went back in at the same time. He buzzed
21 us when we came back from lunch. Because he did
22 have a cigarette, and I know we were only out
23 there, that's what it was.
24    Q.    Okay.

Page 72

1  A. I know it's confusing.
2  Q. I understand it was a long time
3  ago.
4  A. It was a long time ago, but that's
5  what that was. He buzzed us in with lunch.
6  When we came back -- when I came back that
7  second time she was outside he came out for a
8  cigarette then we went in all at the same time.
9  Q. After did he come out at the same
10 time that Heather came out?
11 A. No, it was after.
12 Q. And had she already told you that
13 he had assaulted her?
14 A. Yes.
15 Q. And some time after that had she
16 asked you if you would return to work?
17 A. Yes, she had already asked me if I
18 would return to work.
19 Q. And he came out and had a
20 cigarette. Did he smoke a cigarette?
21 A. Yes.
22 Q. Did you smoke a cigarette?
23 A. I don't remember if I did or not.
24 Q. Do you smoke?

Page 143

1  at one point. I don't know what kind. I don't
2  remember, her mother took her.
3      Q.    And when she was pregnant with
4  Matthew did she appear to you to be kind of --
5  did she appear at all to be depressed or down?
6      A.    No, not that I...
7      Q.    How about after she had Matthew?
8      A.    Not right after she had Matthew,
9  no.
10     Q.    Now, you had testified that when
11 you went to AMSA on that day, May 19th, Tony let
12 you in, and he didn't say anything to you, like,
13 what are you doing here or anything like that;
14 right?
15     A.    From what I recall I don't remember
16 him saying anything.
17     Q.    Did he remind you it was against
18 the rules for you to be there if you weren't on
19 the schedule working?
20     A.    No.
21     Q.    So he didn't say anything about
22 that?
23     A.    No. I don't know if me or Heather
24 said okay I'm in here. I know somebody said it,

Page 144

1  but I don't remember if it was me or her.
2  That's fine, she can stay.
3         Q.      He said that?
4         A.      He said it was okay I was in there.
5         Q.      When you did go into AMSA do you
6  recall how Tony seemed to you, or how he
7  appeared to you?
8         A.      I remember at one point he wasn't
9  wearing his glasses, and I noticed he always
10 wears glasses.  But kind of quiet, he didn't
11 really say much.
12        Q.      Did he seem nervous?
13              MS. ROMANTZ:  Objection.
14              THE WITNESS:  I don't know if he
15        seemed nervous because I don't -- I would
16        say he was nervous, but I don't know if
17        that's how he was.  For me it was nervous.
18        Q.      (By Mr. McLeod)  Do you recall
19 testifying at the criminal trial that he seemed
20 nervous?
21        A.      Yes.
22        Q.      Was that testimony truthful?
23        A.      Yes.  Because of his behavior, what
24 I would think would be nervous for somebody.  It

Page 155

1  English is not Tony's first language?
2       A.    Yes.
3             MS. ROMANTZ:  No more questions.
4             MR. MCLEOD:  Neither do I.
5
6       (Deposition concluded at 1:14 p.m.)

Page 156

1    I, GAYLE OHMAN, a Notary Public in and for
2  the Commonwealth of Massachusetts, do hereby
3  certify that CHRISTINA PARROTT, appeared before
4  me, satisfactorily identified herself, on the
5  16th day of December, 2004, who was by me duly
6  sworn to testify to the truth and nothing but
7  the truth as to her knowledge touching and
8  concerning the matters in controversy in this
9  cause; that she was thereupon examined upon her
10 oath and said examination reduced to writing by
11 me; and that the statement is a true record of
12 the testimony given by the witness, to the best
13 of my knowledge and ability.
14    I further certify that I am not a relative
15 or employee of counsel/attorney for any of the
16 parties, nor a relative or employee of such
17 parties, nor am I financially interested in the
18 outcome of the action.
19    WITNESS MY HAND this 6th day of January,
20 2005.
21 *[signature: Gayle Ohman]*
22 Gayle Ohman           My Commission expires:
23 Notary Public         October 25, 2007
24

Page 157

1  Today's date:        January 6, 2004

2  To:                  Allison Romantz, Esq.

3  Copied to:           William McLeod, Esq.

4  From:                Gayle Ohman

5  Deposition of:       Christina Parrott

6  Taken:               December 16, 2004

7  Action:              HEATHER KIERNAN

8                       Vs. ARMORED MOTOR SERVICE, ET AL.

9  =========================================================

10     Enclosed is a copy of Ms. Parrott's
11 deposition. Pursuant to the Rules of Civil
12 Procedure, Ms. Parrott has thirty days to sign
13 the deposition from today's date.
14     Please have Ms. Parrott sign the enclosed
15 signature page. If there are any errors, please
16 have her mark the page, line and error on the
17 enclosed correction sheet. She should not mark
18 the transcript itself. The certification page
19 and addendum should be forwarded to all
20 interested parties.
21     Thank you for your cooperation in this
22 matter.

23

24

```
                                                      Page 158
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF MASSACHUSETTS
 3
 4                         C.A. No. 04-10131-RBC
 5
 6    ************************************
 7    HEATHER KIERNAN,                    *
 8              Plaintiff                 *
 9    vs.                                 *
10    ARMORED MOTOR SERVICE OF AMERICA,   *
11    INC., and FRANCESCO CIAMBRIELLO,    *
12              Defendants                *
13    ************************************
14
15         I, CHRISTINA PARROTT, do hereby certify,
16    under the pains and penalties of perjury, that
17    the foregoing testimony is true and accurate, to
18    the best of my knowledge and belief.
19         WITNESS MY HAND, this      day of       ,
20    2005.
21
22                       _____
23                       CHRISTINA PARROTT
24
```