# Exhibit E

Case 1:04-cv-10131-RBC   Document 63-8   Filed 02/27/2006   Page 1 of 15

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF MASSACHUSETTS

 3                    C.A. NO. 04-10131

 4

 5   * * * * * * * * * * * * * * * * * *

 6   HEATHER KIERNAN,                        *

 7              Plaintiff                    *

 8   vs.                                     *

 9   ARMORED MOTOR SERVICE OF AMERICA,       *

10   INC. AND FRANCESCO CIAMBRIELLO,         *

11              Defendants                   *

12   * * * * * * * * * * * * * * * * * *

13

14           DEPOSITION OF HEATHER L. KIERNAN

15              MORGAN, BROWN & JOY, LLP

16                   200 State Street

17                 Boston, Massachusetts

18           June 17, 2005      9:55 a.m.

19

20

21

22

23              Maryellen Coughlin

24          Registered Professional Reporter
```

Page 2

1  APPEARANCES:

2  Representing the Plaintiff:

3         McLEOD LAW OFFICES P.C.

4         77 Franklin Street

5         Boston, Massachusetts 02110

6         BY:   William J. McLeod, Esq.

7         (617) 542-2956   (617) 695-2778

8

9  Representing the Defendant Armored Motor Service

10 of America, Inc.:

11        MORGAN, BROWN & JOY, LLP

12        200 State Street, 11th Floor

13        Boston, Massachusetts 02109

14        BY:   Allison K. Romantz, Esq.

15        (617) 523-6666   (617) 788-5007

16

17 Representing the Defendant Francesco

18 Ciambriello:

19        LAW OFFICES OF DAVID R. ARDITO

20        Bates Building

21        7 North Main Street, Suite 215A

22        Attleboro, MA 02703

23        BY:   David R. Ardito, Esq.

24

**HEATHER L. KIERNAN**
**June 17, 2005**

```
                                                    Page 3
 1                        I N D E X

 2

 3    WITNESS:     HEATHER KIERNAN

 4

 5

 6    EXAMINATION:                                  Page

 7    BY MS. ROMANTZ                                  4

 8    BY MR. McLEOD                                 322

 9

10

11    EXHIBITS FOR IDENTIFICATION:

12    No.          Description                     Page

13      1    Document                                74

14      2    Document                                75

15      3    Document                               179

16      4    Document                               256

17      5    Document                               307

18

19

20

21

22

23

24
```

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

Page 4

1                P R O C E E D I N G S
2
3              MS. ROMANTZ:  Before we start,
4    should we all agree to the usual stipulations?
5              MR. McLEOD:  Mm-hmm.  She will read
6    and sign.
7              MS. ROMANTZ:  Read and sign.  All
8    objections, except those as to form and motions
9    to strike, reserved until the time of trial and
10   to waive signing --
11             MR. McLEOD:  Waive notary.
12             MS. ROMANTZ:  And to waive the
13   notary.
14
15                HEATHER L. KIERNAN,
16   having been first duly sworn, was examined
17   and testified as follows:
18
19                    EXAMINATION
20   BY MS. ROMANTZ:
21      Q.      Heather, I'm Allison Romantz.  I'm
22   the attorney for AMSA.  Let me tell you first
23   before we begin what the purpose of your
24   deposition is today.

1   Q.   And what exactly did you do?  Tell
2   me what you mean by data entry.
3   A.   Okay.  When the trucks came in, I
4   entered in the money amounts that they picked up
5   at different places like Shaw's and Stop & Shop.
6   Q.   Enter it into the computer?
7   A.   Yes.
8   Q.   Did your job entail anything else
9   other than entering that data into the computer?
10  A.   Verifying the money.
11  Q.   And what does that mean?
12  A.   Going into the vault and making
13  sure the money bags were there.
14  Q.   Okay.  What was your rate of pay?
15  A.   I believe $10 an hour.
16  Q.   And who took care of Matthew while
17  you were working?
18  A.   My husband.
19  Q.   And what was your plan as to what
20  you were going to do with Matthew once your
21  husband got a job and started working?
22  A.   Put him into day care.
23  Q.   When you started working at AMSA,
24  did you have any type of orientation?

1  plan in place if there was some type of armed
2  robbery or some type of attack on the facility?
3      A.   No.
4           MR. McLEOD:  Objection.
5      Q.   Did you understand while you were
6  working at AMSA that there were security systems
7  in place?
8      A.   No.
9      Q.   You didn't understand that?
10     A.   No.
11          MR. McLEOD:  Objection.
12     Q.   Did you ever see security cameras?
13     A.   Yes.
14     Q.   Okay.  And did you believe that
15 they were operational?
16          MR. McLEOD:  Objection.
17     A.   I didn't -- I don't know.
18     Q.   You don't know, okay.  Was there a
19 security system in place to get into the
20 facility?
21     A.   Yes.
22     Q.   And what was that?
23     A.   You had to be buzzed in and out of
24 the door.

1   Q.      Okay. Did anybody ever tell you
2   while you were working at AMSA how you were
3   suppose to contact the police while at work if
4   there was an emergency in the facility?
5   A.      No.
6   Q.      Were you aware that there were a
7   number of buttons located throughout AMSA's
8   facility that were connected to an alarm, a
9   silent alarm that would connect to the police in
10  the event that there was an emergency?
11          MR. McLEOD:  Objection.
12  A.      No, I wasn't.
13  Q.      You weren't aware of that?
14  A.      No.
15  Q.      Did you ever see any buttons on the
16  walls in AMSA's facility that had a label either
17  above them or below them which said "hold-up
18  button," or something to that effect?
19  A.      No.
20  Q.      You never saw any of those buttons?
21  A.      No.
22  Q.      Did you ever go into the vault?
23  A.      Occasionally.
24  Q.      Did you ever go into the money

1   Q.   With Jason Khoury?

2   A.   Yes.

3   Q.   Okay. And tell me about that.

4   A.   He asked me if I had been offended at all by some of the things that had been said by some of the people in my office, and I said -- I mean, I was a lifeguard, so I was kind of use to people talking like that, but he basically -- he wanted to make sure I wasn't offended by the ATM manager's, what he was talking about and stuff like that.

12  Q.   And when did that occur in relation to the start of your employment at AMSA?

14  A.   Approximately three weeks, maybe.

15  Q.   How did you respond to Mr. Khoury in response to the question as to whether or not you were offended?

18  A.   I told him that some of the things that were said were offensive but lots of things go on like that around me, and I just kind of brushed off, and I didn't dwell on it.

22  Q.   After that conversation, did those types of communications with the ATM manager in your presence cease?

Page 105

1  Q.  Okay. And are both of those
2  individuals armed?
3  A.  I believe so, yeah.
4  Q.  And you understand when I say armed
5  I mean have a gun --
6  A.  Yes.
7  Q.  -- on them? So they drive the
8  truck into the facility.
9  A.  (Witness nods.)
10 Q.  And how does the money get off the
11 truck and into the vault?
12 A.  The guys take it off the truck and
13 put it into a rolling cart.
14 Q.  And by "the guys," you mean the
15 people in the truck?
16 A.  Yes.
17 Q.  Okay. So they put it on to a
18 rolling cart, and what do they do with the cart?
19 A.  They roll it into the area -- I
20 think it's called the trap -- and they hand it
21 over through the trap door.
22 Q.  Okay. And is the trap door one of
23 these half doors?
24 A.  Yes.

Page 109

1   Q.   Okay. And on May -- and then once
2   that's done, you then take your chart and go
3   enter that data on to the computer?
4   A.   Yes.
5   Q.   And what does Tony do while you're
6   doing that?
7   A.   I'm not really sure what his
8   responsibilities were, but he really didn't do
9   anything.
10  Q.   Okay. And when the drivers have
11  fully emptied their rolling cart, what do they
12  do?
13  A.   They leave.
14  Q.   And do they take the truck out? Do
15  they, you know, get back in the truck and drive
16  the truck out?
17  A.   No.
18  Q.   They leave, they walk out? If you
19  know.
20  A.   I believe they get buzzed out. You
21  can't just walk out.
22  Q.   Okay. But they physically walk
23  out?
24  A.   Yeah.

Page 220

1  a breather, and I talked to them about it, and I
2  told them vaguely. I didn't get into details,
3  but I told them what happened.
4      Q.      Tell me specifically what it was
5  that you told them?
6      A.      I told them that I had been raped
7  at work.
8      Q.      Did you use that word raped?
9      A.      Yes.
10     Q.      And did you tell them how you had
11 been raped?
12     A.      No.
13     Q.      Did they ask?
14     A.      No.
15     Q.      Did you give them any details?
16     A.      Not really, no.
17     Q.      Okay. So you told them you had
18 been raped at work, what else?
19     A.      And that I didn't know what to do,
20 how to tell my husband. Excuse me. I didn't
21 know how to tell my husband because I was afraid
22 of his reaction.
23     Q.      Why would you be afraid of your
24 husband's reaction?

Page 221

```
 1        A.      'Cause I was raped.  I didn't know
 2   how to tell my husband I was raped, especially
 3   with an infant.
 4        Q.      While you were telling Mike and
 5   Christina, were you drinking alcohol?
 6        A.      I had a glass of wine.
 7        Q.      Okay.  Was Christina drinking
 8   alcohol?
 9        A.      No.
10        Q.      Was Mike drinking alcohol?
11        A.      I don't think so.  I don't know.
12        Q.      Were you drinking a glass of wine
13   from the wine that you had brought?
14        A.      Yes.
15        Q.      Did Mike appear intoxicated to you?
16        A.      No.
17        Q.      Did he tell you he had been
18   drinking alcohol all day?
19        A.      No.
20        Q.      Was the movie playing while you
21   were telling them that you had been raped at
22   work?
23        A.      Honestly, I really don't know what
24   was going on around me?
```

HEATHER L. KIERNAN
June 17, 2005

Page 322

1            EXAMINATION

2  BY MR. McLEOD:

3      Q.    Is there anyone else who could have
4  been the father of that child?

5      A.    No.

6      Q.    Thank you.

7            (Deposition suspended at 4:46 p.m.)

HEATHER L. KIERNAN
June 17, 2005

Page 323

C E R T I F I C A T E

I, Maryellen Coughlin, a Registered Professional Reporter and Notary Public of the State of Massachusetts, do hereby certify that the foregoing is a true and accurate transcript of my stenographic notes of the deposition of HEATHER L. KIERNAN, who appeared before me, satisfactorily identified themself, and was by me duly sworn, taken at the place and on the date hereinbefore set forth.

I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

*Maryellen Coughlin*
MARYELLEN COUGHLIN, RPR

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI