# Exhibit F

1

1          Volume:  I

2          Pages:  1-182

3          Exhibits:  1-5

4          UNITED STATES DISTRICT COURT

5          DISTRICT OF MASSACHUSETTS

6    - - - - - - - - - - - - - - - - - x

7    HEATHER KIERNAN,

8              Plaintiff,

9       v.                          CA No. 10131MLW

10   ARMORED MOTOR SERVICES OF AMERICA, INC.

11   And FRANCESCO CIAMBRIELLO,

12             Defendants.

13   - - - - - - - - - - - - - - - - - x

14

15        DEPOSITION OF FRANCESCO CIAMBRIELLO

16             Thursday, April 7, 2005

17                10:00 a.m.

18           McLeod Law Offices, P.C.

19             77 Franklin Street

20         Boston, Massachusetts  02110

21

22   Reporter:  Carol A. Pagliaro, CSR/RPR/RMR

23

24                              CERTIFIED ORIGINAL
                                LEGALINK BOSTON

2

```
 1    A P P E A R A N C E S:

 2              MCLEOD LAW OFFICES, P.C.

 3              By William J. McLeod, Esq.

 4              77 Franklin Street

 5              Boston, Massachusetts  02110

 6              617-542-2956

 7              Counsel for the Plaintiff

 8          MORGAN, BROWN & JOY LLP

 9              By Allison K. Romantz, Esq.

10              200 State Street

11              Boston, Massachusetts 02109

12              617-523-6666

13              Counsel for the Defendant

14              Armored Motor Services of America, Inc.

15          LAW OFFICE OF ATTY. DAVID R. ARDITO

16              By David R. Ardito, Esq.

17              Bates Building Suite 215A

18              7 North Main Street

19              Attleboro, Massachusetts  02703

20              508-431-2222

21              Counsel for the Defendant

22              Francesco Ciambriello

23

24
```

3

1                          I N D E X

2    EXAMINATION OF:                              PAGE

3    FRANCESCO CIAMBRIELLO

4    By Atty. McLeod                                   4

5

6

7

8

9

10

11                       E X H I B I T S

12   NO.                                        PAGE

13   1   Copy of the application submitted to

14       AMSA                                   40

15   2   Introductory Period Memo              48

16   3   Smoking Policy                        53

17   4   Sexual Harassment Policy               56

18   5   Attleboro Police Department Statement

19       of Rights                            155

20

21

22     *Original exhibits attached to original

23   transcript.

24

Francesco Ciambriello

04/07/2005

4

1                    P R O C E E D I N G S

2                        Stipulation

3              It is stipulated by and between counsel

4    for the respective parties that Motions to strike

5    and objections, except those as to form, are

6    reserved until the time of trial.  It is further

7    stipulated that the witness may sign the deposition

8    under the pains and penalties of perjury, rather

9    than before a notary public, within 30 days of

10   receipt by his attorney.

11                   FRANCESCO CIAMBRIELLO

12   a witness called for examination by counsel for the

13   Plaintiff, being first duly sworn, was examined and

14   testified as follows:

15                   DIRECT EXAMINATION

16       BY ATTY. MCLEOD:

17       Q.   Could state your name for the record,

18   please?

19       A.   Francesco Ciambriello.

20       Q.   And because I have seen it spelled

21   differently, and it could be my fault, too, could

22   you please spell your first name for me?

23       A.   The first name is F R A N C -- S C E -- S

24   O -- C O, something like...

50

1      English?

2           A.    Nothing.

3           Q.    Nothing.  How did you learn?

4           A.    Talk to people, read a little bit of paper.

5           Q.    No formal training?

6           A.    No.

7           Q.    Have you ever taken English classes here in

8      the U.S.

9           A.    No.

10          Q.    How would you describe your reading, your

11     English reading skills?

12          A.    Bad.

13          Q.    Do you read the paper?

14          A.    Yes.

15          Q.    English paper?

16          A.    Yes.

17          Q.    Do you read English books, English written

18     -- books in English?

19          A.    No, just newspaper.

20          Q.    When you say it's bad, can you tell me what

21     you mean when you say it's bad?

22          A.    A lot of time I read some words that I don't

23     understand what it means.

24          Q.    Is it fair to say that that is not

Francesco Ciambriello
04/07/2005

51

1    information you tend to volunteer to people?  Do you

2    know what I mean?

3        A.  I don't understand the question.

4        Q.  Without being asked do you tell people that

5    you have, in your words, bad English skills?

6        A.  Yes.

7        Q.  You do?

8        A.  Yes.

9        Q.  Without being asked?

10       A.  Yes.

11       Q.  Did you tell AMSA you had bad English

12   skills?

13       A.  No.

14       Q.  Was Loomis Wells Fargo aware that you had,

15   in your words, bad English skills?

16            ATTY. ROMANTZ:  Objection.

17       Q.  Did you tell them?

18       A.  No.

19       Q.  Are you a citizen of the U.S.

20       A.  Yes.

21       Q.  When did you become a citizen?

22       A.  '78 or '79.

23       Q.  There is like an exam, so to speak, when you

24   are becoming a citizen, isn't there?

Francesco Ciambriello                                          04/07/2005

57

```
1         A.   Yes.
2         Q.   And the date that appears, 3/29/01, is that
3    in your handwriting?
4         A.   Yes.
5         Q.   Drawing your attention back to Exhibit 2,
6    which was the Introductory Period Memo, were Exhibit
7    4 and Exhibit 2 signed by you on the same day?
8         A.   Yes.
9         Q.   And did you understand Exhibit 4 when you
10   signed it?
11        A.   Yes.
12        Q.   Was anything explained to you about the
13   content of Exhibit 4 before you signed it?
14        A.   No.
15        Q.   Did you have any discussions with anybody
16   about the information that is contained in Exhibit
17   4?
18        A.   No.
19        Q.   Did you ever have any questions about what
20   you were signing when you signed Exhibit 4?
21        A.   No.
22        Q.   When you were at Wells Fargo were you
23   required to sign any document with regard to sexual
24   harassment?
```

68

1      A.  Yes, boring.

2      Q.  Is there a place that you would typically

3   hang out or would you, during that 4 or 5 hour

4   period, just kind of sit in one location?

5      A.  Yes, sit by the phone.

6      Q.  So after everyone left, after all the

7   drivers and messengers went out, you were alone for

8   about 4 or 5 hours, and then Heather Kiernan showed

9   up to work?

10     A.  Yes.

11     Q.  What was she wearing that day?

12     A.  I don't remember.

13     Q.  Prior to that day had you ever had any

14   discussion with her about her having a baby?

15     A.  No.

16     Q.  Ever have any discussions with her about her

17   husband prior to that day?

18     A.  Yes.

19     Q.  So what discussions did you have with her

20   prior to that day about her and her husband?

21     A.  She was telling me the husband no love her,

22   he no take care of her, he is really bad, watching

23   video porn, smoke pot.

24     Q.  She was saying these things about her

1    husband?

2        A.   To me, yes.  And she said she wasn't happy

3    and he never make her happy.

4        Q.   Anything else?

5        A.   And she want a divorce, and she goes over to

6    Jason Khoury, tell him all the time she want a

7    divorce.

8        Q.   She did, she told Jason Khoury she wanted a

9    divorce?

10       A.   She wanted a divorce because she no happy,

11   husband no take care of her.

12       Q.   Was there anything else that she discussed

13   with you about her marriage?

14       A.   Yes.

15       Q.   What else?

16       A.   He watch porn all the time and then he jerk

17   off.

18       Q.   So she talked about him watching pornography

19   and masturbating?

20       A.   Yes, and he no pay attention to her.

21       Q.   Did she ever talk about her son?

22       A.   Yes.

23       Q.   What did she say about him?

24       A.   She asked me a couple of times if she has a

70

1    divorce if she can take the baby.

2        Q.   Anything else?

3        A.   She tell me she smoke pot, you know.

4        Q.   Was there anything else that Heather

5    discussed about her personal life with you?

6        A.   No.

7        Q.   Did you know how old her son was?

8        A.   No.

9        Q.   Did she talk about anything about her

10   husband not working?

11       A.   Yes.

12       Q.   What did she say about that?

13       A.   She said her husband he doesn't have a job,

14   he no work, he is home all the time, he is a lazy

15   bum, he can't find a job.

16       Q.   Did she say anything about why she was

17   working?

18       A.   No.

19       Q.   Did she ever say anything about what it was

20   like to have a baby?

21       A.   No, no.

22       Q.   Did you two ever have any physical contact

23   prior to May 19, 2001?

24       A.   Physical contact, yes.

1        A.   She went in the break room, she stand there

2    for a little while.  I was with the soda machine

3    getting myself a soda.  I ask him if she wanted

4    soda.  She said, No, I'm all set.  Then I go back in

5    the counter and that was it.

6        Q.   What time of day was this?

7        A.   It could have been maybe 4:00.

8        Q.   What happened next that day?

9        A.   What happening?

10        Q.   Yes, what happened next?

11        A.   We back in the area, she made a phone call,

12    call her friend.

13        Q.   Who was that, do you know?

14        A.   I believe it's Christine.  She talked to

15    Christine.  She said she coming over, if she wanted

16    to go get a bottle of wine, and Christine coming

17    over --

18        Q.   Now do you know Christine?

19        A.   Yes, she work over there.  She work in the

20    money room.  She worked Monday through Friday.

21        Q.   She worked with you when you were there?

22        A.   No.

23        Q.   Did she have a different shift?

24        A.   It's a different area.

127

1        A.   Yes.

2        Q.   Prior to this time, prior to that day, had

3    you ever touched a woman at work like you had

4    touched Heather that day?

5        A.   No.

6        Q.   No?

7        A.   Never.

8        Q.   And when you signed what's been marked as

9    Exhibit 4, the Sexual Harassment Policy, you read it

10   before you signed it, right?

11       A.   Yes.

12       Q.   And you understood it?

13       A.   Yes.

14       Q.   So let me ask you, Did you think that it was

15   appropriate for you to be touching Heather the way

16   you did that day?

17            ATTY. ROMANTZ:   Objection.

18       A.   We decided the both of us, so I had no

19   problem, because wasn't just my idea, it was both my

20   idea, so this has nothing to do with that.

21       Q.   Well prior to the touching you two were

22   having discussion about her husband's sexual

23   behavior, weren't you?

24       A.   Yes.

132

1       Q.   But did you want it to stop?

2       A.   Yes.

3       Q.   You did?

4       A.   Yes.

5       Q.   Is that why you went to Chris to talk to him

6    about it, because you wanted it to stop?

7       A.   No, I wanted Heather have a little bit of

8    clean mouth.

9       Q.   You wanted her to stop talking about her

10   husband?

11      A.   Yes.

12      Q.   Was there anything else that you wanted

13   Heather to stop doing which is why you went to

14   Chris?

15      A.   That's the only reason I went to Chris.

16      Q.   Because you wanted her to stop talking about

17   her husband?

18      A.   Yes.

19      Q.   Was it about her husband in general or was

20   it just about the sexual things that she was talking

21   about with you that you wanted to stop?

22      A.   In general.

23      Q.   In general.  You wanted her to stop in

24   general talking about her husband.  So if she came

Francesco Ciambriello

04/07/2005

180

1    A.   No.

2              ATTY. McLEOD:   I don't have any other

3    questions at this time.   Based on the issues with

4    the joint defense agreement that has just been

5    raised, I will suspend, in the event that I'm able

6    to get further inquiry on the meeting that took

7    place yesterday, but other than that I think we are

8    done.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    C E R T I F I C A T E

2    I, FRANCESCO CAMBRIELLO, do hereby certify that I

3    have read the foregoing transcript of my testimony,

4    and further certify that said transcript is a true

5    and accurate record of said testimony (with the

6    exception of the following corrections listed

7    below):

8    Page     Line              Correction/Reason

9    _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17

18

19       Signed under the pains and penalties of perjury

20   this _____ day of _____, 2005.

21

22                        _____

23                        FRANCESCO CAMBRIELLO

24

Francesco Ciambriello

04/07/2005

182

1  Commonwealth of Massachusetts

2  Suffolk, ss.

3      I, Carol A. Pagliaro, Registered Professional

4  Reporter and Notary Public in and for the

5  Commonwealth of Massachusetts, do hereby certify

6  that FRANCESCO CAMBRIELLO, the witness whose

7  deposition is hereinbefore set forth, was duly sworn

8  by me and that such deposition is a true record of

9  the testimony given by the witness to the best of my

10  skill and ability.

11      I further certify that I am neither related to,

12  nor employed by, any of the parties in or counsel to

13  this action, nor am I financially interested in the

14  outcome of this action.

15      In witness whereof, I have hereunto set my hand

16  and seal this 25th day of April, 2005.

17

18

19  _Carol A. Pagliaro_                    CERTIFIED ORIGINAL
                                          LEGALINK BOSTON
20

21  Carol A. Pagliaro, RMR

22  Notary Public

23  CSR No. 123293

24  My commission expires April 28, 2011