UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **HEATHER KIERNAN,**<br>　　Plaintiff,<br><br>　　　　　　　　v.<br><br>**ARMORED MOTOR SERVICES OF AMERICA, INC. and FRANCISCO CIAMBRIELLO,**<br>　　Defendants. | Civil Action No. 04-10131RBC |

**DEFENDANT AMSA'S OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS AND BIFURCATION FOR SPOLIATION OF EVIDENCE**

**I.     Introduction**

Defendant Armored Motor Services, Inc. ("AMSA") submits this Opposition to Plaintiff's Motion for Sanctions and Request for Bifurcation for Spoliation of Evidence (hereinafter "Opposition").  Recognizing that her credibility at trial is likely to be significantly impaired by the numerous lies that she has admitted to making, both to the police during the criminal investigation into her claim of sexual assault and while under oath at deposition in this case, Plaintiff Heather Kiernan ("Plaintiff" or "Ms. Kiernan") seeks to have sanctions imposed against AMSA based on: 1) the loss of three security videotapes from AMSA's Attleboro facility from May 19, 2001 when Plaintiff alleges that she was sexually assaulted on AMSA's premises by Francisco Ciambriello ("Mr. Ciambriello"); and 2) based on AMSA's failure to preserve videotapes from dates earlier than May 19, 2001 when Plaintiff and Mr. Ciambriello worked together.  Much as Plaintiff would like to pin the blame for the loss of the May 19, 2001 videotapes on AMSA, the pertinent and undisputed record evidence shows that it was an

assistant district attorney who was responsible for the loss of the videotapes, not AMSA. In regard to AMSA's failure to preserve videotapes from earlier dates, AMSA submits that those videotapes are wholly irrelevant to her claim of sexual harassment and AMSA had no obligation to preserve them.

Moreover, while the loss of the three May 19, 2001 videotapes is unfortunate for all involved[1], Plaintiff is in no way prejudiced by their loss. The only relevant images contained on the lost tapes was a two to three second view of Plaintiff and Mr. Ciambriello walking down the hallway from the money room toward the branch manager's office taken from one of the security cameras in the hallway[2]. Importantly, the walk down this hallway was captured by a second security camera albeit from a different angle. That videotape is available to be shown to the factfinder at the trial of this matter.

## II.     Record Facts Relevant to Plaintiff's Spoliation Claim

Plaintiff has brought a sexual harassment claim against AMSA under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. and M.G.L. C. 151B based on an alleged sexual assault which occurred at AMSA's Attleboro facility on May 19, 2001. Plaintiff alleges that Mr. Ciambriello, first sexually assaulted her in the dispatch area of the facility where they were waiting for AMSA's trucks to return to the facility to deliver money that had been collected

---

[1] Mr. Ciambriello believes that the lost videotapes contained exculpatory evidence which showed that Plaintiff was not forced into the office where the alleged sexual assault occurred but rather went into the office voluntarily. Mr. Ciambriello filed a motion to dismiss the criminal charges against him based on the loss of the videotapes. That motion to dismiss was denied by the Bristol County Superior Court.

[2] This portion of the videotape is relevant because Plaintiff has always claimed that she was physically forced into the branch manager's office. While Plaintiff originally claimed that she was "dragged" by Mr. Ciambriello into the office, she later admitted that that characterization was an embellishment and that she was simply escorted into the office by Mr. Ciambriello.

2

from AMSA's customers and that Mr. Ciambriello then forced her down the hall into the branch manager's office where he continued the sexual assault upon her. *(Complaint, ¶¶ 12 and 13).*

Because AMSA had a sophisticated state-of-the-art security system at the Attleboro facility that included multiple security cameras scattered throughout the facility, Plaintiff asserts that videotapes both from May 19, 2001 and earlier dates when she worked with Mr. Ciambriello[3] would show that that she did not consent to any sexual conduct that occurred on May 19, 2001.  However, a determination of whether Plaintiff consented to Mr. Ciambriello's amorous advances on May 19, 2001 will, by necessity, be determined by the factfinder through an evaluation of Plaintiff and Mr. Ciambriello's credibility as the first part of the alleged May 19, 2001 sexual assault occurred in an area of the dispatch room that was out of the camera's range, (s*ee Declaration of Jason Khoury (hereinafter "Khoury Decl.") attached as Exhibit A, at ¶¶ 6 and 9)* and the branch manager's office, where the second part of the alleged sexual assault occurred, was not equipped with a security camera. (*Khoury Decl. at ¶ 10).*

After the alleged sexual assault, Plaintiff continued working until the end of her shift, then she and her friend/co-worker Christina Parrot, went to visit another friend/co-worker at his home in Rhode Island before eventually returning home and reporting the alleged sexual assault to her husband.  Her husband then contacted the Attleboro police.  *(Deposition of Heather Kiernan (hereinafter "Kiernan Dep.") attached as Exhibit B at pp. 211-30).*

In the early morning hours of May 20, 2001, several members of the Attleboro police department went to AMSA's Attleboro facility to investigate.  *(Deposition of John Otrando,*

---

[3]   In addition to complaining about the three videotapes from May 19, 2001 that were misplaced, Plaintiff also appears to be complaining about AMSA's failure to preserve videotapes from all of the other shifts where Plaintiff and Mr. Ciambriello ever worked together.  *(See Plaintiff's Memorandum of Law, at p. 12).*   For reasons discussed in the Argument section, supra, AMSA did not preserve any of the videotapes from the earlier dates when Plaintiff and Mr. Ciambriello worked together.

*(hereinafter "Otrando Dep.") at p. 15, attached as Exhibit C)*. The police investigation centered around reviewing AMSA's security videotapes from the time when the sexual assault allegedly occurred. *(Id. at pp. 16, 22, 24, 35-35)*. Video images from different cameras located within and outside the facility at the relevant time were preserved on six separate videotapes, with each video tape containing multiple camera views. After viewing the videotapes, the Attleboro police took possession of three of the six videotapes as potential evidence in its criminal investigation. *(Otrando Dep. at pp. 37, 39 and 46)*. Because this was a criminal investigation of a serious nature, because AMSA had no reason on May 20, 2001 to believe that civil litigation against it might result from the alleged sexual assault and because AMSA believed that the tapes would remain secure in the custody of the police and that the police would take all necessary steps to preserve the tapes, AMSA allowed the Attleboro police to take these three tapes without objection. (*Deposition of Edward O'Brien hereinafter "O'Brien Dep.") at pp. 49-50, attached as Exhibit D)*. AMSA took steps at that time to preserve the remaining three videotapes from May 19, 2001 in a safe location (*Khoury Decl., at ¶ 12)*.

On August 17, 2001, Detective Otrando returned to the Attleboro facility with a subpoena for the remaining three videotapes. *(Otrando Dep. at pp. 40-41, 44)*. AMSA obtained a "receipt" from Detective Otrando after turning over the three remaining videotapes to the police. On the receipt, Detective Otrando acknowledged that as of that date, the Attleboro police were in possession of all six videotapes from May 19, 2001. (*See Receipt from Detective Otrando, attached as Exhibit E.)* AMSA continued to believe on August 17, 2001 that the police would take all appropriate and necessary steps to safeguard the six videotapes. (*See Khoury Decl. at ¶ 14)*.

In December, 2002, as the Bristol County District Attorney and Mr. Ciambriello's criminal defense counsel were preparing for the criminal trial of Mr. Ciambriello, a request was made to AMSA that the lawyers involved in the criminal case be permitted to come to AMSA's Attleboro facility to view the six videotapes because neither the District Attorney's Office nor defense counsel had the equipment necessary to view the videotapes. *(Otrando Dep. at p. 76).* Although it had no legal obligation to permit the lawyers in the criminal case to use its equipment to view the videotapes, AMSA readily assented to that request. *(O'Brien Dep. at p. 67).* On the agreed upon date, Christopher Abreu ("Mr. Abreu"), a Bristol County Assistant District Attorney and David Ardito ("Mr. Ardito"), Mr. Ciambriello's criminal defense attorney, came to the Attleboro facility to view the tapes. Mr. Abreu brought the videotapes with him which had been obtained from the police. (*Deposition of Christopher Abreu (hereinafter "Abreu Dep.") at pp. 12-14 attached as Exhibit F).*

Mr. Abreu and Mr. Ardito viewed the tapes in AMSA's security room with the assistance of Jason Khoury, AMSA's Attleboro branch manager and Edward O'Brien, AMSA's Director of Security. *(O'Brien Dep. at pp. 75-77).* One particular "scene" on one of the tapes caught the attention of the parties. As Mr. Ciambriello and Plaintiff were walking down a hallway to the branch manager's office, the camera picked up some very faint audio. Mr. Abreu believed that the audio was of Plaintiff stating "I'm not going in there" in an apparent reference to the branch manager's office. (*Abreu Dep. at p. 35).* Mr. O'Brien believed that the Plaintiff's statement captured on the audiotape was the more ambiguous "I don't want to go back there now." (*O'Brien Dep. at p. 59).* Another camera in the same hallway also caught Plaintiff and Mr. Ciambriello on tape but from a different angle. *(Abreu Dep. at pp. 87-89).*

5

There was no discussion between the lawyers and Mssrs. Khoury and O'Brien about leaving the videotapes at AMSA in order for AMSA to make copies of the videotapes. *(Khoury Decl. at ¶ 17; Abreu Dep. at p. 55).* Indeed, Mr. Abreu acknowledged that he never would have left the tapes at AMSA unless he had been specifically instructed to do so by his superiors in the District Attorney's Office because there would have been no way to ensure that the tapes were not tampered with once they left the custody of his office. (*Abreu Dep. at pp. 80-82).* Moreover, Mr. Abreu noted that if he had left the videotapes, the proper protocol would have been for him to issue a receipt to AMSA reflecting that fact. (*Abreu Dep. at pp. 55, 82-83).*

After viewing the videotapes, Mr. Abreu and Mr. Ardito departed. Mr. Abreu testified that in his normal course, he would have returned the videos to the office of the Assistant District Attorney who had been assigned to handle the case for the Commonwealth[4]. (*Abreu Dep. at p. 18).*

At some point after December, 2002, the Bristol County District Attorney's Office discovered that it could only locate three of the six videotapes from May 19, 2001. After searching its offices, the District Attorney's Office contacted AMSA to inquire as to whether Assistant District Attorney Abreu had mistakenly left three of the videotapes at AMSA when he had been at the facility to view the tapes. Although Mr. Khoury believes that he would have noticed after Mr. Abreu left, if Mr. Abreu had mistakenly left the videotapes at AMSA, Mr. Khoury nevertheless did a painstakingly thorough search of the entire Attleboro building after being contacted by the District Attorney's Office and was not able to find the missing video tapes. (*Khoury Decl. at ¶¶ 19 and 20).*

---

[4] Mr. Abreu was not the assistant district attorney assigned to the case. He was simply filling in for that assistant district attorney who had been unable to go to AMSA to view the videotapes on the scheduled day. (*Abreu Dep. at p. 8* ).

6

Upon learning that three of the videotapes had been misplaced by the District Attorney's Office, Mr. Ciambriello filed a motion with the Superior Court seeking to have the criminal indictment against him dismissed based on the loss of what he asserted was exculpatory evidence. (*See Motion and Supporting Memorandum of Law filed by Francesco Ciambriello seeking dismissal of criminal charges against him, attached hereto as Exhibit G*). The Commonwealth opposed that motion and argued that despite the loss of the three videotapes, Mr. Ciambriello was not prejudiced because the individuals who had viewed those missing tapes could testify as to what they had observed on the tapes. (*See Opposition to Mr. Ciambriello's Motion to Dismiss, attached hereto as Exhibit H*). The court denied the motion to dismiss the indictment *(see Exhibit I)* and the criminal case proceeded to trial on November 19 and 20, 2003.

At the conclusion of the criminal trial, the jury found Mr. Ciambriello not guilty on the more serious charge of rape. The jury was unable to reach a verdict on the remaining charge of indecent sexual assault and battery. After the Court dismissed the jury, the Commonwealth proposed and Mr. Ciambriello agreed to plead guilty to a misdemeanor assault and battery charge. *(See transcript of Francesco Ciambriello's plea to simple assault and battery, attached hereto as Exhibit J).*

### III.     Plaintiff's Motion for Sanctions Based on Spoliation of Evidence

Like Mr. Ciambriello, Plaintiff claims that she too is prejudiced by the loss of the three videotapes. Plaintiff argues that AMSA should be precluded at trial from offering any oral testimony that the physical contact between her and Mr. Ciambriello on May 19, 2001 was consensual based on this loss: 1) because AMSA failed to preserve videotapes from earlier dates when Mr. Ciambriello and Plaintiff worked together in which Mr. Ciambriello has claimed he had discussions with Plaintiff in which she spoke disparagingly of her husband and her

7

husband's sexual activity, (*See Plaintiff's Memorandum of Law in Support of Her Motion for Sanctions, at p. 12);* and 2) because Plaintiff believes it was AMSA, and not the Bristol County District Attorney's Office, that was responsible for losing the three videotapes from May 19, 2001. (*Id., at p 13-15*).

IV.     <u>Argument</u>

It is undisputed that the issue of whether Plaintiff consented to the sexual contact with Mr. Ciambriello on May 19, 2001 is one of the seminal issues in dispute. While Mr. Ciambriello admits that there was some sexual contact between himself and Plaintiff on May 19, 2001, he claims that such contact was limited to hugging and kissing and was consented to by Plaintiff. *(See Deposition of Francesco Ciambriello (hereinafter "Ciambriello Dep.") at pp. 109-12, attached hereto as Exhibit K).* Plaintiff alleges that the sexual contact between the two was much more significant and unwelcome. (*Kiernan Dep. at pp. 136-66).* Because Plaintiff believes that AMSA's security cameras would have caught her interactions with Mr. Ciambriello on tape and would be relevant to the issue of consent, she argues that AMSA should be held responsible for the fact that these purported videotapes are not available.

   A.     **AMSA Was Not Required to Preserve Videotapes from Dates Before May 19, 2001 When Plaintiff and Mr. Ciambriello Worked Together**

Plaintiff's argument for sanctions as it relates to AMSA's failure to preserve videotapes from dates earlier than May 19, 2001 is convoluted. Essentially, her argument is that because Mr. Ciambriello testified at his deposition that while working together prior to May 19, 2001, Plaintiff had "initiated sexual conversation, spoke ill of her husband, and complained that her husband did not work, was home all the time, was a 'lazy bum' and that he would 'watch porn all the time and then . . . jerk off" *(Plaintiff's Memo of Law, pp. 11-12)*, and because Plaintiff

8

assumes (without any factual basis to support that assumption) that those conversations must have been recorded by AMSA's security cameras, Mr. Ciambriello should have sought to have AMSA preserve those tapes[5] so that he could use them at his criminal trial to support his defense of consent.  Plaintiff argues that his failure to do so (which she presumably believes resulted in AMSA failing to preserve those tapes) now requires the Court to issue sanctions against AMSA precluding it from arguing at trial that the sexual contact between herself and Mr. Ciambriello on May 19, 2001 was consensual.

This argument is flawed in several respects.  First, it assumes (without any evidence to support that assumption) that these conversations alleged by Mr. Ciambriello to have occurred between himself and Plaintiff at times prior to May 19, 2001 were captured by AMSA's security cameras.  However, AMSA's security cameras did not capture every space in AMSA's facility but were focused on certain locations such as the vault and the money room.  It is unclear where within AMSA's facility that Mr. Ciambriello claims these conversations took place, but unless they occurred while he and Ms. Kiernan were standing directly in the sight line of a security camera, it is unlikely that they were captured on video.  Moreover, the audio capabilities of AMSA's security system was extremely limited and the audio that did exist was often unintelligible. *(Khoury Decl. at ¶ 5).*  Thus, even assuming that these alleged conversations occurred in the sight line of a security camera, there is a strong likelihood that the camera would have filmed images but have no accompanying audio.  Given that Mr. Ciambriello's testimony was that these were simply oral discussions between the two of them, an image of Mr.

---

[5]   AMSA used six videotapes to record its cameras for every 24 hour period.  At the end of the 24 hour period, all of the videotapes were taken out of the video records and replaced with six new tapes.  The removed tapes were then labeled and stored for 90 days.  After 90 days, if AMSA knew of no reason to preserve the tapes, they were used again and the video images on those tapes were taped over by new images.  (*Khoury Decl. at ¶¶ 4 and 23).*

Ciambriello and Plaintiff conversing with no audio would be wholly useless as it would be impossible to know what the parties were saying.

Second, unless Mr. Ciambriello had informed AMSA within 60 days after May 19, 2001[6] that there may be videotapes from dates earlier than May 19, 2001 which would show he and Plaintiff having conversations about her husband's sexual proclivities or lack of employment, AMSA would have had no reason to review and preserve videotapes from other dates when Mr. Ciambriello and Plaintiff worked together.  There is no evidence in the record that Mr. Ciambriello or his counsel made such a request and thus, AMSA would have had no knowledge that such conversations might have been captured on its videotapes and that it was therefore necessary to review those tapes prior to recycling them.

Finally, and most importantly, even if such conversations had been recorded by AMSA's security cameras, they would have absolutely no bearing on the issue of Plaintiff's consent on May 19, 2001.  That Plaintiff may have disclosed to Mr. Ciambriello prior to May 19, 2001 that her husband watched pornography and masturbated or that she was unhappy with her husband's unemployment status simply is irrelevant to the question whether she consented to sexual contact with Mr. Ciambriello on May 19, 2001.

> **B.    Plaintiff's Argument That Ciambriello And AMSA Made No Effort to Preserve Video From the Dispatch Area on May 19, 2001 is Factually Incorrect.**

Plaintiff also argues that sanctions should be imposed against AMSA because Mr. Ciambriello made no effort during the criminal proceedings for AMSA to preserve the videotapes from the dispatch area on May 19, 2001. *(Plaintiff's Memo of Law in Support of Sanctions, at pp. 12-13).*  Again, Plaintiff argues that Mr. Ciambriello (and AMSA) should have

---

[6]    AMSA's tapes were recycled every 90 days.  *(Khoury Decl. at ¶ 4).*  Since Plaintiff had worked for AMSA for approximately 30 days before the alleged sexual assault, the first tapes that AMSA would have had to review would have been taped approximately 60 days after May 19, 2001.

wanted to preserve the videotapes from the dispatch area because, if Mr. Ciambriello is to be believed, those tapes would have shown that Plaintiff was consenting to the shoulder massage that Mr. Ciambriello provided and that she orally consented to get up and go into the branch manager's office. *(Id.).* While AMSA does not disagree with Plaintiff that any videotapes showing Plaintiff and Mr. Ciambriello's interactions while in the dispatch area on May 19, 2001 would undoubtedly be relevant to the question of consent, Plaintiff is simply incorrect when she asserts that no efforts were made to preserve those videotaped images.

The undisputed fact is that AMSA did preserve all of the videotapes from May 19, 2001. However, three of those videotapes were confiscated by the Attleboro police as part of its investigation into Plaintiff's claim of rape on May 20, 2001 as potential evidence. The three remaining tapes were taken by the Attleboro police on August 17, 2001. *(See Exhibit E).* Surely Plaintiff is not suggesting that AMSA should have refused the police's "request" to take three videotapes into its possession on May 20, 2001 as doing so clearly would have impeded the criminal investigation that she claims was so important to her. Moreover, AMSA did take steps to preserve the remaining three videotapes after May 20, 2001 and in fact, did preserve them until they were subpoenaed by the police on August 17, 2001. However, once they were subpoenaed by the police, AMSA had no choice but to turn those tapes over to the police. That an assistant district attorney subsequently misplaced three of the tapes is not the fault of AMSA and AMSA can not be held responsible for that loss. *See Bouve & Mohr, LLC v. Banks*, 274 Ga.App. 758, 618 S.E.2d 650, 654 (2005)(sanctions may not be imposed against a litigant based on a third party's spoliation of evidence if the third party was not acting as the litigant's agent in destroying or failing to preserve the evidence.)

Moreover, what Plaintiff conveniently neglects to inform the Court is that even if the police had not misplaced the three videotapes, those videotapes would have done nothing to prove or disprove the question of consent. The unfortunate, but undisputed fact is that AMSA's security cameras simply did not record the interaction between Plaintiff and Mr. Ciambriello in the dispatch area because they were out of the sight line of the security camera while in the dispatch area. *(Otrando Dep. at p. 38; Khoury Decl. at ¶ 9).* Nor has there ever been any testimony by any person who reviewed those videotapes before they went missing to suggest that any conversation between Plaintiff and Mr. Ciambriello while in the dispatch area on May 19, 2001 was captured on audiotape. (*Otrando Dep. at pp. 26-27).*

      C.    **AMSA Is Not Responsible For the Loss of Three Videotapes on or After December 4, 2002**

Incredulously, Plaintiff argues with absolutely no evidentiary support that AMSA must be responsible for the loss of the three videotapes because they, along with the other tapes from May 19, 2001, were brought to AMSA's facility on December 4, 2002 by an assistant district attorney who has testified that he does not recall what he did with the videotapes after he viewed them at AMSA on that date. *(Abreu Dep. at pp. 46, 51, 106).* While Assistant District Attorney Abreu may have no memory of what he did with these tapes after he viewed them at AMSA, there is simply no evidence to support Plaintiff's fanciful assertion that they were intentionally left at AMSA for copying and that therefore AMSA became responsible for their preservation on or after December 4, 2002.

There is no dispute that Assistant District Attorney Abreu brought several of the videotapes to AMSA on or about December 4, 2002 to view them on AMSA's equipment. Nor is there any dispute that he viewed those tapes, with the assistance of branch manager, Jason Khoury, in AMSA's security office. After the viewing, there was no discussion by Assistant

12

District Attorney Abreu about returning the tapes to AMSA's control and possession and indeed, Assistant District Attorney Abreu testified that he would never have left the tapes at AMSA unless specifically instructed by his superiors to do so because by leaving them there, the chain of custody would have been broken. (*Abreu Dep. at p. 55*). Moreover, Assistant District Attorney Abreu testified that if he had left the tapes with AMSA, proper protocol would have required him to issue AMSA a receipt reflecting it was taking possession of the tapes, something he did not do. (*Id. at 55, 82-83*).

When the District Attorney's Office discovered that it could not locate three of the tapes from May 19, 2001, it contacted AMSA to see whether Assistant District Attorney Abreu might have accidentally left them at AMSA. Mr. Khoury did a painstakingly thorough search of AMSA's entire facility after learning that the tapes were missing and was unable to locate them anywhere in AMSA. (*Khoury Decl. at ¶¶ 20 and 21*). Thus, the undisputed facts show that the loss of the videotapes was due to the negligence of the District Attorney's Office, not AMSA and there is absolutely no evidence to support Plaintiff's contention that on December 4, 2002, three of the videotapes were intentionally transferred to AMSA's control and that thereafter AMSA was responsible for preserving them. *See Bouve & Mohr, LLC v. Banks*, 274 Ga.App. 758, 618 S.E.2d 650, 654 (2005)(sanctions may not be imposed against a litigant based on a third party's spoliation of evidence if the third party was not acting as the litigant's agent in destroying or failing to preserve the evidence.)

### D.   Bifurcation On The Issue of Spoliation Is Not Necessary

In the event that the Court declines to award Plaintiff sanctions now on the issue of spoliation, Plaintiff seeks to have the issue of spoliation bifurcated and tried before a trial on the merits of the case. AMSA opposes this request as it does not believe that there is sufficient

evidence of AMSA of either having destroyed evidence or being responsible for the destruction of crucial evidence to warrant an evidentiary hearing on spoliation. Much as Plaintiff would like to place the blame for the loss of the three videotapes on AMSA, there simply is no evidence to support or even suggest that AMSA bears any responsibility for the loss of these videotapes[7].

          Respectfully submitted,

          ARMORED MOTOR SERVICES OF AMERICA, INC.,

          By its attorneys,

          /s/ Allison Romantz
          Laurence J. Donoghue (BBO#130140)
          Allison K. Romantz (BBO#554909)
          MORGAN, BROWN & JOY LLP
          200 State Street
          Boston, MA 02109
          (617) 523-6666

**CERTIFICATE OF SERVICE**

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 3, 2006.

          /s/ Allison K. Romantz
          Allison K. Romantz

---

[7] AMSA intends to file a motion in limine at the appropriate time seeking to preclude the Plaintiff from offering any argument or testimony that suggests AMSA was in any way responsible for the destruction of the three missing videotapes.