# Exhibit C

```
                                              1
 1                           Volume:    I
 2                           Pages:     1-120
 3                           Exhibits:  1-5
 4            UNITED STATES DISTRICT COURT
 5             DISTRICT OF MASSACHUSETTS
 6                 NO. 04-10131 MLW
 7    - - - - - - - - - - - - - - - - - - - - -x
 8    Heather Kiernan,
 9                       Plaintiff,
10         v.
11    Armored Motor Service of America, Inc.
12    and Francesco Ciambriello,
13                       Defendants.
14    - - - - - - - - - - - - - - - - - - - - -x
15
16            DEPOSITION OF JOHN OTRANDO
17              Tuesday, May 24, 2005
18                   10:15 a.m.
19             MORGAN BROWN & JOY, LLP
20                 200 State Street
21         Boston, Massachusetts 02109-2605
22
23
24    Reporter:  Lori-Ann London, RPR
```

John Otrando                                            05/24/2005

15

| | | |
|---|---|---|
| 1 | Q | Okay. After you left the hospital, where did you go? |
| 3 | A | I went to Armored Motor Services of America on Walton Street. |
| 5 | Q | You went directly there? |
| 6 | A | Yes. |
| 7 | Q | And how long did that take you? |
| 8 | A | Approximately 10, 15 minutes. |
| 9 | Q | Did you go there alone? |
| 10 | A | No, I was with Officer Castro. |
| 11 | Q | Were you riding in the same vehicle? |
| 12 | A | No, he was assigned to the patrol division; he had his own car. |
| 14 | Q | So he followed you or did you follow him? |
| 16 | A | Either way. I'm not sure which. |
| 17 | Q | Okay. And did you meet somebody at Armored Motor Service when you arrived? |
| 19 | A | Yes, I did. |
| 20 | Q | Was somebody there immediately upon your arrival? |
| 22 | A | I'm not sure I met with somebody there. I may have waited in the parking lot or they may have been already present. I don't recall which. |

26

1   her -- at her desk speaking with her. It appeared
2   to be they were in conversation.
3           Other sections of the tape showed
4   Mr. Ciambriello and Heather Kiernan walking
5   through the money room. It appeared that
6   Mr. Ciambriello had his right arm around the back
7   of Ms. Kiernan. His right hand is positioned on
8   the right buttocks/waist area of her. It showed
9   them walking down the corridor. It showed
10  Miss Kiernan in front of Mr. Ciambriello, again,
11  with his hands on her waist. He's very close to
12  her and immediately behind her, and they enter
13  Jason Khoury's office.
14      Q   Okay. Just for the record, you're
15  referring to the police report which is marked as
16  Exhibit 1?
17      A   That's correct.
18      Q   Now, when you were monitoring the
19  videotape that showed Miss Kiernan located at her
20  -- sorry -- located at her workstation, could you
21  pick up any audio?
22      A   You can pick up audio, but at the time
23  we viewed these tapes there was a tone that was
24  coming through the speaker that you really

27

couldn't understand what was being said. It does pick up audio, but there was a ringing or a tone in the background, and you could not hear what the words were.

   Q   Who from the Attleboro Police Department placed a call to AMSA requesting entrance and the meeting in the early morning of May 20th, 2001?

   A   It was not me. It may have been the commanding officer at the time. If I could refer to the report.

   (Pause.)

   A   I'm not sure who made the initial call.

   Q   But it wasn't you?

   A   I don't believe it was me, no.

   Q   Do you know whether or not, when you arrived at the hospital, whether or not that call had already been made?

   A   I am not sure.

   Q   At what point did you become aware the call had been made?

   A   When I was at the hospital speaking with Officer Larsen, I was in contact with the station, and I believe they informed me that they had gotten a representative to go down there. This is

1   upset, concerned; that's to my best recollection.
2       Q   Okay. Did he -- did he -- I'm going to
3   turn this off. Did he appear -- did you have any
4   concerns about his actions that night that he
5   might --
6       A   No.
7       Q   -- take -- he might go after the alleged
8   attacker or anything like that?
9       A   No.
10      Q   Okay. Now, you looked at videotapes in
11  the video room -- we're back at AMSA now -- you
12  looked at videotapes in the video room, and that
13  process took approximately how long?
14      A   Approximately a half hour, approximate.
15      Q   Okay. And what happened after you
16  looked at the videotapes?
17      A   After speaking with everyone involved,
18  looking over the building and observing the tapes,
19  I had taken three of the tapes into evidence.
20      Q   Now -- and then you left the facility?
21      A   Yes.
22      Q   Okay. When you were viewing the tapes,
23  at any time did you see Mr. Ciambriello sitting
24  down with Miss Kiernan in the office area?

1    A    Yes.

2    Q    And did you view Mr. Ciambriello
3 touching or massaging her in any way?

4    A    In regards to touching, they were
5 walking down the hallway of the money room.  He
6 was to her left; he had his right arm around her
7 back in the waist/buttock area.  The best that I
8 recall it was a few seconds of tape that I
9 observed them pass by a camera that was in the
10 money room, it appeared to be mounted high, and
11 then walking down a hallway to go into Jason
12 Khoury's office.  He was in close proximity.  I
13 believe he had his hand on her, guiding her into
14 the office.

15    Q    My question, though, I was focussing on
16 the time when they were sitting down together.
17 Did you ever see him touching her?

18    A    Where they were seated at the dispatch
19 desk?

20    Q    Um-hm.

21    A    No, that was a tough angle because I
22 believe the camera was mounted high coming down,
23 and you really -- you might have seen the legs,
24 but you couldn't see what they were doing.  They

1    were both seated there, though.
2        Q    So you took three tapes that night?
3        A    Yes.
4        Q    Were they of three different angles?
5        A    No, they were -- I believe there are a
6    total of six tapes that are used. I had taken
7    three. I believe they were D, E, and F, and those
8    primarily were the angles that showed
9    Mr. Ciambriello walking with and guiding
10   Miss Kiernan through the -- the money room into
11   the back office, as well as I believe showed her
12   -- him speaking with her at her desk and outside
13   of the building as well.
14       Q    Okay. When you -- when you took the
15   tapes that night, you didn't have a warrant,
16   right?
17       A    That's correct.
18       Q    Okay. And did you leave a receipt or
19   anything for AMSA that night?
20       A    No, I did not.
21       Q    Okay.
22            MR. McLEOD:  If I could have this
23   marked, please.
24            (Document marked as Exhibit No. 3.)

40

1   Q   I'm placing before you what's being
2   marked as Exhibit 3. Do you recognize this
3   document?
4          (Document exhibited to witness.)
5   A   Yes, I do.
6   Q   What is it, please?
7   A   It is a receipt that I signed for six
8   tapes. It was given to me by I believe Jason
9   Khoury. That is, after I received -- I had taken
10  D, E, and F, and several days later I obtained
11  a -- I believe it was a subpoena from the district
12  attorney's office, and they handed over tapes A,
13  B, and C.
14  Q   Is this the only receipt that you signed
15  off on?
16  A   Yes.
17  Q   Is there any reason why you didn't give
18  AMSA a receipt on May -- on the morning of
19  May 20th?
20  A   No.
21  Q   Whose -- strike.
22         That's your signature that appears
23  at the bottom?
24  A   Yes.

John Otrando                                                05/24/2005

41

1   Q   Is there anything else on this document
2   that is in your handwriting?
3   A   The date.
4   Q   When you signed this document, it had
5   already been drafted for you?
6   A   Yes.
7   Q   And do you know who drafted it for you?
8   A   It was presented to me by Jason Khoury,
9   I believe. I am not sure. It wasn't drafted in
10  my presence, so I do not know who drafted it.
11  Q   Okay. Now -- and you said you had
12  obtained a subpoena in August of 2001 from the
13  district attorney's office?
14  A   Yes.
15  Q   It was a subpoena for those videotapes?
16  A   The remaining tapes, yes.
17  Q   The remaining three?
18  A   Yes.
19  Q   A, B, and C -- A, B, and C?
20  A   Yes, that's correct.
21  Q   Is it procedure when obtaining
22  materials, documents or things, via subpoena that
23  you leave a receipt?
24  A   I'm not sure what the proper procedure

John Otrando                                                  05/24/2005

                                                                      44

1    A    Correct.
2    Q    Okay. When you left AMSA's premises on
3  May 20th, 2001, did you have an understanding as
4  to what was on tapes A, B, and C?
5    A    No.
6    Q    How did you come to learn about the
7  existence of tapes A, B, and C?
8    A    I realized that there were six tapes in
9  all. In viewing the tapes that night, primarily
10 from what I was told by people present, that the
11 scenes that we were viewing that night were on D,
12 E, and F, so that's why I had taken tapes D, E,
13 and F and left A, B, and C.
14   Q    When did you first contact AMSA about
15 obtaining tapes A, B, and C?
16   A    I assume it was just prior to
17 August 17th. It was maybe a week or two prior to
18 that date.
19   Q    Okay. How did you go about serving the
20 subpoena on AMSA?
21   A    I responded -- I went to the front door,
22 I spoke with Jason Khoury, I gave him the subpoena
23 and he had handed me the receipt.
24   Q    He didn't let you in the facility?

John Otrando                                            05/24/2005

46

1    Q    And at the time you served the subpoena
2    you had no knowledge that they were represented by
3    counsel?
4    A    Not to my knowledge, no.
5    Q    When you left AMSA on the morning of May
6    20th, you had three videotapes in your possession,
7    correct?
8    A    I had picked up three videotapes that
9    afternoon, yes, I did.
10   Q    Okay.  The videotapes you take -- took
11   on the morning of May 20th, were they like in a
12   standard size VHS cassette?
13        MR. McLEOD:  And just for the
14   record, can we all agree that this is a standard
15   VHS cassette?
16        MR. DONOGHUE:  Yes.
17        MR. ARDITO:  Yes.
18   A    Yes.
19   Q    Where did you go when you left AMSA that
20   morning?
21   A    I went back to the station.
22   Q    Did you bring the tapes with you to the
23   station?
24   A    Yes, I did.

1   indicated that I had obtained custody of D, E, and
2   F; and that at some point I received a subpoena,
3   took custody of tapes A, B, and C.  A.D.A. Markey
4   requested those tapes.  I brought them up to New
5   Bedford to his office.  I received a call from him
6   several days later indicating that they were not
7   viewable.
8            He instructed me to contact AMSA to
9   set up a date and be there when the tapes would be
10  viewed with defense counsel.  I was then contacted
11  by A.D.A. Markey indicating that he was going to
12  go down there; I wouldn't be needed.  My
13  understanding, the defense counsel had gone down
14  there with an A.D.A. and viewed those tapes in the
15  presence of representatives from AMSA.  I was not
16  present for that.  I received information that
17  they did have that viewing of the tapes, and I
18  never received any tapes back from the District
19  Attorney's office.
20       Q    Did you ever question the A.D.A. that
21  attended the viewing as to what happened with
22  those tapes?
23       A    Yes.
24       Q    Who is it that you spoke to?