# Exhibit D

Edward O'Brien                                          06/16/2005

                                                                1

                              Volume:    I

                              Pages:     1-105

                              Exhibits: None


              UNITED STATES DISTRICT COURT

              DISTRICT OF MASSACHUSETTS


                              C.A. No. 04-10131 RBC
- - - - - - - - - - - - - - - - - - - - - x

HEATHER KIERNAN,

          Plaintiff

vs.

ARMORED MOTOR SERVICE OF AMERICA, INC.

and FRANCESCO CIAMBRIELLO,

          Defendants
- - - - - - - - - - - - - - - - - - - - - x


          DEPOSITION OF EDWARD O'BRIEN

       Thursday, June 16, 2005 - 9:59 a.m.

              McLeod Law Offices

              77 Franklin Street

              Boston, Massachusetts

                 - - - - - - - -

Reporter:  Maureen J. Manzi, CSR

                    LegaLink Boston
                    (800) 822-3376

49

1  the original?
2      A.  They would never get the original, no.
3      Q.  Now, in terms of that morning when you
4  received the phone call from Mr. Callahan and you
5  had given authorization for the police to take three
6  tapes, did you say that you wanted copies made or
7  did you offer to make copies or have the company
8  make copies?
9      A.  No.
10     Q.  You were not aware that any money claim had
11 been raised by a customer at that point, right?
12     A.  Right.
13     Q.  And you were not aware that there could have
14 been any loss of money that day that a customer
15 could have raised, right?
16     A.  Right.
17     Q.  So why then did you authorize the release
18 of, if I understand correctly, original tapes to the
19 police without retaining a copy for AMSA during that
20 phone call?
21     A.  Well, probably two things I thought of
22 during the time was the seriousness of the charges.
23 No. 2 was that, knowing the police I felt we'd have
24 a chain of continuity and that the tapes would be

50

1  under, you know, more than adequate care. And if I
2  needed to get them back, I'd have access to them.
3  The third one in the back of my mind I felt that it
4  would be of no use to them because I felt they
5  couldn't play them back without us being there.
6           MS. ROMANTZ: Can we take a break?
7           MR. McLEOD: Oh, sure.
8           (Recess held.)
9      Q. As I understand. When the police were
10 requesting tapes, you had had no, and this is on
11 that morning, that 6:00 in the morning phone call
12 you were getting, you didn't have copies of those
13 tapes?
14     A. Correct.
15     Q. Do you recall the name of the officer you
16 spoke to on the phone?
17          MS. ROMANTZ: Objection. You can
18 answer.
19     A. I don't recall right now.
20     Q. Was it more than one officer you spoke to or
21 just one?
22     A. Detective. Just one, yeah.
23     Q. So the people you spoke with on the phone
24 that morning who were calling from AMSA, that was

1   that "I don't want to go back there now."
2       Q.  And did you communicate that to anyone?
3       A.  I believe I told the police.  Plus the
4   attorneys were right there, and they were arguing
5   back and forth as to the inference of that
6   statement.  That's the impression that they were
7   going back and forth on.
8       Q.  In terms of anything else on videotapes you
9   may have seen, did you see anything that led up to
10  them walking into the office, anything that could
11  have been construed or you might have seen as maybe
12  flirting or anything like that?
13      A.  No.  The tapes -- the cameras in question
14  that we were viewing an the overall cameras would be
15  one in the corner of a room looking forward, just an
16  overall view.  They weren't of sharp quality, the
17  sharpest quality like we would use in the money
18  room.  And her job function, I believe she was data
19  entry.  She would be moving throughout the ante room
20  area into another office there.  And his primary
21  function would be to control the doors, talk to the
22  trucks on the radios, answer the phone which put him
23  up in a space in a dispatch area.  And as I recall
24  on the video that is where the date and time were

67

1   Q. How did you go about scheduling the viewing
2   with the other attorneys?
3   A. I believe I got a phone call from Attleboro
4   that they wanted to come down, I don't know whether
5   it was the detective that called Attleboro and the
6   lawyers, to see if I was available. Jason Cory
7   would call me as part of being security. So I would
8   tell him when I was available. This particular day
9   -- there was one day that I went down there and they
10  didn't show up. And this is probably the third time
11  I was available to go down.
12  Q. Had you had direct contact with the D.A.'s
13  office prior to that in terms of setting up the
14  viewing?
15  A. No.
16  Q. What about Mr. Ardito?
17  A. No.
18  Q. What time of day did this occur?
19  A. I don't know. I really don't.
20  Q. Do you recall what day of the week it was?
21  A. No.
22  Q. Did you have a calendar that kept track of
23  your appointments?
24  A. Sure. I'm sure, but that's gone.

75

1  that to get every camera that was taped that day in
2  the facility because they were constantly taping 24
3  hours.
4      Q.  But the district attorney during that
5  meeting, he wasn't interested in every single tape
6  viewing, was he?  Wasn't he only interested in
7  certain portions of the tape?
8          MS. ROMANTZ:  Objection.
9      A.  I don't recall --
10     Q.  In terms of what he asked to be shown.
11     A.  Yeah, I'm showing him what was basically
12 requested.
13     Q.  And the same thing with Mr. Ardito.  He was
14 also similarly interested in a particular window in
15 these tapes, window of time, correct?
16     A.  The best I can recall.  I don't remember any
17 more or less than that.  I just showed them what
18 they wanted to see.
19     Q.  So the meeting lasted about an
20 hour-and-a-half?
21     A.  Hour-and-a-half, yeah.
22     Q.  Is it a windowed room?
23     A.  No.
24     Q.  And was it spring, summer?

76

1      A. I don't recall. I really don't.

2      Q. With the number of people in the room and
3  its size and the equipment, did it get hot?

4      A. Yeah, it's hot in there.

5      Q. Hotter than other rooms?

6      A. Yeah, generally.

7      Q. When the viewing ended, who was the first
8  person to leave, physically leave the room? Did you
9  lead them out; did the attorneys lead them out?

10     A. I don't recall. I'm sure they left first
11 because I would have been showing them the monitor
12 -- I would have been playing a tape on the monitor.
13 They would generally have to be behind me to look at
14 what's going on. They would have to leave first.

15     Q. If I understand your testimony correctly,
16 when the assistant district attorney appeared, when
17 he arrived that day, he was carrying the tapes in
18 his hand?

19     A. I don't recall who had the tapes. I really
20 don't.

21     Q. Do you recall what the assistant district
22 attorney was carrying?

23     A. No, not really.

24     Q. Was he taking notes?

77

1   A.  Not that I recall.

2   Q.  How about Mr. Ardito, was he taking notes?

3   A.  No, not that I recall.  I don't recall.

4   Q.  Did the attorneys immediately leave the premises, in other words, did they go right from the viewing room, for lack of a better term, out the door or did they like stop and go to the bathroom or did they --

9   A.  I don't recall if they went to the bathroom or not.  They have to be accompanied by somebody.  So that would be myself or somebody armed.  They wouldn't have spent much time in the facility other than to look around first, and we showed the video and escorted them out of there.

15  Q.  Was the assistant district attorney wanded when he arrived?

17  A.  I don't recall.

18  Q.  If a nonAMSA employee arrives at the facility and they're carrying a firearm, what happens to the firearm when they're checking in?

21  A.  Well, it depends on the situation.  At one point we wouldn't let anybody in the facility with firearms even if they were Brinks and Dunbar from a different facility making deliveries to us or a