# Exhibit F

```
                                          1
 1                          Volume:    I
 2                          Pages:     1-109
 3                          Exhibits:  1-3
 4
 5           UNITED STATES DISTRICT COURT
 6         FOR THE DISTRICT OF MASSACHUSETTS
 7
 8                      C.A. No. 04-10131
 9
10   - - - - - - - - - - - - - - - - - - - x
11   HEATHER KIERNAN,
12            Plaintiff
13   vs.
14   ARMORED MOTOR SERVICE OF AMERICA, INC. and
15   FRANCESCO CIAMBRIELLO,
16            Defendants
17   - - - - - - - - - - - - - - - - - - - x
18       DEPOSITION OF CHRISTOPHER W. ABREU
19       Thursday, June 2, 2005 - 10:15 a.m.
20            MORGAN BROWN & JOY, LLP
21         200 State Street - 11th Floor
22              Boston, Massachusetts
23                 - - - - - - - -
24   Reporter:  Maureen J. Manzi, CSR
```

8

1  since I was heading back to the office if I could
2  take some videotapes, meet with David Ardito and
3  watch the videotapes at the armored car
4  establishment.
5        Q.  Did he give you any other instructions?
6        A.  No.
7        Q.  He didn't tell you what to look for in the
8  videotapes or anything like that?
9        A.  He just basically asked if I could look at
10 the videotapes and let me know what I thought of
11 them.
12       Q.  Were you given a copy of the D.A.'s file
13 prior to doing that?
14       A.  No.  I did know that it was basically just
15 -- it was a rape case, alleged rape, and I believe
16 that Christopher Markey had asked Chris Saunders to
17 review the tapes just to see what was on there since
18 Chris couldn't go, he gave them to me.
19       Q.  When you assumed this responsibility on the
20 case, was it your understanding that -- what was
21 your -- let me strike that.  When you assumed the
22 responsibility that you just described for this
23 case, who was your understanding that was in charge
24 of the case, which D.A.?

1    A.   Um-hmm.

2    Q.   That would pull us back to May of 2002.

3    A.   Okay.

4    Q.   So --

5    A.   My daughter was born in April and I was just transferred. So it would have to be the summer of 2001 when I reviewed the tapes.

8    Q.   When your daughter was born, you were in New Bedford?

10    A.   Yes.

11    Q.   Sometimes those events help us to get a timeline.

         Now, was it Mr. Saunders that handed the tapes to you?

15    A.   Yes.

16    Q.   And were they in anything when he gave them to you?

18    A.   From what I recall there was just a stack of tapes with an elastic around them.

20    Q.   When you say "a stack," did they look like a regular VHS tape?

22    A.   Yeah.

23    Q.   How many were there?

24    A.   I recall maybe five; four or five or six

Christopher W. Abreu                                          06/02/2005

13

1   even.  I remember it being a healthy stack of
2   videotapes.
3       Q.  Did you have any understanding as to what
4   the status of the proceedings were against the
5   defendant at that time?
6       A.  No.
7       Q.  Did you know whether or not he had already
8   been indicted?
9       A.  No.
10      Q.  When you were given the tapes, did you
11  already have an appointment to meet Mr. Ardito at
12  the facility?
13      A.  Yes.
14      Q.  How was that appointment made?
15      A.  It must have been made by Chris Markey or
16  Chris Saunders.
17      Q.  So you didn't make it?
18      A.  No.  I was just told that -- I was just
19  asked if I could go watch the tapes at a certain
20  time with David.
21      Q.  And have you met Mr. Ardito prior to that
22  day?
23      A.  Yes.
24      Q.  Had you worked with him on other cases?

LegaLink Boston
(617) 542-0039

1   A.  Yes.
2   Q.  Had you worked with him on this case?
3   A.  No.
4   Q.  After you took the tapes -- let me back up.
5   When you took the tapes, where physically were you?
6   A.  In the Attleboro District Court office.
7   Q.  When you went to AMSA, did you take your
8   car?
9   A.  Yes.
10  Q.  What kind of car was that at the time?
11  A.  It was a '96 BMW.
12  Q.  And you drove to AMSA?
13  A.  Yes.
14  Q.  In the car?
15  A.  Yes.
16  Q.  Where were the tapes in the car when you
17  were driving?
18  A.  Within my possession.
19  Q.  Front seat, back seat, trunk?
20  A.  Front seat probably I think.
21  Q.  Did you have a briefcase with you?
22  A.  Yes.
23  Q.  Any other bags or --
24  A.  No.

1   you brought them back?
2       A.  Well, I can only say this.  On any normal
3   case, there's no question I would have taken them
4   back to keep a chain of custody.  In this case, the
5   only way I would have left them there is because
6   nobody had the technology to tape them at a frame
7   where they could watch it on any regular VCR.
8       Q.  Let me ask you this.  When you say take them
9   back, what I'm trying to figure out is were you
10  going to be handing them to Mr. Saunders, putting
11  them in his office, putting them in a room that was
12  for films that was ceased, something?  What was the
13  procedure, if anything?
14      A.  In my normal course, I would have just put
15  them back in his office.
16      Q.  And he had his own office, he wasn't in a
17  cube or anything like that?
18      A.  He had his own office.  We all had our own
19  office.
20      Q.  How long had you known Mr. Ardito up to that
21  time?
22      A.  Tough to say.  Maybe a year.  Maybe I had
23  some cases when I was in Taunton.  And I saw him
24  regularly when I was in Attleboro.

                                                                35

1  a dead space. You couldn't see exactly what they
2  were doing until you shifted to a next camera angle.
3      Q.  Was it your understanding that in this dead
4  space they were sitting or standing?
5      A.  They were walking.
6      Q.  Okay. Thank you.
7      A.  And while they were walking, once you
8  shifted to the next frame, okay, you still couldn't
9  see them at the time, okay, but I remember hearing
10 someone say "I'm not going in there."
11     Q.  But you didn't see the person actually
12 verbalizing that?
13     A.  Right. I don't recall -- if my memory's
14 correct, I don't recall seeing the people actually
15 say it, okay, because I believe they were out of
16 camera angle at that time.
17     Q.  Was it a male voice or a female voice?
18     A.  It was a female voice.
19     Q.  And is there anything else in looking at
20 this quote that refreshes your recollection about
21 what you saw about the tape?
22     A.  Well, I recall quite a bit about the tape.
23     Q.  But just with regard to the "I'm not going
24 to go in there." I'm going to break it down.

46

1  day?
2     A.  I'm not sure.
3     Q.  Is this the only page of notes you gave to
4  Mr. Saunders?
5     A.  I'm not sure.
6     Q.  And let me qualify it. Did you give these
7  notes to Mr. Saunders?
8     A.  I don't recall. I either just left them in
9  his office with the videotapes if I had them. I
10 just don't recall. If I had brought the videotapes
11 back like I think I would have, this would have been
12 left with the videotapes, folded up and thrown on
13 top of with the elastic.
14    Q.  The reason why you had gone to AMSA that day
15 is because you didn't have the equipment to look at
16 the videotapes?
17    A.  Correct.
18    Q.  Did you have any understanding that day as
19 to how you'd go about having the tapes, for lack of
20 a better term, decoded or formatted in such a way
21 that they could play on a normal VCR?
22    A.  Well, I knew that they had to be -- you had
23 to get a regular VCR and tape it off of the time
24 lapse VCR while it was playing in its time lapse

```
1       Q.  Put them down where?
2       A.  Either on the shelf or on the floor.  I
3   don't recall.
4       Q.  Now, when he would take the tapes out, what
5   would he do with them?
6       A.  He'd put them in the VCR.
7       Q.  When he took the tapes out of the VCR, what
8   would he do with them?
9       A.  I don't recall.  He either gave them to me
10  or he put them down somewhere on the table or some
11  box or something like that on the shelf.
12      Q.  Where was the table?
13      A.  I don't recall there being a table.  I just
14  don't know what he did with the tapes afterwards.
15      Q.  Where was the shelf?
16      A.  The units that house all the VCRs?
17      Q.  Yes.
18      A.  Perhaps there was space there.  I really
19  don't recall what happened to the tapes.
20      Q.  After you stopped watching the tapes, what
21  did you then do at the facility?
22      A.  We basically just shook hands and left.
23      Q.  Who's "we"?
24      A.  Mr. Ardito, I and the security consultant,
```

1   comings and goings at that time?
2       A.  No.
3       Q.  The entranceway where you would have entered
4   into the D.A.'s office at that time, was it under
5   video surveillance?
6       A.  No.
7       Q.  Did you bring the tapes back?
8       A.  I don't recall.  I think I did, but maybe I
9   didn't.  Like I said, the only reason I would have
10  left the tapes there would be to copy them.  But I
11  still don't see myself doing that.
12      Q.  Was there any discussion about AMSA making
13  copies of the tapes for you?
14      A.  I don't remember, that's the thing.
15      Q.  Was there any discussion about AMSA saying,
16  you know, we'll get these tapes formatted for you in
17  such a way so you can play them on a normal VCR or
18  something along those lines?
19      A.  I don't remember.  I don't know.  I just
20  remember leaving.  I would think that I had the
21  tapes.  But it was so long ago, I just have no idea.
22      Q.  Well, in sitting in the office and viewing
23  the tapes, did you have any understanding as to,
24  especially with regard to the comment "I'm not going

1    A.  I'm not sure where it was written or if it
2  was written on the top or on the back end of it.
3    Q.  Did each of the tapes have a little carrying
4  case?
5    A.  If I recall, none of them had a case.
6    Q.  And it's your recollection that they were,
7  the tapes that you had were marked with a letter of
8  the alphabet?
9    A.  Correct.
10   Q.  And there was no other marking on them in
11 any way?
12   A.  I'm not sure, not that I recall.  But I do
13 remember them having a letter or a number.  I'm not
14 sure it was a letter.
15   Q.  And when you viewed these tapes at AMSA, I
16 believe you testified you understood that at least
17 one or more of those videotapes would be evidence in
18 the criminal case --
19   A.  Correct.
20   Q.  -- used by a factfinder?  And you understood
21 that at the time --
22   A.  Correct.
23   Q.  -- or believed it at the time that those
24 tapes would be evidence in the criminal matter?

1  Knowing that they would be evidence in a criminal
2  matter, would it be your normal procedure to leave
3  that evidence somewhere, for use of a better word,
4  the chain of custody would be broken?
5           MR. McLEOD: Objection.
6      A.  Normally, no.  Like I said, the only thing
7  that was different in this case is that at the time
8  we didn't have the capabilities of taping it.  The
9  only reason I would have left the tapes there was
10 for them to make a copy of the tapes, something that
11 we could view.
12     Q.  If you left the tapes there meaning so that
13 AMSA could make copies of the tapes?
14     A.  Correct.
15     Q.  Would there be any way if you left them
16 there to prevent AMSA or somebody who got ahold of
17 them from altering the tapes in any way?
18          MR. McLEOD: Objection.
19     A.  If I had left them there?
20     Q.  Yes.
21     A.  I'm sure anybody could do anything with
22 them.
23     Q.  Or erase them?
24     A.  Correct.

1  Q. And would that have been a concern you would
2  have?
3  A. The only way it would not be a concern is if
4  all the intended parties knew about it. For
5  instance, if Chris Markey knew about it or if Chris
6  Saunders knew about it. I just wouldn't have done
7  it on my own given the fact it wasn't my case and I
8  had these tapes in my custody.
9  Q. And is it your testimony today, do you have
10 any recollection prior to going to AMSA that you had
11 a conversation with either Chris Markey or Chris
12 Saunders talking about we're going to leaving the
13 tapes there to be copied?
14 A. I don't recall.
15 Q. And do you recall while you were there
16 making a telephone call to Chris Markey or Chris
17 Saunders to talk about, hey, should I leave the
18 tapes there?
19 A. I definitely didn't make a phone call from
20 the facility, no.
21 Q. If you had left them at the facility
22 intentionally, would you have obtained a receipt
23 signed by the security consultant in any way
24 reflecting the date and agreement that you were

1  leaving them and he was accepting them?
2          MR. McLEOD: Could I have that read
3  back, please.
4          (Question read back.)
5     A. Proper protocol would say, yes.
6     Q. Let me ask you. If the tapes were left
7  there unintentionally, you know, simply because they
8  had put down on a table and everybody forgot about
9  them, to the best of your recollection would there
10 have been any way for somebody working at AMSA to
11 recognize that those tapes were from that particular
12 night in question which I think was May 19th, 2001
13 versus tapes from any other day or particular time?
14         MR. McLEOD: Objection.
15    A. I don't know.
16    Q. Do you recall speaking to the security
17 consultant while you were there as to whether AMSA
18 had copies of the tapes that you had?
19    A. I don't recall it, no.
20    Q. Well, turning your attention to what's been
21 marked as Exhibit 2 and the portion of this e-mail
22 chain that appears to be a message that you wrote on
23 June 17th to Jeanne Veenstra. You see there that
24 you wrote, "I also know that the facility still has

1   tapes, it's the one that says Working Detective's
2   Tapes.  Chris, I'm going to show you hopefully --
3   and just so the record's clear.  I'm showing Chris a
4   tape, that particular tape.  It's pretty short,
5   isn't it?
6           MR. McLEOD:  Yes.
7       Q.  Why don't we watch the whole thing.
8           (Videotape being played.)
9       Q.  I'm going to stop it right there and let me
10  ask you.  At 17:32 did you observe two individuals
11  walking somewhere?
12      A.  Yes.
13      Q.  And would those two individuals that you saw
14  on the tape when you were out at AMSA reviewing the
15  tape?
16      A.  Yes.
17      Q.  And was that the same viewing that you saw
18  while you were at AMSA of the two individuals
19  walking?
20      A.  No.
21      Q.  Did you see what's on this particular tape
22  of those two individuals walking --
23      A.  Yes.
24      Q.  -- while you were at AMSA?  That was a

Christopher W. Abreu                                           06/02/2005

                                                                      88

1  really bad question.  Let me ask that again.  What
2  we just observed on the tape of those two
3  individuals walking down a hallway, did you observe
4  that particular view of them?
5       A.  I don't recall if I did or not.
6       Q.  You saw in this particular one that the tape
7  looked like it was from the front of them?
8       A.  Correct.
9       Q.  And your recollection is that what you saw
10 was from the back?
11      A.  Correct.
12      Q.  Perhaps leading you to believe that it was
13 at a different angle?
14      A.  Yeah, exactly.
15      Q.  In terms of the quality of the clarity of
16 what you were seeing, how would you compare what we
17 just saw to what you saw?
18      A.  As far as that particular portion where
19 they're walking, the clarity was the same, but it
20 was a camera looking at them from behind.
21      Q.  Was this particular camera that viewed them
22 walking on this videotape that we've marked as
23 Exhibit 3 about the same distance away as the camera
24 viewing that you saw?

89

1    A.  The camera, the angle that I saw I believe
2  was directly overhead. So at one point in time they
3  were much closer and then they walked farther and
4  farther away in distance.
5    Q.  Did you understand there to be a camera that
6  was in the ceiling just pointing down?
7    A.  I believe it must have been on the wall
8  because you had a direct view of the hallway.
9    Q.  The entire hallway?
10   A.  Yes.
11   Q.  In this one that we just saw, could you tell
12 whether or not Mr. Ciambriello had his hand, his
13 right hand around Heather Kiernan's body or waist?
14 Do you want me to play it again?
15   A.  Yeah, could you please.
16   Q.  Sure.
17        (Videotape being played.)
18   Q.  Could you tell in this video the location of
19 his hands?
20   A.  No.
21   Q.  As you sit here today, do you have any
22 knowledge of the significance of that first scene
23 that we see which appears to be one of the doors in
24 the facility, what relevance that might have to this

1  A. I don't know. I do not know.

2  Q. Would I being correct in saying that in June
3  17th, 2002, if you recalled leaving the tapes at the
4  facility, you would have said I left the tapes at
5  the facility as opposed to what you did say which is
6  "I also know that the facility still has tapes of
7  the incident"?

8  MR. McLEOD: Objection.

9  A. All that I can say is, I do not ever
10 remember specifically what happened with the tapes.
11 Because it was such a formality just going to view
12 the tapes, it was nothing that I was paying extreme
13 interest to. I can only make presumptions about
14 what happened with the tapes. I do not know. And I
15 do not have an independent memory of what happened
16 with those tapes.

17 Q. And you also don't have an independent
18 memory of what knowledge you had in writing that
19 statement?

20 A. Correct, I don't.

21 Q. Thanks.

22          FURTHER REDIRECT EXAMINATION
23 BY MR. McLEOD:

24 Q. I have just a quick follow-up. I'm sorry.