# Exhibit I

COMMONWEALTH OF MASSACHUSETTS

BRISTOL, SS SUPERIOR COURT
BRISTOL, SS.
FILED

SEP 19 2003

MARC J. SANTOS, ESQ.
CLERK/MAGISTRATE

SUPERIOR COURT
BRCR2002-0773(1-2)

COMMONWEALTH

v.

FRANCESCO CIAMBRIELLO

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER ON MOTION TO DISMISS

### INTRODUCTION

Defendant Francesco Ciambriello ("Ciambriello") moves to dismiss these indictments for indecent assault and battery and rape because the Commonwealth has lost three of six surveillance tapes from the facility where the events occurred. Ciambriello says that the interactions between himself and the complaining witness were consensual and that the lost tapes would provide crucial exculpatory evidence. After an evidentiary hearing, the court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

Heather Kiernan alleges that Ciambriello sexually assaulted and raped her on the night of May 19, 2001, while they were working at Armored Motor Car Services of America ("AMSA"). Ciambriello was Kiernan's supervisor.

AMSA is a money-processing depository facility. It has security cameras throughout the facility and outside of the building. The only place inside the facility where there are no video cameras is the supervisor's office. Ms. Kiernan says that the assault occurred in this office.

1

The images from the security cameras are displayed on VCR-type monitors in a small room by the manager's office. This is a multiplex display, with each screen displaying nine frames. The result is that there are multiple images from many cameras on the same video tape. The tape machine is set to cover a specific amount of time – 8, 12, 24, 48 hours – and then the images will be recorded at intervals that result in a two hour tape being filled at the end of that time period. The AMSA machines were set to cover at least an eight hour shift. This means that there is not true continuous coverage but, more importantly for this case, it means that each of the six video tapes cover the same period of time, albeit recording from different cameras. There is also an audio recording.

In the early morning hours of May 20, 2001, Sergeant John Otrondo, of the Attleboro Police Department went to AMSA. He looked at the surveillance tapes in the small room next to the manager's office. He saw three scenes: Kiernan and Ciambriello and another woman standing outside the facility smoking; Kiernan at her desk with Ciambriello speaking to her; and Ciambriello walking with Kiernan down a corridor (looking from the back and from their left sides), with his arm around her, going towards the "money room" at the back, and entering the supervisor's office. In none of these scenes could Otrondo see facial expressions nor hear what the people were saying. Otrondo reported that Edward O'Brien, one of the employees of AMSA, later heard Kiernan say on the audio tape, "No. No. I don't want to go back there."

As they reached the supervisor's office, Otrondo could see the door open. About five minutes passed. Kiernan came out, turned left to go towards the ladies room. Otrondo could see the front of Kiernan, but could not see any facial expressions not make any observations about her demeanor.

2

Otrondo seized three of the six video tapes. The tapes were marked in black marking pen with capital letters with circles around the letters. Otrondo seized tapes D, E, and F. He dropped off the tapes with ADA Christopher Markey. Markey asked him to get the other tapes. Otrondo seized tapes A, B, and C. He still has custody of tapes A, B, and C. He does not have tapes D, E, and F.

ADA Markey went to the Attleboro Police Department to get the tapes so defense counsel David Ardito ("Ardito") could review the tapes. They were unable to play the tapes on the DA's equipment. Markey arranged for Ardito to go to AMSA to review the tapes. He left the tapes in the District Attorney's office in the Attleboro District Court for former Assistant District Attorney Christopher Saunders who was going to do the probable cause hearing. This is the last time that Markey saw the tapes. Saunders does not know where the tapes are.

Former Assistant District Attorney Christopher Abreu ("Abreu") was asked to assist ADA Saunders. Abreu made arrangements to take the tapes to AMSA so that Ardito could view them. Abreu and Ardito met O'Brien at AMSA; they went into the viewing room. Abreu viewed part of the tapes. He heard the woman on the tape say "I don't want to go back there." He saw that the man had a firearm tucked in his belt, in back on the left side. The woman was on the right side. He could not see facial expressions nor any obvious signs of demeanor. He saw the two enter a room; he could not see inside the room. The door opened about five minutes later. The woman left; the man left sometime after. He could see no obvious facial expressions or signs of demeanor. He does not recall seeing on the tape anyone else in the facility.[1] He does not

---

[1] Apparently, Ms. Kiernan testified that she called a woman co-worker friend after the events in question, that the friend came to AMSA, and that the friend came into the facility. If no one saw this woman on any tape, this might affect Ms. Kiernan's credibility. First, if the woman

3

recall if he left with the tapes. He believes he would have. He has no specific memory about what happened to the tapes.

Police Officer Russell Castro of Attleboro also viewed the tapes. He saw, and did not see, essentially what the other people who viewed the tapes saw, and did not see. That is to say, he like the others did not see any facial expressions not see any noteworthy demeanor. He could not hear any words. He was asked by Officer Otrondo to take tapes A, B, and C to the Raynham Police Department to Deputy Chief Pacheco. Pacheco was able to retrieve images from the tapes and made a video tape of the images of Kiernan and Ciambriello. The court reviewed this tape; it appeared to have on it the same scenes that the various witnesses testified that they saw when they viewed the various tapes, including those who viewed lost tapes D, E, and F.

## CONCLUSIONS OF LAW

Where potentially exculpatory evidence is lost or destroyed, the court employs a balancing test to determine the appropriateness and extent of remedial action. Commonwealth v. Olszewski, 401 Mass. 749, 755 (1988) ("Olszewski I"). The defendant bears the initial burden of proving that the evidence in question is potentially exculpatory. Commonwealth v. White, 47 Mass.App.Ct. 430, 433 (1999). If the defendant meets that burden, the court weighs (1) the culpability of the Commonwealth; (2) the materiality of the lost evidence; and (3) the potential risk of prejudice to the defendant in order to determine an appropriate remedy. Id.; Commonwealth v. Charles, 397 Mass. 1, 13 (1986). Because there is a significant public interest in "bringing guilty persons to justice," dismissal of an indictment is warranted only where the

---

was not there, it might indicate that Ms. Kiernan is an inaccurate reporter of events and bolster the consent defense. If the woman was there, she had an ally. Since Kiernan did not leave with her friend, that might bolster the consent defense.

4

Commonwealth's conduct is "egregious." Commonwealth v. Olszewski, 416 Mass. 707, 717 (1993) ("Olszewski II"); see also Commonwealth v. Perito, 417 Mass. 674, 681 (1994) (calling dismissal of an indictment a "drastic remedy.")

In this case, the defendant has demonstrated that the lost evidence is potentially exculpatory. Evidence is "potentially exculpatory" if there is a "reasonable possibility," based on "concrete evidence rather than a fertile imagination, that access to the material would have produced evidence favorable to his cause." Commonwealth v. Willie, 400 Mass. 427, 433 (1987); Commonwealth v. Neal, 392 Mass. 1, 12 (1984). The information on the lost tapes includes the amount of time the defendant and Kiernan were alone together in the supervisor's office; approximately five minutes.[2] A jury watching these tapes could question whether that time was sufficient for the alleged assault to occur. The lost tapes also raise important questions about Kiernan's credibility. While Kiernan claims that a friend visited her inside the building after the assault occurred, the friend is not present on any of the recordings. Because the defense in this case is consent of the victim, evidence that tends to damage Kiernan's credibility could benefit the defendant.

Nonetheless, in balancing the culpability of the Commonwealth, the materiality of the lost evidence, and the risk of prejudice to the defendant,[3] a dismissal of the indictment is not warranted in this case. While the Commonwealth's conduct was far from ideal, Massachusetts courts have consistently held that the negligent loss or destruction of evidence is not sufficient to

---

[2] This information is also on the remaining tapes.

[3] There is also prejudice to the Commonwealth. The statement of the victim, "I don't want to go back there," appears to be only on one of the lost tapes.

5

warrant the dismissal of an indictment. For example, in Commonwealth v. Olszewski, the Supreme Judicial Court held that the accidental destruction of a witness's exculpatory statement and the loss of evidence found at a murder scene was "certainly improper," but not "sufficiently egregious to warrant dismissal of the indictment" against the defendant. 417 Mass. 707 at 537. Similarly, the loss of the tapes in this case is unfortunate, but the defendant does not suggest, nor is there any indication, that the Commonwealth acted intentionally or in bad faith. Defendant's Brief at 2. Accordingly, the Commonwealth's conduct is not "sufficiently egregious" to warrant dismissal of the indictment. Id.; see also Commonwealth v. Martinez, 420 Mass. 622, 628 (1995) (declining motion for a new trial where police lost wallet with potentially exculpatory evidence in part because there was "no showing that the police were more than negligent"); Commonwealth v. Waters, 420 Mass. 276, 279 (1995) (upholding trial judge's refusal to dismiss indictments where "the police had been at most negligent" in destroying tape recordings of radio dispatch calls). Cf. Commonwealth v. Sasville, 35 Mass.App.Ct. 15, 24 (1993) (dismissing indictment where Commonwealth authorized the destruction an aborted fetus after teenager reported being raped upon discovering she was pregnant, and calling Commonwealth's conduct "gross negligence" and "perilously close to supporting an inference of bad faith").

The court must next consider the materiality of the lost evidence. Evidence is material if, "in considering the entire record, it creates a reasonable doubt as to the defendant's guilt that would not otherwise have existed." Commonwealth v. Rodriguez, 50 Mass.App.Ct. 405, 406 (2000). While it is true that the lost tapes contain evidence that may be favorable to the defendant, the tapes were also viewed by a number of potential witnesses – including defense counsel – before they were lost. Each of these witnesses may testify before the jury. In addition,

6

all six tapes cover the same period of time, albeit from different angles, and none of the videotapes – lost or otherwise – depicts the facial expressions or demeanor of Kiernan or the defendant. Accordingly, the lost tapes do not create a "reasonable doubt as to the defendant's guilt *that would not otherwise have existed.*" Rodriguez, 50 Mass.App.Ct. 405 at 406 (emphasis added); see also Commonwealth v. Shipps, 399 Mass. 820, 836 (1987) citing United States v. Agurs, 427 U.S. 97, 109-110 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense").

Finally, the prejudice to the defendant is marginal. The jury will not be deprived of any potentially exculpatory evidence because the information on the lost tapes is known and there are several witnesses available testify as to their contents. Commonwealth v. Hunter, 426 Mass 715, 719 (1998); Olszewski II, 416 Mass. 707 at 17. Furthermore, Kiernan is expected to testify at trial, and the defendant may impeach her credibility at that time. Any prejudice to the defendant is "too unsubstantial and uncertain" to warrant a dismissal of the indictment. Charles, 397 Mass. 1 at 14; see also Commonwealth v. Fielder, 23 Mass.App.Ct. 506, 516 (1987) (prejudice caused by Commonwealth's loss of tape recording of witness identifying defendant "not substantial enough" to justify remand).

## ORDER

For the reasons stated in this opinion, the court **DENIES** the motion to dismiss. The court will leave to the trial judge any appropriate remedy for mitigating any prejudice that the defendant may have suffered because of the loss of the three videos. The judge may consider an appropriate instruction to the jury about the lost tapes; may allow testimony about the lost tapes;

7

may limit cross examination of witnesses who viewed the tapes about not seeing another woman in the facility; or whatever other cure that judge may find appropriate.

*[signature]*
Nonnie S. Burnes
Associate Justice

Date: September 16, 2003

8