UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS AT BOSTON

_____

HEATHER KIERNAN,

      Plaintiff,

-v-                                              CIVIL NO.  04-10131 RBC

ARMORED MOTOR SERVICE OF
AMERICA, INC., and
FRANCESCO CIAMBRIELLO

      Defendants.

_____

**PLAINTIFF HEATHER KIERNAN'S REPLY MEMORANDUM OF FACTS AND LAW
IN SUPPORT OF HER MOTION FOR SANCTIONS AND
OTHER RELIEF OR IN THE ALTERNATIVE, MOTION FOR BIFURCATION AGAINST
THE DEFENDANTS ARMORED MOTOR SERVICE OF AMERICA INC. AND
<u>FRANCESCO CIAMBRIELLO FOR SPOLIATION OF EVIDENCE</u>[1]**

      AMSA states that "[r]ecognizing that her credibility at trial is likely to be significantly impair by the numerous lies that she has admitted to making, both to police during the criminal investigation…..and while under oath at deposition in this case, Plaintiff…seeks …sanctions."[2]  Plaintiff has already admitted at the reconvening of her deposition, and in a pleading filed in this case, that she lied under oath at her deposition about facts unconnected to those facts giving rise to this case.  For the reasons stated herein, AMSA's statement is not only illuminating, but profoundly offensive.

      AMSA also raises an issue of Plaintiff's credibility in an uncited footnote (see fn 2).  Therein, AMSA states that Plaintiff admitted "embellishing" her testimony by telling police she was "dragged" into the room, when she later admitted she was "escorted."

---

[1] This reply addresses the opposition filed by AMSA (Document no. 64).  Ciambriello did not file an opposition. As stated on p. 19 of Plaintiff's Memorandum in Support, fn 14, Defendant Ciambriello agrees that the case should be bifurcated.  Since the co-Defendant finds bifurcation necessary, Plaintiff believes that AMSA's opposition is moot.  Indeed, since Ciambriello believes it should be bifurcated, than he presumably believes he will be prejudiced if it is not.

[2] A review of the complaint confirms that these missing tapes – and the legal and factual issues concerning those missing tapes have <u>always</u> been an important issue in this case.

The fact is, at the criminal trial the Plaintiff admitted on cross examination that she should not have used the term "dragged." See Trial Transcript, Volume 1, Exhibit R, pages 1-58 - 1-59. At no time did she admit she "embellished her testimony." While AMSA implies that this is evidence that Plaintiff is lying, it is entirely reasonable for a jury to believe that Plaintiff felt that she was under duress when her side arm carrying supervisor forced her down a hall and into a room where she would be raped, and thus, felt "dragged." Other than that statement of pure conjecture Defendant AMSA has absolutely no factual basis for the claim that Heather Kiernan lied to police about the sexual assault.

## ARGUMENT

### AMSA's Argument is Premised on Inconsistent Facts:
### Jason Khoury Cannot Keep His Story Straight

In a new affidavit, Jason Khoury now claims that "[t]here was absolutely no discussion while the attorneys were present about leaving the tapes with AMSA so that AMSA could make copies of the tapes and I never agreed to have the tapes returned to AMSA so that copies could be made."[3] Para. 17. Yet Khoury was not in the room with the attorneys when they were viewing the tapes, it was O'Brien. See Khoury, Exhibit S, 72.[4]

O'Brien testified that he was in the room with Ardito and Abreu. Indeed, everyone agrees that only three people can fit into this room. Khoury, Exhibit S, 71-72.

It is expected that AMSA will argue that Plaintiff's counsel never asked Khoury if he was standing outside. After all, O'Brien testified that "if" Khoury was there, he was

---

[3] Khoury implies that he was in a position to agree or disagree even though the arrangements to view the tapes at AMSA with the ADA and Attorney Ardito was made with O'Brien, not Khoury. Khoury, 71. Exhibit S.

[4] Q.  You said about three people could fit in there, right?
A.  Very tight, yes.
Q.  How many people were in there?
A.  Eddie, the DA, and the other attorney, three. Khoury, Exhibit S, 72.

2

standing outside and he "may" have heard something.  O'Brien, Exhibit T, 62-63.[5]  But Khoury was also asked the following:

> Q. Were there any other meetings or discussions or anything like that at the time?
> A. Other than saying hello to them and good-bye, Eddie O'Brien brought them in, viewed the tapes, and escorted them out and left with them. So there was no meeting, no.

Khoury, Exhibit S, 73.[6]

His new affidavit tries to put himself someplace no one ever thought or testified that he ever was.  Additionally, his testimony at that time is not consistent with other testimony (including O'Brien) that the ADA and Ardito were discussing what they saw.  O'Brien, Exhibit T, 95-96; Abreu, Exhibit U, 90-91, 94-95.

O'Brien testified that there might have been a conversation about copying the tapes and that he could make of certain portions.  O'Brien, Exhibit T, 73.  In light of Abreu's testimony (discussed in Plaintiff Memorandum in Support), this tends to suggest that there was a discussion of copying the tapes.  Taking all of these facts into consideration a jury could determine that the tapes were left with AMSA to copy them.  It could also determine that Khoury destroyed them.[7]

AMSA's opposition does not comment – and indeed cannot comment on thew knowledge of the DA's office during the summer of 2002 and the winter of 2003.  ADA

---

[5] Plaintiff does not believe that such speculative testimony could be admissible.  Alternatively, even if O'Brien were permitted to testify to that fact, O'Brien's statement at his deposition clearly implies that he had no knowledge that Khoury was there.  Given the issues in this case, O'Brien's role and Khoury's position, Plaintiff finds it unlikely that O'Brien – who is head of security – could not know that the branch manager was standing outside and listening to the conversation, and not testify to that fact at his deposition.

[6] O'Brien said the meeting lasted about an hour and a half.  O'Brien, Ex. T, 70.  Khoury said it only lasted a half-hour.  Khoury, Ex. S, 74.

[7] Contrary to the statements in Khoury's affidavit, at no time did Plaintiff accuse any individual of destroying the tapes or otherwise misappropriating them.  Khoury (and AMSA) must explain exactly who accused him of destroying them (or alternatively, whoever communicated that fact to him).  No individual has ever been accused of destroying them, and indeed, there is no information that the DA's office accused any individual. Khoury's admission is perplexing, at best.

3

Veenstra and ADA Abreu all had knowledge that AMSA had the tapes, had copies of the tapes, or both. See Exhibit G. When confronted with that fact, AMSA's response was "[but] we have a receipt" indicating the police took them.[8] Exhibit J.

### What AMSA Knew

According to a memo prepared by Tim Pomerleau from the Hartford Claims Office, on June 1, 2001, a little more than 10 days after the attack, he spoke with William Callahan, then security manager for AMSA:

> Callahan informed me that the Attleboro Police had only one copy of the video and would not release it, as it was evidence in a criminal prosecution. He did state that if at a later time, he was able to view the tape or copy it he would also provide a copy for this investigation.

See Exhibit V, 1-3 and Affidavit in Exhibit A.

Based on this, AMSA knew that once the Attleboro Police took custody of the tapes, they would not release them. The Hartford wanted a copy of the tapes and Callahan told the Hartford that if he had an opportunity to view the tapes, he would provide a copy for its investigation. As we know, AMSA had such an opportunity to view and copy the tapes since AMSA was the only one at the time with that technology.

Additionally, AMSA was very concerned about where litigation could go. The Hartford disclosed documents demonstrating that it was investigating all aspects of liability. Legal research was being undertaken. Exhibit V, 4-12. Moreover, AMSA was directly involved since under the terms of its policy with The Hartford, it was responsible for the first $250,000 of the workers compensation claim. See Exhibit V, 13.

Putting all of those important facts aside, on December 4, 2001, AMSA feared it was being sued (and indeed was being sued at MCAD) and was being sued in the

---

[8] The Attleboro Police did not issue a receipt when it took the tapes on May 20, 2001. Otrando, Exhibit B, 40-41. When Otrando requested the remaining three tapes, Khoury told him they wanted a subpoena. Id., pp. 40-43. It was at that time that the receipt – prepared by Khoury – was presented to Otrando for signature.

Department of Industrial Accidents in a workers compensation claim. On December 4, 2001 those tapes were back on AMSA premises and under AMSA's control. When asked where the tapes were, AMSA maintained the technical position that it had a "receipt." Exhibit J. Considering these facts, a jury could find that AMSA intentionally destroyed evidence that was left on its premises for copying by an ADA who did not think to obtain documentation of that fact.[9]

After all, it had a receipt.

Thus, any claim that AMSA did not or could not know it was going to be sued is inconsistent with the facts.

### AMSA's Defense to Plaintiff's Motion is Contrary to Public Policy

"The destruction of relevant evidence . . . has a pernicious effect on the truth-finding function of our courts." Wiedmann v. Bradford Group, Inc., 444 Mass. 698, 705 (Mass. 2005)[citing: Fletcher v. Dorchester Mut. Ins. Co., 437 Mass. 544, 553, 773 N.E.2d 420 (2002). The facts AMSA relies on (supplied by Khoury) contradict the other facts in this case.[10] These inconsistencies only raise greater suspicion as to what AMSA's motives may have been at the time.

AMSA's argument has two components. First, it contends that it surrendered custody and control of the tapes on May 20, 2001 and August 17, 2001 and have a receipt proving that fact. And the second, which is evident from the opposition, is that it

---

[9] Additionally, notwithstanding AMSA's analysis of what it thinks the tapes prior to May 19, 2001 might have shown, it is axiomatic that it never reviewed the tapes to see if there was any behavior that would support a claim that the sexual activity was consensual. Based on Plaintiff's short employment window, the company policy on tape preservation, and the fact that those tapes are no where to be found, a jury should consider the spoliation of those tapes as well.

[10] Another questionable fact raised by Jason Khoury, which is only amplified by the inconsistencies in his deposition testimony and his affidavits is that he claims in July 2001, he was in contact with Defendant's counsel, Allison Romantz. Khoury, Exhibit S, 84-87. If Attorney Romantz was, in fact, involved, she should have taken steps to ensure that evidence was preserved (as there is no evidence that she was no involved in the workers compensation claim). If she was not involved (as has been represented to Plaintiff's counsel), Khoury needs to explain to the jury why he was not truthful at his deposition.

was <u>reasonable</u> for them to rely on the police protecting the evidence.  AMSA has abandoned its reliance on the receipt.  However the reasonableness defense is contrary to the underlying public policy behind the spoliation doctrine.

      The Attleboro Police and the DA cannot be sued for losing the evidence, even if they did have custody of it pursuant to a "receipt."  See Mass.Gen.L. c. 258, §10, and see <u>Breault v. Chairman of Bd. Of Fire Comm'rs</u>, 401 Mass 26, 513 N.E.2d 1277 (1987), <u>cert.den</u>. 485 US 906, 108 S.Ct 1078, 99 L.Ed 2d 237 (1988) (public employees are immune from liability for their negligent acts performed within the scope of their official duties, but not for intentional acts).   AMSA knew that the police had the tapes, and they were not going to give them back.  In addition, AMSA knew:

    1.    The DA could only view the tape on AMSA's equipment.

    2.    AMSA (and the insurer) wanted a copy of the tapes, and at that time, AMSA has the equipment make the copies.

    3.    The tapes were back on AMSA's premises and there was some discussion of copying the tapes in the video room.

    4.    If the tapes were left there for the purposes of copying the tapes, the ADA erred by not documenting it.  This allowed AMSA to rely on the receipt.[11]

Notwithstanding these facts (or the reasonable inferences to be drawn from them), AMSA argues against bifurcation.

      <u>Not</u> bifurcating the spoliation issue may reward the party who may have destroyed key evidence.  If AMSA did not cause any spoliation, there should be no cries for one trial and one jury.  Yet assuming AMSA is the spoiling party, it wants to enjoy the fruit of its nefarious actions by giving itself the shot at that better defense that

---

[11] AMSA never took the position it now takes in this case.  It never informed MCAD, Ardito, or even Plaintiff's counsel that Khoury scoured the facility looking for lost tapes or that they conducted an investigation wherein they confirmed – based on facts – that the tapes left the premises in the care and custody of the ADA.  Instead, they just maintained "we have a receipt."

presumably motivated the spoliation in the first place.[12] Indeed, the tone and tenor of its opposition confirms that without the missing tapes, they will use the civil trial to vilify this Plaintiff who was raped by her supervisor. Our civil justice system cannot to support such a perversion.

## CONCLUSION

For all of the foregoing reasons, the Plaintiff respectfully requests that her Motion for Sanctions be GRANTED or in the alternative, that the issue of spoliation be bifurcated.

DATED:   March 14, 2006

Respectfully submitted:
HEATHER KIERNAN

/s/ William J. McLeod
William J. McLeod, BBO No. 560572
McLEOD LAW OFFICES, PC
77 Franklin Street
Boston, MA  02110
617.542.2956/phone
617.695.2778/fax
wjm@mcleodlawoffices.com

Certificate of service

In accordance with the rules of this Court, I hereby certify today, March 14, 2006, that I caused a true copy of this document and all exhibits and attachments to be served on all parties listed below, who are participants in the Court's ECF program:

David Ardito, counsel for Ciambriello
Allison Romantz, counsel for AMSA

/s/ William J. McLeod
William J. McLeod

---

[12] Indeed, AMSA has maximized the benefits from the lost evidence by re-interpreting it. Notably, the Defendant consistently maintains that the Plaintiff is heard saying on the tape "I do not want to go in their now." However, the police and the DA, as well as the Plaintiff herself, have maintained that she said "I do not want to go in there." See Grand Jury Testimony, John Otrando, I-60, Exhibit W; See Abreu, Exhibit D, 34 ("I'm not going in there."), and see p. 1, Exhibit G. AMSA's slight and seemingly harmless change gives it the additional room to argue that Plaintiff consented by suggesting that she might want to go into the room later, or at some other time.