# Exhibit S

```
                                                                    1
```

**CERTIFIED ORIGINAL LEGALINK BOSTON**

1                                              VOLUME:  I

2                                              PAGES:  1 to 114

3                                              EXHIBITS:  1 to 7

4              UNITED STATES DISTRICT COURT

5              DISTRICT OF MASSACHUSETTS

6   - - - - - - - - - - - - - - - - - - x

7   HEATHER KIERNAN,

8                    Complainant,

9        v.                              Civil Action

10                                       No. 10131MLW

11  ARMORED MOTOR SERVICES OF

12  AMERICA, INC.,

13                    Respondent.

14  - - - - - - - - - - - - - - - - - - x

15

16

17            DEPOSITION OF JASON J. KHOURY

18                   March 2, 2005

19                     10:10 a.m.

20                 Gillette Corporation

21                  One Gillette Park

22              South Boston, Massachusetts

23

24       Reporter:  Karen A. Interbartolo, RPR

1   APPEARANCES:
2
3       MCLEOD LAW OFFICES
4       By William J. McLeod, Esquire
5       77 Franklin Street
6       Boston, Massachusetts 02110
7       (617) 695-2777
8       Counsel for the Complainant
9
10      MORGAN, BROWN & JOY, LLP
11      By Laurence J. Donoghue, Esquire
12      200 State Street
13      Boston, Massachusetts 02109-2605
14      (617) 523-6666
15      Counsel for the Respondent Armored Motor Services
16      of America, Inc.
17
18
19
20
21
22
23
24

3

1                           I N D E X

2    EXAMINATION OF:                                    PAGE

3    JASON J. KHOURY

4

5      Direct Examination by Mr. McLeod                  4

6      Cross-Examination by Mr. Donoghue                96

7      Redirect Examination by Mr. McLeod              100

8

9

10                         E X H I B I T S

11   No.                                                Page

12

13   1         Applicant Reference Check/                18

14             Verbal

15   2         AMSA Written Reference Form               22

16   3         Memorandum dated 3/15/01                  26

17   4         Authorization Form                        28

18   5         Introductory Period Memorandum            30

19             dated 4/16/01

20   6         Handwritten Letter dated                  62

21             8/17/01

22   7         Letter dated 2/20/03                      67

23

24   *Original exhibits retained by Mr. McLeod.

```
 1                    P R O C E E D I N G S
 2
 3                       JASON J. KHOURY
 4
 5    having been satisfactorily identified and duly sworn by
 6    the Notary Public, was examined and testified as
 7    follows:
 8
 9                      DIRECT EXAMINATION
10    BY MR. MCLEOD:
11         Q.   Could you state your name for the record?
12         A.   Jason Khoury.
13         Q.   Mr. Khoury, my name is Bill McLeod.  I
14    represent Heather Kiernan in a case that she's brought
15    against Armored Motor Services of America and Francesco
16    Ciambriello.
17              I'm going to be asking you some questions
18    today.  You're under oath.  You need to give me verbal
19    answers.  The court reporter can't take down shakes of
20    the head or anything like that.
21              You're going to have an opportunity to review
22    your deposition transcript and make whatever changes.
23    Is that something that you'd like to do?
24         A.   Yes.
```

| | | |
|---|---|---|
| 1 | Q. | There was nobody in the vault? |
| 2 | A. | Oh, yes. People were working, yes. |
| 3 | Q. | How many people were working? |
| 4 | A. | At that point? Probably three or four. |
| 5 | Q. | And who was working; do you know? |
| 6 | A. | No. I'd have to guess. No, I don't know. |
| 7 | Q. | And who arrived at AMSA to look at the tapes? |
| 8 | A. | It was Eddie O'Brien, the district attorney, and I believe Mr. Ardito. |
| 10 | Q. | And you knew they were coming. They didn't just show up saying, Hey, we need the tapes? |
| 12 | A. | It was a scheduled appointment. |
| 13 | Q. | And how far ahead did they schedule the appointment? |
| 15 | A. | I think it was a couple of weeks. |
| 16 | Q. | And who did they schedule it with? |
| 17 | A. | Eddie O'Brien. |
| 18 | Q. | Did they all arrive at the same time, the DA, the -- |
| 20 | A. | Yes. |
| 21 | Q. | And approximately what time of day was that? |
| 22 | A. | It was early morning or afternoon. |
| 23 | Q. | Do you recall what the weather was that day? |
| 24 | A. | I think it was sunny out, but I don't know. |

1    Q.   Who let the people in the door?
2    A.   It would have been the dispatcher in the
3    vault or operations manager in the vault at that time
4    would have had to buzz them in.
5    Q.   And that would have been videotaped, right?
6    A.   Yes, it would have.
7    Q.   And the people leaving that day would have
8    also been videotaped?
9    A.   Yes.
10   Q.   Where were they physically in the building
11   when they were viewing the tapes?
12   A.   In the video room.
13   Q.   Which is that really small room you were
14   testifying about before?
15   A.   The real tiny room near the manager's room,
16   yes.
17   Q.   You said about three people could fit in
18   there, right?
19   A.   Very tight, yes.
20   Q.   How many people were in there?
21   A.   Eddie, the DA, and the other attorney, three.
22   Q.   The DA, was it a male or female?
23   A.   Male.
24   Q.   And was he physically carrying the tapes

73

1  when -- Was he carrying the tapes in his hand or did he
2  have them in his hand when he arrived?
3       A.   Somebody had an envelope with them, a manila
4  envelope, yes.  I don't know who was carrying them.
5       Q.   Were they little cassettes?
6       A.   No, big VHS cassettes.
7       Q.   How many tapes were there?
8       A.   Three.  I think there were there.
9       Q.   But the police had left with six?
10      A.   Yes.
11      Q.   And how long were they there viewing the
12 tapes?
13      A.   Maybe a half hour.
14      Q.   Were there any other meetings or discussions
15 or anything like that at the time?
16      A.   Other than saying hello to them and good-bye,
17 Eddie O'Brien brought them in, viewed the tapes, and
18 escorted them out and left with them.  So there was no
19 meeting, no.
20      Q.   Left with them who?
21      A.   Ardito and the district attorney.
22      Q.   They all left at the same time?
23      A.   Yes.
24      Q.   Neither Ardito nor the district attorney hung

74

```
1    around?
2        A.   No.
3        Q.   And Mr. O'Brien didn't hang around?
4        A.   I don't think so, no.
5        Q.   And was anything left behind that you can
6    recall?
7        A.   No.
8        Q.   When they left the building, would they have
9    had to have signed out?
10       A.   No.
11       Q.   How long were they there?
12       A.   About a half hour.
13       Q.   And at some point did you come to learn that
14   tapes were missing?
15       A.   Yes.
16       Q.   How soon after that day?
17       A.   I want to say maybe like a month after or a
18   couple of weeks or so.
19       Q.   How did you come to learn they were missing?
20       A.   I got a phone call from someone, whether it
21   was Doug Wilson or Eddie O'Brien.  Somebody called me.
22   I don't remember who.  It might have even been the
23   detective.  I don't know -- Yes, it was.  I'm sorry.  I
24   remember him calling asking if I had the tapes.  And I
```

84

1  appearance that day that sticks out in your mind?
2      A.   No.
3      Q.   Was there anything remarkable about her
4  demeanor that day that sticks out in your mind?
5      A.   No.  She seemed fine and anxious to come back
6  to work.
7      Q.   How soon after arriving at AMSA, if you know,
8  was she let into your office?
9      A.   Immediately that day to -- Right away.
10     Q.   And Ms. Coleman was in there with you?
11     A.   I think she met her at the door and walked
12 back with her.
13     Q.   Was there anything discussed at that meeting
14 other than what you've testified to?
15     A.   No.
16     Q.   And you didn't have any discussions with
17 Ms. Kiernan after that day?
18     A.   No.
19     Q.   And was she scheduled -- You had said, Come
20 to work tomorrow?
21     A.   It was tomorrow or next week or -- I don't
22 remember.  It was a short time, within a week or a day.
23 Whether it was a weekend or a Monday, I don't know what
24 it was exactly, but --

1   Q.   Did she go to work?
2   A.   I don't think so.  I think I remember getting
3   a phone call from either her or her girlfriend,
4   Christina Perret, something like that, saying that her
5   attorney thought it would be best for her not to come
6   to work.  I remember that briefly, but that's all I
7   remember of it.
8   Q.   But you don't know who conveyed that to you?
9   A.   It was either her herself or her girlfriend
10  Christina, Christina Perret.  I don't know if I'm
11  saying that right.
12  Q.   Tell me about that conversation, please.
13  A.   It was just a phone call saying that she was
14  not going to be in.  And I said, "Well, why not?"
15  "Because her attorney thought it would not be a good
16  idea for her to do that."
17  Q.   How, then, did the conversation end?
18  A.   "Okay.  Good-bye."
19  Q.   At that point was she considered terminated
20  by the company or voluntarily resigned?
21  A.   Not by me, but I did contact HR and let them
22  know what had happened.  And I think I remember
23  speaking to Debbie Gates, and then Debbie Gates
24  directed me to contact Allison Romantz.  I believe

```
                                                                    86
 1   that's what took place after that.
 2        Q.   Why would you need to call Allison Romantz
 3   after receiving that phone call?
 4             MR. DONOGHUE:  Objection.  Go ahead and
 5   answer.
 6        A.   Because I contacted HR to let them know,
 7   Debbie Gates, and told her that she was scheduled to
 8   come back and now called and said her attorney said she
 9   couldn't come back.  And I was directed to call Allison
10   Romantz by Debbie Gates from HR.
11        Q.   Are there any circumstances that would have
12   occurred that would have caused you to call Ms. Romantz
13   without being directed by someone at AMSA?
14        A.   No.
15             MR. DONOGHUE:  Note my objection to
16   that.  But go ahead and -- I'm sorry.  I wouldn't have
17   instructed you not to answer that question, so --
18        Q.   No?
19        A.   No.
20        Q.   So, unless you were instructed, you wouldn't
21   have any reason to contact her?
22        A.   I don't think so, no.
23        Q.   Did you have any discussions with Ms. Kiernan
24   following that day?
```

1      A.    I don't think so. I don't think I remember
2 talking to her.
3      Q.    No?
4      A.    No.
5      Q.    How about her husband?
6      A.    No.
7      Q.    Christina Perret was also employed at AMSA?
8      A.    Yes.
9      Q.    Did she start before or after Ms. Kiernan?
10     A.    After.
11     Q.    And did her employment at AMSA at some point
12 end?
13     A.    Yes.
14     Q.    When was that, please?
15     A.    She had a motor vehicle accident. I don't
16 remember when it was. She hurt her back.
17     Q.    Is that why she ended her employment at AMSA?
18          MR. DONOGHUE: Objection. But go ahead
19 and answer.
20     A.    I think so. I think she came back and tried
21 to work and it only lasted a day or two, and then she
22 couldn't take the pain with the sitting and standing.
23 I think she resigned. I think she quit because she
24 couldn't do it, but I'm not positive.

```
                                                                  112
 1   Mr. Ciambriello had been terminated from his
 2   employment?
 3        A.   I don't know.
 4        Q.   And did she specifically mention anything
 5   concerning the incident?
 6        A.   No.
 7             MR. MCLEOD:  I have no further
 8   questions.  Because of the issue that we objected to,
 9   we'll suspend.
10             MR. DONOGHUE:  Yes, that's fine.
11   Subject to that --
12             MR. MCLEOD:  Yes, subject to that, we're
13   concluded.
14             MR. DONOGHUE:  And I have no further
15   questions.
16             (Whereupon the deposition
17              was concluded at 12:10 p.m.)
18
19
20
21
22
23
24
```

```
                                                                        114
 1   COMMONWEALTH OF MASSACHUSETTS
                                              CERTIFIED ORIGINAL
 2   SUFFOLK, SS.                              LEGALINK BOSTON

 3

 4        I, Karen A. Interbartolo, Registered Professional

 5   Reporter and Notary Public in and for the Commonwealth

 6   of Massachusetts, do hereby certify that JASON J.

 7   KHOURY, the witness whose deposition is hereinbefore

 8   set forth, was duly sworn by me and that such

 9   deposition is a true record of the testimony given by

10   the witness.

11

12        I further certify that I am neither related to nor

13   employed by any of the parties in or counsel to this

14   action, nor am I financially interested in the outcome

15   of this action.

16

17        In witness whereof, I have hereunto set my hand

18   and seal this 15th day of March, 2005.

19

20

21                          [signature: Karen A. Interbartolo]

22                          Notary Public

23                          My commission expires

24                          March 9, 2012
```