# Exhibit T

1

| | | |
|---|---|---|
| 1 | CERTIFIED ORIGINAL | Volume:    I |
| 2 | LEGALINK BOSTON | Pages:    1-105 |
| 3 | | Exhibits: None |

4

5              UNITED STATES DISTRICT COURT

6              DISTRICT OF MASSACHUSETTS

7

8                          C.A. No. 04-10131 RBC

9    - - - - - - - - - - - - - - - - - - - - - x

10   HEATHER KIERNAN,

11             Plaintiff

12   vs.

13   ARMORED MOTOR SERVICE OF AMERICA, INC.

14   and FRANCESCO CIAMBRIELLO,

15             Defendants

16   - - - - - - - - - - - - - - - - - - - - - x

17

18          DEPOSITION OF EDWARD O'BRIEN

19       Thursday, June 16, 2005 - 9:59 a.m.

20             McLeod Law Offices

21             77 Franklin Street

22             Boston, Massachusetts

23             - - - - - - - - -

24   Reporter:  Maureen J. Manzi, CSR

Edward O'Brien                                                        06/16/2005

2

1    APPEARANCES:

2    ***    MCLEOD LAW OFFICES

3             (BY WILLIAM J. MCLEOD, ESQ.)

4             77 Franklin Street

5             Boston, Massachusetts   02110

6             (617) 542-2956

7             Counsel for the Plaintiff

8

9    ***    MORGAN BROWN & JOY, LLP

10            (BY ALLISON K. ROMANTZ, ESQ.)

11            200 State Street

12            Boston, Massachusetts   02109

13            (617) 523-6666

14            Counsel for the Defendant, Armored Motor

15            Service of America, Inc.

16

17

18

19

20

21

22

23

24

Edward O'Brien                                              06/16/2005

3

1                          I N D E X

2     EDWARD O'BRIEN

3     BY MR. McLEOD              4, 93

4     BY MS. ROMANTZ             84

5

6

7

8

9                       E X H I B I T S

10                        - NONE -

11

12

13

14

15

16

17

18

19

20

21

22

23

24

4

1                    P R O C E E D I N G S

2                EDWARD O'BRIEN, having been

3    satisfactorily identified by the production of his

4    driver's license, and duly sworn by the Notary

5    Public, was examined and testified as follows:

6              MR. McLEOD:   Same stipulations as before

7              MS. ROMANTZ:  That's fine.

8                    DIRECT EXAMINATION

9    BY MR. McLEOD:

10       Q.  Mr. O'Brien, you have the right to read the

11   transcript that the court reporter is going to be

12   preparing today and make any corrections that you

13   wish.  You'll be able to do that within a 30 day

14   period after we receive it.  Is that something you'd

15   like to do?

16       A.  I might.

17       Q.  I'll make it available for you then.

18       A.  Yes.

19       Q.  You'll have 30 days.  You won't have to sign

20   it in the presence of a notary.

21       A.  Okay.  I have to sign off on it though,

22   right?

23       Q.  You don't have to, but if you want to, you

24   have that right.

62

1    you know?

2        A.   I don't recall that, how long.  Once he did

3    it, it was just a egregious violation for us.  It's

4    not a matter of how long.  As soon as he opens the

5    door, he puts everybody else at risk.

6        Q.   And how about in the office, how long was he

7    in the office?

8        A.   I didn't make any notes.  I wasn't tracking

9    the time the door closed.  They were in there for a

10   period of time.  I had no idea.

11       Q.   Was he seen going into the room, the office

12   before or after he was seen outside?

13       A.   I believe it was before.

14       Q.   And did you yourself when you were viewing

15   the tapes ever take notes?

16       A.   No.

17       Q.   Did anyone besides you from AMSA ever see

18   the tapes?

19       A.   Bill Callahan, maybe Jason Cory, the manager

20   might have been there that day, but the place where

21   we showed the tapes, there was.  Very little room.

22   It's a small closet area.  It was a small facility.

23   We had a couple of recorders in there, and we locked

24   up the room, secured it, alarmed it.  But as it,

63

1    grew they kept putting more recorders.  It's a very,

2    very small room.  So it was me to be able to play a

3    monitor and the two lawyers would be standing there

4    cramped, they're watching and listening.  If Cory

5    was there, he was outside standing next to -- so he

6    may have seen something or heard something.

7        Q.  The last thing you needed was a fourth body

8    in the room?

9        A.  Yeah.  I mean, it was hot enough.  It's not

10    the best situation.  It's not set up primarily for

11    that setup to play a tape back, tape it and get out

12    of there.

13        Q.  The date and time that would have been

14    posted on the screen, they were consistent on all

15    screens?

16        A.  Consistent?

17        Q.  Well, they would have all shown the same

18    date and time?

19        A.  Depends.  The crew was supposed to check

20    them, I say the opening crew or whoever went in and

21    checked the tapes was supposed to check them every

22    morning, play them back and make sure they're

23    working, and at some point make sure that the times

24    are all consistent with other.  But they're pieces

1    that AMSA was going to be sued for this, for the
2    incident.

3         A.  At that point, maybe.  I'm not sure what the
4    charge -- I'm not sure what my thought process was.
5    I don't recall whether I knew then whether we were
6    going to be sued or not by who for anything.

7         Q.  Were you aware at that point that there had
8    been a Workers' Compensation case?

9         A.  I don't recall that.  I'm trying -- it was
10   not something that I would be involved in back then,
11   Workers' Comp.  So it wasn't -- I wouldn't have
12   known what a Workers' Comp case was other than in my
13   mind somebody falling off a truck and hurts
14   themselves at that point.  But, no, I don't recall
15   what I knew back then as far as civil matters or
16   anything like that.

17        Q.  Do you recall ever having a discussion with
18   Pamela Storm?

19        A.  No.  Refresh my memory.  Who is she?

20        Q.  She's an attorney.  No recollection?  She
21   was involved in a Workers' Comp case.

22        A.  For AMSA?  On AMSA's side?

23        Q.  My understanding is that she was with the
24   insurance company.

1      Q.   Yeah.

2      A.   He was right there.

3      Q.   I know.  What were you talking about?

4      A.   Nothing specific other than what they wanted

5   to see on the tape.

6      Q.   That's it?

7      A.   Yeah.

8      Q.   How about Mr. Ardito?

9      A.   No.  Same thing.

10     Q.   Did Mr. Ardito mention that Ms. Kiernan was

11   suing AMSA at this time?

12     A.   No, I don't recall that.

13     Q.   And how many tapes did they have with them,

14   if you recall?

15     A.   I don't recall.  I just remember three.  I

16   don't remember if they had them all.

17     Q.   Now, the assistant district attorney, did he

18   say anything to you like I need copies of these

19   tapes or how do I get these tapes to look normal, if

20   you know what I mean, in terms of not having them be

21   garbledy gook and be able to play on a regular VCR?

22     A.   He might have asked about copying the tapes.

23   I don't recall my specific conversation.  But I

24   would have told him I could have made copies of

95

1    when I say this time period, let's just say the

2    first half of 2001.  Had there been any customer

3    complaints coming from the Attleboro facility?

4         A.   Disputes?

5         Q.   Disputes.  Thank you.

6         .A.   I'm sure there were.  I'm sure there were,

7    yeah, for the amount of deposits we did around

8    there.

9         Q.   Do you have any recollection as to the

10   number?

11        A.   No.  No.  Maybe two a month.  Maybe two a

12   month.  Yeah, for that facility that would be pretty

13   typical.

14        Q.   In setting the times on the multiplexers,

15   the dates and times, that would have been the

16   responsibility of the manager?

17        A.   Overall.  You have to assign somebody that

18   is very responsible to go in and change tapes every

19   day and to maintain -- it was under alarm.  So they

20   have to have an alarm code to get in and a key.

21   It's a situation where if the branch comes under

22   duress or somebody tries to rob it, they want to get

23   at the tapes, the bad guys.  So we have a method

24   through the alarms to send a duress in case it's

Edward O'Brien

1    robbed.  So whoever had the alarm and keys and codes

2    to get in there was an important person to us

3    securitywise.

4        Q.  In terms of the day of the viewing, you

5    testified that Mr. Ardito and the assistant district

6    attorney were arguing back and forth in terms of

7    what they were seeing on the tapes and what they

8    were both inferring in terms of what they were

9    seeing.  Was it a heated argument?

10       A.  Oh, no.  No.  It was just discussion.  As we

11   watched the tape, a person walking the down the

12   hall, there was the hand on the back.  There was

13   some discussion about that.  I think it was the

14   first time they had heard that conversation, that

15   piece.

16       Q.  The piece of?

17       A.  Where she made the statement that "I don't

18   want to go back there now."  There was some talk

19   about what that meant.

20       Q.  And you're sure she said "now"?

21       A.  I'm almost positive because in retrospect

22   thinking about it, I wasn't sure what that inference

23   was.

24       Q.  And you told the police that she didn't want

103

1      Q.   Ultimately responsible for the branch?

2      A.   Yeah, for all that.

3      Q.   I'm all set.

4           MS. ROMANTZ:   Great.   I am, too.

5           (Whereupon, at 12:09 p.m., the

6   deposition of Edward O'Brien adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



105

1   COMMONWEALTH OF MASSACHUSETTS



2   MIDDLESEX, ss.

3          I, Maureen J. Manzi, Certified Shorthand

4   Reporter and Notary Public, CSR #135093, duly

5   commissioned and qualified in and for the

6   Commonwealth of Massachusetts, do hereby certify

7   that there came before me on the 16th day of June,

8   2005 the person hereinbefore named, who was by me

9   duly sworn to testify to the truth and nothing but

10  the truth of their knowledge touching and concerning

11  the matters in controversy in this cause; that they

12  were thereupon examined upon their oath, and their

13  examination reduced to typewriting under my

14  direction and that the deposition is a true record

15  of the testimony given by the deponent.

16          In Witness Whereof, I have hereunto set my

17  hand and affixed my seal this 26th day of June,

18  2005.

19

20

21

22  Notary Public

23  My Commission Expires:

24  January 17, 2008