# Exhibit U

|    |                                              |
|----|----------------------------------------------|
| 1  | Volume: I                                    |
| 2  | Pages: 1-109                                 |
| 3  | Exhibits: 1-3                                |
| 5  | UNITED STATES DISTRICT COURT                 |
| 6  | FOR THE DISTRICT OF MASSACHUSETTS            |
| 8  | C.A. No. 04-10131                            |
| 10 | - - - - - - - - - - - - - - - - - - - - x   |
| 11 | HEATHER KIERNAN,                             |
| 12 | Plaintiff        **CERTIFIED ORIGINAL**      |
| 13 | vs.              **LEGALINK BOSTON**         |
| 14 | ARMORED MOTOR SERVICE OF AMERICA, INC. and   |
| 15 | FRANCESCO CIAMBRIELLO,                       |
| 16 | Defendants                                   |
| 17 | - - - - - - - - - - - - - - - - - - - - x   |
| 18 | DEPOSITION OF CHRISTOPHER W. ABREU           |
| 19 | Thursday, June 2, 2005 - 10:15 a.m.          |
| 20 | MORGAN BROWN & JOY, LLP                      |
| 21 | 200 State Street - 11th Floor                |
| 22 | Boston, Massachusetts                        |
| 23 | - - - - - - - - -                            |
| 24 | Reporter: Maureen J. Manzi, CSR              |

1  APPEARANCES:

2  ***   McLEOD LAW OFFICES

3           (BY WILLIAM J. McLEOD, ESQ.)

4           77 Franklin Street

5           Boston, Massachusetts   02110

6           (617) 542-2956

7           Counsel for the Plaintiff

8

9  ***   MORGAN BROWN & JOY, LLP

10          (BY ALLISON K. ROMANTZ, ESQ.)

11          200 State Street - 11th Floor

12          Boston, Massachusetts   02109-2605

13          (617) 523-6666

14          Counsel for the Defendant, Armored Motor

15          Service of America, Inc.

16

17

18

19

20

21

22

23

24

3

1                    I N D E X

2  CHRISTOPHER W. ABREU

3  BY MR. McLEOD            4, 90, 103, 106

4  BY MS. ROMANTZ           68, 98, 105

5

6

7

8

9                  E X H I B I T S

10  Exhibit 1, notes........................ 31

11  Exhibit 2, series of e-mails............ 59

12  Exhibit 3, Working Detectives Tape

13  6/20/2003............................... 86

14

15

16

17

18

19

20

21

22

23  *Exhibit 1 and 2 included in the transcript.

24  *Exhibit 3 retained by Attorney Romantz.

4

1      P R O C E E D I N G S

2          MR. McLEOD: Regular stips?

3          MS. ROMANTZ: That's fine.

4          MR. McLEOD: Mr. Abreu, you have the
5   right to read and sign your transcript. Do you want
6   to do that?

7          MR. ABREU: Yeah, why not.

8          CHRISTOPHER W. ABREU, having been
9   satisfactorily identified by the production of his
10  driver's license, and duly sworn by the Notary
11  Public, was examined and testified as follows:

12              DIRECT EXAMINATION
13  BY MR. McLEOD:

14      Q.  Could you state your name for the record?

15      A.  It's Christopher Abreu.

16      Q.  Mr. Abreu, my name is Bill McLeod. I'm
17  going to ask you some questions today. You are
18  placed under oath. It is the same oath that you
19  would take in a court of law. This is a case
20  brought by Heather Kiernan as well as the Armored
21  Motor Service of America and Francesco Cambriello.
22  You're here under Subpoena. If you need a break,
23  just say the word. If you don't understand a
24  question, let me know. The court reporter needs to

1   case?

2   A. I believe that is where they were working
3   together, they got up and they opened the door and
4   walked through a hallway. To the best of my
5   recollection, the hallway went at an angle and you
6   had to take a right, okay, and then that right led
7   you straight to the office where the alleged
8   incident occurred.

9   Q. I don't have any other questions.

10          MR. McLEOD: I have some follow-up.

11              REDIRECT EXAMINATION

12  BY MR. McLEOD:

13  Q. When you were having discussions with Mr.
14  Ardito in the viewing room about what you saw, were
15  you attempting to get him to stipulate to certain
16  things that you were seeing on the videotapes?

17  A. No.

18  Q. You weren't trying to stipulate to facts or
19  anything like that that you were seeing?

20  A. No.

21  Q. So you were asking him that merely for
22  confirmation, did you hear it, too?

23  A. Yeah.

24  Q. Now, on the videotapes -- actually I'll

1   strike that. Was there any discussion that came
2   from Mr. Ardito in the viewing that day that the
3   tapes should show Ms. Kiernan and the defendant
4   touching each other in any way?
5       A.  We didn't know what the tapes were going to
6   show because Mr. Ardito hadn't even watched the
7   tapes at that point. This was the first time he was
8   watching the tapes to my recollection.
9       Q.  So was it your understanding that Mr. Ardito
10  had no idea what was going to be on these tapes?
11      A.  Correct.
12      Q.  On the tapes you saw Ms. Kiernan and the
13  defendant working together --
14      A.  Yes.
15      Q.  -- and they were sitting down? At any time
16  did you see them touching each other while they were
17  sitting down?
18      A.  I don't recall. But I will say, that the
19  angle that when they were working together was far
20  off at the end of this camera angle. So it wasn't
21  very clear. You would be able to see two figures,
22  but exactly what they were doing with their hands
23  specifically, you really couldn't see.
24      Q.  If those two figures say just hypothetically

1   exactly where they were walking to, and he would
2   just guide us that way. But that's it.
3       Q. But he didn't offer any editorial comment in
4   terms of what you were watching?
5       A. He only indicated I remember in the office
6   that the alleged incident occurred, there was no
7   camera in that area.
8       Q. Did Mr. Ardito make any editorial comment in
9   terms of what you were watching?
10      A. Mr. Ardito and I both made our own comments
11  regarding what we were seeing, what we thought would
12  be compelling for each of our cases, stuff like that
13  in just verifying what we both believed we saw in
14  viewing the tape.
15      Q. What did Mr. Ardito say that he believed he
16  saw that he felt was compelling for his case?
17      A. The fact that there was no grappling, no
18  dragging down the hallway.
19      Q. Grappling, is that what you said?
20      A. I don't know what. But looking at a case
21  that you'd try to put forward, there was no actual
22  physical grabbing of the alleged victim down the
23  hallway. There wasn't any forcing into the room.
24  The fact that she left or went outside, had

1   opportunity to leave. The fact that never called
2   the police. The fact that somebody went there
3   didn't leave with that person. The fact that she
4   went back in the building were all.
5       Q. Those are all things that you pointed out?
6       A. Yes.
7       Q. And was there anything that he specifically
8   wanted to see on the tapes that hadn't been shown,
9   such as, any interaction prior to 17:41:32?
10      A. No. We were watching to see if we could
11  hear anything while they were at the workplace or
12  any complaining or anything like that, but
13  unfortunately the audio was just so bad you couldn't
14  really hear anything. You just saw two figures in
15  the location. So nothing came up of importance
16  until they both got up and I heard the "I'm not
17  going in there."
18      Q. Now, at this time was this the first case
19  you had been involved with that had videotapes as
20  evidence?
21      A. No.
22      Q. Was it the first case you had been involved
23  with that had videotapes as evidence that had
24  videotapes in this type of format?

107

1  On the bottom of the page it says CTS.  Do you know
2  what CTS refers to?  I'm referring to Exhibit 2.
3      A.  I do not.  I did not write that.
4      Q.  And ATDC, do you know what that means?
5      A.  No, I do not.
6      Q.  Okay.  Thanks.  I have nothing further.
7              (Whereupon, at 12:08 p.m., the
8  deposition of Christopher Abreu adjourned.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

1  COMMONWEALTH OF MASSACHUSETTS

2  MIDDLESEX, ss.

3      I, Maureen J. Manzi, Certified Shorthand

4  Reporter and Notary Public, CSR #135093, duly

5  commissioned and qualified in and for the

6  Commonwealth of Massachusetts, do hereby certify

7  that there came before me on the 2nd day of June,

8  2005 the person hereinbefore named, who was by me

9  duly sworn to testify to the truth and nothing but

10 the truth of their knowledge touching and concerning

11 the matters in controversy in this cause; that they

12 were thereupon examined upon their oath, and their

13 examination reduced to typewriting under my

14 direction and that the deposition is a true record

15 of the testimony given by the deponent.

16     In Witness Whereof, I have hereunto set my

17 hand and affixed my seal this 17th day of June,

18 2005.

*Maureen J. Manzi*
Notary Public

My Commission Expires:

January 17, 2008

**CERTIFIED ORIGINAL
LEGALINK BOSTON**