# United States District Court
# District of Massachusetts

HEATHER KIERNAN,
              Plaintiff,

        V.                      CIVIL ACTION NO. 04-10131-RBC

ARMORED MOTOR SERVICE OF
      AMERICA, INC.,
FRANCESCO CIAMBRIELLO,
               Defendants.

## MEMORANDUM AND ORDER ON DEFENDANT ARMORED MOTOR SERVICE OF AMERICA, INC.'S MOTION FOR SUMMARY JUDGMENT (#58)

COLLINGS, U.S.M.J

### I. INTRODUCTION

In this action, Heather Kiernan ("Kiernan" or the "plaintiff") has sued defendant Armored Motor Service of America, Inc. ("AMSA") for violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and Mass. Gen. L. c. 151B

("c. 151B") (Counts I and II) and Francesco Ciambriello ("Ciambriello") for violations of the Massachusetts Civil Rights Act (Count III) arising out of an incident in which Kiernan, an employee of AMSA, was sexually assaulted by Ciambriello, also an employee of AMSA. On February 10, 2006, AMSA moved for summary judgment on both Counts I and II and submitted a supporting memorandum of law and statement of undisputed facts (##58, 59, 60). On February 27, 2006, Kiernan opposed the motion (#63-1) and submitted a response to AMSA's statement of undisputed facts (#63-2) along with a memorandum of facts and law in support of her opposition (#63-3). On March 14, 2006, AMSA filed a reply memorandum (#65). With the record complete, the motion for summary judgment is ripe for decision.    For the reasons discussed below, the Court shall allow in part and deny in part AMSA's motion.

## II.  FACTUAL BACKGROUND[1]

In 2001, AMSA operated a vault and cash collection business in Attleboro, Massachusetts. (#59, ¶ 4) During that time frame, Jason Khoury ("Khoury") was the branch manager of AMSA's Attleboro facility. (#59, ¶ 5) Ciambriello was employed as a part-time vault supervisor at AMSA's Attleboro facility,

---

[1]    The Court restates only those facts that are relevant for decision on the instant motion and often quotes the facts verbatim from the parties' pleadings albeit without quotation marks.

working nights and weekends, between March 12, 2001 and May 20, 2001. (#59, ¶ 7) Kiernan contends that Ciambriello was hired as a "supervisor" but held the title of "weekend supervisor" and that he controlled the Attleboro facility in Khoury's absence. (#63-2, ¶ 7)

Ciambriello did not have the authority to hire, fire or discipline employees. (#59, ¶ 9) Moreover, Ciambriello was not involved in making decisions regarding promotions or demotions of employees. (#59, ¶ 11) Ciambriello also was not responsible for evaluating employees or scheduling hours of work for employees, but there is a dispute as to whether Kiernan "answered to" Ciambriello when she worked with him on the weekends. (#59, ¶ 10; #63-2, ¶ 10) Ciambriello was the "supervisor" on the weekends, but during the week he was not a "supervisor" even though his duties did not change in any way from the workweek to the weekend. (#59, ¶ 13) Kiernan posits that on the weekends Ciambriello "controlled" the building in the absence of the branch manager. (#63-2, ¶ 13)  On the weekends, Ciambriello's duties were to: send the trucks on the road, make sure they had the correct amount of money and make sure the building was safe and secure. (#59, ¶ 14)

Kiernan began employment at AMSA as a part-time data entry clerk in AMSA's Attleboro facility in April, 2001. (#59, ¶ 18) Both Kiernan and

3

Ciambriello were provided with copies of AMSA's sexual harassment policy when they began work with AMSA, a policy that provided reporting options for employees to report unwelcome harassment. (#59, ¶¶ 19, 20, 21) AMSA also provided training on preventing sexual harassment in the workplace to its managers and supervisory staff, although it is unclear whether Ciambriello ever received such training. (#59, ¶ 22; #63-2, ¶ 22)

Prior to May 21, 2001, Ciambriello had engaged in conduct in front of Kiernan that she found to be sexually inappropriate and offensive, specifically he unbuttoned his pants in order to tuck in his shirt. (#59, ¶ 23) Kiernan did not report the behavior of Ciambriello to anyone. (#59, ¶ 25)  In addition, the ATM manager with whom Kiernan shared an office had conversations with others about sexual matters in Kiernan's presence. (#59, ¶ 24)  Kiernan was also present when other employees engaged in inappropriate behavior of a sexual nature, about which she spoke with Khoury. (#63-2, ¶ 24) When Khoury asked if it bothered her, Kiernan told Khoury she was used to people talking like that. (#63-2, ¶ 24)

Kiernan and Ciambriello were both scheduled to work on Saturday, May 19, 2001. (#59, ¶ 26) Kiernan had plans to socialize with her friend, Christina Parrot ("Parrot"), after work on May 19, 2001. (#59, ¶ 27) Parrot also had

4

recently started working for AMSA in the Attleboro facility. (#59, ¶ 27) During the day on May 19, Parrot came to the Attleboro facility to meet with Kiernan so that Kiernan could give Parrot money to purchase alcohol which the two intended to drink after Kiernan finished with work. (#59, ¶ 28) When Parrot arrived at the facility, Kiernan and Ciambriello left the building to smoke cigarettes together with Parrot. (#59, ¶¶ 29, 30) In leaving the building, Ciambriello left the vault unlocked and unattended which was a serious breach of AMSA policy. (#59, ¶ 31) However, this policy is not documented anywhere in writing. (#63-2, ¶ 31) After the three finished their cigarettes, Parrot left and Kiernan and Ciambriello returned inside. (#59, ¶ 32)

Kiernan claims that while Kiernan and Ciambriello were inside, Ciambriello sexually assaulted her by kissing her and touching her breasts and then forcing her into the branch manager's office where he performed oral sex on her, digitally penetrated her vagina and exposed his penis to her while requesting that she perform oral sex on him. (#59, ¶ 33) Ciambriello denies Kiernan's account of what happened and claims that the two were kissing voluntarily and when Kiernan wanted it to stop, he stopped. (#59, ¶ 33 n. 2) It is unclear how long Kiernan and Ciambriello were in the branch manager's

office. (#59, ¶ 34; #63-2, ¶ 34)[2] When Kiernan told Ciambriello that she needed to use the restroom, he stepped aside and Kiernan left the branch manager's office to use the ladies' room. (#59, ¶ 34) When Kiernan exited the restroom, Ciambriello asked Kiernan whether she wanted a soda and after she declined, the two walked back into the dispatch area. (#59, ¶ 35)

At some point after the assault, Kiernan called Parrot and asked her to return to the Attleboro facility. (#59, ¶ 40) When Parrot arrived, Kiernan left the facility to meet with her in the parking lot; Ciambriello remained inside. (#59, ¶ 41) Kiernan and Parrot smoked cigarettes, and Kiernan told Parrot that "something had happened" and that she wanted Parrot to come back into the building with her and remain there for the rest of Kiernan's shift. (#59, ¶ 42) Parrot asked Ciambriello if it was o.k. that she was in the building, and Ciambriello said it was fine. (#63-2, ¶ 42) Parrot remained with Kiernan for the rest of Kiernan's shift, and when Kiernan was finished, she and Parrot left the facility. (#59, ¶¶ 43, 44)

Kiernan eventually told her husband she was raped, and her husband

---

[2]

Although it is not particularly relevant for purposes of summary judgment, there were apparently some videotapes that would have shown how long Kiernan and Ciambriello were in the branch manager's office. Those tapes have disappeared. (#63-2, ¶ 34)

called the Attleboro police to report the matter and called an ambulance to pick up Kiernan and take her to the hospital. (#59, ¶ 50) The Attleboro police notified AMSA that Kiernan was claiming to have been raped while at work by another employee, Ciambriello. (#59, ¶ 51)

When AMSA and the police reviewed AMSA's (now missing) security videotapes for May 19, 2001, AMSA discovered that Ciambriello had gone outside during his shift and left the vault unlocked and unattended. (#59, ¶ 52) On Sunday, May 20, 2001, Khoury contacted Ciambriello to advise him that he was suspended from AMSA for three days for leaving the building with the vault open on May 19, 2001. (#59, ¶ 53) A three day suspension is the discipline that AMSA would typically give for this type of violation. (#59, ¶ 53) Khoury later testified that at the time of the suspension, there was "probably nothing" more that needed to be done in furtherance of the investigation, but that maybe AMSA wanted to check the policy to see if what Ciambriello had done (i.e., leaving the building) was a termination offense. (#63-2, ¶ 53) Ciambriello was notified after his suspension was completed that his employment with AMSA had been terminated. (#59, ¶ 54)

### III.  DISCUSSION

## A. Standard of Review

Summary judgment purports "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.,* 332 F.3d 6, 12 (1 Cir., 2003) (citing *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1 Cir., 1990) (quoting Fed. R. Civ. P. 56 Advisory Committee's note)).  The party moving for summary judgment bears the initial burden of asserting the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.,* 335 F.3d 15, 19 (1 Cir., 2003).  After the moving party has met its burden, "the burden shifts to the summary judgment target [the non-moving party] to demonstrate that a trialworthy issue exists." *Mulvihill,* 335 F.3d at 19 (citing *Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1 Cir., 2000)).

When considering whether to grant summary judgment, the Court must determine whether:

> ...the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c).

In making this assessment, the Court must "scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor." *Mulvihill,* 335 F.3d at 19 (citing *Morris v. Gov't Dev't. Bank of Puerto Rico,* 27 F.3d 746, 748 (1 Cir., 1994)); *see also Podiatrist Ass'n, Inc.,* 332 F.3d at 13; *Pure Distributors, Inc. v. Baker,* 285 F.3d 150, 152 (1 Cir., 2002); *New England Regional Council of Carpenters v. Kinton,* 284 F.3d 9, 19 (1 Cir., 2002) (citing *Dynamic Image Technologies., Inc. v. United States,* 221 F.3d 34, 39 (1 Cir., 2000)); *Kearney v. Town of Wareham,* 316 F.3d 18, 22 (1 Cir., 2002).

Despite this "notoriously liberal" standard, *Mulvihill,* 335 F.3d at 19, summary judgment cannot be construed as "a hollow threat." *Kearney,* 316 F.3d at 22. A factual dispute which is neither "genuine" nor "material" will not survive a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Thus, in deciding whether a factual dispute is "genuine," the Court must determine whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248; *Kearney,* 316 F.3d at 22 (citing *United States v. One Parcel of Real Prop. (Great*

*Harbor Neck, New Shoreham, R.I.),* 960 F.2d 200, 204 (1 Cir., 1992)*; Suarez,* 229 F.3d at 53 (citing *McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313,  315 (1 Cir., 1995)).  In circumstances where submitting the issue in dispute to the jury amounts to "nothing more than an invitation to speculate," summary judgment is appropriate.  *Feliciano de la Cruz v. El Conquistador Resort and Country Club,* 218 F.3d 1, 9 (1 Cir., 2000)   (quoting *Lattimore v. Polaroid Corp.,* 99 F.3d 456, 467-68 (1 Cir., 1996)).  In weighing whether a factual dispute is "material," the Court must examine the substantive law of the case, because "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248; *Kearney,* 316 F.3d at 22.

The focus at the summary judgment phase "'should be on the ultimate issue: whether, viewing the aggregate package of proof offered by the plaintiff and taking all inferences in the plaintiff's favor, the plaintiff has raised a genuine issue of fact.'" *Rivas Rosado v. Radio Shack, Inc.,* 312 F.3d 532, 535 (1 Cir., 2002) (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.,* 202 F.3d 424, 430-31 (1 Cir., 2000)); *see also Leahy v. Raytheon Co.,* 315 F.3d 11, 16-17 (1 Cir., 2002); *Suarez,* 229 F.3d at 53.  The party objecting to summary judgment may

not merely rest upon the statements put forth in its own pleadings.  *See Gillen v. Fallon Ambulance Service, Inc.,* 283 F.3d 11, 26 (1 Cir., 2002) (citing *Colantuoni v. Alfred Calcagni & Sons, Inc.,* 44 F.3d 1, 4-5 (1 Cir., 1994) (a party objecting to summary judgment fails to put forth a genuine issue of material fact merely by filing an affidavit contradicting unambiguous answers contained in a prior deposition)).  Instead, Rule 56(c):

> mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on  which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## B. The Motion for Summary Judgment

AMSA has moved for summary judgment on the grounds that there are no issues of disputed fact and that it, as an employer, cannot be held vicariously liable under Title VII and c. 151B for a sexually hostile work environment created by a co-worker of Kiernan because AMSA: (1) neither knew nor should have known about Ciambriello's sexually inappropriate behavior prior to the alleged assault; and (2) once it learned of Kiernan's allegation, it acted promptly and effectively by removing Ciambriello from his job.  AMSA also posits that

even if Ciambriello was Kiernan's supervisor, rather than her co-worker, AMSA still cannot be held liable because it has an affirmative defense. (#58 at 1-2) Kiernan has opposed the motion, contending that there are genuine issues of disputed fact as to (1) whether Ciambriello was Kiernan's supervisor; (2) whether AMSA knew or should have known about Ciambriello's inappropriate behavior; and (3) whether AMSA's remedial action of firing Ciambriello was sufficient as interpreted by the case law. (*See generally* #63-3)

1.    *Ciambriello's Status – Supervisor or co-worker?*

The first issue to be addressed is whether there is a genuine dispute as to whether Ciambriello was Kiernan's supervisor.   The question of whether Ciambriello was a supervisor is particularly pertinent because the standard for employer liability is different depending on whether the harasser was a supervisor or a co-worker of the victim.   As the Supreme Court explained regarding an employer's liability for a supervisor's actions:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages....The defense comprises two necessary elements: (a) that the employer exercised

12

> reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998)(citing *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742 (1998)).

The affirmative defense described above has come to be known as the "*Faragher/Ellerth* defense." *Noviello v. City of Boston*, 398 F.3d 76, 94 (1 Cir., 2005). Such a defense is not available to c. 151B claims. Indeed, "chapter 151B does not afford employers any affirmative defenses to liability.... [T]he SJC has endorsed a rule that holds employers strictly liable for supervisory harassment." *Noviello*, 398 F.3d at 95.

As for co-worker harassment, Title VII and c. 151B have much the same standard:

> When coworkers, rather than supervisors, are responsible for the creation and perpetuation of a hostile work environment, Title VII and chapter 151B seem essentially coterminous as they relate to employer liability....Typically, this involves a showing that the employer knew or should have known about the harassment, yet failed to take prompt action to stop it....Similarly, under chapter 151B, employer liability for coworker harassment requires a showing that the employer knew or should have known about the harassment, yet failed to halt it.

*Noviello*, 398 F.3d at 95 (citations omitted). *See also Messina v. Araserve, Inc.*, 906 F. Supp. 34, 37 (D. Mass., 1995) ("the effect of adequate remediation on employer liability for sexual harassment committed by a co-worker under Chapter 151B is the same as under Title VII: it is a bar to liability.").

As to whether Ciambriello was a supervisor, the parties disagree wholeheartedly. AMSA argues that despite Ciambriello's job title, he was not a supervisor because he was not "imbued with any supervisory powers." (#60 at 5) As AMSA points out, it is undisputed that Ciambriello "did not have the power to hire or fire[,]...to promote, transfer or discipline any employee." (#60 at 6) Moreover, he was not responsible for evaluating Kiernan's performance and his "job duties were limited to sending the delivery trucks on the road, acting as the dispatcher while the trucks were on their routes, making sure the trucks delivered the correct amount of money and making sure the building was

safe and secure." (#60 at 6)

Kiernan, on the other hand, contends that there is at least a genuine issue of fact as to whether Ciambriello was a supervisor because he had the title of "weekend supervisor" and "had control over the facility that the Plaintiff worked in and control over everyone inside that facility." (#63-3 at 3, 7)  In addition, says Kiernan, she "answered to Ciambriello on the weekends" and Ciambriello ran the building in Khoury's absence. (#63-3 at 4) Finally, Kiernan argues that even if Ciambriello was not actually her supervisor, a jury could find that she reasonably believed that he was her supervisor. (#63-3 at 7)

In the instant case, the Court finds that there is enough conflicting evidence to create a genuine issue of fact as to whether Ciambriello was Kiernan's supervisor.  As one court pointed out, "[t]he question of whether an employee is a supervisor in the relevant sense is itself factual in nature." *Noviello*, 398 F.3d at 95.  The court in *Noviello* went on to explain that:

> The key to determining supervisory status is the degree of authority possessed by the putative supervisor....Thus, courts must distinguish employees who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers....Having in mind both common law agency principles and the purposes of the anti-discrimination and anti-retaliation laws, we agree

15

> with the Seventh Circuit that the essence of supervisory
> status is the authority to affect the terms and
> conditions of the victim's employment....This authority
> primarily consists of the power to hire, fire, demote,
> promote, transfer, or discipline an employee....We
> think that the same standard applies under chapter
> 151B.

*Noviello,* 398 F.3d at 95-96 (citations and internal quotations omitted). *See also*

*Newell v. Celadon Security Svcs., Inc.*, 417 F.Supp.2d 85, 93 (D. Mass.,

2006)(applying Massachusetts law)("where an employer has conferred

supervisory authority on an employee, regardless of the actual title given the

employee, there may be strict liability on the part of the employer even if the

supervisor is not the victim's direct supervisor").

While it is undisputed here that Ciambriello did not have the authority to

hire, fire or evaluate Kiernan, what is disputed is whether Ciambriello had the

authority to direct Kiernan's activities.   Moreover, there is some evidence that

even if Ciambriello was not her actual supervisor, Kiernan believed that he was

her supervisor in that she "answered to him on the weekends".  Granted, if it is

alleged that "there [was] a false impression that the actor was a supervisor,

when he in fact was not, the victim's mistaken conclusion must be a reasonable

one." *Ellerth*, 524 U.S. at 759 (citing Restatement (Second) of Agency (1957)

16

at § 8, Comment c).   Here, a jury could find that Kiernan's belief that Ciambriello was her supervisor was reasonable.  Indeed, there is confusion on both Kiernan and Ciambriello's behalf as to whether he was a supervisor.  Also, there is evidence that Ciambriello had control over the Attleboro facility in that he decided who came into the building.  Thus, viewing the facts in the light most favorable to Kiernan, the Court finds that there is a genuine issue of fact as to whether Ciambriello was Kiernan's supervisor.  *See Miller v. Rebo, Inc.*, 2002 WL 31951260, *5 (S.D. Ohio, Dec. 19, 2002) ("At the very least, a question of fact exists as to whether [employee] had enough authority to qualify as an agent" and therefore as a supervisor).

2.    *Has AMSA Satisfied the Faragher/Ellerth Affirmative Defense?*

If Ciambriello is found by a jury to be a supervisor, then under Title VII, AMSA may rely on the affirmative defense set out above.[3]  Specifically, AMSA may assert: (a) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that  Kiernan unreasonably failed to take advantage of any preventive or corrective opportunities provided by the

---

[3]

Of course, as already explained, if Ciambriello is determined to be a supervisor, then Kiernan prevails under c. 151B because there is no affirmative defense available to AMSA.  "[U]nder Massachusetts law, an employer's remediation does not bar liability committed by a supervisor." *Messina*, 906 F. Supp. at 37.

employer or to avoid harm otherwise. *Noviello*, 398 F.3d at 95. If the Court was to find that there was no genuine issue of material fact as to either prong of the above affirmative defense, then it would be essentially a moot point that the Court found that there was an issue of fact as to whether Ciambriello was a supervisor. That is, if there is no factual question as to the affirmative defense, then the Court could rule as a matter of law that if Ciambriello is found to be a supervisor, summary judgment should enter for AMSA.

While it is a close call, the Court rules that there is an issue of fact at least as to the second prong of the affirmative defense. As to the first prong, it is undisputed that AMSA had a written sexual harassment policy in place and that Kiernan and Ciambriello both received copies of the policy. Moreover, it is undisputed that AMSA provided training in preventing sexual harassment to its managers and supervisory staff. However, it is unclear whether Ciambriello received such training. "While proof that an employer had promulgated an antiharassment policy...is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed...when litigating the first element of the defense." *Faragher*, 524 U.S. at 807. Thus, as to the first prong, there is no disputed issue

– AMSA had a policy and training in place to prevent sexual harassment, demonstrating that it, as an employer, took reasonable care to prevent and correct harassing behavior by its employees.

As to the second element – whether Kiernan failed to take advantage of any preventive or corrective opportunities provided by AMSA – there is enough of a dispute to warrant the issue being presented to a jury. AMSA argues that prior to the assault Ciambriello had engaged in behavior that was harassing to Kiernan, i.e., unbuttoning his pants and tucking in his shirt in her presence, but that Kiernan never reported such actions to anyone at AMSA. Although Kiernan alleged that she was "disgusted" by such behavior (*see* #1, ¶ 10), there is no evidence that Kiernan considered it to be sexually harassing such that it should have been reported. Moreover, when other employees spoke in a sexually inappropriate way in Kiernan's presence, she told Khoury that she was "used to" people speaking in such a manner. (#63-2, ¶ 23) In short, there is a dispute over whether Kiernan failed to avail herself of opportunities provided by AMSA to correct sexually harassing behavior. Indeed, it is not even clear that prior to the sexual assault Kiernan had considered herself to have been harassed such that she should have reported it.

In sum, there is a disputed issue of fact as to whether Ciambriello was Kiernan's supervisor. Moreover, there is an issue of fact as to whether Kiernan had reason to and yet failed to take advantage of measures provided by AMSA designed to prevent sexual harassment. Thus, summary judgment for AMSA on this issue is not appropriate.

3.    *If Ciambriello is Found to be a Co-Worker, Did AMSA Take Prompt and Corrective Action to Stop Ciambriello?*

If a jury finds that Ciambriello was a co-worker of Kiernan rather than her supervisor, the standard for AMSA's liability under both Title VII and c. 151B is quite different than in the supervisor situation. For Kiernan to prevail if Ciambriello is found to have been a co-worker, she would have to show that AMSA "knew or should have known about the harassment, yet failed to take prompt action to stop it...." *Noviello*, 398 F.3d at 95; *see also Brissette v. Franklin County, Sheriff's Office*, 235 F. Supp.2d 63, 89-90 (D. Mass., 2003)(quoting *White v. New Hampshire Dept. of Corrections*, 221 F.3d 254, 261 (1 Cir., 2000))("If the harassment was caused by a co-employee, then 'the employer is liable if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action.'"). It is undisputed that when AMSA learned what Ciambriello had done to Kiernan, it

suspended him for three days and then terminated his employment.

However, Kiernan argues that such actions do not constitute "prompt and corrective action" because the stated reason for Ciambriello's termination was that he violated a company policy by leaving the vault unattended. Kiernan suggests that AMSA's actions were not sufficient because they were "not calculated to prevent further harassment." (#63-3 at 13) In other words, according to Kiernan, AMSA sent no message to Ciambriello or any other employee that Ciambriello's sexual assault was unacceptable. (#63-3 at 13) AMSA, on the other hand, asserts that it is irrelevant what the stated reason for Ciambriello's firing was because the ultimate result was that AMSA stopped Ciambriello's harassing behavior and that AMSA's actions were prompt, effective and adequate.[4] (#50 at 7-8)

Unfortunately for Kiernan, the case law does not support her position that in order for an employer's actions to be considered prompt and effective, they must send a "message" to the harasser and to other employees. Although the

---

[4]

The Court finds as a matter of law that AMSA did not know, nor should it have known, of any prior harassing behavior by Ciambriello. The only other evidence of purportedly sexually inappropriate action by Ciambriello was his unbuttoning his pants and tucking in his shirt in front of Kiernan. Even if this behavior could be considered sexually harassing, which is debatable, it was never reported to anyone at AMSA, and therefore AMSA had no reason to know of any propensity by Ciambriello for sexually inappropriate behavior. Thus, the only issue that must be decided is whether once AMSA learned of the sexual assault, the actions it took were prompt and adequate as a matter of law.

First Circuit has not addressed this issue specifically, other courts have consistently held that the employer's actions simply must be calculated to stop the harassment. And while some courts have found that the actions must include some disciplinary measure, firing the employee is certainly sufficient to constitute discipline.

For example, the Third Circuit has held that an "effective remedy–one that stops the harassment–is adequate per se" and that "the remedy need not include discipline to be adequate." *Jensen v. Potter*, 435 F.3d 444, 453 (3 Cir., 2006)(citing *Knabe v. Boury Corp.*, 114 F.3d 407, 411-13 and n. 8 (3 Cir., 1997)), impliedly overruled on other grounds, *Burlington Northern & Santa Fe Railway Co. v. White*, ___U.S. ___, 126 S.Ct. 2405 (2006). *See also Moore v. City of Philadelphia*, ___ F.3d ___, 2006 WL 2492256 (3 Cir., Sept. 13, 2006). Similarly, the Seventh Circuit has held that an "employer's response to alleged instances of employee harassment must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made." *Hayden v. Heart Ctr. of Hendricks County*, 2001 WL 1089528, *6-7 (S.D. Ind., Sept. 13, 2001)(quoting *Berry v. Delta Airlines, Inc.*, 260 F.3d 830 (7 Cir., 2001)(quoting *McKenzie v. Ill. Dept. of*

*Transp.*, 92 F.3d 473, 480 (7 Cir., 1996)). And, the Eighth Circuit relies on several factors in determining whether an employer's remedial measures are reasonable, including "'the temporal proximity between the notice and remedial action, the disciplinary or preventative measure taken and whether the measures ended the harassment.'" *Carlson v. C.H. Robinson Worldwide, Inc.*, 2005 WL 758602, *20 (D. Minn., Mar. 31, 2005)(quoting *Meriweather v. Caraustar Packaging Co.,* 326 F.3d 990, 993 (8 Cir., 2003)). Additionally, the Ninth Circuit has stated that "the reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment." *Ellison v. Brady*, 924 F.2d 872, 882 (9 Cir., 1991). In *Ellison*, the court explained that appropriate action by the employer should include some discipline and that such discipline could include reprimand, probation, suspension or termination. 924 F.2d at 882.

Moreover, the District of Massachusetts has held that "the chief measure of the adequacy of an employer's response is not the victim's own personal sense of justice, but rather–particularly where there is no prior history of workplace harassment–whether the behavior that gave rise to the complaint has ceased and does not threaten to reoccur." *Saad v. Stanley St. Treatment and*

*Resources, Inc.*, 1994 WL 846911, *10 (D. Mass., May 20, 1994)(citations omitted); *see also Hayes v. Henri Bendel, Inc.*, 945 F. Supp. 374, 380 (D. Mass., 1996)(granting summary judgment for employer because "[w]here an employer takes prompt and effective remedial action upon learning of harassing conduct, summary judgment is appropriate."); *Messina*, 906 F. Supp. at 38 (granting summary judgment for employer because employer's actions of reprimanding harasser and placing warning letter in his file were "prompt and appropriate.").

In the instant case, it is clear that AMSA's actions of suspending and then firing Ciambriello were prompt and effective–AMSA took action immediately, its actions prevented Ciambriello from acting against Kiernan or anyone else, there was no possibility that the offensive actions would reoccur and AMSA's measures did include discipline in that Ciambriello was suspended and terminated. While AMSA did not specifically inform Ciambriello that he was being fired because of the sexual assault against Kiernan, it is undisputed that AMSA did act promptly and forcefully in that it stopped Ciambriello completely from perpetrating any further harassment against Kiernan or any other AMSA employee. Under the standard set forth above, no reasonable factfinder could determine that AMSA did not act promptly and effectively. Kiernan's argument

that AMSA must have stated that it was disciplining Ciambriello specifically for the sexual assault is unavailing.

Therefore, if Ciambriello is found by a jury to be a co-worker of Kiernan rather then her supervisor, judgment should enter for AMSA because the evidence presented clearly demonstrates that AMSA took prompt and effective corrective action against Ciambriello by suspending him and terminating his employment.

## IV.  CONCLUSION AND ORDER

For the reasons set out above, it is ORDERED that Defendant Armored Motor Service of America, Inc.'s Motion for Summary Judgment (#58) be, and the same hereby is, DENIED on the grounds that there is a genuine issue of material fact as to whether defendant Ciambriello was Plaintiff's supervisor and an issue of fact as to whether Kiernan availed herself of AMSA's measures to prevent harassment.  However, it is further ORDERED that Defendant Armored Motor Service of America, Inc.'s Motion for Summary Judgment (#58) be, and the same hereby is, ALLOWED to the extent that if defendant Ciambriello is found to have been a co-worker of Plaintiff rather than her supervisor, AMSA's actions of terminating Ciambriello were sufficient as a matter of law to absolve

AMSA of liability.

/s/ Robert B. Collings

ROBERT B. COLLINGS
United States Magistrate Judge

September 29, 2006.