UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS AT BOSTON
_____

HEATHER KIERNAN,

        Plaintiff,

-v-                                    CIVIL NO. 04-10131 RBC

ARMORED MOTOR SERVICE OF
AMERICA, INC., and
FRANCESCO CIAMBRIELLO

        Defendants.
_____


## JOINT PRETRIAL MEMORANDUM[1]

**1.** **Summary of Evidence:**

    a.    Plaintiff:

Plaintiff Heather Kiernan ("Kiernan") began her employment with Defendant Armored Motor Service of America, Inc. ("AMSA") on or about April 10, 2001 following the birth of her first child.  Shortly after giving birth, her husband had lost his job, and she needed to return to the workforce to support the family.  On May 19, 2001, she went to work at AMSA.

With the limited exception of drivers who checked in, and Plaintiff's friend who stopped by, Defendant Franceso Ciambriello ("Ciambriello") was the only other person on the premises with the Plaintiff on that day.  Ciambriello held the title of "Weekend Supervisor": he had exclusive control over the facility in that no

_____
[1] Plaintiff and Defendant AMSA have jointly filed this pretrial memorandum.  Since these parties received nothing by way of contribution to this memorandum, the parties assume that Defendant Ciambriello will file his own pretrial memorandum.

one could exit or enter without his authority.  He also carried a side-arm.

Assuming this evidence is not enough to prove a supervisory relationship, a jury

can conclude that Plaintiff reasonably believed that Ciambriello was her

supervisor.

During her shift, Ciambriello engaged in conduct wherein he attempted to

massage Plaintiff's shoulders and grab her breasts.  Plaintiff attempted to resist

his advances.  At some point, Ciambriello led the Plaintiff to the office of Jason

Khoury, the Branch Manager.  Videotaped evidence with audio revealed that

Plaintiff clearly stated "I am not going in there."  He nevertheless led her into the

room.

In the room – which was the only room in the entire facility that was not

under constant video surveillance – Ciambriello digitally penetrated her, kissed

her, and bit her leaving marks on her thigh and below her breast.  Ciambriello

contends Plaintiff consented.

Within a few hours of the ending of her shift, Plaintiff reported the rape to

the police.  In the early morning of May 20, AMSA voluntarily surrendered 3 video

tapes depicting the Plaintiff and Ciambriello.

On the evening of May 22, 2001, Ciambriello was called to the Attleboro

Police station by the lead detective, John Otrando ("Otrando").  Ciambriello,

appearing nervous, denied having any contact with Kiernan and gave nothing but

unqualified denials of accusations that he attacked the Plaintiff.  Finally, when

Otrando told Ciambriello that there was videotaped evidence supporting the

allegations, Ciambriello responded "are you going to go ahead and arrest me?" Otrando took that as an invitation, and placed him under arrest.

Shortly thereafter, Plaintiff filed a workers compensation claim wherein liability was being contested.   Documents obtained from the insurer confirm that not only was liability contested, but there was concern over their financial exposure.

In July 2001, Plaintiff needed to return to work to support her family and agreed to meet with Jason Khoury ("Khoury") to work out a schedule.  Khoury took the Plaintiff into his office where a discussion took place.  However, the Plaintiff was quite distressed about having to be in the place where the attack happened.  She declined to return to work at AMSA.

On December 4, 2002, the ADA and Defendant Ciambriello's then and current counsel (the "attorneys") appeared at AMSA to view the video tapes in the possession of the ADA.  Because of the format of the tapes, AMSA was the only place that had the special equipment where the tapes could be watched. The attorneys stayed for approximately two hours.

When they entered the viewing room, the ADA handed the tapes over the Edward O'Brien, then Director of Security for AMSA.  There were discussions about making copies of the tapes for all parties, as well as putting the tape into a format wherein it could be shown to a jury on a standard VCR.  The ADA testified to facts that would lead a reasonable juror to conclude that the tapes were left at AMSA.

This conclusion is supported by a memo written June 2002 to ADA Jeanne Veenstra who stated that AMSA still had tapes of the incident. In February 2003, Defendant Ciambriello's criminal counsel Ardito sent a letter to AMSA's counsel Allison Romantz asking for a copy of the tapes. Romantz responded by relying on the receipt from August 2001 releasing the tapes into the custody of the police. She never acknowledged that AMSA had constructive possession of the tapes in December 2002.

In March 2003, Veenstra sent a letter to Ardito admitting that the ADA never took the tapes with him when he left AMSA and states "it is possible that they were left at the AMSA facility." While Ardito claims that the tapes were exculpatory, as counsel in the criminal matter, he never made a copy of the tapes.

The missing evidence has created a benefit for both Defendants. For Ciambriello, he enjoys the benefit of an acquittal on a rape charge, and has the opportunity to tell the jury his story that Plaintiff invited his advances. For AMSA, they have gone farther. They have implied that Plaintiff was having an extra martial affair. They have implied that because Plaintiff's whereabouts before she arrived at AMSA cannot be fully accounted for, that it is possible that someone else may have attacked the Plaintiff. They have implied that even though Plaintiff went to a Rape Crisis Center following her attack, she identified herself as being a victim of domestic violence at the hands of her now ex-husband. It would seem that AMSA wishes to imply that Plaintiff's visible wounds could have been inflicted by someone other than Ciambriello.

In essence, a reasonable jury can conclude that the Plaintiff was raped by her Weekend Supervisor at AMSA, Defendant Ciambriello; videotaped evidence confirmed that Ciambriello's advances were neither consensual nor welcome; Defendant AMSA immediately contested liability and was concerned over its financial exposure, yet failed to preserve the evidence; the tapes were back on AMSA's premises in December 2002; the tapes were left on AMSA's premises in December 2002 by the ADA; and rather than return the tapes to the police or the ADA, AMSA relied on the receipt it received in August 2001 when it surrendered the remaining tapes; and further, not even Ciambriello (by and through his counsel) preserved this evidence that he later claimed was exculpatory.  A jury can conclude that Defendant AMSA caused evidence of be lost or destroyed that ultimately lead to the acquittal of Ciambriello on the rape charges, and did so hoping it could merely rely on the technicality that the police took the tapes, and they had a receipt.

The rape had a traumatic effect on this Plaintiff.  The evidence will show that the Plaintiff's marriage was already strained at the time of the rape because Plaintiff had just given birth to her first child, and her husband was unable to find gainful employment.  The evidence will show that when Plaintiff learned about the missing tapes, she became obsessed with finding them.  She had believed that the videotaped evidence was conclusive proof that the rape occurred. This obsession, coupled with the pressure of a trial and a collapsing marriage sent her life into a downward spiral.  The evidence will show that the Plaintiff suffered from drug problems and at one point require hospitalization.

The Plaintiff is now in a new stable relationship, and pregnant with her third child.

b. <u>Defendant Armored Motor Services of America:</u>

Defendant AMSA expects to present the following evidence at trial:

Until July 1, 2003, AMSA was in the business of collecting and supplying banks and businesses with money and supplying ATM machines with cash for monetary transactions.  AMSA operated a vault and cash collection/distribution facility in Attleboro, Massachusetts.   Defendant Francesco Ciambriello ("Mr. Ciambriello") was employed as a part-time vault supervisor at AMSA's Attleboro facility, working nights and weekends, between March 12, 2001 and May 20, 2001. As a part-time vault supervisor, Mr. Ciambriello: did not have the authority to hire or fire any employees; did not have the authority to discipline employees; was not responsible for evaluating the work of employees or scheduling hours of work for any employees; did not have the ability to assign work to employees; and was not involved in making decisions regarding promotions, demotions or discipline of employees.  On the weekend shifts, Mr. Ciambriello's duties were limited to sending the trucks on the road, making sure the trucks had the correct amount of money and making sure the building was safe and secure

Plaintiff Heather Kiernan ("Ms. Kiernan") was hired by AMSA on or about April 10, 2001 as a data entry clerk.  At the beginning of her employment with AMSA, Ms. Kiernan was provided with a copy of AMSA's sexual harassment policy.  Mr. Ciambriello was also provided with a copy of AMSA's sexual harassment policy at the start of his employment with AMSA.

Plaintiff and Mr. Ciambriello were both scheduled to work on Saturday, May 19, 2001. They were the only two employees scheduled to work at the Attleboro facility that day, although several pairs of driver/messengers would be entering the building in late afternoon to transfer cash to the vault.

Ms. Kiernan was not scheduled to report to work until 3 p.m. on May 19, 2001. Although she had an infant, Ms. Kiernan left her home on May 19, 2001 at approximately 9 a.m. and told her husband that she was going to work. Ms. Kiernan did not report to work until 3 p.m. She has never disclosed where she spent the more than five hours that passed between leaving home and reporting to work, despite repeated inquiries by her husband as to her whereabouts during this time frame. Notwithstanding being away from her husband and baby between 9 a.m. and 3 p.m. on May 19, 2001, Ms. Kiernan made plans to socialize with her friend and co-worker, Christina Parrot, after work on May 19, 2001.

Ms. Kiernan reported to work on May 19, 2001 at approximately 3 p.m. as scheduled. Until the trucks returned from their delivery runs, there was nothing for Ms. Kiernan and Mr. Ciambriello to do. While she was waiting, Ms. Kiernan called Ms. Parrot on the telephone to have Ms. Parrott drive down to AMSA so that she could give Ms. Parrot some money for Ms. Parrot to purchase alcohol that the two intended to drink after Ms. Kiernan was finished with work. When Ms. Parrot arrived at AMSA, Ms. Kiernan and Mr. Ciambriello left the building to meet Ms. Parrot outside in the parking lot. All three smoked cigarettes and Ms. Kiernan gave Ms. Parrot money for the alcohol purchase. While outside in the

parking lot, Mr. Ciambriello left the vault unlocked and unattended which was a serious breach of AMSA policy.  After finishing their cigarettes, Ms. Parrot left and Ms. Kiernan and Mr. Ciambriello went back inside to continue waiting for the arrival of the trucks.

While Ms. Kiernan and Mr. Ciambriello continued to wait for the first truck to arrive in the dispatch area, Ms. Kiernan complained that her shoulder hurt and Mr. Ciambriello gave her a shoulder massage.  Ms. Kiernan appeared receptive and the two kissed.   After kissing for a few minutes, the two decided to go to the branch manager's office.  They walked together down the hallway to the branch manager's office, Mr. Ciambriello unlocked the door and the two entered.

Once in the branch manager's office, they continued to kiss and hug for a few minutes until Ms. Kiernan broke away and indicated that she did not wish to continue.   She then indicated that she needed to use the ladies room and left the office.  Ms. Kiernan and Mr. Ciambriello were in the manager's office for approximately five minutes.

 Because Mr. Ciambriello needed to unlock the door to get back into the dispatch area, he waited for Ms. Kiernan in the break room.  After she exited the restroom, they returned to the dispatch area to continue waiting for the arrival of the trucks.

AMSA's Attleboro facility was equipped with numerous "hold up" buttons which will activate a silent alarm to the Attleboro police station when pushed, including one which was located in the dispatch area and one in the branch manager's office.  All of the buttons were prominently marked with a large sign

that said "Hold Up Button."   Ms. Kiernan never pushed any of the hold up buttons after the alleged sexual assault which would have alerted the police that there was a problem at the facility and brought them to the facility.

At some point after returning to the dispatch area from the branch manager's office, Ms. Kiernan called her friend Christina Parrot on the telephone and asked her to come back to the Attleboro facility.  When Ms. Parrott arrived, Ms. Kiernan again went outside to meet Ms. Parrot in AMSA's parking lot.  Mr. Ciambriello remained inside the building while Ms. Kiernan went outside.  Ms. Kiernan and Ms. Parrot again smoked cigarettes in the parking lot.  While outside, Ms. Kiernan told Ms. Parrot that "something had happened" and that she wanted Ms. Parrot to come back into the building with her.  Ms. Parrott went inside and remained with Ms. Kiernan for the remainder of Ms. Kiernan's shift.

At least one driver/messenger team (and possibly two or three teams) entered the facility after Ms. Kiernan and Mr. Ciambriello had returned to the dispatch area from the branch manager's office.  Both the driver and the messenger carry a firearm on their person while they work.  Ms. Kiernan had the opportunity but did not disclose the alleged sexual assault to any of the drivers and messengers that came into the building, nor did she do or say anything to indicate to them that she was concerned for her safety.

After the last truck had been unloaded and the money accounted for and placed in the vault, Ms. Parrot and Ms. Kiernan left the facility.  At the time that they left, Mr. Ciambriello was still inside finishing up his work.  Once outside in AMSA's parking lot, Ms. Kiernan and Ms. Parrot agreed to meet at the Shaw's

supermarket in Attleboro and they both got into their respective cars and drove off.  When they got to the Shaw's supermarket, Ms. Kiernan left her car and went to sit in Ms. Parrot's car.  Ms. Parrott then called Michael Pascetta, another AMSA co-worker, on her cell phone.  Mr. Pascetta invited Ms. Kiernan and Ms. Parrot to visit him at his home in Johnston, Rhode Island.

Ms. Parrot drove herself and Ms. Kiernan to Mr. Pascetta's home where they remained for more than two hours.  During their visit, Ms. Parrot and Ms. Kiernan drank the alcohol that Ms. Parrot had purchased earlier in the day.  Mr. Pascetta was inebriated before Ms. Parrot and Ms. Kiernan arrived as he had consumed a large amount of alcohol during the day and he continued to drink alcohol throughout their visit.

At approximately 11 p.m., Ms. Parrot and Plaintiff left Mr. Pascetta's home.  Ms. Parrot dropped Ms. Kiernan off at her car at the Shaw's supermarket and Ms. Kiernan drove home.  At no time during the day from the time Ms. Kiernan had left her home at 9 a.m. until she returned ten hours later did Ms. Kiernan make any effort to telephone her husband to check on her baby.   When Ms. Kiernan arrived home, her husband asked her where she had been and indicated that he had been trying to reach her for several hours.  Ms. Kiernan told him that she had been raped at work.  She failed to disclose to her husband that she had actually left work hours earlier and had gone to Mr. Pascetta's house after leaving work with Ms. Parrott for several hours.   After telling her husband that she had been raped, the husband called the Attleboro police to report the matter and also called an ambulance.

When first interviewed by the police, Ms. Kiernan told the police that she had remained in AMSA's parking lot for one hour after leaving work until Mr. Ciambriello drove away as she was concerned that he would follow her.  She did not disclose to the police that she had driven to Michael Pascetta's house and spent several hours there before returning home.

The Attleboro police subsequently notified AMSA to report that Plaintiff was claiming to have been raped while at work on Saturday, May 19, 2001 by another employee, Francesco Ciambriello. When AMSA and the police reviewed AMSA's security videotapes for May 19, 2001, AMSA discovered that Mr. Ciambriello had gone outside during his shift to smoke a cigarette with Ms. Kiernan and Ms. Parrott and when doing so he had left the vault open and unattended.   The police took three of the six security videotapes as evidence in its criminal investigation.  On August 17, 2001, Detective Otrando returned to the Attleboro facility with a subpoena for the remaining three videotapes.  AMSA obtained a "receipt" from Detective Otrando after turning over the three remaining videotapes to the police.  On the receipt, Detective Otrando acknowledged that as of that date, the Attleboro police were in possession of all six videotapes from May 19, 2001.

 Branch manager Jason Khoury contacted Francesco Ciambriello on Sunday, May 20, 2001 to advise him that he was suspended from AMSA for three days for leaving the building with the vault open on May 19, 2001.  Mr. Ciambriello was notified after his suspension was completed that his employment with AMSA had been terminated.

On May 22, 2001, Ms. Kiernan went to New Hope, a rape and domestic violence crisis center. The patient intake form completed by the counselor that met with Ms. Kiernan indicated that Ms. Kiernan had represented that she was the victim of domestic abuse by her husband. Although the form had a section regarding sexual assault/rape, there is no mention on the form that Ms. Kiernan indicated to the counselor that she had been raped three days earlier.

In December, 2002, Christopher Abreu ("Mr. Abreu"), a Bristol County Assistant District Attorney and David Ardito ("Mr. Ardito"), Mr. Ciambriello's criminal defense attorney, came to the Attleboro facility to view the tapes. Mr. Abreu brought the videotapes with him which his office had obtained from the police. After viewing the tapes on AMSA's equipment, Mr. Abreu and Mr. Ardito left. Mr. Abreu has acknowledged that he never would have left the tapes at AMSA unless he had been specifically instructed to do so by his superiors in the District Attorney's Office (which he was not) because there would have been no way to ensure that the tapes were not tampered with once they left his custody. Mr. Abreu further noted that if he had left the videotapes, the proper protocol would have been for him to issue a receipt to AMSA reflecting that fact. He did not issue such a receipt.

Ms. Kiernan was already on a downward life spiral prior to May 19, 2001. On May 18, 2001, Ms. Kiernan's husband found an amorous e-mail that Ms. Kiernan had sent to AMSA co-worker Michael Pascetta which suggested that they were involved in a romantic relationship notwithstanding that Ms. Kiernan was married. In addition, Ms. Kiernan had been terminated from her prior job as

a supervisor at Delkin Dry Cleaners for stealing and had been arrested and charged with larceny.  Prior to working at Delkin Dry Cleaners, Ms. Kiernan held a number of menial jobs, all for short periods of time and all of which ended under mysterious circumstances according to her husband.  Both before and during her pregnancy, Ms. Kiernan kept late hours and would not disclose to her husband where or with whom she was spending her time or what she was doing, including one instance in which she "disappeared" for more than 24 hours causing her family to contact the police.  After May 19, 2001, Ms. Kiernan continued her spiral downward.  She and her husband filed several cross petitions for restraining orders and custody, each claiming that the other was physically violent toward the other.  Ms. Kiernan became addicted to crack cocaine in 2004 and disappeared for several months without disclosing to her husband or other family members where she was.  After several attempts to reconcile, Ms. Kiernan and her husband were finally divorced.

    **2.  Stipulated Facts**

        a.    Ciambriello did not have the authority to hire or fire employees.

        b.    AMSA had a policy and training in place to prevent sexual harassment.

        c.    Kiernan was provided with a copy of AMSA's sexual harassment policy at the beginning of her employment with AMSA.

    d.     Ciambriello was provided with a copy of AMSA's sexual harassment policy at the beginning of his employment with AMSA.

    e.     Ciambriello was terminated from his employment at AMSA.

### 3. Disputed Facts

All facts other than those set forth above in the Stipulated Facts Section are disputed.

### 4. Issues of Law

    a.     Whether there was a spoliation of evidence by AMSA and if so, the nature of sanctions to be ordered for the alleged spoliation of evidence.  See e.g. Wienmass v. Bradford Group, Inc., 444 Mass.698, 705 (Mass. 2005)[citing Fletcher v. Dorchester Mut. Inc. Co., 437 Mass 544, 553, 773 N.E.2d 420 (2002) ("The destruction of relevant evidence….has a pernicious effect on the truth-finding function of our courts.").[2]

    b.     Whether Kiernan was subjected to a hostile work environment pursuant to M.G.L. c. 151B.

    c.     Whether Kiernan was subject to a hostile work environment pursuant to Title VII of the Civil Rights Act of 1964, as amended.

    d.     Whether Kiernan unreasonably failed to take advantage of any preventive or corrective opportunities provided by AMSA related to her claim of sexual harassment.

---

[2]Following the Court's order of March 22, 2007, the Plaintiff will be addressing the spoliation issue and "setting forth her position as to how the Court (or jury) should resolve the spoliation issues in this case.." in a separate memorandum to be filed on or by April 5.

    e.      Whether Ciambriello was a supervisor for the purposes of establishing liability under M.G.L. c. 151B.

    f.      Whether Ciambriello was a supervisor for the purposes of establishing liability under Title VII.

    g.      Whether the actions of Defendant Ciambriello were willful, and done with threats, intimidation or coercion and thus violating M.G.L. c. 12 § 11.

    h.      Whether the actions of AMSA "were outrageous, because of its evil motive or its reckless indifference to the rights of others" such that an award of punitive damages under M.G.L. c. 151B or Title VII is warranted.

**5.  Requested amendments to pleadings**

    a.    <u>For Plaintiff</u>:  None.

    b.    For Defendant AMSA:  None.


**6.  Additional matters to aid in the disposition of the action**

    None.

**7.  Names of witnesses to be called (and purposes)**

    a.    <u>For the Plaintiff:</u>

        i.   Heather Kiernan: Factual

        ii.   John Kiernan: Factual

        iii.   Christina Parrot: Factual

        iv.   Jason Khoury: Factual

     v.   Edward O'Brien: Factual

     vi.   Francesco Ciambriello: Factual

     vii.   John Otrando: Factual

     viii.   Christopher Abreu: Factual

     ix.   Jeanne Veenstra: Factual

     x.   Allison Romantz: Factual

     xi.   David Ardito: Factual

     xii.   Gary Orlacchio: Factual

     xiii.   Keeper of Records: Fuller Hospital

     xiv.   Keeper of Records: Sturdy Hospital

     xv.   Keeper of Records: Hartford Insurance Company

    b.    <u>For the Defendant AMSA</u>

Defendant AMSA intends on calling some or all of the witnesses identified by Plaintiff.  AMSA also anticipate calling the following additional witnesses:

     i.   Michael Pascetta (factual)

     ii.   Ellen Ciambriello (factual)

     iii.   Keeper of Records from New Hope Rape and Domestic

          Violence Crisis

          Center (factual)

     iv.   Officer Gerald Larsen, Attleboro Police Department

     v.   Officer Susan Boisse, Attleboro Police Department

     vi.   Cathy Dowler  (factual)

     vii.   Michael Bucci (factual)

8. **Exhibits**

    a.    <u>For Plaintiff:</u>

        i.   Emergency Room records (Sturdy);

       ii.   "Receipt" dated 8/17/2001 signed by John Otrando;

      iii.   Arrest report: Attleboro Police Department dated 5/22/2001;

      iv.   Sexual Harassment Productive Work Environment Policy: Signed by Ciambriello, 3/29/2001: See Tab 7, Defendant AMSA's Motion for Summary Judgment;

       v.   Management Training for Armored Motor Service of America, Inc.: See Tab 8, Defendant AMSA's Motion for Summary Judgment;

      vi.   Fax, Sexual Harassment Constructive Discipline Seminar, dated 2/2/62001 (7 pages);

     vii.   Fax dated 3/4/2003 from David Ardito to Jeannie Veenstra;

    viii.   Letter dated 2/20/2003from David Ardito to AMSA;

      ix.   Letter dated 2/27/2003 from Allison Romantz to David Ardito;

       x.   Letter dated 3/18/2003 from David Ardito to Jeanne Veenstra;

      xi.   Complainant Heather Kiernan's Application to Stay Investigation (MCAD) dated 5/2/2003;

     xii.   Respondent AMSA's Opposition to Complainant's Application to Stay Investigation dated 5/12/2003;

xiii.   Complainant Heather Kiernan's Supplemental Statement in Support of Her Application to Stay Investigation dated May 19, 2003;

xiv.   Respondent's Supplemental Opposition to Complainant's Application to Stay Investigation dated May 21, 2003;

xv.   Affidavit of David Ardito dated 7/30/2003;

xvi.   Affidavit of David Ardito dated 7/27/2005;

xvii.   Fee Agreement: Ex. 4, Ciambriello deposition, 10/12/2006;

xviii.   Records from the Hartford Insurance Company with affidavit dated 3/28/2005;

xix.   Hand written notes from the DA's office (undated);

xx.   Emails from DA's office dated June 17, 2003 and June 13, 2002;

xxi.   Transcript of Defendant Ciambriello's sentencing;

xxii.   Fuller Hospital Records, December 2004;

xxiii.   Memo from William Callaghan to Edward O'Brien dated 5/20/2001;

xxiv.   Memo to Doug Wilson from Jason Khoury dated May 20, 2001;

xxv.   Affidavit of Gary Orlacchio dated February 2006;

xxvi.   Affidavits of Jason Khoury, dated February 2006

b.    Defendant AMSA intends to submit the following documents as exhibits:

i. Security videotape from May 19, 2001 showing Ms. Kiernan
and Mr. Ciambriello walking down hallway to branch
manager's office;

ii. Receipt from Detective John Otrando dated August 18, 2001
showing Attleboro Police having possession of six security
videotapes from AMSA;

iii. Patient Intake Record from New Hope Rape and Domestic
Violence Crisis Center;

iv. Verified Complaint from Massachusetts Commission Against
Discrimination filed by Heather Kiernan dated  November 12,
2001;

v. Acknowledgment of Receipt of Sexual Harassment Policy by
Francisco Ciambriello;

vi. Acknowledgement of Receipt of Sexual Harassment Policy
by Heather Kiernan;

vii. Application for Criminal Complaint filed by Sgt. David
Dawes, North Attleboro Police Department charging Heather
Kiernan with violation of M.G.L. 266, §§ 20 and 30.

viii. Criminal Docket Sheet, Docket No. 0034CR005097.

ix. Sworn Affidavit of Heather Kiernan filed with the
Massachusetts Probate Court, Bristol County, dated
September 18, 2001.

    x.  Sworn Affidavit of Heather Kiernan filed with the Massachusetts Probate Court, Bristol County, dated July 16, 2003.

    xi.  Complaint for Protection from Abuse filed by Heather Kiernan July 15, 2003.

    xii.  Complaint for Protection from Abuse filed by Heather Kiernan October 22, 2001.

    xiii.  Voluntary Statement by Heather Kiernan to Attleboro Police Department dated May 21, 2001.

    xiv.  March 27, 2005 Affidavit by John Kiernan.

    xv.  September 19, 2001 Affidavit by John Kiernan.

    xvi.  "Valuing and Respecting Each Other" training video

9. <u>Names, addresses and telephone numbers of trial counsel</u>

For Plaintiff:

William J. McLeod
McLeod Law Offices, PC
77 Franklin Street
Boston, MA  02110
617-542-2956/phone
wjm@mcleodlawoffices.com

For Defendant AMSA:

Allison K. Romantz
Laurence Donoghue
MORGAN, BROWN & JOY LLP
200 State Street
Boston, MA 02109
617 523-6666/phone
aromantz@morganbrown.com

For Defendant Francisco Ciambriello:

David Aridito
7 North Main Street, Suite 215A
Bates Building
Attleboro, MA 02701

Respectfully submitted:

HEATHER KIERNAN, Plaintiff

/s/  William J. McLeod
William J. McLeod, BBO No. 560572
McLEOD LAW OFFICES, PC
77 Franklin Street
Boston, MA  02110
617.542.2956/phone
617.695.2778/fax
wjm@mcleodlawoffices.com

ARMORED MOTOR SERVICES OF AMERICA, INC., Defendant

/s/ Allison K. Romantz
Allison K. Romantz BBO No. 554909
MORGAN, BROWN & JOY LLP
200 State Street
Boston, MA 02109
617.523.6666
aromantz@morganbrown.com