UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **HEATHER KIERNAN,**<br><br>    Plaintiff,<br><br>           v.<br><br>**ARMORED MOTOR SERVICES OF AMERICA, INC. and FRANCISCO CIAMBRIELLO,**<br><br>    Defendants. | Civil Action No. 04-10131RBC |

### DEFENDANT AMSA'S RESPONSE TO PLAINTIFF'S MEMORANDUM OF LAW REGARDING PROPOSED RESOLUTIONS OF SPOLIATION ISSUES

**I.      Introduction**

Defendant Armored Motor Services, Inc. ("AMSA") submits this Response to Plaintiff's Corrected Memorandum of Law Regarding Her Proposed Resolution of Spoliation Issues (hereinafter "Plaintiff's Proposed Resolution"). This Response sets forth AMSA's position as to how the Court (or jury) should resolve Plaintiff's claim of spoliation in this case.

**II.     Summary of Record Facts Relevant to Plaintiff's Claim Against AMSA for Spoliation**

Plaintiff Heather Kiernan ("Kiernan") has brought a sexual harassment claim against AMSA under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. and M.G.L. C. 151B based on an alleged sexual assault by another employee, Francisco Ciambriello ("Ciambriello"), which occurred at AMSA's Attleboro, Massachusetts facility on May 19, 2001. Both Kiernan and Ciambriello were employees of AMSA working in the Attleboro facility on May 19, 2001. Because the Attleboro facility stored large amounts of currency and thus was an

obvious target for theft (by both non-employees and employees), AMSA had in place a number of security measures meant to deter theft, including multiple video cameras which were positioned throughout the facility and recorded 24 hours per day.  Kiernan alleges that Ciambriello first sexually assaulted her in the dispatch area of the facility and that he subsequently dragged her down a hallway into the branch manager's office where he then allegedly continued his sexual assault.

There is no dispute that no part of the alleged sexual assault was ever captured on videotape.  This is because the video cameras in the dispatch area were not positioned to record that area of the dispatch area where the sexual assault allegedly occurred.  The branch manager's office, where the second part of the sexual assault allegedly occurred, did not have a video camera.

Plaintiff's spoliation claim involves a videotape that recorded her and Ciambriello as they proceeded down the hallway from the dispatch area to the branch manager's office.  Two video cameras were positioned in this hallway: one of which had audio, the other of which did not[1]. There is no dispute that the video with the audio was of such exceedingly poor quality that when it was viewed by the police and AMSA personnel in the early morning hours of May 20, 2001, neither the police nor anyone at AMSA was able to hear any communication between Kiernan and Ciambriello as they proceeded down the hallway.

After viewing the videotapes in the early morning hours of May 20, 2001, the Attleboro police took possession of three of the six videotapes as potential evidence in its criminal investigation.  Because this was a criminal investigation of a serious nature, because AMSA had

---

[1]     The parties have the videotape with no audio and AMSA intends to show that videotape to the jury to demonstrate that Kiernan's statements to the police and in pleadings filed before the Massachusetts Commission Against Discrimination that Ciambriello "dragged" her down the hallway into the branch manager's office were outright falsehoods.

2

no reason on May 20, 2001 to believe that civil litigation against it might result from the alleged sexual assault and because AMSA believed that the tapes would remain secure in the custody of the police and that the police would take all necessary steps to preserve the tapes, AMSA allowed the Attleboro police to take these three tapes without objection.  AMSA took steps at that time to preserve the remaining three videotapes from May 19, 2001 in a safe location.

On August 17, 2001, Sergeant Otrondo from the Attleboro Police Department returned to the Attleboro facility with a subpoena for the remaining three videotapes.  AMSA had no knowledge that the police would return with a subpoena to take the remaining three videotapes and thus would have had no reason to make copies of the tapes since it retained the originals. Once the police returned to the facility with a subpoena for the three videotapes, AMSA was legally obligated to turn the videotapes over to the police.  Moreover, there was no reason for AMSA to be concerned that the videotapes would not be adequately preserved by law enforcement authorities charged with investigating alleged crimes and preserving evidence. AMSA obtained a written "receipt" from Sergeant Otrondo in which he acknowledged that, as of that date, the Attleboro police were in possession of all six videotapes from May 19, 2001.

The six videotapes remained in the possession of the Attleboro police for the next 12 months.  In August, 2002, the Attleboro police gave the six videotapes to the Bristol County District Attorney's office for the prosecuting attorney to review in preparation for the criminal trial of Ciambriello.  After the prosecuting attorney discovered that the District Attorney's Office did not have the equipment necessary to view these tapes, the prosecuting attorney made a request to AMSA that he and Ciambriello's criminal defense attorney be permitted to come onto AMSA's property in order to review the videotapes on AMSA's equipment.  AMSA agreed and Assistant District Attorney Christopher Abreu ("Abreu") and Ciambriello's criminal defense

attorney David Ardito ("Ardito") went to AMSA's Attleboro facility on December 4, 2002 to watch the videotapes. The videotapes were brought to AMSA's facility by Abreu. In addition to Ardito and Abreu, AMSA's Director of Security, Ed O'Brien ("O'Brien") was also present as the videotapes were played.

When watching the videotapes on December 4, 2002, Abreu believes that he heard Kiernan say "I'm not going in there" as she proceeded down the hallway toward the branch manager's office. O'Brien believed that Kiernan actually said the more ambiguous "I don't want to go back there now." The other video camera in the same hallway also recorded Kiernan and Ciambriello as they proceeded down the hallway but from a different angle and without any audio[2].

After watching the videotapes, Abreu and Ardito departed. AMSA believed at that time and it continues to believe that Abreu took all six of the video tapes with him when he left the facility. Abreu has also testified that he believes that he took all of the videotapes with him when he departed.

In or around April, 2003, as the Bristol County District Attorney's Office was preparing for the criminal trial of Ciambriello, it could only locate three of the six video tapes. When Abreu was questioned about what he did with the videotapes by his superiors, he could not recall what he had done with the tapes. He has testified at deposition that in his normal course he would have returned the videos to the office of the Assistant District Attorney who had been assigned to handle the case for the Commonwealth[3] and that he believes that he took all of the video tapes with him when he left AMSA on December 4, 2002. Importantly, he has also

---

[2]  Because that videotape clearly showed that Kiernan was not truthful when she had alleged that Ciambriello "dragged" her into the branch manager's office, Kiernan was forced to admit at Ciambriello's criminal trial that this characterization that she was "dragged" into the branch manager's office was "an exaggeration."

[3]  Abreu was not the assistant district attorney assigned to the case. He was simply filling in for that assistant district attorney who had been unable to go to AMSA to view the videotapes on the scheduled day.

4

admitted that he never would have left the tapes at AMSA unless he had been specifically instructed to do so by his superiors in the District Attorney's Office and that he had not been instructed to do so in this case[4]. Moreover, Abreu acknowledged that if he had left the videotapes at AMSA, the proper protocol would have been for him to obtain a receipt from AMSA reflecting that fact.

At some point after it discovered that it could not locate three of the six video tapes, the Bristol County District Attorney's Office contacted AMSA to inquire as to whether Abreu had mistakenly left the missing videotapes at AMSA when he had been at the facility to view the tapes. Although AMSA's Attleboro branch manager, Jason Khoury ("Khoury"), did not believe that Abreu had left any tapes at AMSA and had never seen the tapes at any time after Abreu had left the facility on December 4, 2002, he nevertheless did a painstakingly thorough search of the entire facility after being contacted by the District Attorney's Office and was not able to find the missing video tapes or any evidence suggesting that the tapes had been left at the facility.

Finally, in a self serving attempt to mitigate the impact of his having lost these three videotapes, Abreu sent an e-mail to the Assistant District Attorney who was assigned to try the criminal case against Ciambriello, Jeanne Veenstra ("Veenstra"), assuring her that the loss of the videotapes was of no import because AMSA "had extra copies" of the tapes. Veenstra, in turn, sent a letter to Ardito suggesting that it was possible that Abreu could have left the tapes at AMSA although she readily acknowledged in that same letter that she had no personal knowledge one way or another whether that was the case. These two self-serving statements by prosecutors in the Bristol County District Attorney's Office had no basis in fact and were made without these individuals having any personal knowledge whatsoever as to whether their

---

[4]   Presumably Abreu's superior in the Bristol County District Attorney's Office would never have instructed him to leave any of the tapes at AMSA since allowing the tapes to leave its possession would have broken the chain of custody, allowed the tapes to potentially be altered and therefore rendered them unuseable in the criminal trial.

5

statements had any validity. Plaintiff, however, has seized upon these statements to concoct a theory that the missing tapes must have been left at AMSA, that AMSA discovered that the tapes were left at its facility and that it thereafter either intentionally or negligently destroyed them[5].

### III.    Legal Standard

In order for the Court to impose sanctions and/or remedies against AMSA for the loss and/or destruction of these videotapes, there must first be a finding that AMSA "negligently or intentionally lost or destroyed evidence known to be relevant for an upcoming legal proceeding". *Wiedmann v. Bradford Group, Inc*. 444 Mass. 698, 705 (Mass. 2005) citing *Keene v. Brigham & Women's Hospital, Inc.*, 439 Mass. 223, 234, 786 N.E. 2d 824 (Mass. 2003). If such a finding is made, it is left to the Court's discretion to determine and fashion the appropriate remedy.

### IV.    Defendant's Proposed Resolution of Spoliation Issues

Notwithstanding that there is not even a speck of evidence to suggest that the three video tapes were either intentionally or mistakenly left at AMSA on December 4, 2002, Plaintiff continues to claim: 1) that AMSA had an obligation to make copies of the three videotapes that remained in its possession between May 20 and August 17, 2001 and that its failure to do so was somehow improper; and 2) that it was AMSA and not the Bristol County District Attorney's Office that was responsible for the loss of the three videotapes after December 4, 2002. In response to Plaintiff's previous Motion for Sanctions based on these same assertions, the Court ruled on September 27, 2006 that it "would not decide the issue of alleged spoliation of evidence without an evidentiary hearing before the Court or before a jury because there are too many contested issues of fact."

---

[5]    The tenacity with which Plaintiff has continued to pursue this claim of spoliation notwithstanding the complete lack of any evidence to support her theory suggests that Plaintiff recognizes only too well the weaknesses of her underlying claim of sexual harassment and is resorting to desperate measures to do what she can to both draw the attention of the jury away from the weaknesses of her underlying claims and to obtain some tactical advantage.

6

## A. Evidentiary Hearing Should Be Held Immediately Before Start of Trial

AMSA believes that the most expeditious and appropriate way to address Plaintiff's claim of spoliation is for the Court to hold an evidentiary hearing on this issue immediately before seating a jury. At that hearing, Abreu, Veenstra and Otrondo could each testify regarding the chain of custody related to the missing videotapes and Abreu and Khoury could testify as to what occurred at AMSA on December 4, 2002 and afterward with regard to the missing videotapes. AMSA believes that this evidentiary hearing would take no more than a few hours at most and at the conclusion of the evidentiary hearing, the Court would be able to make a determination as to whether Plaintiff has presented sufficient evidence of spoliation on the part of AMSA to allow her to submit evidence and make arguments related to spoliation on the part of AMSA at the trial.

Assuming, as AMSA does, that Plaintiff will simply be able to present absolutely no evidence whatsoever to support her claim that AMSA "negligently or intentionally lost or destroyed evidence known to be relevant for an upcoming legal proceeding," AMSA believes that it would be unduly prejudiced at trial if the spoliation issue were not resolved prior to trial and Plaintiff was allowed to make statements to the jury accusing AMSA of engaging in the destruction of evidence. Moreover, AMSA also believes that this issue will be unduly distracting to the jury and its attention will be diverted from the real matter before them -- AMSA's alleged violation of Chapter 151B and Title VII.

Finally, determining in advance whether Plaintiff may be permitted to present evidence and make arguments related to spoliation at trial could potentially streamline the trial and lessen the burden on the jury. The trial would be significantly shorter if the Court ruled that Plaintiff was not permitted to present evidence related to spoliation as one or more witnesses would no

longer be necessary at all at the trial and the testimony of other witnesses would be significantly shorter.

      **B.**     **Presentation of Spoliation Evidence at Trial**

If the Court opts not to hold an evidentiary hearing immediately prior to the start of trial and rules that the spoliation issue may be presented at trial, AMSA has no objection to Plaintiff's request that she be permitted in her opening statement to refer to the facts that she expects to offer into evidence related to the loss of the tapes and AMSA similarly requests that it be permitted in its opening to make reference to the facts it intends to offer into evidence related to the loss of these tapes. AMSA similarly would have no objection to Plaintiff eliciting from any trial witness the circumstances surrounding the chain of custody of the videotapes and would similarly request that it be permitted to question witnesses regarding their custody and control of the videotapes. AMSA does not agree to Plaintiff's proposal that she may be permitted to elicit testimony from any trial witness as to what they were told was heard on the tapes as AMSA believes that such testimony is hearsay.

Assuming that the Court does permit testimony at trial related to who was responsible for misplacing these tapes, AMSA intends, at the conclusion of the presentation of evidence, to move for a directed verdict on the spoliation issue. Depending on how the Court rules on that motion would dictate whether the parties would be permitted to make arguments concerning the lost tapes in their respective closings and whether the jury would need to be given instructions related to spoliation and what those instructions would be[6].

---

[6]    AMSA objects to the jury instructions set forth in Plaintiff's Proposed Resolution and intends to submit proposed jury instructions to the Court on May 4, 2007 as directed in the Court's Pre-Trial Order that will address how the jury should deal with the issue of spoliation in the event that the Court rules that the jury should be permitted to decide this issue

Respectfully submitted,

ARMORED MOTOR SERVICES OF AMERICA, INC.,

By its attorneys,

/s/ Allison Romantz
Laurence J. Donoghue (BBO#130140)
Allison K. Romantz (BBO#554909)
MORGAN, BROWN & JOY LLP
200 State Street
Boston, MA 02109
(617) 523-6666

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on April 19, 2007.

/s/ Allison K. Romantz
Allison K. Romantz

9